FB98SKEC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                      15 Cr. 317 (KMW)

DEAN SKELOS and
ADAM SKELOS,

              Defendants.

------------------------------x

                          November 9, 2015
                          10:00 a.m.

Before:

                  HON. KIMBA M. WOOD

                          District Judge

                    APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
RAHUL MUKHI
TATIANA MARTINS
JASON MASIMORE
THOMAS McKAY
      Assistant United States Attorneys

GAGE, SPENCER & FLEMING, LLP
      Attorneys for Defendant Dean Skelos
G. ROBERT GAGE, JR.
JOSEPH EVANS


ROPES & GRAY LLP
      Attorneys for Defendant Adam Skelos
CHRISTOPHER P. CONNIFF
JON DANIELS

FB98SKEC

1          (Case called)

2          THE DEPUTY CLERK:  Will counsel please state their

3 appearances.

4          MR. McKAY:  Good morning, your Honor.  Thomas McKay,

5 Jason Masimore, Tatiana Martins and Rahul Mukhi for the

6 government.

7          THE COURT:  Good morning.

8          MR. GAGE:  Good morning, your Honor.  Robert Gage and

9 Joseph Evans for Dean Skelos.

10          THE COURT:  Good morning.

11          MR. CONNIFF:  Good morning, your Honor.  Christopher

12 Conniff and Jon Daniels for Mr. Adam Skelos, who is here with

13 me.

14          THE COURT:  Good morning.

15          The main purpose of today's conference is for argument

16 and for my rulings on motions in limine, but I thought we might

17 deal with a few housekeeping matters first.

18          The written juror questionnaire with the language

19 proposed by counsel will be administered tomorrow by as many

20 jurors as Linda Thomas has.  Once she has those pulled

21 together, she will send them to my chambers, and they can be

22 picked up by the government and enough copies made for

23 everyone.

24          When we begin voir dire on Monday, I will first ask

25 the jurors orally all the questions that both sides asked me to

FB98SKEC

ask orally.  When a juror raises his or her hand, I will just take the juror number, and we will note it as something to deal with when we deal with all of the jurors' answers.  When I say that, I mean any follow-up questions we have in addition flowing from the written questionnaire.

So we will hear from each juror in turn, their answers to the biographical questionnaire, the written questionnaire, and the oral questions I ask them.  That way you will get a fuller picture of each juror.

Does the defense object to my giving as part of my preliminary instructions to the jurors, once they have been sworn, the text proposed by the government in their November 6 letter?

MR. GAGE:  We do, your Honor, and I will take it in several parts, if I could.

THE COURT:  Sure.

MR. GAGE:  The first is we believe the traditional approach should be followed, which is to say that the legal instructions should be given at the conclusion of the case by your Honor, in the context of the charges in the indictment, the statute, and given the overall context of the case.

There is good reason for that traditional approach, but particularly here, your Honor, where these are complex charges, and to single out any one aspect of the charge, to truncate them in the way they have been, I just don't think is

FB98SKEC

1    fair to the overall instruction of the jury. We spent, both

2    sides, an enormous amount of time submitting to your Honor

3    proposed instructions, and I think for the jury to get the

4    overall context at the same time is the most fair and effective

5    way to do it.

6            THE COURT:  Typically, the jury learns what is coming

7    from opening statements, and I can imagine the government

8    opening with something similar to what you have proposed that I

9    give them.  With that said, I have always thought that we leave

10   jurors too much in the dark.  It's very difficult for them to

11   follow evidence as it comes in, as we know, bit by bit when

12   they don't have a really good framework for it.

13           So I would like to give some thought, and I would like

14   to ask you to give some thought, to what would be a fair guide

15   for the jurors.  We will take that up at the final pretrial

16   conference.  Perhaps you can give me a version that you think

17   is as close as possible to the length the government suggests

18   that you think would be fair, even if you don't think it is

19   completely fair, just your best effort.

20           MR. GAGE:  OK.

21           THE COURT:  And you won't have to stand behind it.  I

22   would just like to hear your thinking.

23           MR. GAGE:  We will do that.  If we may have a few days

24   just to review the government's submission.

25           THE COURT:  Absolutely.

FB98SKEC

1          MR. GAGE:  With the understanding your Honor just

2     stated.

3          THE COURT:  Would Wednesday at 5 be doable?

4          MR. GAGE:  Yes, your Honor.  Thank you.

5          THE COURT:  OK.  Good.

6          In addition to the preliminary instructions, I want

7     you to know that -- I think I did tell you -- I give jurors a

8     written pledge that they sign promising -- I will hand out some

9     copies -- promising that they will not do any research on the

10    case, not use the Internet or otherwise to communicate about

11    the case.  And if you want to add or subtract anything from

12    that, I am happy to hear you at the final pretrial conference.

13         I would like to move to the motions in limine.  And I

14    propose to take the defense motions first in this order:

15    Rainstorm, protestations of innocence, colorful political

16    calls, legal referral recordings, and purported exaggerations

17    by Adam Skelos.

18         Beginning with the rainstorm, it seems to me that a

19    simple redaction should solve the problem, but let me see if I

20    am right.  If we redact lines 5 and 6 and the first two words

21    of line 7, we leave the context and I think anything that's

22    relevant.

23         MR. GAGE:  That's a good suggestion, your Honor.

24         MR. MASIMORE:  Your Honor, the government believes

25    that the proposed redaction, specifically, keeping out the

FB98SKEC

1    "keep it coming" language, sort of changes the nature of the

2    conversation in a substantive way.

3          The "keep it coming" is best read as an indication

4    that the weather events are important for Adam Skelos's and

5    AbTech's business interests.  And so without that portion, this

6    call then does not become evidence of Senator Skelos and his

7    son discussing the specific business interest that could be

8    served by weather and by having this conference call.

9          THE COURT:  You have made that with a straight face,

10   and I congratulate you.

11         I will reserve on a 403 ruling.  I suspect that it

12   will be cumulative and not sufficiently probative because it's

13   cumulative, and that its probative value will be outweighed by

14   its prejudicial effect, but I am happy to leave that open and

15   let you argue it.

16         Moving to protestations of innocence.  I believe that

17   the protestations are fairly left in the conversations and the

18   government is free to argue the government's view of why the

19   words are being said.

20         I did tell you that this would be argument as well as

21   rulings.  So if you wish to argue anything, you may do so.  You

22   can consider my statements tentative until I have heard you.

23         MR. MASIMORE:  With respect to your Honor's ruling

24   here, I think we don't have anything additional than what we

25   set forth in our papers.

FB98SKEC

1          THE COURT:  OK.  Then my ruling is that the rule of

2     completeness requires the inclusion of that language and the

3     government is free to argue that it was self-serving.

4          MR. CONNIFF:  The government conceded I think, but

5     just so the record is clear, we are talking about sessions 2811

6     and 2534, both will be included.

