1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          20 Cr. 494 (PGG)

5  ROBERT ADAMS,

6            Defendant.                  Conference

7  ------------------------------x

8                                        New York, N.Y.
                                         October 25, 2021
9                                        2:15 p.m.

10 Before:

11
                      HON. PAUL G. GARDEPHE,
12
                                         District Judge
13
                         APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  JARROD L. SCHAEFFER
        RUSHMI BHASKARAN
17      Assistant United States Attorneys

18 SAMUEL GREGORY
   ZACHARY TAYLOR
19      Attorneys for Defendant

20

21

22

23

24

25

1

2          THE COURT:  Please be seated.  Sorry for the delay.

3          I am trying a case across the street.  The jury is

4     deliberating, and they sent out several notes, so I had to

5     address those.

6          So I understand there is a superseding indictment that

7     Mr. Adams needs to be arraigned on.

8          Is that correct?

9          MR. SCHAEFFER:  That's correct, your Honor.

10          THE COURT:  All right.  Mr. Adams, would you please

11     rise.  Your are here this afternoon with your attorneys,

12     Mr. Adams?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Is that correct?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Have you received a copy of the

17     superseding indictment, which reflects the charges against you?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Have you discussed the superseding

20     indictment with your attorney?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Count One of the superseding indictment

23     charges you with violating 18 United States Code, Section

24     201(b)(2), which generally relates to bribery.

25          Count Two charges you with violating 18 United States

1    Code, Section 873, which generally relates to blackmail.

2             And Count Three of the superseding indictment charges

3    you with violating 18 United States Code, Section 4, which is

4    misprision of a felony.  As to that charge the government

5    contends that you concealed knowledge of the commission of a

6    federal felony offense.

7             Do you wish me to read the superseding indictment to

8    you now here in open court, Mr. Adams?

9             THE DEFENDANT:  No.

10            THE COURT:  Then I ask you now with respect to Count

11   One of the superseding indictment, how do you plead?  Guilty or

12   not guilty?

13            THE DEFENDANT:  Not guilty.

14            THE COURT:  As to Count Two of the superseding

15   indictment, how to you plead?  Guilty or not guilty?

16            THE DEFENDANT:  Not guilty.

17            THE COURT:  And as to Count Three of the superseding

18   indictment, how do you plead?  Guilty or not guilty?

19            THE DEFENDANT:  Not guilty.

20            THE COURT:  Thank you.  You may be seated.

21            THE DEFENDANT:  Yes, your Honor.

22            THE COURT:  I will now address the parties' motions *in*

23   *limine*.  I will begin with the government's motions.

24            The government has moved to introduce certain

25   statements which it characterizes as prior consistent

1    statements of an individual that the government refers to as

2    Visitor-1; also, certain internet searches performed by

3    Visitor-1.

4           I will give some background.

5           Visitor-1 is expected to testify that, on July 5,

6    2019, Adams confronted her at the MCC after determining that

7    she had smuggled in contraband to an inmate, Keith Outlaw.

8    Citing government's motion *in limine* brief, Docket No. 33 at

9    page 4, and the defendant's motion *in limine* opposition, Docket

10   No. 40 at page 2.

11          Instead of reporting Visitor-1's smuggling in of the

12   contraband, Mr. Adams allegedly told her that she "would be in

13   trouble unless she met him at a nearby pizzeria that evening."

14   Citing the government's motion *in limine* brief, Docket No. 33,

15   page 4.

16          Visitor-1 met Adams that night at the pizzeria, where

17   he instructed her to get into his car.  Adams then drove

18   Visitor-1 to a motel and told her that, if she had sex with

19   him, she could continue to visit the MCC.  Visitor-1 is

20   expected to testify she did not want to have sex with the

21   defendant, but feared that he would report her conduct to law

22   enforcement and that her MCC visiting privileges would be

23   revoked if she did not.  Accordingly, Visitor-1 had sex with

24   Adams at the motel.  *Id.*

25          After the having sex with Adams, Visitor-1 was

1    permitted to continue her inmate visits at the MCC.  In

2    subsequent visits, she again smuggled or attempted to smuggle

3    contraband into the facility.

4        On or about July 26, 2019, Visitor-1 arrived at the

5    MCC to visit inmate Outlaw, but Adams turned her away, saying

6    that there was a risk that Outlaw would get into a fight with

7    another inmate in the visiting room.

8        While escorting Visitor-1 out of the MCC, Adams

9    slapped her buttocks in an elevator and commented that

10   Visitor-1 was having a "dry month," which she understood to be

11   a comment on her inability to get paid for delivering

12   contraband to Outlaw.  *Id.* at page 5.

13       The government has identified two prior statements

14   made by Visitor-1, and two internet searches performed by her,

15   that it argues are consistent with her anticipated testimony,

16   and could be used to rehabilitate Visitor-1's credibility as a

17   witness under Federal Rule of Evidence 801(b)(1)(B).

18       The internet searches are as follows:

19       On July 6, 2019, the day after she had sex with Adams,

20   Visitor-1 conducted several searches which involved various

21   iterations of "Federal Correctional officer Robert Adams."

22   Citing the government's motion *in limine* brief, Docket No. 33

23   at page 5.

24       And on July 7, 2019, Visitor-1 took a screen shot of a

25   press release relating to the prosecution of another MCC

1    corrections officer who had been charged with bribery and

2    smuggling-related offenses.  *Id.*

3         As to the prior statements, in a July 8, 2019 text,

4    Visitor-1 told a friend that something "weird happened to me."

5    Using a racial epithet, Visitor-1 said that this individual

6    "took the condom off."  The friend responded, "What you mean

7    something weird.  He took the pussy?"

8         Visitor-1 wrote in response, "Nah, bribed me.  Then

9    pulled the condom off the last 20 seconds."

10        After the friend asked Visitor-1 who had done this,

11   Visitor-1 responded, "He a officer, federal officer."*Id.*

12        And in a July 26, 2019 text -- the same day that Adams

13   had turned Visitor-1 away from the MCC -- Visitor-1 texted a

14   different friend about her upcoming visit to the MCC.  Before

15   leaving for the MCC, Visitor-1 texted her friend that she was

16   "ready to see" Outlaw at the MCC.  Later that day, Visitor-1

17   texted this friend that she "couldn't see him," and that she

18   was now "broke."

19        The friend asked, "dam the co-[racial epithet] wasn't

20   there?" to which Visitor-1 responded, "Yeah, he was rubbing my

21   butt, talking about he can't get him." *Id.* at pages 5 to 6.

22        Adams has not objected to the government's proposed

23   introduction of Visitor-1's prior statements and Internet

24   searches.  Citing defendant's motion *in limine* opposition,

25   Docket No. 40 at pages 2 through 10.

1          I will nonetheless reserve decision on the

2     government's application as to these internet searches and

3     statements, because their relevance is not clear to me.

4          Based on the defendant's briefing to date, it appears

5     that he will not dispute that he had sex with Visitor-1 after

6     discovering that she had brought in contraband to the MCC.

7     Because it appears that Adams will not deny his encounter with

8     Visitor-1 at the MCC and the sex thereafter, the internet

9     searches about Adams and bribery and smuggling offenses

10     committed by another MCC corrections officer do not appear

11     relevant.  And the press release is likely more prejudicial

12     than probative under Federal Rule of Evidence 403.

