LASAADACps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          20 Cr. 494 (PGG)

5   ROBERT ADAMS,

6               Defendant.              Jury Trial
    ------------------------------x
7
                                        New York, N.Y.
8                                       October 28, 2021
                                        3:10 p.m.
9

10  Before:

11                  HON. PAUL G. GARDEPHE,

12                                      District Judge

13
                         APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  JARROD L. SCHAEFFER, ESQ.
         RUSHMI BHASKARAN, ESQ.
17       NICOLAS T. LANDSMAN-ROOS, ESQ.
         Assistant United States Attorneys
18
    SAMUEL GREGORY, ESQ.
19       Attorney for Defendant

20  TAYLOR & COHEN LLP
         Attorneys for Defendant
21  BY:  ZACHARY S. TAYLOR, ESQ.

22

23

24

25

LASAADACps

1          (Jury panel not present)

2          THE COURT:  The purpose of today's hearing is to

3     address defendant Robert Adams's October 26, 2021 motion in

4     limine (Docket No. 46), in which Mr. Adams seeks to introduce

5     the following exhibits at trial:

6          First, Defense Exhibits E1 through E22, which comprise

7     all text messages sent between Adams and Shahada Harris -- whom

8     the government has referred to as "Visitor No. 1" -- between

9     July 5, 2019 and July 26, 2019;

10          Second, Defense Exhibit H, which is a July 26, 2019

11     text message sent by Harris to a group of her friends stating

12     that she "bagged one of the feds";

13          Third, Defense Exhibit J, which is an August 14, 2019

14     Snapchat video created by Harris in which she sings the words

15     "[e]xpose you for exactly who you are";

16          Fourth, Defense Exhibit L, which are text messages

17     between Harris and an alleged co-conspirator in a prison

18     smuggling scheme, after Harris was caught smuggling contraband

19     into the MCC on August 14, 2019; and

20          Fifth, testimony from MCC Corrections Officer Richard

21     Fletcher as well as Defense Exhibit M, both of which relate to

22     a visit that Harris made to the MCC on August 7, 2019.

23          Yesterday evening, the government filed a responsive

24     letter, which is Docket No. 47, in which it agreed that Adams

25     could introduce some of this evidence, with certain limitations

LASAADACps

1    I will discuss in a moment.

2            Adams submitted a letter yesterday evening responding

3    to several arguments raised in the government's letter.  *See*

4    Docket No. 48.

5            As we consider the evidence that will be received at

6    trial, it is important to keep in mind what Mr. Adams is

7    charged with, what the disputed issues are, what evidence is

8    relevant to those disputed issues, as well as the limitations

9    on cross-examination that goes to a witness's credibility.

10           I should also say that my obligation is to enforce the

11   rules of evidence regardless of what positions the parties take

12   as to the admissibility of evidence.  The rules of evidence

13   exist for a reason.  The purpose of the rules of evidence is to

14   help ensure that a jury reaches a fair, just, and rational

15   verdict.  Whenever a party or a court ignores the rules of

16   evidence, it creates a risk that the jury may not reach a fair,

17   just, and rational verdict.  Accordingly, it is both my

18   obligation and my practice to enforce the rules of evidence in

19   both civil and criminal proceedings, and that is what I will do

20   here.

21           I'll begin with the nature of the charges and then

22   turn to the disputed factual issues and what evidence is

23   relevant to resolving those factual issues.

24           First, Mr. Adams was a corrections officer at the MCC.

25   He is charged with (1) demanding a bribe -- sex from someone

LASAADACps

who visited the MCC, Shahada Harris –– in exchange for not

arresting Harris or disclosing her smuggling contraband into

the MCC on July 5, 2019 (that makes up Count One); (2)

blackmailing Harris by demanding sex in exchange for not

arresting Harris or disclosing her smuggling contraband into

the MCC on July 5, 2019 (Count Two is premised on that

conduct); and finally and (3) misprision of a felony, in that

Adams did not report Harris's smuggling of contraband into the

MCC on July 5, 2019.  That is the basis for Count Three.