7          THE COURT:  That's exactly right.

8          MR. CONNIFF:  Thank you, your Honor.

9          With respect to 3107, a discussion of strategy with

10    respect to the governor's 30-day amendment, a call between Adam

11    Skelos and Dean Skelos, it's relevant to show the close

12    relationship between Adam Skelos and Dean Skelos in discussing

13    legislative strategy.  The Rule 403 motion should be renewed by

14    defense counsel at trial before the evidence comes in, and at

15    that point I will be in a better position to make the weighing

16    of probative value against prejudicial effect.

17         MR. GAGE:  That's what we will do.

18         THE COURT:  Very good.

19         3880 has Adam Skelos and Dean Skelos discussing the

20    governor's daughter's lobbying.  The same ruling there.  It may

21    have less probative value than 3101.  It may be cumulative and

22    prejudicial as well as confusing, as the defense said, but the

23    403 ruling has to await trial.

24         The same is true of 3840, where Adam and Dean Skelos

25    discuss strategy and actions vis-a-vis the governor.

FB98SKEC

1          I found the legal referral language ambiguous.  The

2     evidence is relevant insofar as it shows Adam and Dean Skelos

3     working together to help ETC gain access to Senator A.  It's

4     probative of Dean Skelos's willingness to help Adam Skelos help

5     Adam's client by putting him in touch with an influential

6     senator.

7          To the extent that Adam Skelos informs Senator A that

8     helping the client, who is the CEO of an engineering company

9     that is starting to do some business in New York, and "it could

10    lead to other stuff," that could well be nothing more than

11    other legal business, and so I think that has to wait for trial

12    for a 403 ruling.

13          MR. CONNIFF:  May I be heard briefly?

14          THE COURT:  Yes.

15          MR. CONNIFF:  Your Honor, when you look at -- and I

16    know the Court has reviewed the lines of the transcripts from

17    those calls so I won't belabor it, but when you look at the

18    context of that communication and exchange, I think it's clear

19    that the communications between Senator Skelos and his son

20    relating to the other senator are related entirely to the other

21    senator's role as a lawyer.

22          As the Court knows, the Senate in New York State is

23    part-time and many senators have other full-time jobs, and the

24    senator at issue in this particular exchange is a lawyer, and

25    he had, as the evidence demonstrates, helped Adam Skelos on a

FB98SKEC

traffic violation previously.  And I think the exchange, which
comes initially from the cooperating witness to Adam asking
about a legal referral, and the possibility of this cell phone
ticket that he received, the entire flow of communications
after that relate primarily to getting in touch with a legal
referral, somebody who can represent CW-2 in connection with
it.

         And I think, your Honor, the suggestion by the
government that this senator also held a significant position
in the Senate is a little bit of a red herring, because the
communication has nothing to do with his role in the Senate and
everything to do with his role as a private practitioner whose
law firm apparently handles these types of cases, tickets and
things like that.

         I think, your Honor, as we noted in the papers, the
real risk is that if published in the newspapers the day after
these transcripts hit the press, the assumption or the possible
misperception is that somehow the fix was in on this case and
that this senator was somehow fixing the ticket or something
corrupt was going on around it, and that what was written about
these exchanges when the motions were filed initially.

         So I think that it creates some real prejudice.  I
don't think the government plans to argue or intends to argue
that there was anything corrupt around the representation of
CW-2, if that ever occurred, by the law firm, or that the

FB98SKEC

 1    ticket wouldn't be processed and litigated perfectly

 2    legitimately.  So in my view there is a risk that the jury sees

 3    this more as a kind of corrupt effort than what it is, which is

 4    just a plain and simple legal referral.

 5           THE COURT:  I will hear you when the time comes.  The

 6    reference to "it could lead to other stuff" is ambiguous, and I

 7    would like to hear you in the context of the evidence that has

 8    come in.

 9           The exaggerations.  As the defense points out, the

10    government had not stated what the exaggerations were so it was

11    difficult to argue it.  The government has since given the

12    Court a brief letter outlining some of the exaggerations.  Each

13    of them appears to be an instance in which Dean Skelos did

14    something favoring Adam Skelos's client, and that Adam Skelos

15    claimed that he had accomplished that, not mentioning that he

16    wasn't present and that his father accomplished that.

17           If there is evidence to that effect, I believe that is

18    relevant to the assistance Adam was receiving.  He was in a

19    position to make those exaggerations, either because he was

20    present or he knew from his father exactly what had been done

21    on behalf of the company, which was then recorded by his father

22    to him.  This does not depend on whether Dean Skelos knew about

23    these particular statements made by Adam.

24           MR. CONNIFF:  May I be heard briefly on that because I

25    think there is a greater context, and I appreciate the

FB98SKEC

government's effort this morning to get your Honor a letter before we started.

The background of this I think is important. The issue of these exaggerations and misstatements originated from the government's June 22nd letter, which I know the Court is familiar with. And in that letter, the representation about these exaggerations, which is in footnote 3 of the June 22nd letter, relates to what the defense characterizes as exculpatory information around the design-build and P3 legislation that was being negotiated and argued about in Albany in 2015 in connection with the 2015-2016 budget. And there are a number of statements, and I am happy to hand the letter up to your Honor, if you would like, but there are a number of statements in the paragraph on page 3 of that June 22nd letter which relate to witnesses' testimony that Senator Skelos had no role in various aspects of the design-build and P3 negotiation and legislative process.

I am happy to read that, your Honor, if you don't have it in front of you, but it says:

"In connection with these allegations, the government interviewed several individuals, including Robert Mujica, Thomas Locascio, both Senate staffers, James Malatras and Senators Carl Marcellino, Jack Martins, Thomas Croci and Michael Venditto, who stated, in sum and substance and in part, that to the best of their recollection, they are not aware of

FB98SKEC

any steps taken by Dean Skelos to seek design-build/P3
authorization during the budget process, or to extend the
governor's proposed P3 legislation to municipalities.

"2.  Dean Skelos did not spearhead any effort to
create a clean water infrastructure fund or otherwise to
allocate budget funds, specifically, for stormwater or water
infrastructure in the budget.

"3.  Public officials other than Dean Skelos were
requesting that budget funds be allocated to water
infrastructure projects across the state."

Then the letter goes on.

That's where this footnote appears, and the footnote
in my mind is suggesting that there were exaggerations or
misrepresentations by Adam Skelos about what his father was
doing in connection with the P3 and design-build legislation,
which, as your Honor knows, are key and core elements of the
government's AbTech related charges.

So while I appreciate the statements in the
government's letter this morning, it doesn't appear to me at
least that they go to the core of what the defense was raising
in connection with those exaggerations.

MR. MASIMORE:  Thank you, your Honor.

In particular, some of the evidence that the
government would seek to present at trial related to this would
show that certain of the statements that Adam Skelos made to

others, made to representatives of the environmental technology
company, were statements that he made after speaking with his
father about various things.  For example, there is evidence
that Adam's father told him that a lobbyist would call him and
we would refocus on these other things.  The other things that
the lobbyist was working on was P3 legislation and stormwater
surplus legislation.

So the issue here really is:  What does this evidence
say about what the Skeloses are informing the environmental
technology company as to what their capabilities are in
connection with the services that they are providing to the
environmental technology company?