13          The July 26, 2019, text message would likewise only

14     become relevant if the defendant denied the July 26, 2019,

15     encounter with Visitor-1.  At this point, I don't have any

16     reason to believe that he will deny that encounter.

17          As to the July 8, 2019, text message, Visitor-1 writes

18     that the "federal officer" "bribed" her.  That is a somewhat

19     confusing reference because the government's theory is that the

20     defendant coerced Visitor-1 into having sex, not that he bribed

21     her into having sex.

22          Because it is not clear to me that the statements and

23     internet searches proffered by the government are relevant, I

24     will reserve decision on the government's motion.

25          The government has moved to preclude Adams from

eliciting that Visitor-1, after having second with other men,

asked those men for money.  Citing the government's motion *in*

*limine* brief at Docket No. 33, page 2.

          According to the government, in text messages with

Adams, Visitor-1 asked him for money.  *Id.* at 10, No. 4.

          Moreover, Visitor-1 took a screen shot of her CashApp

account, which shows that she found the defendant on CashApp

and drafted a money request to him.  There's no evidence the

request was ever sent.  *Id.*

          According to Adams, when investigators asked Visitor-1

about the text message she had sent to him requesting money,

Visitor-1 told the investigators that "she asks boys for money

all the time."  Citing defendant's motion *in limine* brief,

Docket No. 38, page 6.

          Adams seeks to cross-examine Visitor-1 about this

statement and other evidence showing that Visitor-1 has a

practice of asking men, with whom she has had sex, for money.

*Id.*

          Adams argues that such evidence is "crucial to explain

the requests for money that she directed to Mr. Adams." Adams

argues that a refusal to admit such evidence "could give rise

to a false inference -- namely, that there was something out of

the ordinary about Visitor-1's liaison with Mr. Adams that

justified her asking him for money or gave her leverage over

him." *Id.* at 6 to 7.

1      The government, for its part, argues that any evidence

2   that Visitor-1 asked previous sexual partners for money should

3   be excluded under Federal Rule of Evidence 412 and 403.

4   Although the government concedes that evidence that Visitor-1

5   asked Adams for money is an appropriate topic for

6   cross-examination, the government objects to Adams eliciting

7   from Visitor-1 that she has made similar requests of other men

8   with whom she has had sex.  Government motion *in limine* brief,

9   Docket No. 33 at page 10, note 4.

10      Federal Rule of Evidence 412(a) provides that, "in a

11   criminal proceeding involving alleged sexual misconduct," no

12   party may introduce "(1) evidence offered to prove that a

13   victim engaged in other sexual behavior; or (2) evidence

14   offered to prove a victim's sexual predisposition."

15      Although the rule originally applied only to cases in

16   which certain sex offenses were charged, in 1994 it was amended

17   to apply to any proceeding "involving alleged sexual

18   misconduct."

19      The 1994 Amendment Committee Note to Rule 412 explains

20   that:

21      "The strong social policy of protecting a victim's

22   privacy and encouraging victims to come forward to report

23   criminal acts is not confined to cases that involve a charge of

24   sexual assault.  The need to protect the victim is equally

25   great when a defendant is charged with kidnapping, and evidence

is offered, either to prove motive or as background, that the defendant sexually assaulted the victim."

Accordingly, Rule 412 may apply to a criminal proceeding "even where a defendant is not charged with sexual misconduct." Citing *United States v. Doe* 2008 WL 4964615 at *3 (S.D.N.Y. October 21, 2008).

Where Rule 412 is applicable, parties are precluded from eliciting evidence of a victim's previous "sexual behavior" or the victim's "sexual predisposition." The Second Circuit has made clear that these terms are to be interpreted broadly, explaining, for example, that "behavior encompasses activities of the mind, such as fantasies." Citing *Wallock v. Spucci* 217 F.3d 157, 160 (2d Cir. 2000), which in turn is quoting Federal Rule of Evidence 412, 1994 Amendment Committee's note. Moreover, "Rule 412's ban on sexual predisposition evidence includes matters relating to the alleged victim's mode of dress, speech or lifestyle." *Id.*

Rule 412's bar on sexual behavior or predisposition evidence "is not absolute" however. Citing *United States v. Rivera*, 799 F.3d 180, 184 (2d Cir. 2015). Indeed, Rule 412(b) "makes explicit that evidence whose exclusion would violate the defendant's constitutional rights should be admitted," *id.*, which in turn is quoting Federal Rule of Evidence 412(b)(1)(C). "The constitutional rights contemplated by this exception include the accused's rights under the Sixth Amendment to

confront a witness," *id.*, including "by impeaching the
credibility of a prosecution witness by cross-examination." *Id.*
at 185.

Accordingly, in a criminal case, where proffered
evidence falls within the scope of Rule 412, courts must
balance the relevance of the evidence in effectively
cross-examining the victim against the harm that Rule 412 seeks
to protect against -- namely, "invasion of privacy, potential
embarrassment and sexual stereotyping that is associated with
disclosure of intimate sexual details." *See Id.* at 184-185.

Even if evidence of a victim's other sexual behavior
or sexual predisposition is not barred by Rule 412, it may, of
course, be excluded under Rule 403 as substantially more
prejudicial than probative. *See, e.g., United States v.
Graham*, 2013WL 321568 *3 (W.D.N.Y., January 28, 2013)
(explaining that even if evidence of a victim's sexual behavior
provides some basis for impeaching a witness, it is still
subject to exclusion under Rule 404).

As a preliminary matter, Adams argues that Rule 412
does not apply here because he's not charged with "sexual
misconduct" and Visitor-1 is not the "victim" of "sexual
misconduct" within the meaning of Rule 412.  Citing defendant's
motion *in limine* brief, Docket No. 38 at page 7, note 2.

But Count Two charges that Adams used blackmail to
coerce Visitor-1 into having sex.  According to the government,

1  Adams "under a threat of informing, or as consideration for not

2  informing, against any violation of any law of the United

3  States" -- "demanded or received" a thing of value.  Citing 18

4  United States Code, Section 873.

5       Here, that thing of value was sex.  The government's

6  theory is that Visitor-1 is the "victim" of Adams' alleged

7  blackmail in that he demanded sex from Visitor-1 in exchange

8  for not reporting her violation of federal law.  Adams' conduct

9  can thus be fairly described as "sexual misconduct."

10       And, as I noted earlier, Rule 412 is no longer limited

11  to criminal proceedings in which the defendant is charged with

12  a sex crime.  *See Doe* 2008 WL 4696415 at *3.

13       I conclude that this case involved alleged sexual

14  misconduct and that Visitor-1 is an alleged victim of sexual

15  misconduct for purposes of Rule 412.

16       I further conclude that evidence that Visitor-1 sought

17  money from other men with whom she had sex constitutes evidence

18  of her "sexual behavior" or "sexual predisposition."

19       Adams contends that if he refers to Visitor-1's other

20  sexual partners as "boyfriends" or as "men she was dating,"

21  Rule 412 would become inapplicable.  According to Adams, use of

22  these terms would "leave ambiguous whether those relationships

23  were of a sexual nature."  Citing defendant's motion *in limine*

24  brief, Docket No. 38 at page 6.

25       This argument is not persuasive.

1    It seems likely that if I were to permit defense

2    counsel to examine Visitor-1 about her conduct with other

3    "boyfriends" or dating partners, including that she requested

4    money from them, the jury would likely conclude -- based on her

5    conduct with Adams -- that these relationships involved sex.