(Citing the S1 indictment, Docket No. 31.)

        Relevant evidence is of course evidence that is

material in the sense that it makes it more or less likely that

someone committed a crime, in that case that Adams committed

one or more of the crimes alleged in the indictment.  (Citing

Fed. R. Evid. 401.)

        It is undisputed that Adams had sex with Harris on

July 5, 2019 after her visit that day to the MCC.  (Citing

Defendant's motion in limine opposition, Docket No. 40, at

pages 2 and 3.)  Therefore, the primary fact issues as to the

bribery and blackmail charges are what Adams said and did with

respect to Harris on July 5, 2019 and his state of mind on that

day –– that is, whether he intended to demand sex from Harris

as part of an effort to solicit a bribe or to blackmail her in

connection with her smuggling of contraband into the MCC.

        In considering what evidence is relevant to these

LASAADACps

disputed issues, we cannot forget that Harris is not on trial
here and that her state of mind is not of primary significance.
What matters here is Mr. Adams's state of mind.  Accordingly,
statements that Harris made to other people or statements that
she recorded of herself, statements that were not communicated
to Adams, are generally not relevant or admissible, because to
the extent they were not communicated to Mr. Adams, they could
not have affected his state of mind.

Now, Ms. Harris is the government's primary witness at
trial, and her credibility will be at issue as to what
Mr. Adams said to her and what he did in connection with their
sexual encounter on July 5, 2019.  Adams contends that the
sexual encounter was entirely consensual.  The government
contends that Adams coerced Harris to have sex by threatening
her with arrest and/or with barring her from visiting the MCC.

The defense of course will be permitted to
cross-examine Harris as to the circumstances in which she had
sex with Adams.  In doing so, the statements she made to
others, as well as the recorded statement of her own, serve as
a basis for cross-examination.  But these statements -- which
Adams himself never heard and which thus could not have
affected his state of mind -- are not admissible as direct
evidence.  These statements go only to Harris's credibility as
a witness.  These statements are thus subject to Federal Rule
of Evidence 608(b), which provides that "[e]xcept for a

criminal conviction under Rule 609, extrinsic evidence is not
admissible to prove specific instances of a witness's conduct
in order to attack or support the witness's character for
truthfulness."  (Citing Fed. R. Evid. 608(b).)

          The effect of Rule 608(b) here is that while defense
counsel is free to cross-examine Harris as to her prior
statements, to the extent that this cross-examination goes
solely to her credibility, counsel will not be permitted to
further impeach her testimony by offering extrinsic evidence.
For example, if counsel is dissatisfied with Harris's answers,
counsel will not be permitted to call another witness solely
for the purpose of underlining Harris's credibility.  That is
barred by Federal Rule of Evidence 608(b).

          So with that background, I will now turn to the
various exhibits currently at issue, beginning with text
messages between Adams and Harris that Adams has marked as
Defense Exhibits E1 through E22.  These exhibits are a series
of photographs of Harris's cellphone that show text messages
between Adams and Harris between July 5, 2019 and July 26,
2019.

          In an October 26, 2021 letter, Adams complains that
the government is planning to introduce only a portion of the
text messages between Adams and Harris, and Adams goes on to
complain that the partial submission of these text messages
"would create a false impression about the relationship"

between Adams and Harris, and thus would mislead the jury.

(Citing the October 26, 2021 defense letter, Docket No. 46, at

page 4.)

In response, the government filed a letter yesterday

evening in which it agrees to introduce nearly all of the text

messages between Adams and Harris, subject to the redaction of

five areas.  October 27, 2021, government letter, Docket

No. 47, at page 1.  Adams objects to any redaction of the text

messages.  (Citing the October 27, 2021 defense letter, Docket

No. 48, at pages 1 to 2.)

I will now address the government's proposed

redactions in the material which Adams has marked as Defense

Exhibit E1 through E22.