As our letter this morning points out, as just a
base-level matter, we do not intend to present evidence in this
case that we know to be false and then argue to the jury that
those things are true.  But there are reasons, and I think the
Court has already indicated its view on relevance on some of
these, and we believe the Court is correct.

THE COURT:  What is your view of the material alluded
to in the footnote raised by Mr. Conniff?

MR. MASIMORE:  Again, we set forth in this letter what
those witnesses, in sum and substance, had told the government.
The footnote explains that we don't know exactly, necessarily,
at all times what Senator Skelos may have told Adam Skelos
about what those conversations were or what his efforts are.

FB98SKEC

1   But what we do know is they had the conversations and then Adam

2   Skelos was telling the environmental technology company what

3   their plans were with respect to these.

4          So the footnote was a way to put the defense on notice

5   that, to the extent there may be some exaggerations that Adam

6   Skelos had made during the course of this (A) we wanted them to

7   be aware that we were aware there might be some exaggerations,

8   and (B) this is the potential use we might make of those

9   exaggerations as an evidentiary matter.

10         THE COURT:  So I will ask you to raise it at the

11  appropriate time during trial.

12         I have just been handed a letter from Ropes & Gray,

13  which I have not read.  Do you want a ruling on this today?

14         MR. CONNIFF:  Your Honor, we submitted two letters to

15  chambers last night.

16         THE COURT:  This is testimony of Kevan Abrahams.

17         MR. CONNIFF:  We submitted that, your Honor, pursuant

18  to your order that we get things in front of the Court as soon

19  as possible.  We do not need to take that up today.  The

20  government has not had a chance to review it.

21         THE COURT:  Thank you.

22         MR. MUKHI:  Your Honor, may we have until tomorrow to

23  respond to that?

24         THE COURT:  Certainly.

25         Moving to the government motions, the conversation in

FB98SKEC

the Greek diner.  Again, whether this is probative of

wrongdoing and whether its probative value is substantially

outweighed by a danger of unfair prejudice needs to be made in

the context of trial.  I note that, as the defense points out,

there is no proffer that this man, the diner owner, was a

campaign donor to Dean Skelos, that he engaged in business

before the state, or that he had any interaction with Dean

Skelos.  And the defense claims that Adam Skelos merely sought

to obtain him as a utility customer and that the approach

occurred two to three years earlier than the call.

But the language used by Adam Skelos could be

interpreted as claiming that he has political reach through his

proximity to Dean Skelos, and as offering something unlawful.

Because when Adam Skelos is asked by the owner "like

what?" -- sorry, I should put that in context -- Adam Skelos

said he could get a lot of things done for him, for the owner,

the owner asks "like what?," the answer is, "I'm not going to

go there.  I am not going to say this on the phone."  That is,

without question, odd language for someone to use if he is

trying to sell gas or other utility to someone, but I am not

going to make that ruling now.  I'd rather make it during the

trial.

With respect to the zoning board, I don't have enough

before me to know what is at issue here, although this could be

probative of Dean Skelos's willingness to use his political

FB98SKEC

clout to help his son, although she was not appointed

apparently. The government says that it has intercepted calls

where Adam Skelos discusses with third parties his ability to

corruptly obtain zoning decisions favorable to real estate

deals he brokered, given his wife's appointment. If that

exists, that may be admissible, but I will have to see it.

MR. CONNIFF: Your Honor, may I be heard on that last

point because I think it is an important distinction.

THE COURT: Yes.

MR. CONNIFF: To me, I would break this scenario into

really two episodes. The first is the appointment to the

Zoning Appeals Board by Adam Skelos's wife, Annmarie Skelos,

which the Court correctly points out never occurred.

The government conveniently in their papers said it

never occurred because their investigation was revealed, etc.,

which seems to be always the response when nothing happened.

But there is no proffer of information, there is no witness

that I am aware of from the 3500 material that we have received

that is going to suggest in any way that there was anything

corrupt about that. And whether that event occurred or not,

and whether Senator Skelos was going to put in a good word or

recommend his daughter-in-law, etc. is not illegal, and

certainly not the focus of this case.

People may not like the fact that at times folks are

recommended for positions in that way, but it's certainly not

FB98SKEC

1    what the allegation here is.  The allegation here is that

2    Senator Skelos used his authority corruptly in order to help

3    his son with campaign donors and people with business before

4    the state.  So there is no evidence that that occurred in

5    connection with this particular possible appointment.  And I

6    might add there are people on the appeals board who also have

7    relatives who are significant people on Long Island.  That's

8    really not a huge surprise probably to your Honor.

9            But I would separate it from the second part of it

10   because I think this is a very important distinction and in

11   many ways what the case is about.  The second part of this is

12   the calls, which I am aware of that the government have

13   identified, are calls between Adam Skelos and third parties;

14   not identified co-conspirators in this case, not identified in

15   any bill of particulars as part of the scheme, third parties

16   related to real estate transactions that Adam Skelos is trying

17   to sell to them on Long Island.

18           Assuming that the allegations in the recording are

19   what the government argues them to be, which is Adam Skelos

20   saying, my wife will be on the appeals board, or my wife is on

21   the appeals board, which is an obvious lie, we will be able to

22   get variances for these properties if you need them, that's a

23   totally separate conspiracy, scheme, than is alleged in the

24   indictment.  Because what is alleged in the indictment is

25   Senator Skelos taking action.  Adam Skelos, as your Honor

FB98SKEC

knows, is not a public official, can only be guilty in this
case for aiding and abetting or causing the crime to occur
through his father.  And so here you have a scenario where, in
the best light for the government, Adam Skelos is conspiring
with some other third party in order to get a real estate deal
done through his wife, who is not even yet on the appeals
board.

So, your Honor, I think that that second part is
actually more prejudicial in some respects and also far afield
from the actual crimes that are charged in this indictment.  So
I really would urge the Court to keep that kind of -- it's just
prejudice.  All of what we are talking about this morning is a
series of prejudicial innuendo by the government, based pretty
much on calls that they recorded, that dirties up particularly
Adam Skelos, but creates a taint or a smear that this all had
to do with Senator Skelos's position, which the evidence just
doesn't support.  And my concern is that the introduction of
all these little pieces is going to create kind of a stink
that, well, these guys are using it for political purposes, or
there is just a stink here so there must be something wrong.

The government has its charges.  It's very clear.
They have the environmental technology company, they have the
real estate developer, they have the medical malpractice
administrator.  That's the core of their case.  And they have a
lot of evidence that they intend to put on to prove that case.

FB98SKEC

1   We obviously disagree, but these other instances appear to be

2   designed solely to create prejudice against Senator Skelos and

3   his son.

4            THE COURT:  I understand.  Does the government wish to

5   respond?

6            MR. McKAY:  It might be helpful if I can frame what we

7   are trying to use this evidence for a little more clearly, your

8   Honor.

9            First of all, it is not in fact the case that the

10  three substantive counts involving the developer, the

11  environmental technology company, the malpractice insurer are

12  so much the core of our case.  The first two charges allege a

13  wide-ranging conspiracy, whereby Dean Skelos used his official

14  position to obtain payments for Adam Skelos and his family.