6    Accordingly, the solution proposed by defense counsel is simply

7    an improper device to evade Rule 412's restrictions on asking

8    an alleged victim about other sexual relationships.

9    In sum, I conclude that Rule 412 prohibits the

10    questioning of Visitor-1 as to whether she requested money from

11    other sexual partners, "boyfriends," or dating partners.

12    Adams argues, however, that even if the proffered

13    evidence about Visitor-1's sexual behavior is prohibited by

14    Rule 412(a), it still should be admitted under the exception

15    set forth in Rule 412(b)(1)(C) for evidence whose exclusion

16    would violate the defendant's constitutional rights.  Citing

17    defendant's motion *in limine* brief, Docket No. 38 at page 7.

18    This argument is likewise not persuasive.

19    While Adams has a Sixth Amendment right to confront

20    the government's key witness and present a complete defense at

21    trial, precluding evidence that Visitor-1 asked men with whom

22    she had had sex for money will not impinge on Adams' Sixth

23    Amendment rights.

24    As an initial matter, Adams will be permitted to

25    cross-examine Visitor-1 about her texts to Adams in which she

asks for money, along with the screen shot of her draft CashApp

request to Adams.  Adams will therefore be able to use this

evidence to argue that Visitor-1 and Adams had a relationship

that went beyond the quid pro quo alleged by the government in

which Visitor-1 provided sex to Adams in exchange for him not

reporting her misconduct and allowing her to continue her

visits to the MCC.

           Moreover, Visitor-1's requests for money from other

men appear to have little probative value.  Adams claims that

he would use this conduct to rebut an inference that the

encounter between him and Visitor-1 was "out of the ordinary"

or that Visitor-1 believed that she had somehow had leverage

over Adams.  *Id.* at pages 6 to 7.

           These arguments are not persuasive.

           To the extent that Adams intends to argue that it is

normal or typical for a woman to request money from someone

with whom she has had sex, it is not.  To the contrary, this

evidence would suggest that Visitor-1 is, in effect, a

prostitute -- someone who trades sexual favors for money.

           To the extent that Adams wishes to argue that it was

not "out of the ordinary" for Visitor-1 to request money from

men with whom she has had sex, this evidence is of little

probative value, because here Adams already has evidence

available to him suggesting that Visitor-1 was attempting to

trade sexual favors for money -- namely, Visitor-1's request

for money to Adams and the draft CashApp request.  There is
also evidence that Visitor-1 sent Adams several sexually
charged messages and images without his prompting.  *See*
government's motion *in limine* opposition, Docket No. 39 at page
3.

Adams thus already has ample evidence to (1) attack
Visitor-1's account of the alleged sexual coercion and quid pro
quo relationship between her and Adams; and (2) to argue that
the two were merely engaged in a consensual relationship
predicated either on romantic interest or a commercial sex
transaction.

In sum, allowing Adams to introduce evidence that
Visitor-1 requested money from other men with whom she had had
sex would risk causing the precise harm to alleged victims that
Rule 412 is designed to prevent:  The "public disclosure of
intimate sexual details and the infusion of sexual innuendo
into the fact-finding process."  Citing *Spucci*, 217 F.3d at
160, which in turn is quoting Federal Rule of Evidence 412,
1994 Amendment Committee's note.  This proposed evidence has
little bearing on Adams' ability to present his defense and
effectively cross-examine Visitor-1, and would encourage the
jury to speculate about Visitor-1's sexual history.

Finally, even if Rule 412 did not forbid introduction
of this proposed evidence, it would be excluded under Rule 403.
As I have noted, given the other evidence suggesting that Adams

1    and Visitor-1 had a consensual relationship, the evidence of

2    Visitor-1's requests for money from other men with whom she had

3    had sex has little probative value.  While the proposed

4    evidence has little probative value, it has the potential to

5    cause significant unfair prejudice.  As I have noted, the

6    proposed evidence suggests that Visitor-1 is in effect a

7    prostitute and is trading sex for money.  The issue before the

8    jury, however, is the nature of her relationship with Adams,

9    and not her interactions with other men.

10        In sum, the government's motion *in limine* to exclude

11    evidence of Visitor-1's requests for money from other men with

12    whom she had sex is granted pursuant to both Federal Rule of

13    Evidence 412 and Rule 403.

14        The government has moved to exclude both expert and

15    lay testimony from Maureen Baird.  Citing the government's

16    motion *in limine* brief, Docket No. 33 at page 3.

17        Baird served as the warden of the MCC between June

18    2014 and December 2015.  In an expert witness notice, Adams

19    says that Baird will testify about "the physical state of and

20    working conditions at the MCC and procedures relating to

21    reporting contraband found on inmates and the creation of

22    incident reports."  Citing the government's motion *in limine*

23    brief, Docket No. 33, Exhibit A.

24        In his opposition to the government's motion *in limine*

25    Adams states that Baird will testify that:

"(1) working conditions at the MCC were exceptionally poor and had a direct impact on correctional officers' morale and behavior;

"(2) working conditions deteriorated after Baird's promotion to another federal correctional facility and by mid 2019 were extremely bad;

"(3) chronic understaffing throughout the BOP and particularly at the MCC resulted in MCC correctional officers' routinely being required to back-to-back shifts; and

"(4) double shifts at the MCC were assigned by the lieutenant for a short-handed shift by grabbing correctional officers from the previous shift who had not yet left the facility."

Citing the defendant's motion *in limine* opposition, Docket No. 40 at page 5.

According to Adams, this testimony is relevant to his state of mind in not reporting that Visitor-1 had smuggled contraband into the MCC. *Id.* at pages 6 to 7.

Adams claims that Baird's testimony will demonstrate that his failure to report Visitor-1's misconduct was not motivated by an intent to coerce her into having sex. Instead, Adams claims that he did not make the report because he was worried that -- if he prepared an incident report concerning Visitor-1's misconduct -- he would be pressured to work another shift. *Id.* at page 7.

1          The government moves to preclude Baird's testimony on

2     several grounds.

3          As an initial matter, the government argues that

4     Adams' expert notice is deficient under Federal Rule of

5     Criminal Procedure 16(b)(1)(C) because Adams does not disclose

6     the actual testimony or opinions Baird will offer.  Citing the

7     government's motion *in limine* brief, Docket No. 33 at pages 17

8     to 18.

9          The government further argues that Adams is improperly

10    trying to prove his state of mind through Baird's testimony and

11    notes that, in any event, Baird left the MCC in December 2015

12    and Adams' alleged crimes took place in July of 2019.  Citing

13    the government's *Daubert* letter, Docket No. 42 at pages 4 to 5.

14         Finally, the government argues that Baird's proposed

15    testimony regarding working conditions and double shifts at the

16    MCC is not outside the ken of the average juror and is

17    therefore not an appropriate subject matter for expert

18    testimony under Federal Rule of Evidence 702(a).  *Id.* at pages

19    1 to 3.