The government has redacted the following from the

July 9, 2019 text message of Adams.  Adams writes, "I'm working

everyday this week which puts me at 12 days straight but I'm

going to make some time for you though, somehow." (Citing

Government Exhibit 401 at page 4.)  The government seeks to

redact the portion of this text message in which Adams refers

to "working every day this week" and working "12 days

straight." *Id*.

The government argues that the redacted portion of

this text message is irrelevant, that it does not fall within

any hearsay exception, and that it's substantially more

prejudicial than probative.  The government further argues that

LASAADACps

1    the redaction does not run afoul of the rule of completeness

2    because there is nothing misleading about redacting Adams's

3    discussion of his work schedule.  (Citing the October 27, 2021

4    government letter, Docket No. 47, at pages 4 to 5, and page 4,

5    note 2.)

6            Adams responds that (1) the redacted portion of the

7    text message is relevant because it is "highly probative of

8    Mr. Adams's view of his relationship with [Harris]"; (2) it is

9    admissible for its truth under Rules 803(1), present sense

10   impression, and 803(3), then-existing mental condition; and (3)

11   in any event it should be admitted under Rule 106 because the

12   redaction "makes it very difficult to understand Mr. Adams's

13   message that he is 'going to make some time for [Harris].'"

14   (Citing the October 27, 2021 defense letter, Docket No. 48, at

15   page 1; as well as the October 26, 2021 defense letter, Docket

16   No. 46, page 4.)

17           Adams's arguments are not persuasive.

18           As an initial matter, Adams's July 9, 2019 statement

19   that he's "working everyday this week," which "puts [him] at 12

20   days straight," provides no insight into Adams's state of mind

21   on July 5, 2019, when he allegedly demanded sex from Harris and

22   when he failed to report Harris's smuggling of contraband.

23   Absent testimony from Adams that ties his long working hours to

24   his purported excuse for failing to report Harris's smuggling

25   in of contraband, there is no logical link that makes his

LASAADACps

1    working conditions at the MCC relevant.  Stated another way,

2    the fact that Adams was working long hours at the MCC does not

3    make it more or less likely that he demanded sex from Harris,

4    or that he knowingly and intentionally covered up her smuggling

5    in of contraband.

6        To the extent that Adams argues that the redacted

7    material shows that he is being considerate of Harris, as of

8    July 9, 2019 (citing the October 27, 2021 defense letter,

9    Docket No. 48, at page 1), that has no bearing on whether Adams

10   demanded sex from her on July 5, 2021, after he discovered that

11   she had smuggled contraband into the MCC.

12       The redacted material is also hearsay, because it is

13   being offered for the truth of the statement regarding Adams's

14   work hours.  The redacted material is obviously not a present

15   sense impression or a statement of then-existing mental

16   condition.  It is instead a statement of fact.

17       The Rule of completeness does not require that the

18   redacted material about Adams's work schedule be admitted,

19   because the redaction does not make the passage misleading.

20   The material that will be admitted contains Adams's statement

21   "[t]oo bad I can't slip away for a few, [I'd] come right to you

22   if I could" (citing Government Exhibit 401 at page 4).  The

23   redacted material is therefore "neither explanatory of nor

24   relevant to the admitted passages" (citing *United States v.*

25   *Johnson*, 017 F.3d 793, 796 (2d Cir. 2007)).

LASAADACps

1         Finally, even if Adams's work schedule were relevant

2    and even if the statement was admissible under a hearsay

3    exception, it would be excluded under Federal Rule of Evidence

4    403.  The statement has no probative value on the current

5    record, and it appears designed to elicit sympathy for Adams.

6    Indeed, Adams states that "the possibility that Mr. Adams's

7    statement that he must work for 12 days straight might engender

8    sympathy is precisely the statement's point" (citing the

9    October 27, 2021 defense letter, Docket No. 48, at page 1).

10         For all these reasons, the government's first

11    redaction to Government Exhibit 401 will remain.