15           So this evidence involving the zoning board is really

16  very probative of the existence of the charged conspiracy

17  because it shows the way the defendants worked together to get

18  these benefits for Adam Skelos.  And it's going to be

19  particularly probative if the defendants argue, as they have in

20  some of their motion papers, that Dean Skelos was really not

21  involved in Adam Skelos's efforts.

22           So as we set forth in the brief, for instance, in the

23  December 31st intercepted call, Dean Skelos said to his son,

24  "We're going to make sure we get" -- and then he names Adam

25  Skelos's wife -- "into that spot," referring to the town board.

FB98SKEC

1          With respect to the notion that we haven't proffered

2     any evidence of quid pro quo, among the things that we cite in

3     our reply brief is an e-mail from Dean Skelos's wife to her

4     cousin.  Now, I am sure defense counsel will have a different

5     meaning of this e-mail, but that's an inference that they can

6     argue.  We think this does show quid pro quo.  She talks about

7     how Adam Skelos's wife is going to be appointed to the town

8     board.  She will get health insurance and a pension and "about

9     time Dean gets something, keep it quiet."  And then she names

10    the name of an individual who is going to be appointed to the

11    town board.  Just days before that Dean Skelos had gone out to

12    dinner with this individual.

13          I think the two calls that we described, where Adam

14    Skelos is talking to other individuals about the benefits he

15    can earn if his wife is on the zoning board, first of all, I

16    think I heard defense counsel say that they are not with

17    co-conspirators.  That's, in fact, not right.  One of the two

18    calls is with CW-2.  That is session number 1894.  And on that

19    call, Adam Skelos tells CW-2, "My wife just got appointed to

20    the Town of Hempstead zoning board" -- he goes on -- "which is

21    kind of awesome, by the way, because I do a lot of real estate

22    stuff, so she literally is the person that gives the thumbs-up

23    or thumbs-down to, like, new giant projects.  So it helps me in

24    a lot of ways."

25          I think that call is extremely probative of the

FB98SKEC

```
1    defendant's corrupt intent, because it shows just how
2    comfortable Adam Skelos is using a clear conflict of interest
3    to benefit him financially.  It's also necessary to complete
4    the story of the crime on trial, because during the calls
5    between Dean and Adam Skelos, they discuss the financial
6    benefit of this health insurance that his wife is going to get
7    if appointed.  This is during a time when Adam Skelos's
8    employment with a malpractice insurer has changed, such that he
9    is no longer getting health insurance benefits as part of that
10   job.  So I think it just goes to show that when one benefit
11   runs dry, the defendants work together and find another source
12   for that income for Adam Skelos.
13           So for all those reasons, we think it's direct
14   evidence of the conspiracy, and it's also, in the alternative,
15   404(b) of the defendants' corrupt intent in their common
16   scheme.
17           THE COURT:  All right.  Again, I will make that ruling
18   at the time of the trial.
19           This has to do with Dean Skelos's statement that there
20   was a wall between the law firm and the lobbying firm, and that
21   he had nothing to do with the latter.  If there is evidence
22   rebutting whether there was such a wall, that would be relevant
23   character evidence, if character evidence becomes admissible.
24           With respect to conflict of interest, the question
25   whether he used his official position to get paid by a private
```

FB98SKEC

firm that represented entities with business before the state,
and that had a lobbying arm that directly lobbied the Senate
while Dean Skelos was in power, this is relevant to conflict of
interest.

       The government has also said that Dean Skelos sought
an opinion from the Nassau County Bar Association Ethics
Committee about whether his work for the law firm was ethical,
and he apparently heard back that it was not, and yet failed to
follow their advice.  I will need some voir dire before the
jury hears any of this just to make sure what the testimony is.

       MR. McKAY:  Would you like to hear some examples of
that now or shall we wait until the trial?

       THE COURT:  Now if you'd like.

       MR. McKAY:  So with respect to the Nassau County Bar
opinion, I have printed out just two examples.  I am happy to
hand up copies if you'd like.

       THE COURT:  Fine.

       MR. McKAY:  Your Honor, what I have handed up are two
news articles that we think are just two of the examples when
Dean Skelos made public statements contrary to the import of
the Nassau County Bar opinion.

       So just for context, the bar opinion said that -- and
I am quoting now -- "The committee believes that in the
circumstances described" -- which are the circumstances,
essentially, Dean Skelos's employment with the firm -- "it

FB98SKEC

1     would not be appropriate for the state official/of counsel to

2     make either a positive or negative statement about the client's

3     project because it would have the appearance of an impropriety

4     or be prejudicial to the client."

5          And that opinion is not specific to these clients we

6     are talking about, but we think it generally covers the subject

7     matter of what happens here.

8          So the first article is one from the Long Island

9     Business News.  If you look down to the fourth paragraph, he

10    touts legislation that was passed just that year, to clear the

11    way for a pharmaceutical company, to create about 800 direct

12    and indirect jobs with an annual payroll of approximately 500

13    million.  That pharmaceutical company is a client of the law

14    firm.

15         The second article that we handed up to you is from

16    the governor's Web page.

17         I should mention that for that pharmaceutical client,

18    Dean Skelos actually got origination credit for bringing that

19    client to the law firm.

20         The second article is from the governor's Web page,

21    and it announces a landmark agreement to restructure utility

22    operations on Long Island.  If you go to the second printed

23    page of that, the first full paragraph is Dean Skelos's public

24    comment about this.  He said, "This legislation will bring much

25    needed oversight, protect rate payers, and ensure those in

FB98SKEC

1   charge are prepared to deal with dangerous storms in a

2   responsive and accountable way." This legislation, among other

3   things, privatized the power to give PSEG -- that's a client of

4   the lobbying firm associated with the law firm -- full

5   authority over the utility's day-to-day operation.

6       So, again, an example of Dean Skelos touting projects

7   that benefit clients of the law firm and its affiliated

8   lobbying arm. Those are just two examples of what we think is

9   contrary to the Nassau Bar opinion.

10      THE COURT: Thank you.

11      I don't think now is the moment to fully argue it

12  unless you wish to respond. I think this can wait.

13      MR. GAGE: I agree, your Honor. A couple of very

14  brief notes, and I hope your Honor will take that approach with

15  regard to the first two tentative observations by the Court.

16      And the reason I say that, and I will be brief, in the

17  preliminary 3500 material, it was divided into two parts,

18  likely witnesses -- perhaps I got the term slightly wrong, but

19  likely witnesses and unlikely witnesses, and there were 15

20  members of that law firm listed at that point as unlikely

21  witnesses.

22      So when we wrote in our papers that these issues would

23  require a minitrial, I think perhaps we understated it. There

24  is a great deal of background and context here and potentially

25  testimony. So I note that for the Court, and would agree with

FB98SKEC

1  the Court that reserving until a more full, factual context

2  develops is the correct approach.

3  THE COURT:  Thank you.

4  MR. McKAY:  Just quickly, with respect to the

5  minitrial issue, I want to emphasize that all we are asking

6  here for is for leave to cross-examine the defendant on these

7  points if he testifies and puts his character at issue.  It's

8  not going to require additional exhibits, additional witnesses

9  on our part, at least not unless the defendant testifies

10  falsely as to these issues.  So we think we can absolutely

11  cabin this cross-examination in a way that won't create a

12  minitrial.