20         As to Baird providing lay witness testimony regarding

21    working conditions at the MCC in July 2019, the government

22    repeats that, because Baird left the MCC in December 2015, she

23    is not competent to testify as to conditions at that facility

24    in July 2019.  Citing government's motion *in limine* brief,

25    Docket No. 33 at pages 19 to 20.

1          In opposing the government's motion to preclude, Adams

2     argues that:

3          (1) his expert disclosure complied with Federal Rule

4     of Criminal Procedure 16(b)(1)(C);

5          (2) Baird's expected testimony is properly

6     characterized as expert testimony because most jurors are not

7     familiar with the inner workings of the MCC; and

8          (3) Baird has relied on her contacts at the MCC in

9     forming her opinions about the conditions at the MCC in July

10    2019, and expert witnesses are permitted to rely on such

11    hearsay in offering expert testimony.  Citing defendant's

12    motion *in limine* opposition, Docket No. 40 at pages 4 through

13    8.

14         I will begin with the issue of notice under Federal

15    Rule of Criminal Procedure 16(b)(1)(C).  That rule provides

16    that a defendant wishing to offer expert testimony at trial

17    must "give to the government a written summary of any testimony

18    that the defendant intends to use under Rules 702, 703, or 705

19    of the Federal Rules of Evidence."  "This summary must describe

20    the witness's opinions and the bases and reasons for those

21    opinions and the witness' qualifications."  Citing *United*

22    *States v. Ulbricht*, 858 F.3d 71, 114 (2d Cir. 2017), which in

23    turn is quoting Federal Rule of Criminal Procedure 16(b)(1)(C).

24    Expert disclosures under Rule 16 are lacking where they "merely

25    list general and extremely broad categories on which the

1    experts might opine."  Citing *Id.* at 115.

2            Defects in notice may be cured in supplemental

3    briefing, however, where such briefing "discloses the opinions

4    that the expert intends to offer.  *See id.*

5            Adams' initial disclosure -- in the form of a

6    September 25, 2021, letter -- provides only generalized

7    information about Baird's expected testimony.  But in his

8    opposition to the government's motions *in limine*, Adams goes

9    into considerably more detail regarding the opinions he expects

10   Baird to offer, including that, by 2019, the working conditions

11   at the MCC had deteriorated and that correctional officers were

12   regularly required to perform double shifts.  *See* defendant's

13   motion *in limine* opposition, Docket No. 40 at page 5.

14           I conclude that with the additional material provided

15   in defendant's opposition brief, Adams has satisfied his notice

16   obligation under Federal Rule of Criminal Procedure

17   16(b)(1)(C).

18           I will now address whether Baird's proposed testimony

19   constitutes proper expert testimony under Federal Rule of

20   Evidence 702.

21           Federal Rule of Evidence 702 provides that "a witness

22   who is qualified as an expert by knowledge, skill, experience,

23   training, or education may testify in the form of an opinion or

24   otherwise" only where:

25               (a) the expert's scientific technical or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Citing Federal Rule of Evidence 702.

As part of a district court's gatekeeping role under Rule 701, "a Court must ensure the reliability and relevancy of expert testimony presented to a jury." Citing *United States v. Mendlowitz* 2019 WL 6977120 at *4 (S.D.N.Y., December 20, 2019). Expert testimony is properly excluded under Rule 701 if it is "directed solely to lay matters which a jury is capable of understanding and decided without expert's help." Citing *United States v. Castillo*, 924 F.2d 1227 at 1232 (2d Cir. 1991). Indeed, "a district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." Citing *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).

Here, I conclude that Baird's proposed testimony is inadmissible as expert testimony. Adams claims that Baird

should be permitted to offer an opinion concerning Adams' state
of mind when he failed to report that Visitor-1 had brought
contraband into the MCC for an inmate.  According to Adams, he
failed to report Visitor-1's misconduct merely because he
feared that completing an incident report would lead to him
being asked to work another shift.  Citing defendant's motion
*in limine* opposition, Docket No. 40 at pages 6 to 7.

Federal Rule of Evidence 704, however, expressly
prohibits an expert witness such as Baird from "stating an
opinion about whether the defendant did or did not have a
mental state or condition that constitutes an element of the
crime charged or of a defense" because "those are matters for
the trier of fact alone."

Although Adams proffers that Baird will testify that
"everyone at the MCC was aware that officers who remained in
the facility after the conclusion of their shifts ran the risk
of being required to stay for another eight hours" -- citing
defendant's *Daubert* letter, Docket No. 43 at page 3 -- this
testimony has no bearing on what was actually going through
Mr. Adams' mind when he decided not to report Visitor-1's
misconduct.

*United States v. Martoma* is illustrative on this
issue.  In that case the defendant sought to introduce expert
testimony to prove his state of mind, arguing that the expert's
opinion constituted circumstantial evidence about whether he

had the necessary state of mind to commit securities fraud.

Citing *United States v. Martoma*, 993 F.Supp.2d 452, 455

(S.D.N.Y. 2014).  Martoma claimed that his expert witness would

testify that the market was "overheated" for the particular

stock he was alleged to have traded using nonpublic

information, and that there was therefore little upside for

trading in the stock when Martoma traded it.  *See Id.* at 454.

I granted the government's motion to exclude the

expert testimony on the grounds that the expert's "post hoc

conclusion that the market for the [traded] stock was in fact

overheated in July 2008 would not assist the jury in

determining whether Martoma himself believed that the stock was

overheated at that time.  *Id.* at 455 to 456.

The same rationale applies here.  Even if Baird were

to testify that working conditions at the MCC were abysmal in

2019 and that correctional officers feared being asked to work

a double shift if they stayed beyond their first shift, this

testimony would not assist the jury in assessing whether it was

this concern that motivated Adams' decision not to report

Visitor-1's misconduct.  In sum, Baird's proposed testimony is

not probative of Adams' state of mind in July 2019, and is thus

irrelevant.

Even if Baird's proposed testimony could shed light on

Adams' state of mind -- which it does not -- it would still not

be an appropriate subject for expert testimony.  As I noted

earlier, expert testimony is appropriate only where its subject matter is beyond the ken of the average juror.  Here, Baird's testimony is "directed solely to lay matters which a jury is capable of understanding without the expert's help."  Citing *Castillo*, 924 F.2d at 1232.  While it is true that the general public may not be aware of working conditions at the MCC -- such as the prevalence of double shifts or the methods by which double shifts are assigned -- such information could be conveyed by a lay witness without any expert training and still be easily understood by a jury.  Such routine fact testimony about the day-to-day operations of a workplace plainly fall outside the scope of Rule 702(a).  *See, e.g.*, *Pfeiffer v. Lewis County* 308 F.Supp.2d 88, 96 (N.D.N.Y. 2004)(holding that proposed testimony about the "job descriptions" and "responsibilities" of state correctional officers did not qualify as expert testimony because "there was nothing complicated about the evidence such that it would be helpful to have assistance from an expert.")

        In sum, Baird's proposed testimony (1) will not shed light on Adams' state of mind in deciding not to report Visitor-1's misconduct and (2) is not an appropriate subject for expert testimony.  Accordingly, the government's motion *in limine* to preclude Baird from testifying as an expert witness is granted.

        Given my ruling on this issue, the government's

application for a *Daubert* hearing concerning Baird's

qualifications to serve as an expert witness regarding

conditions at the MCC in 2019 (*See* government *Daubert* letter,

Docket No. 42 at page 3) is denied as moot.

As to Adams' argument that Baird should be permitted

to testify as a lay witness, that argument is likewise

unpersuasive.