12         The government's second redaction spans several pages

13    and covers approximately 30 text messages between Adams and

14    Harris that were sent between July 9, 2019 and July 15, 2019.

15    *See* Government Exhibit 401 at pages 8 to 12.  All of the text

16    messages at issue in redaction no. 2 concern Adams's work and

17    his work schedule.  For example, in a July 14, 2019 text

18    message, Adams writes, "I haven't slept in two days," and in

19    another text he writes, "I'm at work pulling a double right

20    now."  (*Id.* at page 10.)

21         The government's third redaction concerns the

22    following statement by Adams: "Why at work I was freezing my

23    ass off cold air conditioning was on artic blast n the

24    building."  (*Id.* at page 14.)

25         As with the government's first redaction, these

LASAADACps

1  redacted text messages -- all sent between July 9 and July 15,

2  2019 -- are irrelevant to Adams's state of mind on July 5 or to

3  any other fact that's at issue in this case.  Adams claims that

4  his comment about air conditioning is relevant because it

5  demonstrates the bond between him and Harris, since "[p]eople

6  bond over pet peeves like over-airconditioned buildings."

7  (Citing the October 27, 2021 defense letter, Docket No. 48, at

8  page 2.)  However, the alleged "bond" between Adams and Harris

9  on July 15 cannot give the jury insight into Adams's state of

10 mind when he allegedly demanded sex from her on July 5, 2019.

11         This redacted material is likewise offered for its

12 truth, and it does not constitute either a present sense

13 impression or a statement of then-existing mental condition.

14 Instead, these are narrative factual statements about Adams's

15 day-to-day routine, and backward-looking statements.

16         The rule of completeness does not require admission of

17 this material, because the redactions do not render the

18 admitted material misleading.

19         Finally, the defendant's request to admit the material

20 that is the subject of the government's second and third

21 redactions seems intended only to engender juror sympathy for

22 Adams.  Accordingly, this material is also properly excluded

23 under Rule 403.

24         The government's final two redactions concerning a

25 fall suffered by Adams's mother and Adams's reference to his

LASAADACps

 1    family obligations.

 2            The government has redacted the following statement

 3    made by Adams on July 17, 2019: "Hey I been busy with my mom

 4    she fell and hurt herself she s been in the hospital."  Harris

 5    responds: "Hope she get well and it's hot too out here I hope

 6    you got rest."  (Government Exhibit 401 at page 16.)

 7            The government has also redacted the following

 8    statement by Adams on July 26, 2019: "Gotta do something with

 9    my family today," along with Harris's response, "Oh OK."  *(Id.*

10    at page 21.)

11            Adams argues that in these text messages he makes

12    excuses for not being able to meet up with Harris, and that

13    these messages suggest that Adams's relationship with Harris

14    went beyond merely coercing her to have sex with him on July 5,

15    2019.  (Citing the October 27, 2021 defense letter, Docket

16    No. 48, at page 2.)  As I have already explained, however, the

17    existence of a continuing relationship between Adams and Harris

18    after their July 5, 2019 sexual encounter does not shed light

19    on whether Adams demanded sex from Harris on July 5, 2019.  And

20    even if it did, there is more than ample material that will be

21    admitted from the extensive text message communications between

22    Adams and Harris from which the jury can evaluate the

23    significance of their continuing relationship.

24            The material that is the subject of the government's

25    fourth and fifth redactions is also being offered for its

LASAADACps

1   truth, and no hearsay exception is applicable.

2            Similarly, the rule of completeness does not require

3   admission of this material.

4            Finally, the redacted material -- which relates to a

5   fall suffered by Adams's mother as well as Adams's family

6   obligations -- has no probative value, and the request for its

7   admission seems designed to engender sympathy for Adams.

8            For all of these reasons, the fourth and fifth

9   redactions in Government Exhibit 401 will remain.

10           Before I turn to the remaining exhibits proffered by

11  Adams, I will address the instruction that I will be giving to

12  the jury when these text messages are admitted.

13           I will be instructing the jury that Government Exhibit

14  401 is to be considered not for the truth of the matters

15  asserted in the text messages, but only to the extent that the

16  jury determines that these text messages shed light on Adams's

17  state of mind at the time he committed the alleged crimes and

18  whether he acted with criminal intent.