13  MR. GAGE:  Obviously, we have a different view, but as

14  the Court said, we will leave that till later.

15  THE COURT:  OK.  Good.

16  Moving to evidence of sympathy towards Adam Skelos.

17  MR. CONNIFF:  Just to remind the Court, this section I

18  believe is under seal.

19  THE COURT:  I am not going to state anything that

20  would bring that into play.

21  MR. CONNIFF:  Thank you, your Honor.

22  THE COURT:  It's my view that with respect to any of

23  this evidence, there should be voir dire of the witness before

24  the witness testifies outside the hearing of the jury so that

25  we know exactly what the witness will testify to and what he or

FB98SKEC

1    she won't testify to.  And the reason for that is that in

2    questioning, subjects could be mentioned by the questioner and

3    fixed in the jurors' minds even where the answer will be no.

4              Any objection to voir dire?

5              MR. CONNIFF:  The only objection I have is I think

6    that it potentially could either disrupt or chill the

7    cross-examination of these witnesses.  I don't know when your

8    Honor would propose that would occur, whether it's going to be

9    before their direct or as part of the cross-examination and

10   then we will redo the cross-examination in front of the jury.

11             THE COURT:  Do you have a preference?

12             MR. CONNIFF:  I would prefer it be done on

13   cross-examination.

14             THE COURT:  So that the government in its questioning

15   wouldn't know what the answers would be.  I think in fairness

16   it would be before the witness testifies at all.

17             MR. CONNIFF:  OK, your Honor.

18             MS. MARTINS:  I just would raise that if we could know

19   which witnesses because, as your Honor knows, that section of

20   the defendants' brief was filed ex parte; we have never even

21   seen and have responded sort of in a vacuum, as your Honor

22   knows.

23             THE COURT:  I think it would be fairer for the defense

24   to let the government know the identities of those who are

25   expected to testify as having been sympathetic in their hiring.

1          MR. CONNIFF:  We filed it ex parte for a reason,

2     because we feel that it's clear in our eyes, and we submitted

3     to your Honor the notes and 3500 which we think supports it,

4     and don't think necessarily that we are required to prepare the

5     government to address certain of those issues.  I mean, the

6     government doesn't give us their questions and answers for

7     their witnesses on direct examination.  I am not sure we should

8     be required to do the same.  We are making a good faith

9     representation to the Court.  I think it's beyond good faith

10    because we have submitted actual portions of 3500 material

11    where the witnesses are indicating that certain aspects of Adam

12    Skelos's life were a factor in decisions to hire him.  And,

13    frankly, that goes to the core of this case, because state of

14    mind of these witnesses is obviously an important part of the

15    government's case -- they argued it in their papers -- and what

16    these witnesses were thinking and doing at the time they hired

17    Adam Skelos, it's core to the case.

18          THE COURT:  I am not saying it's inadmissible.  And I

19    understand your position that the government isn't strictly

20    entitled to a preview of that.  If we have voir dire before any

21    of these people take the stand, I think the government will

22    have enough time to respond with questions and any added

23    research.  So you won.

24          MR. CONNIFF:  Then I will sit down.

25          MR. GAGE:  May I have just a moment?

FB98SKEC

1          THE COURT:  Yes.

2          MR. CONNIFF:  Nothing further, your Honor.

3          MS. MARTINS:  How far in advance of the voir dire

4    might we expect to get notice that there will be a voir dire of

5    a particular witness?  We are not asking for the defense's

6    specific questions, obviously.  Mr. Conniff suggested we are

7    not entitled to their specific Q and A.  That's not what we are

8    asking for.  We are asking for just the identity so we have an

9    opportunity to understand which witnesses will then be taken

10   out of the presence of the jury to prepare our own directs so

11   that there is not some sort of surprise with respect to that

12   witness.

13          As you know, if the Court makes certain rulings that

14   things are excluded, we then don't put them in our directs

15   because of that ruling; and if the Court let's it in, we do so

16   it doesn't just show up on cross for the first time.  So those

17   are things that are very important to the government.  In terms

18   of presenting a case, we don't want to overstep any of your

19   rulings in our direct.  So that's why I just ask for the

20   identity, not the questions that will be asked, but which

21   witnesses we are concentrating on.

22          THE COURT:  I do think it would be fair for the

23   government to get that.  Certainly the day before shouldn't

24   constrain the defense in any way.  Is that acceptable?

25          MR. CONNIFF:  If I could just give it some thought,

FB98SKEC

1   your Honor.  It seems OK.

2           THE COURT:  All right.  Thank you.

3           Moving to statements by the malpractice insurance

4   administrator with respect to Adam Skelos's work, and that is

5   combined with, in the government papers, combined with

6   statements expressing discomfort with Adam Skelos's employment.

7           None of this is under seal, is it?

8           MR. GAGE:  No, your Honor.

9           THE COURT:  Taking them in turn, with respect to the

10  December 10, 2013 conversation in which a medical malpractice

11  administrator lobbyist told the CEO of the company that he

12  should not hire Adam Skelos because, first, the company had

13  significant interests before Dean Skelos, the Senate Majority

14  Leader, and, second, hiring Adam Skelos could pose a problem

15  for the company.

16          The defense concern is that this is being offered for

17  its truth, and that the jurors will accept it as true when

18  stated by someone with expertise in relations with politicians.

19  The government states that it needs this to establish extortion

20  under color of official right, given that they must prove that

21  the medical malpractice administrator was motivated to pay Adam

22  Skelos as a result of Dean Skelos's control or influence.

23          These statements to the CEO are evidence of his state

24  of mind, that he had his company pay Adam Skelos

25  notwithstanding the lobbyist's warning because of Dean Skelos's

FB98SKEC

position.  A limiting instruction, which I would give, will

emphasize to the jury not to take this evidence for its truth,

but, rather, only as evidence of the effect on the CEO's state

of mind.

With respect to the January 10, 2013 incident,

Supervisor 1 told the same CEO, first, that Adam Skelos had not

shown up for work, despite having been hired for a full-time

position, and that Adam Skelos told his supervisor that he did

not have to work the requisite number of hours because his

father was the Senate Majority Leader.  Next, the CEO relayed

this to Dean Skelos, who told the CEO to continue employing

Adam Skelos.

These are being offered, according to the government,

not for their truth, but for the effect on the CEO, that is,

that his continuing to employ Adam Skelos was necessary to

receive favorable treatment from the State Senate, i.e., a quid

pro quo.  It's admissible for the same reason as the January

10, 2013 talks are relevant and admissible, with the same

limiting instruction.

And the same ruling would apply to the February 2013

incident in which the same lobbyist, upon learning that Adam

Skelos was treating his job with the medical malpractice

administrator as a no-show job, the lobbyist again warned the

CEO that Adam Skelos's job was problematic given the company's

lobbying relationship with Dean Skelos.  That's probative of

FB98SKEC

1   the CEO's state of mind.  He feared that he could not take

2   action against Adam Skelos based on his January 10, 2013 call

3   with Dean Skelos.