While experts are permitted to rely on hearsay if

"experts in the field reasonably rely on such evidence in

forming their opinions," *United States v. Locasio* 6 F.3d 924,

938 (2d Cir. 1993), the same is not true of lay witnesses.

Instead, "a lay opinion must be rationally based on the

perception of the witness." Citing *United States v. Glenn*, 312

F.3d 58, 67 (2d Cir. 2002).

Here, Baird left her position at the MCC in December

2015. Accordingly, any firsthand knowledge she had of the

working conditions at the MCC was stale by July 2019, when

Adams committed his alleged crimes. Although Adams asserts

that Baird's current opinions about the working conditions at

the MCC are based on an unidentified individual with whom she

has maintained contact since leaving the MCC, (*See* defendant's

motion *in limine* opposition, Docket No. 40 at page 8) if she

were to testify as a lay witness she would not be permitted to

rely on hearsay accounts offered by former coworkers.

Because Baird's proposed testimony is not admissible

either as expert opinion or lay testimony, the government's motion to exclude Baird as a witness is granted.

The government has moved to exclude all evidence of working conditions at the MCC -- whether introduced through Baird or any other witness.  Citing the government's motion *in limine* brief, Docket No. 33 at page 3.

The government also appears to seek exclusion of any testimony "regarding the wisdom or efficacy of policies requiring federal correctional officers to report contraband smuggling." *Id.* at page 21.

The government contends that evidence regarding work conditions at the MCC, and policies regarding the reporting of contraband, is irrelevant under Federal Rule of Evidence 401 and substantially more prejudicial than probative under Federal Rule of Evidence 403*.  Id.*

As an initial matter, it is not clear that Adams seeks to introduce evidence concerning the wisdom of the MCC's contraband reporting policies.  To the extent that he does, such evidence would appear to be improper, since the Second Circuit has made clear that arguments "suggesting that everybody did it and therefore it isn't illegal" are "properly proscribed" because they do not bear on a defendant's guilt or innocence.  Citing *United States v. Litvak*, 808 F.3d 160, at 189 to 190 (2d Cir. 2015).  Accordingly, to the extent that Adams seeks to introduce testimony questioning the wisdom or

efficacy of the MCC's policies regarding contraband, the
government's motion *in limine* to preclude such evidence is
granted.

As to the government's motion to preclude all evidence
regarding Adams' working conditions at MCC in 2019, however,
that motion is denied.  While, for the reasons I have
explained, Baird is not an appropriate witness to testify about
working conditions at the MCC in July 2019, Adams himself has
personal knowledge about these matters.  Moreover, testimony
from Adams concerning his desire to avoid working a double
shift appears to go to his state of mind in failing to file an
incident report concerning Visitor-1's misconduct.

Adams claims that his failure to report Visitor-1's
misconduct was not motivated by a desire to coerce Visitor-1
into having sex with him.  According to Adams, his failure to
file an incident report was motivated by his desire to avoid
being saddled with a double shift.  Citing defendant's motion
*in limine* opposition, Docket No. 40 at page 7.

The prevalence of double shifts at the MCC;
supervisors' alleged practices of assigning a second shift to
officers who stayed at the facility after completing a shift;
and practices regarding the preparation of incident reports are
relevant to Adams' state of mind and his motivation for not
reporting the contraband.  For reasons already discussed,
however, this evidence must come through Adams, because only

1    Adams can testify as to his state of mind.

2            To the extent that Adams seeks to introduce evidence

3    about general disrepair at the MCC, for example, "feces on the

4    floor from broken pipes" (*See Id.* at 8) such evidence is

5    irrelevant because it has no bearing on Adams' motivation for

6    not filing an incident report.

7            In sum, the government's motion *in limine* is granted

8    in part and denied in part as to the evidence regarding Adams'

9    workings conditions at the MCC.

10           I will now turn to Adams' motions *in limine*.

11           Adams' motions are either moot or have been addressed

12   in connection with my rulings concerning the government's

13   motions.

14           Adams seeks to preclude testimony that Joy Aassiddaa,

15   an MCC employee, cried after being told by Visitor-1 that Adams

16   forced Visitor-1 to have sex with him.  Citing defendant's

17   motion *in limine* brief, Docket No. 30 at page 2.

18           The government has agreed not to offer such testimony

19   at trial.  Citing government's motion *in limine* brief Docket

20   No. 39, page 4.

21           Accordingly, Adams' motion *in limine* is denied as moot

22   with respect to this issue.

23           Adams has moved *in limine* for permission to question

24   Visitor-1 about her previous requests for money from boyfriends

25   or other men she was dating with whom she had sex.  Citing

1    defendants' motion *in limine* brief, Docket No. 38 at page 2.

2          As I explained earlier, such evidence is inadmissible

3    under Federal Rule of Evidence 412 and 403.  Accordingly,

4    Adams' motion *in limine* is, as to this request, denied.

5          Adams has also moved to preclude testimony that

6    Visitor-1 observed Adams' service firearm in the glove

7    compartment of his car.  *Id.*

8          The government has agreed not introduce evidence on

9    this point, unless "the defendant opens the door by, for

10   example, arguing that he did not reinforce the fact that he was

11   an official actor while he drove Visitor-1 to a motel to have

12   sex with him."  Citing the government's motion *in limine*

13   opposition, Docket No. 39 at page 4.

14          I am not sure what arguments Adams will make at trial,

15   but at this stage it does not appear that he will dispute his

16   authority as a correctional officer working at the MCC.

17   Moreover, the government has not alleged that Adams threatened

18   Visitor-1 with his service firearm or that he otherwise

19   physically coerced Visitor-1 into having sex with him.

20   Accordingly, the probative value of the firearm would appear to

21   be very slight while the risk of unfair prejudice flowing from

22   admission of the firearm would appear to be great.

23          For present purposes, Adams' motion *in limine* is, as

24   to this issue, denied as moot.  If at trial the government

25   believes that Adams has offered evidence that renders the

firearm probative, the government will make an application to
the Court for admission of such evidence before making any
reference to the gun.

         I am going to turn to the subject of jury selection.
As the parties know, we will proceed with jury selection on
Wednesday morning.  I am available to meet with the parties
Wednesday morning at 9:30 to discuss any last-minute issues, so
let's plan on meeting in this courtroom at 9:30 that morning,
Wednesday morning.

         Jury selection will begin in the vicinity of 10:15 or
so and will take place in the jury assembly room on the first
floor of 500 Pearl Street.  Once notified that the jury panel
is ready for us, we will proceed to Room 120, the clerk's
office, where we will line up to enter the jury assembly room.
Counsel will meet the jury department staff prior to coming to
down to the clerk's office to line up so that the jury
department staff can show counsel where they'll be seated.

         As you know, I have decided to use a jury
questionnaire.  I have provided the draft questionnaire to
counsel this morning.

         Do the parties have any comments on the questionnaire?

         MR. SCHAEFFER:  Just one clarifying question and then
one comment, your Honor.

         The jury questionnaire is dated October 27, 2021.
Does that mean that this questionnaire will be provided in the

1   morning on Wednesday, and then the jurors will leave and come

2   back on Thursday morning?

3           THE COURT:  That was my hope.  However, I have been

4   told that there is no room available on Thursday.  So, sadly,

5   what we are going to have to do is distribute the jury

6   questionnaire on Wednesday morning and then tell the jury panel

7   to come back on Friday.  I am sorry to have to do that, but the

8   difficulty is we have a limited number of rooms available large

9   enough to hold the panel consistent with our COVID-19

10  protocols.