19           I will now turn to Defense Exhibits H, J, and L.

20           Seems seeks to introduce these exhibits to impeach

21  Harris's credibility.  Defense Exhibit H is a text message that

22  Harris sent to a group of friends after her July 26, 2019 visit

23  to the MCC, during which the government claims that Adams

24  turned Harris away and slapped her buttocks in an elevator.

25  (Citing the government's motion in limine brief, Docket No. 33,

1    at page 5.)  Harris's text message states, "I'm headed home I

2    bagged one of the feds he said he might give me money."

3    (Citing Defense Exhibit H at page 2.)

4          Defense Exhibit J is an August 14, 2019 video that

5    Harris made on the Snapchat app, in which she is looking into

6    the camera and singing a song that includes the lyric "expose

7    you for exactly who you are."  (Citing Defense Exhibit J.)

8          Defense Exhibit L is a series of text messages that

9    Harris sent to an alleged co-conspirator in the smuggling

10   contraband operation between August 14, 2019 and August 16,

11   2019.  On August 14, 2019, Harris was stopped and detained at

12   the MCC while trying to smuggle in contraband.  (See October

13   26, 2021 defense letter, Docket No. 46, at page 4.)  In her

14   text messages, Harris tells the co-conspirator that her phone

15   was taken, that "they," an apparent reference to law

16   enforcement, would be looking through her Instagram and

17   Facebook accounts, and that the authorities had asked her

18   whether a corrections officer helped her smuggle contraband

19   into the MCC.  Harris says that she had responded "no."  Harris

20   also writes that she believes that corrections officers "[a]re

21   [g]etting [i]n [t]rouble [t]oo."  (Citing Defense Exhibit L at

22   pages 1 to 3.)

23         In its October 27, 2021 letter, the government states

24   that while defense counsel may cross-examine Harris as to the

25   matters that are the subject of Defense Exhibits H, J, and L,

LASAADACps

none of these exhibits should be received in evidence, because they are hearsay. (citing the October 27, 2021 government letter, Docket No. 47, at page 5.) The government further argues that these exhibits constitute extrinsic evidence offered "to prove specific instances of a witness's conduct in order to attack...the witness's character for truthfulness," and are thus inadmissible under Federal Rule of Evidence 608(b).

Federal Rule of Evidence 608(b), as I noted, provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But a court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of...the witness." Under Rule 608(b), a party may "inquire into specific instances of conduct on cross-examination but may not contradict through extrinsic evidence any answer given by the witness." (Citing *United States v. Weichert*, 783 F.2d 23, 26 note 3 (2d Cir. 1986).) Moreover, "[e]ven if the specific instance is probative of the witness's veracity, the court still must balance that probative value against the risk of unfair prejudice..., pursuant to Rule 403." (Citing *United States v. Desposito*, 704 F.3d 221, 233 (2d Cir. 2013).)

While defense counsel may cross-examine Harris about the subject matter contained in Defense Exhibits H, J, and L,

these exhibits constitute extrinsic evidence of Harris's

conduct, and fall within the prohibition of Rule 608(b).

Accordingly, these exhibits will not be received in evidence.

I will briefly discuss each of these exhibits.

In the July 26, 2019 text message that is Defense

Exhibit H, Harris writes that she "bagged one of the feds he

said he might give me money."  Adams may cross-examine Harris

about this statement, because it goes to her credibility.  This

statement is not admissible under Rule 608(b), however, for

reasons I have already explained.  Parenthetically, I would

note that the parties' arguments regarding hearsay are

irrelevant, because Defense Exhibit H would be offered to show

Harris' state of mind, at least as of July 26, 2019.

Defense Exhibit J is the August 14, 2019 Snapchat

video in which Harris records herself singing lyrics that

include the phrase "expose you for exactly who you are."  Adams

may cross-examine Harris as to this phrase, which she filmed

the same day that she was stopped and detained at the MCC, and

questioned about the involvement of correction officers in her

smuggling of contraband.