4           MR. GAGE:  Your Honor, if I may, and I apologize for

5   interrupting the Court.

6           THE COURT:  It's OK.

7           MR. GAGE:  With regard to the Court's rulings, if I

8   could just urge that as the trial proceeds we be allowed to

9   revisit that, mindful of what the Court has said today.  In

10  part, the reason I say that, without extensive argument, is the

11  job that was offered to Adam Skelos was offered by the CEO in

12  August 2013.  So these conversations come much later.  And my

13  concern is at some point, if all this evidence comes in, it's

14  going to shift the focus from what I think should be the

15  central focus, Dean Skelos's state of mind, to the CEO's state

16  of mind.  In weighing how much of it comes in, the nature of

17  the Court's limiting instruction, I just think to some extent,

18  once the Court hears openings and the evidence on this topic

19  comes in, we would like the chance to revisit it.  That's all I

20  would say for now.  There are timing issues, there's quality of

21  evidence issues, which I think are best addressed at the time.

22          MS. MARTINS:  Your Honor, a point of clarification.  I

23  think defense counsel said in these conversations the job was

24  offered in August 2013.  It was August 2012.

25          MR. GAGE:  That is correct, your Honor.

FB98SKEC

1          MS. MARTINS:  There were then several discussions

2     between the medical malpractice CEO and Senator Skelos

3     subsequent to that up through December 2012.  At the time that

4     the medical malpractice CEO got that warning from the lobbyist,

5     he had already offered the job to Adam Skelos and had told Dean

6     Skelos, so that it really goes to his state of mind because he

7     felt that he could not rescind that offer at that point given

8     who the Senator was.

9          So it's really quite contemporaneous these

10    discussions.  Then the subsequent discussion, after the

11    lobbyist finds out that Adam is treating it as a no-show job

12    is, again, shortly after that call with Senator Skelos in

13    January, it's maybe a month or six weeks after that.  So these

14    are all quite contemporaneous discussions that we believe your

15    Honor is correct in ruling, obviously given our argument that

16    it goes to the CEO's state of mind, which is something we have

17    to prove.

18         MR. GAGE:  That is correct, your Honor, I did misspeak

19    as to August 2012.  But I think it makes the point that there

20    is a big time lag here.  I would just like the Court to be able

21    to hear openings and some evidence on this before making a

22    final ruling.

23         THE COURT:  I will do that.

24         The government is not planning to open using these

25    incidents?

FB98SKEC

 1          MS. MARTINS:  Yes, we are.  That's what I actually
 2    just got up to let your Honor know.  We are.  And also, while I
 3    am on this topic, with respect to the ruling about
 4    exaggerations, we are also planning to open, obviously, on the
 5    three schemes, one of which is the scheme involving the
 6    environmental technology company.  We are opening on the fact
 7    that there were communications with the company about what the
 8    senator and Adam Skelos could do for the company, that is
 9    central to our charges.  And I don't think your Honor's
10    reserving on that will have an impact on that, but I just
11    wanted to let the Court know that we are planning to open, of
12    course, on all of these things.
13          THE COURT:  Well, I think Mr. Gage has offered a new
14    objection.  The earlier objection was that the state of mind
15    exception to the hearsay rule doesn't apply because the
16    statements are not contemporaneous, and I think your argument
17    today is that the evidence of the purported victim's state of
18    mind will be overwhelming compared to that of Dean Skelos's
19    state of mind.
20          MR. GAGE:  It is, your Honor, and I think it goes back
21    to a 403 analysis.  I was going to come to this, but we will do
22    it in the letter we submit to the Court, if there are
23    pre-instructions so to speak.
24          Reading from Justice Kennedy's concurrence in the
25    evidence case -- I will go slowly, and we will have this in our

FB98SKEC

```
1    papers, your Honor -- a public official violates 1951, the
2    Hobbs Act, if he intends the payor to believe that, absent the
3    payment, the official is likely to abuse his office and trust
4    at the detriment and injury of the respective payor.
5           I think what has been lost here, the big picture --
6    and I realize we are going through point by point, and I
7    appreciate the Court doing it that way, it has been very
8    focused and helpful -- the big picture is Dean Skelos's state
9    of mind, his intent to cause the payor to believe.  And I think
10   what is happening here is we are seeing the government's 3500,
11   how they intend to present this case, and everything is being
12   shifted to the payor's state of mind.  Yes, as Mr. Conniff
13   pointed out, it has got to be a reasonable belief, obviously,
14   but the core of the case is what Senator Skelos intended.
15          THE COURT:  I don't mean to interrupt you.  Do you
16   want to continue?
17          MR. GAGE:  No, your Honor.  Go ahead.
18          THE COURT:  Looking at the January 10, 2013 incident,
19   the CEO had a telephone call with Dean Skelos, and Dean
20   Skelos's statements and demeanor on the call led the CEO to
21   believe that he could not terminate Adam's employment.
22          MR. GAGE:  Without, obviously, agreeing on a blanket
23   basis that every conversation with Dean Skelos is admissible,
24   yes, the CEO can testify about his state of mind regarding that
25   phone call.  But to have others come in --
```

FB98SKEC

1          THE COURT:  Your concern is having others corroborate

2     that the CEO made those statements to them.

3          MR. GAGE:  Yes, your Honor.  And again and again and

4     again, basically.  We are going to see it, I believe, in the

5     next session your Honor is going to come to.  It really is

6     bolstering.  Let the CEO testify.  He will say what he says,

7     and we should go from there.  I don't see that the government

8     has to open on -- I think the 403 analysis outweighs it -- that

9     person after person testifies about what the CEO thought.  Let

10     him testify.

11          THE COURT:  What is your 403 prejudice?

12          MR. GAGE:  In addition to other things, if witnesses

13     other than the CEO are testifying, in effect, about his state

14     of mind, and I believe there was reference to it earlier, these

15     are experienced lobbyists or people with political relations,

16     it improperly bolsters.  I have a sense of what the CEO is

17     going to say, but I would like to hear what he has to say on

18     the stand before we go forward.  There is a larger context

19     here.

20          THE COURT:  Tell me what that larger context is.

21          MR. GAGE:  The relationship, just speaking generally

22     now, with some of these persons goes back decades with Senator

23     Skelos.  So we want to fully explore that.  So to begin to

24     bolster the CEO's testimony before we have heard it.  Put

25     differently, I don't think these 3500s capture the entire

context and nature of the relationships with regard to a lot of

witnesses, and that's critical.  We are talking about one's

child in this case, one's son.

THE COURT:  Well, you will be able to elicit that.

MR. GAGE:  I appreciate that, your Honor, but to allow

other persons, senior lobbyists from firms, talk about what

they told the CEO.  The starting point is:  Based on talking to

Senator Skelos, what did the CEO conclude and why?

THE COURT:  A warning from a lobbyist is also relevant

to a purported victim's state of mind.