11          We had planned on using the ceremonial courtroom on

12  the 9th floor at 500 Pearl for that purpose, but I was told

13  today that another judge has a fairness hearing scheduled for

14  11 o'clock in that courtroom, and he's unwilling to move it.

15  So we don't have access to the ceremonial courtroom on the

16  ninth floor, and we have no other room that's large enough

17  available to hold the jury panel.

18          The jury assembly room itself on Thursday is going to

19  be used as an overflow room for the fairness hearing.  This was

20  unexpected, but I haven't been able to find a solution for the

21  problem.

22          So we are going to distribute the jury questionnaires

23  Wednesday morning.  We will meet Wednesday afternoon to go over

24  the questionnaires and try to reach agreement on the jury panel

25  members that should be excused based on their answers to the

1    questionnaire.  Then we will pick up with the voir dire Friday

2    morning 9:30.

3            MR. SCHAEFFER:  The only clarifying comment that we

4    had was to suggest that, to the extent it would more

5    efficiently use the court's time, it might make sense, given

6    the span of time, to introduce some more of the more standard

7    voir dire questions into the jury questionnaire -- for

8    instance, if they knew any of the parties or things like

9    that -- in order to minimize the amount of time we would have

10   to spend on those standard questions on the individual voir

11   dire on Friday.

12           THE COURT:  Well, I have two responses.  One, my

13   preference is to do as much of the voir dire as possible in

14   public and not by way of questionnaire.  Secondly, if you think

15   there are questions that are likely to provoke responses, I'm

16   certainly willing to consider adding them to the questionnaire.

17   The one example you gave does not strike me as one that's

18   likely to be an issue.  There may be others, I don't know, but

19   I don't think there's much chance that a lot of jurors are

20   going to say they know Mr. Adams or they know other people

21   whose names will be mentioned at the trial.

22           MR. SCHAEFFER:  I think that's right, your Honor.  I

23   think the government's view is that this may not be a case

24   where it's so complex that the jury questionnaire itself is

25   necessary.  But to the extent we proceed with it, we were just

suggesting moving some of the questions over.  That said, we're happy to proceed however it makes sense to the Court.  We don't think there are any questions here that will provoke such a reaction among the jurors that it can't be dealt with individually in the regular voir dire process.

THE COURT:  The reason why I'm using the questionnaire -- I certainly agree it's not a complex case. The reason why I was inclined to use the questionnaire is that I have had cases in the past which have involved allegations of sexual abuse or reference to sexual abuse, and I will tell you that it was staggering to me the percentage of the panel that had had such an experience.

And what I anticipate, if I don't use a questionnaire, is that I will spend a significant amount of time at the bench questioning people about intimate matters that they would prefer not to talk about.  That's why I'm inclined to do it by way of questionnaire.  So that's the logic.

It is not my habit to use questionnaires.  I reserve them for cases that have received significant public attention and in cases where there's something about the subject matter that might be sensitive for people in the jury panel.  That is the reason for the use of the questionnaire.

MR. SCHAEFFER:  I think we defer to the Court's experience in that regard, and we have no comments on the questionnaire itself.

1        THE COURT:  All right.  Do defense counsel have

2    comments on the questionnaire.

3        MR. GREGORY:  No, your Honor.

4        THE COURT:  All right.

5        Now let me turn to just the logistics of this.

6        We are only allowed to have 42 members of the panel in

7    the jury assembly room, 42.

8        The rest of the panel will be seated in an overflow

9    room and will watch the proceedings in the jury assembly room

10   by video.  If, as a result of excusing people in the jury

11   assembly room, I don't have enough jurors to complete the jury

12   selection process, I will have to restock the chairs in the

13   jury assembly room by bringing people in from the overflow room

14   and pose the same questions to them that I posed in qualifying

15   the first 42.

16       As I said, we will be proceeding in the jury assembly

17   room in 500 Pearl.  For purposes of the actual trial, we will

18   be sitting in Courtroom 26B in 500 Pearl.

19       Can I ask the lawyers how long they expect the trial

20   is going to take once we've completed jury selection?

21       MR. SCHAEFFER:  Yes, your Honor.  From the

22   government's perspective, I think it's right that we're sitting

23   9:30 to 2:30 each day.  We expect the government's case would

24   take approximately three days sitting during that period.  We

25   understand that there may be a defense case, so it may take a

1    few days after that.

2        THE COURT:  All right.

3        Does the defense counsel agree with that estimate?

4        MR. GREGORY:  Your Honor, my guess would be two and a

5    half days if we work from 9:30 to 2:30 as proposed.

6        THE COURT:  So it sounds like I would be safe in

7    telling the panel that the trial is expected to take a week or

8    possibly less.

9        Does that seem safe?

10        MR. SCHAEFFER:  I think that's right, your Honor.

11        MR. GREGORY:  Yes, your Honor.

12        THE COURT:  Okay.

13        So it is my intention to sit 9:30 to 2:30.  The trial

14    I have been engaged in the past two weeks we sat 9:30 to 2:30.

15    There were some days I took two breaks.  There were other days

16    I only took one break.  It all depended on where we were in

17    terms of the witness testimony.  The 9:30 to 2:30 schedule

18    seemed to work well.

19        As counsel is aware, it's difficult to try a case

20    under these circumstances, and I think it's easier for the

21    jury, the 9:30 to 2:30 day.  We will, of course, be picking a

22    jury of 12.  We will have three alternates.

23        The government will have six peremptory challenges as

24    to the jury of 12; Mr. Adams will have ten.  We will then

25    select three alternates.  Each side will have two peremptory

1    challenges as to the alternates.

2            After I have qualified enough jurors to complete the

3    process, I will ask you to come up to sidebar and inquire

4    whether there are any challenges for cause.  I will then ask

5    you to prepare a list of jurors against whom you wish to

6    exercise peremptory challenges.  You are going to have to keep

7    track during the questioning of the jury panel members, those

8    against whom you wish to exercise peremptory challenges.

9            Prepandemic I would have taken a break to give you

10   time to prepare your lists of jurors against whom you wish to

11   exercise peremptory challenges, but the jury staff has told me

12   it's not practical to take a break given the circumstances,

13   because of difficulties in reconvening the panel, making sure

14   everybody is sitting in the right chair, etc.  Accordingly, I

15   will ask you to move expeditiously in preparing your lists of

16   the jurors against whom you will exercise peremptory

17   challenges.

18           Your lists will be submitted simultaneously.  Once I

19   have your lists I will read them to you.  If the same juror

20   appears on both the government list and the defense list, it

21   will simply mean that he or she is excused by both sides.

22           Once we have agreed upon the 12 lowest numbered jurors

23   who have survived the process, we will then turn to the

24   selection of alternates.  You will simultaneously submit the

25   list of the two jurors against whom you wish to exercise

 1    peremptory challenges.  We will then agree on the three lowest

 2    numbered jurors who have survived the alternate process, and

 3    those individuals will be our alternate jurors.

 4            You may have logistical questions about the jury

 5    selection process.  If you do, please take them up with my

 6    deputy, Mr. Ruocco, who ordinarily would be in the courtroom,

 7    but he is across the street with the other jury.

 8            Any questions about jury selection?

 9            MR. TAYLOR:  Your Honor, my apologies.  Could you

10    repeat how we are supposed to communicate challenges for cause

11    to the Court.