According to Adams, Harris will say that "the video

has nothing to do with Mr. Adams, but rather concerned her

intention to expose someone else."  (Citing the October 26,

2021 defense letter Docket No. 46 at page 7.)  Defense counsel

is free to cross-examine Harris on this point, but the video

LASAADACps

1    will not be received in evidence, because it is extrinsic

2    evidence under Rule 608(b).

3         Defense Exhibit L contains Harris's text messages with

4    her co-conspirator between August 14 and August 16, 2019.  As I

5    noted, Harris was stopped and detained at the MCC on August 14,

6    2019, after attempting to smuggle contraband into the MCC.

7         Adams may cross-examine Harris regarding these text

8    messages, in which she says that she told the authorities that

9    no corrections officer had assisted her with her smuggling.

10   *See* Defense Exhibit L at page 3.

11        As with Defense Exhibit H and J, however, Adams may

12   not introduce Defense Exhibit L, because it constitutes

13   extrinsic evidence under Rule 608(b).

14        Adams seeks to introduce testimony from MCC

15   Corrections Officer Richard Fletcher as well as Defense

16   Exhibit M.  Both Fletcher's testimony and Defense Exhibit M

17   relate to Harris's August 7, 2019 visit to the MCC to see

18   inmate Keith Outlaw.  (Citing the October 26, 2021 defense

19   letter, Docket No. 46, at page 1.)

20        Adams states that Correction Officer Fletcher will

21   testify that on August 7, 2019, he "noticed Outlaw and a female

22   visitor [Harris] making suspicious facial gestures to one

23   another" and that "he discovered lubricant inside Keith

24   Outlaw's buttocks" after this interaction.  *Id.* at page 7.

25   Defense Exhibit M is an extraction report from Harris's phone

LASAADACps

1   of incoming and outgoing calls around the time of her MCC visit

2   on August 7, which Adams argues is "material because it helps

3   establish the length of time [Harris] was inside the MCC."  *Id.*

4          Adams has not explained why Harris's August 7, 2019

5   visit to the MCC is relevant here.  The parties do not contend

6   that Adams was on duty that day.  I assume that the purpose of

7   conducting cross-examination concerning this visit is to

8   demonstrate that Harris was involved in illegal activity that

9   day.  On that basis, defense counsel will be permitted to

10  cross-examine Harris concerning her August 7, 2019 visit to the

11  MCC.

12         The government does not object to testimony from

13  Corrections Officer Fletcher or to the phone records marked as

14  Defense Exhibit M.  (Citing the October 27, 2021 Government

15  letter, Docket No. 47, page 6.)

16         Notwithstanding the fact the government has not

17  objected to Fletcher's testimony or to the phone records, as I

18  mentioned at the outset, I do have an independent obligation to

19  ensure that this material is admissible under the Federal Rules

20  of Evidence.

21         The purpose of calling Fletcher and introducing the

22  phone records is to impeach Harris's credibility.  As I have

23  stated many times, under Rule 608(b), extrinsic evidence of

24  this nature is not admissible to attack credibility.

25  Accordingly, the testimony of Corrections Officer Fletcher and

LASAADACps

the phone records marked as Defense Exhibit M will not be

received in evidence, as a result of Rule 608(b).

All right.  I have reviewed the list of names

submitted by the parties that are likely to come up at trial.

I have some questions about the list.  There is a reference to

Tijuana Doctor on the list.  What's that about?  Tijuana

Doctor.

MS. BHASKARAN:  Tijuana Doctor is the MCC employee who

caught Visitor 1 smuggling contraband on August 14.

THE COURT:  Is that the person's name?

MS. BHASKARAN:  Yes.

THE COURT:  The person's name is Tijuana Doctor.

MS. BHASKARAN:  Correct, your Honor.

Excuse me, your Honor.  I misspoke.  Tijuana Doctor is

not the person who actually caught Ms. Harris.  I believe she

was a lieutenant at the MCC that day when Harris was caught on

August 14.