MR. GAGE:  I have to, respectfully, your Honor,

suggest that it is different in the case law.  It's one thing

to tell someone in the pharmaceutical business, here is a

regulation you should be aware of before proceeding, which I am

roughly paraphrasing one of the leading cases.  But here, as I

read it, to say, it could pose problems for the company, it

doesn't say it's wrong, or, gee, here is a pharmaceutical

regulation, Mr. CEO, that you should be aware of, because if

you were, then you would know you had a problem.  The language

here is much softer.  The punch line is:  Could pose problems

for the company.

THE COURT:  Well, you can bring out what kind of

problems.

MR. GAGE:  The government's version, I am actually

sticking to their version and giving them the benefit of the

FB98SKEC

1    doubt.

2             THE COURT:  I agree that you're sticking with their

3    version.  I understand.

4             MR. GAGE:  The third discussion --

5             THE COURT:  What date are you referring to?

6             MR. GAGE:  It says in or about December 2013.

7             THE COURT:  So you're going back to my prior ruling.

8             MR. GAGE:  Yes, your Honor.  That's what I wanted to

9    be heard on.

10            I'm sorry.  That may be 2012.  I think, with so much

11   briefing, maybe both sides have made mistakes.

12            THE COURT:  December 2013?

13            MR. GAGE:  I think it should be 2012.

14            MR. MUKHI:  That's correct, your Honor.

15            THE COURT:  So we are correcting that page?

16            MR. MUKHI:  Yes.

17            MR. GAGE:  Yes, your Honor.

18            What I have also misspoken on earlier was August 2012,

19   from the material we have been provided, is when the CEO offers

20   Adam Skelos a job.

21            I guess the point, your Honor, and in discussion with

22   the Court I focus on more and more, and if our brief didn't do

23   it total justice with all the time constraints I apologize, but

24   the testimony is going to be, using the government's version,

25   it could pose a problem with the company, or in the next

FB98SKEC

1   conversation, it could be problematic.

2         My concern is here that the jury hears "pose a

3   problem," "problematic," and there is a real risk they are

4   going to transmute that to it's wrong, something wrong has been

5   done here.

6         THE COURT:  I will give a strong curative instruction.

7         MR. GAGE:  I appreciate that, and I am sure your Honor

8   will.  But in addition to the curative instruction, I think the

9   CEO should be doing the testifying, his testimony or state of

10  mind shouldn't be bolstered by a lobbyist who he is speaking

11  to.

12        THE COURT:  Well, his state of mind at the moment is

13  admissible, and if his state of mind is that he listened to

14  what was correct advice, but ignored it, that's relevant to his

15  state of mind as to why he thought he had to continue employing

16  Adam Skelos.

17        MR. GAGE:  Your Honor, we respectfully view it

18  differently.  It's the reasonableness of his state of mind.

19        THE COURT:  I understand.  I view this as admissible

20  and it can be used during the openings.

21        This brings us to the judge, the part-time judge, as

22  to whom there were mere allegations.  He was accused in a press

23  report of violating rules of judicial conduct in connection

24  with certain campaign donations he made in his personal

25  capacity to political candidates in 2011 and 2012, and in

FB98SKEC

```
1    connection with his work as a registered lobbyist, including on
2    behalf of Developer 1.  The New York State Commission on
3    Judicial Conduct dismissed its inquiry regarding these
4    allegations, without any finding, in view of the fact that the
5    judge departed the bench, and they left it subject to being
6    reopened should he return to his judicial office.
7              I do not think that is appropriate fodder for
8    cross-examination.  In my mind it's analogous to an arrest that
9    never leads to a conviction.  It's even short of an arrest, of
10   course, but the logic is the same.
11             Do you wish to be heard on that?
12             MR. CONNIFF:  Just briefly.  I appreciate your Honor's
13   time on the issue.
14             To me, there are two issues.  One is the credibility,
15   which your Honor just ruled on.
16             The second would be, if this witness does provide
17   testimony in connection with his lobbying efforts, which I
18   expect he will, will we be permitted to probe on
19   cross-examination regarding his knowledge and potential
20   failings around this, even if we don't mention this issue right
21   off the bat?
22             THE COURT:  How are you going to mention potential
23   failings?
24             MR. CONNIFF:  I haven't thought of the exact question
25   yet.
```

1          THE COURT:  Have you ever been arrested for -- I don't
2     mean arrested.  I am substituting the word.  Have you ever been
3     investigated for possible violations?

4          MR. CONNIFF:  Your Honor, that's down the road, I
5     think, to --

6          THE COURT:  I wouldn't permit that.

7          MR. CONNIFF:  If he testifies with some level of
8     knowledge and expertise about how lobbying is done, we would be
9     foreclosed from questioning his capabilities in that regard?

10         MR. McKAY:  I think I can proffer that this witness is
11    not going to testify about the rules governing judicial
12    conduct.  That's what he is alleged to have violated.  What he
13    would testify about is lobbying and campaign finance issues
14    involving state legislature, but these are apples and oranges.
15    So he is not going to be testifying about judicial conduct
16    rules.  And for those reasons we don't think it's reasonably
17    related to his direct testimony.

18         MR. CONNIFF:  I am not suggesting that we would go
19    into the judicial conduct rules, because he left the bench and
20    there is no finding on this, there was literally no finding on
21    it.  What I am saying is he is, I think, going to testify in
22    his capacity as a lobbyist for Developer 1, and I don't know
23    what his testimony is going to be.  So I am just trying not to
24    foreclose the possibility that if this witness presents to the
25    jury some testimony that suggests that he is in the right about

FB98SKEC

1    how this lobbying should be conducted, I would think we would

2    be entitled to question that authority in light of this

3    allegation.  And if he says, No, I appropriately withdrew what

4    I had done in connection with these contributions, etc., I

5    would suspect that would be the end of it, your Honor.

6         THE COURT:  I will allow you to take it up at the time

7    outside the hearing of the jury.  I am doubtful that a ruling

8    in your favor would result.

9         MR. CONNIFF:  I would not do anything on

10   cross-examination until we talk about it.

11        THE COURT:  OK.  Good.

12        Is there anything else in the way of a motion in

13   limine?

14        MR. MUKHI:  Yes, your Honor.  There was one other

15   issue with respect to statements of witnesses regarding the

16   fact that they felt uncomfortable by Dean Skelos's request to

17   provide Adam Skelos with payments.  These are conversations

18   between CW-1 and the Developer 1 lobbyist, as well as

19   conversations between the CEO of the malpractice insurer and

20   another executive at that firm.

21        THE COURT:  Let's see.  We are talking about the

22   material on page 17 of the government's motion in limine?

23        MR. MUKHI:  Yes, your Honor.

24        This is also a state of mind issue.

25        THE COURT:  I may be wrong.  I thought we had dealt

FB98SKEC

1   with this.

2           MR. MUKHI:  I think it's just a point of

3   clarification.

4           THE COURT:  Ms. Martins indicated that she wanted to

5   open with this material, and I said she could.

6           MS. MARTINS:  I think that this may just be the way we

7   drafted the motions, and we just wanted to clarify that your

8   Honor's rulings applied to both.  We split it up into the

9   803(3) issues with respect to the state of mind of the victims,

10  and then we had another section on the listener.