12            THE COURT:  Yes.

13            So, as I said, after I've qualified what I deem to be

14    an adequate number to complete the jury selection process, I

15    will ask counsel to come to the bench.  I will then ask you

16    whether you have any challenges for cause, and I will rule on

17    challenges for cause.

18            I will then ask both sides to simultaneously submit

19    lists of the jurors against whom they wish to exercise

20    peremptory challenges.  The defendant has ten peremptory

21    challenges; the government has six.

22            Assuming that both sides choose to exercise all their

23    peremptory challenges, I will receive a list of ten panel

24    members from the defense and a list of six panel members from

25    the government.  Those lists will be submitted simultaneously.

1    I will then read off the names and numbers of the jurors on

2    both lists.  We will tell you who are the 12 lowest numbered

3    jurors who have survived the process, and they will become the

4    jury of 12.

5           We will then turn to the selection of alternates.  As

6    I said, we will have three alternates, and each side will have

7    two peremptory challenges as to the alternates.  So each side

8    will prepare a list of the two panel members against whom they

9    wish to exercise peremptory challenges, and those lists of two

10   will be submitted simultaneously.  I will read the names and

11   numbers to you, and then we will tell you who the three lowest

12   numbered jurors are who have survived the process, and they

13   will become our Alternate Jurors 1, 2 and 3.

14          Is that clear?

15          MR. TAYLOR:  Yes.  Thank you, your Honor.

16          THE COURT:  For the voir dire, we do need a list of

17   names that counsel knows might come up at trial.  We'll need to

18   include those names in the list.  If you can get me that list

19   by say tomorrow at noon that will be helpful.

20          Sometimes a person has a common name.  If so, it would

21   be helpful if you could give me some sense of what their role

22   is in this or some other identifying information so that if

23   there's a John Smith in the list I can help the jurors

24   understand whether they would know the John Smith who is in the

25   list.

1            Has the 3500 material been provided?

2            MR. SCHAEFFER: It has your Honor. The government

3      also has binders of exhibits and 3500 for the Court. We're

4      happy to give them to you here or we can deliver them to

5      chambers, whichever is easier.

6            THE COURT: We'll take them with us. Thanks.

7            Are there other matters the lawyers want to raise?

8            MR. SCHAEFFER: A quick scheduling matter, your Honor.

9            On Friday, I assume that we are following the same

10     procedure of meeting here and going over to the jury assembly

11     room.

12           THE COURT: Yes. Well, I suppose there's no need for

13     that unless there's something to talk about. If there is

14     something to talk about, I'm happy to meet with you here. If

15     you don't tell me there's something to talk about, we should

16     just meet there at 9:30.

17           MR. SCHAEFFER: Certainly, your Honor. And then on

18     Friday, would it be the Court's plan to proceed with openings,

19     and should the government have its first witness ready?

20           THE COURT: I think it's reasonable to think that

21     openings might take place on Friday. You know, it's just hard

22     to predict how quickly the jury selection process is going to

23     go.

24           Let me ask you this: How long do the lawyers expect

25     the openings are going to be? Half an hour or less?

1          MR. SCHAEFFER:  We are not sure about the defense

2     counsel, your Honor, but we expect ours to be about 15 minutes

3     from us.

4          THE COURT:  What about defense counsel?

5          MR. GREGORY:  15 minutes, your Honor.

6          THE COURT:  Okay.  So, because the openings are so

7     short, yes, I think you should plan on having a witness

8     available, because it's possible that we'll get through jury

9     selection quickly enough.  Given the brevity of the openings,

10    it's quite possible that we would get into hearing testimony on

11    Friday.

12         Other questions?

13         MR. TAYLOR:  Your Honor, there are certain exhibits

14    which we made a lot of progress with the government, but we

15    have not agreed as to admissibility on them.  So I imagine that

16    the Court would appreciate that we queue up some of these

17    issues.

18         THE COURT:  Absolutely.  Can you give me a sense now

19    of what they are?

20         MR. TAYLOR:  Yes.

21         So one category is that there are a series of text

22    messages between Mr. Adams and Ms. Harris after July 5, 2019,

23    which is the date of the liaison.  The government has prepared

24    an exhibit that is a subset of those.  Our view is that the

25    entirety of those messages should come in.  We are disagreeing

regarding the relevance, whether 403 should exclude some of
those and the hearsay rule.  So, I mean, you know, that's where
our difference of opinion is.

THE COURT:  All right.  Well, it sounds like what you
are suggesting is that these messages would come in in the
absence of Mr. Adams' testifying, right?

Is that the scenario that you are suggesting?

MR. TAYLOR:  Well, that is a scenario.  But regardless
of whether Mr. Adams testifies, our view is that these messages
as a whole are relevant to their relationship and shed light on
what preceded those messages.

THE COURT:  The problem is that the vehicle for
admitting them in the absence of Mr. Adams would be an argument
relying on the rule of completeness.  In other words, to
understand the text messages that the government is going to be
introducing, the jury in fairness needs to see the other text
messages.  I of course have no way at this point of knowing
whether that is true.

It is a demanding standard, because essentially the
adversary has to argue that the jury would be misled if all it
saw was the text messages introduced in this case by the
government, that there would be like a misimpression if they
didn't see those other text messages that you want to
introduce.

So what I would say to you is obviously you should

1    continue your discussions with the government, but you should

2    tee up the issue pretty quickly by laying before me the text

3    messages that you are interested in introducing and telling me

4    why that's appropriate.  Then obviously the government would

5    need to respond.

6            When do you think you will be in a position that you

7    could do that?

8            MR. TAYLOR:  We can get you a letter no later than

9    tomorrow close of business, your Honor.

10           THE COURT:  Okay.

11           Does the government have anything it wishes to say

12   about this issue concerning the text messages?

13           MS. BHASKARAN:  No, your Honor, we will respond to the

14   defense's letter, if we are going to get it by the close of

15   business tomorrow, which is Tuesday, we would suggest by midday

16   Thursday for a response by the government.

17           THE COURT:  How many text messages are we talking

18   about?

19           Let me ask defense counsel.

20           Can you give me a sense of globally what we are

21   talking about here?

22           MR. TAYLOR:  It is no a huge number, your Honor.  It

23   depends on the presentation.  So, for instance, the way that

24   the defense is presenting these messages is from photographs

25   that were taken of Ms. Harris' phone when she was questioned.

1    So there are 22 of those photographs.  So you can imagine that

2    each screen shows about five or six messages and then there

3    will be some overlap before you get to the next image so that

4    you are seeing a continuous whole.  So if I had to guess, I

5    would say somewhere around maybe a hundred messages in total,

6    many of which are very short, you know, just a couple of

7    letters or an emoji or something like that.

8            THE COURT:  How many substantive texts do you think

9    there are once you get rid of the emojis and so forth?

10           MR. TAYLOR:  We believe that the emojis are

11   substantive, but I understand your meaning, your Honor.  I

12   would estimate somewhere around a half dozen.

13           THE COURT:  So I think what would make sense in terms

14   of schedule is that defense counsel will get his letter in by 5

15   tomorrow.  Based on what I have heard so far, I am not sure why

16   the government couldn't get its response in by 5 the following

17   day.  If for some reason that proves impractical, you will let

18   me know, but given that text messages are generally pretty

19   short it doesn't seem like it's going to take a long time to go

20   through it.