THE COURT:  OK.  And there's a reference to someone

named Stanley Jean.  Is that right?  First name Stanley, last

name Jean?

MS. BHASKARAN:  Correct, your Honor.

THE COURT:  All right.  Are there other issues the

lawyers want to raise?

MS. BHASKARAN:  Your Honor, just one housekeeping

matter.  We wanted to get your Honor's preferences with respect

LASAADACps

1   to the reading of stipulations.  Do you prefer that we have a

2   witness on the stand when we read a stipulation, or will we be

3   permitted to read or offer stipulations in between witnesses?

4           THE COURT:  You can do it in between witnesses.

5           MS. BHASKARAN:  Thank you.

6           MR. TAYLOR:  Your Honor, on the same subject, there

7   are a number of defense stipulations.  Do we have to wait until

8   the defense case to read defense stipulations, or can we read

9   it at an appropriate time -- you know, obviously, with the

10  government's consent -- during the government's case?

11          THE COURT:  You mean during cross-examination.

12          MR. TAYLOR:  Exactly.

13          THE COURT:  Well, I mean, as a technical matter you're

14  supposed to offer your direct evidence on your own case.  But I

15  suppose if there's a stipulation that's relevant to

16  cross-examination, it might make sense to introduce it then.

17  What's the government's view?

18          MS. BHASKARAN:  Your Honor, I expect that that would

19  be fine.

20          THE COURT:  OK.  So if the defense feels during

21  cross-examination it's necessary to offer a stipulation at that

22  point, it may do so.

23          MR. TAYLOR:  Thank you, your Honor.

24          THE COURT:  All right.  To review what's going to

25  happen tomorrow, as you know, the jury panel is returning to

LASAADACps

1    the jury assembly room at 9:30.  I will begin the session with

2    them by calling up to the bench the folks whose questionnaires

3    raise issues and who were not excused as a result of the

4    session that we had yesterday.  So that's going to take some

5    time, because there's quite a few people still remaining whose

6    questionnaires raise issues.  After I do that, I will then

7    commence with the traditional voir dire, and hopefully that

8    will go quickly.

9            Any questions about tomorrow, or about anything else?

10           MS. BHASKARAN:  Your Honor, just a COVID protocol

11   question with respect to when we go through the questionnaires:

12   approximately how many people do you think from each side will

13   be able to be near the bench when we do that?

14           THE COURT:  Anyone who wants to be at the bench can be

15   there.

16           Let me explain the physical setting.  So as you know,

17   it's in the jury assembly room, so there's a very large bench

18   there.  We will meet to my right, and I'll call the juror up,

19   and there's plenty of room right in front of the bench there

20   for the court reporter and the lawyers and the juror.  So

21   there's plenty of room for everybody to be there.  So don't

22   worry about that.

23           MS. BHASKARAN:  Thank you.

24           MR. GREGORY:  Your Honor, I did have one thing.

25           THE COURT:  Yes.

LASAADACps

1          MR. GREGORY:  I spoke with Mr. Biale and Mr. Tremonte,

2     and they said when they were questioning witnesses inside of

3     the plexiglass box, that they had a difficult time during

4     certain periods hearing the witness.  So I ask the Court to let

5     the witnesses know that it's difficult to hear in that box and

6     if they could speak up.  I just don't hear that well anyway.

7     So I'm going to have a double problem.

8          THE COURT:  Yes.

9          MR. GREGORY:  So I appreciate that.

10          THE COURT:  Yes.  I will.  So is it awkward in the

11     courtroom as reconfigured for COVID?  Yes, it is.  And as you

12     mentioned, the witness is in an enclosed plexiglass booth, and

13     the lawyer is across the room in a separate plexiglass booth.

14          Now, I will say that when people are in the plexiglass

15     booth, both the witness and the lawyer, they are permitted to

16     remove their masks.