11          So one of them was things that, for example, the

12  medical malpractice insurer said with respect to his state of

13  mind.  So that applied to the statements he made to his

14  executive about, had this call with Dean Skelos, now I feel I

15  can't take action with respect to Adam Skelos.  I am

16  paraphrasing of course.  Then we had what your Honor

17  specifically had discussed in your ruling, the statements from

18  the lobbyist to the CEO.

19          I think when your Honor opened that section you

20  mentioned both types of statements.  We ended up focusing the

21  discussion only on what we discussed.  And so we just wanted to

22  clarify that your Honor's ruling had applied to both of those

23  types of statements, as they were divided in our brief.

24          THE COURT:  It does.

25          Go ahead, Mr. Gage.

FB98SKEC

1          MR. GAGE:  With regard to the statements between the

2     CEO of the medical malpractice insurer administrator and a

3     lobbyist, they offered that, as I read their briefs, and we

4     addressed it, on a listener basis.

5          Now, these statements between CW-1, the real estate

6     executive, and the lobbyist for the real estate developer,

7     those are being offered on a different evidentiary theory,

8     state of mind, which prohibits backward-looking statements.

9     And my concern here, your Honor, is the lobbyist has not been

10    identified as a co-conspirator.  So what you have are purported

11    discussions between the real estate executive and Senator

12    Skelos, and then maybe some discussions between the lobbyist

13    and Senator Skelos, and then they get together and rehash, as

14    it were, your Honor, with different points of view and agenda.

15    In any event, they get together and rehash the discussions.

16    It's backward looking in the most traditional sense and

17    therefore, as we discussed in our papers, it really doesn't fit

18    the state of mind exception.

19         Additionally, it is highly prejudicial.  With respect

20    to your Honor, we view the other issue differently too, but

21    this is a different issue, a different dynamic.  And I think

22    there is a real 403 prejudice with two witnesses, and I can't

23    think of a better word than rehashing, recapitulating what they

24    said, or didn't say frankly, in a discussion with Senator

25    Skelos.  They will be able to testify about that.  Why should

FB98SKEC

1    their rehash be admitted as state of mind?

2            MR. MUKHI:  Your Honor, this is not backward looking

3    or rehashing.  These statements are made by the recipients of

4    the demands from Dean Skelos during the time the demands are

5    being made.  So Senator Skelos made these demands starting at

6    the end of 2010.  They extend through 2011 into 2012.  And

7    during this three-year period, there are up to ten requests

8    more from Sarah Skelos to both CW-1 and the lobbyist to find

9    Adam Skelos sources of income and sources of payment, and it's

10   over the course of those three years, during that time, during

11   the scheme, that recipients of these demands are discussing

12   they feel uncomfortable.  That is their state of mind, which is

13   one of the elements the government has to prove.

14           They will also testify as to their state of mind, but

15   the fact that they were having contemporaneous conversations

16   with each other that this was their state of mind is

17   corroborative.  The defense calls it bolstering, but the

18   government is entitled to corroborate its case through

19   admissible evidence, and this is admissible.

20           THE COURT:  I do see that it is admissible.  Do you

21   wish to argue any further?

22           MR. GAGE:  As always, I want to be respectful of the

23   Court's rulings.  Just to say that we obviously, respectfully,

24   disagree.  Your Honor has ruled, and we will proceed that way,

25   but if we come to these and the door hasn't already been

FB98SKEC

1  opened, by argument or otherwise, I just would like the chance
2  to revisit it as we go along.  I am mindful of what the Court
3  has said.

4          THE COURT:  This material will be in the government's
5  opening, and you can certainly argue down the road, but as I
6  understand it, it will be in the opening.

7          Anything further on motions in limine or anything
8  else?

9          MR. GAGE:  I will let the government go first, but I
10  do have one item.

11          MR. McKAY:  Nothing further from the government.

12          MR. GAGE:  We noted from the Court's pretrial order,
13  in terms of structuring how the trial should be conducted, that
14  as it stands, the government is to turn over to us the witness
15  list for its first week and the order of the witnesses
16  Thursday.  We would respectfully request, and urge if we could,
17  your Honor, that we get that list today.

18          The reason I say that is, in this case it's difficult
19  because there is so much electronic, but there are probably
20  over 15 million documents.  The 3500 material is voluminous and
21  it keeps coming.  There has been almost every other day
22  production of new material.  For us to be fully prepared and
23  ready to go, it would just be enormously helpful.  And your
24  Honor, of course, is not bound by anything Judge Caproni has
25  done, and I wouldn't suggest it, but I know that they are

FB98SKEC

1    getting it a week in advance.  But in this case, more

2    importantly, the amount of material is overwhelming.  I don't

3    see any prejudice to the government and it helps us to present

4    better on both evidentiary and substantive issues.

5            THE COURT:  Does the government have a lineup of its

6    first day?

7            MR. MUKHI:  We have an intended lineup for next week.

8            Just to respond, we think that the schedule set out by

9    the Court's order is appropriate.  We have provided the defense

10   with 3500 a month in advance of trial.  As we got closer, we

11   are pointing the defense to particular witnesses that we now

12   believe are likely to testify.  The supplemental material is

13   generated because we continue to prepare our witnesses and turn

14   over pages of notes; it's not a whole new category of evidence.

15   So we have done all we can to help the defense prepare.

16           We haven't received anything from the defense by way

17   of witnesses.  There was a representation that defense might

18   have a case up to a week potentially.  We haven't received a

19   witness list.  We received a small amount of Rule 16 material.

20   We don't know beyond that any exhibits that the defense intends

21   to introduce.  So I think the Court's current order is more

22   than fair, and putting a burden on the government to do that

23   the week before, the government of course will do, but I think

24   that's a fair schedule that the Court has laid out.

25           THE COURT:  There is an enormous volume of material.

FB98SKEC

1    Is the defense prepared to provide the same to the government,

2    with respect to any exhibits or witnesses you intend to put on,

3    giving one week's notice?

4              MR. GAGE:  Yes, your Honor.  If I may, with the

5    scheduling, we are having to dial up with the Court, and

6    frankly with the government, so that we can inform the jury of

7    the approximate length.  So it is very difficult for the

8    defense to predict if there will be a case, but the one word

9    answer is, yes, we will do that one week in advance.

10             THE COURT:  I think it would be fair to give them a

11   week's notice of your exhibits and witnesses.

12             Anything else?

13             MR. CONNIFF:  Your Honor, literally a housekeeping

14   matter.  Would it be OK if we brought some materials down on

15   Friday and left them over in the corner of the courtroom?

16             THE COURT:  That's fine.

17             MR. CONNIFF:  We will submit to your Honor the

18   proposed order for electronic devices, which will be quite

19   limited, but we will get that to your Honor today or tomorrow.

20             THE COURT:  All right.  Good.

21             So we will next be together on Thursday at 11 for the

22   final pretrial conference and you will have given me your

23   excuses for cause and follow-up questions.

24             Thank you very much.  We are adjourned.

25             (Adjourned)