21           Other issues?

22           Anything else besides the text messages that you

23   anticipate are going to present evidentiary issues?

24           MR. TAYLOR:  Yes, your Honor.

25           An item that was recovered from Ms. Harris' phone is a

1   DOJ press release.

2          THE COURT:  Yes.  I talked about that in the bench

3   ruling.

4          MR. TAYLOR:  That's correct, your Honor.  Counsel and

5   I will review your decision.  I think that there might be a few

6   other issues regarding a couple of other items of evidence, but

7   the main things are the text messages.

8          THE COURT:  Okay.

9          MR. GREGORY:  Your Honor, I did have one request or

10  just thought.  That is what the Court's position is on using an

11  exhibit or two during opening statement.  Would you permit

12  that?

13         THE COURT:  Well, I will hear from the government in a

14  second, but I guess if both sides were a hundred percent

15  confident that the exhibit was going to be admissible at trial,

16  I would certainly consider it.

17         What does the government say about the concept?

18         MR. SCHAEFFER:  I think, your Honor, it would depend

19  on what exhibit was going to be shown.  We were not planning

20  showing the jury anything during our openings, and I would

21  agree with the Court that we would have to determine that

22  there's no question of admissibility.

23         I think presenting an exhibit out of context in the

24  opening could also be a bit jarring or lead the jury down an

25  avenue that we wouldn't want them to go, so we would have to

1    consider that kind of on an exhibit-by-exhibit basis.

2    THE COURT:  All right.  If you want to use something

3    in your opening, I would suggest you open discussions with the

4    government about that right away.  As I said, I am not

5    rejecting it out of hand.  I would want to know what the

6    exhibit is and I would want to know what the government's

7    position is.  So I will consider it.  So I think we should tee

8    that up issue again as soon as you can.

9    MR. GREGORY:  Yes, your Honor.  Thank you.

10    THE COURT:  Other issues?

11    MR. SCHAEFFER:  Nothing on the exhibits or evidentiary

12    issues, your Honor.  We just have one thing to put on the

13    record before the conference concludes.

14    THE COURT:  Go ahead.

15    MR. SCHAEFFER:  An October 12, 2021, the government

16    sent defense counsel a *Pimentel* letter setting forth its

17    understanding of the guidelines that are applicable in this

18    case, that those guidelines calculations result in a sentencing

19    range of 27 to 33 months' imprisonment.

20    THE COURT:  Has there been any response from the

21    defense with respect to your *Pimentel* letter?

22    MR. SCHAEFFER:  No, your Honor, there has not.

23    THE COURT:  Okay.

24    So, Mr. Adams, let me just address you directly for a

25    moment.  The government tells me that they provided your

1    counsel with what's called a *Pimentel* letter, which is a letter

2    that sets forth the government's understanding of what it

3    believes is the sentencing guidelines exposure in this case.

4           What the assistant has said is that the government at

5    least currently believes that the sentencing guidelines range,

6    applicable range is 27 to 33 months' imprisonment.

7           Have you spoken with your counsel about this *Pimentel*

8    letter?

9           THE DEFENDANT:  Yes, your Honor, I have.

10           THE COURT:  And have you discussed with counsel

11    whether it's in your best interest to go to trial in this case

12    given all the circumstances?

13           THE DEFENDANT:  Yes, I have, your Honor.

14           THE COURT:  Is it your conclusion after consultation

15    with counsel that it is in your best interest to proceed to

16    trial?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  All right.  Thank you.

19           Anything else?

20           MR. SCHAEFFER:  This may be a pie-in-the-sky request,

21    your Honor, but is there any possibility that perhaps we could

22    do the questionnaires on Wednesday and the voir dire

23    questioning in the afternoon on Wednesday just to conserve the

24    Court's time, or is that not possible?

25           THE COURT:  Let me explain the process.

1           So I think we have called for about 90 jurors.  My

2    deputy would know better than I do.  So what's going to happen

3    is these 90 people, or whatever number it is that is being

4    provided to us, they are all going to complete the

5    questionnaires.

6           Then the questionnaires have to be Xeroxed.  We've got

7    to do that.

8           Then the questionnaires have to be provided to the

9    parties.

10          And then the parties have to have an opportunity to

11   review the questionnaires and make a decision about whether

12   they believe that certain panel members should be excused on

13   the basis of their responses to the questionnaire.

14          So my experience in the past is that that takes a fair

15   amount of time.  That is to say the Xeroxing takes time,

16   counsel's review of the completed questionnaires takes time,

17   and then our discussion of the questionnaires takes time.

18          So, to put it in perspective if we start with -- the

19   earliest that we are going to be able to start with the panel

20   is about 10:15 because there are some preliminaries that the

21   jury staff goes through with them.  Realistically it is going

22   to be later than 10:15.

23          Realistically it could easily be 11 before I even meet

24   with them.  So I give them the questionnaire.  They fill it

25   out.  Let's assume that process is over by say 11:45 or 12

1    noon.

2              Then, as I've said, we've got to Xerox 80 to 90

3    questionnaires, we have got to get them to you, you've got to

4    review them, and then we have to talk about them.

5              My experience in the past is that if we can have our

6    meeting to discuss the questionnaires at 2:30, we will be doing

7    very well.  To get through 90 questionnaires is likely going to

8    take us until 5.

9              So I just couldn't see how it's possible to do

10   anything with the panel that same day.  I've explored whether

11   we could utilize the jury assembly room as well as the overflow

12   room, the ceremonial courtroom, in the afternoon of Thursday.

13             I have been told no, because the judge anticipates

14   that, I guess that there will be objections to the proposed

15   settlement, and he's expecting a large turnout.  I don't know

16   much about the case.  I haven't had time to even find out what

17   the case is.  But the long and short of it is I have been told

18   that we cannot utilize either the jury assembly room or the

19   ceremonial courtroom for any period of time on Thursday.

20             Unfortunately, we have so few rooms available that are

21   large enough to permit 40 people to be inside, given the COVID

22   restrictions, that there are just very limited options.  I have

23   explored whether the large courtrooms in this building are

24   available, like 110 or 506 or 318, and I'm told that they are

25   all committed for purposes of trials.  So we have very limited

1  options.  The fairness hearing was scheduled in April, so it's

2  been scheduled for a very long time.  The judge was unwilling

3  to adjourn it to another date.  That's where we are.

4         So I don't have any ideas.  I've tried to explore with

5  the jury staff what other options there might be, and I didn't

6  come up with any options.

7         So it's not the way I would prefer to proceed, but

8  nothing about what we're doing during this pandemic is the way

9  I want to proceed, so my hands are tied at this point.  If you

10  have any ideas, I'm happy to consider them, but I'm fresh out

11  of ideas on this one.

12         MR. SCHAEFFER:  Understood, your Honor.  Nothing that

13  it sounds like the Court hasn't already tried.  Thank you.

14         THE COURT:  All right.

15         If there's nothing else, we will meet again 9:30

16  Wednesday morning here to talk about any last-minute issues.

17  Once we hear from the jury clerk that they are prepared for us,

18  we will head over to the 500 Pearl jury assembly room to begin

19  the process through the distribution of the questionnaire and

20  we'll take it from there.

21         If there's nothing else, we are adjourned.

22         Thank you.

23         (Adjourned)

24

25