17          MR. GREGORY:  Right.  I understand that.

18          THE COURT:  So that helps some.  I'm not saying that's

19     a total solution, but it does help some, because at least you

20     can see the person, you can see their lips moving, and, you

21     know, sometimes that can help you understand what they're

22     saying.  But I will try to be alert to the hearing issue and to

23     remind myself to tell the witness to speak up.

24          We are blessed in this case in that we won't have to

25     use interpreters.  And the problem we ran into in the case

1    involving Mr. Biale was that most of the witnesses were

2    testifying through interpreters.  We had so many interpreters.

3    We had a Croatian interpreter for two of the witnesses.  The

4    main cooperator is a Spanish interpreter.  One of the

5    defendants spoke French, so he had a French interpreter.  Some

6    of the interpreters were very good about projecting and some

7    were not.  So actually what Mr. Biale, I think, was talking

8    about is a difficulty with some of the interpreters, not so

9    much the witness, because the witnesses were testifying in a

10    foreign language to start with, for the most part.  I mean,

11    there was a DEA agent that testified in English, but almost all

12    of the testimony was in a foreign language, either Spanish or

13    Croatian.

14            So we won't have that problem here.  And certainly if

15    you have any difficulty hearing a witness, let me know and I'll

16    try to be alert to that too.  It's not an ideal setting but we

17    do our best.

18            MR. GREGORY:  Thank you.

19            THE COURT:  Other issues.

20            MS. BHASKARAN:  Your Honor, sorry.  Just one more

21    logistical question.  Should we meet the Court here tomorrow or

22    over at 500 Pearl?

23            THE COURT:  I'm not anticipating we'll have anything

24    to talk about tomorrow morning, so it seems like it would make

25    sense to just meet there at 9:30, unless someone disagrees?

LASAADACps

1          MS. BHASKARAN:  That's fine for the government.

2          MR. GREGORY:  Judge, I do have one other thing.  I

3    don't remember what it was.  So many days ago.  I guess it was

4    Monday.  We want went up, Mr. Taylor and I went up to take a

5    look around the courtroom.  I never saw you on the bench.  I

6    know -- I'm assuming you got the apology.  I just didn't see

7    you there.  It was embarrassing for me, to be walking around

8    the courtroom.

9          THE COURT:  No, not at all.  You had every right to be

10   there.  I did notice you.  I thought you wanted to see the

11   courtroom, which makes perfect sense.

12         MR. GREGORY:  I didn't see you.  I didn't know the

13   jury was coming in.  So I was -- well, I apologize.

14         THE COURT:  No.  You had every right to be there.

15   Nothing to apologize for.

16         MR. GREGORY:  Can we go up now?  And I don't want to

17   inconvenience anybody.  Will that be open?  Maybe you can call

18   maintenance or something.  I don't want your courtroom deputy

19   being inconvenienced.  But we can just go up there and take a

20   look?

21         (Discussion held off the record)

22         THE COURT:  Mr. Ruocco says he would be happy to take

23   you over there.

24         MR. GREGORY:  Thank you very much.

25         THE COURT:  All right.  Anything else?

LASAADACps

1          MS. BHASKARAN:  Your Honor, I just, as my colleague,

2     Mr. Roos, mentioned yesterday, the government will be filing a

3     supplemental letter on the prior consistent statements that

4     your Honor had reserved on.  I expect we'll file that letter

5     tonight or first thing tomorrow.  But I don't think it will be

6     something we'll be ready to discuss before we begin tomorrow.

7          THE COURT:  OK.  All right.

8          OK.  So we will meet again at 9:30 tomorrow to pick up

9     with the jury selection.

10          As always, if something unexpected comes up tonight

11     and we do need to meet earlier, let me know and I'm happy, I'm

12     always happy to meet you here earlier, or to meet you earlier

13     once we're in 26B.  So please keep that in mind.  If I don't

14     hear from you, I'll expect to see you at 9:30 over at the jury

15     assembly room.

16          MR. GREGORY:  Terrific.

17          THE COURT:  Thank you all very much.

18          (Adjourned)

19

20

21

22

23

24

25