LATAADA1ps

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        20 Cr. 494 (PGG)

 5   ROBERT ADAMS,

 6                 Defendant.             Jury Trial
     ------------------------------x
 7
                                          New York, N.Y.
 8                                        October 29, 2021
                                          3:15 p.m.
 9
     Before:
10
                     HON. PAUL G. GARDEPHE,
11
                                          District Judge
12

13                       APPEARANCES

14   DAMIAN WILLIAMS
          United States Attorney for the
15        Southern District of New York
     BY:  JARROD L. SCHAEFFER, ESQ.
16        RUSHMI BHASKARAN, ESQ.
          NICOLAS T. LANDSMAN-ROOS, ESQ.
17        Assistant United States Attorneys

18   SAMUEL GREGORY, ESQ.
          Attorney for Defendant
19
     TAYLOR & COHEN LLP
20        Attorneys for Defendant
     BY:  ZACHARY S. TAYLOR, ESQ.
21

22   Also Present:  Annie Pfifer
                     Paralegal, U.S. Attorney's Office
23

24

25
```

LATAADA1ps

1          (A jury of 12 and three alternates as impaneled and
2     sworn)
3          THE COURT:  Ladies and gentlemen, you are now a jury.
4     There is no higher function in our legal system.  From now on,
5     whenever you enter or leave the courtroom as a juror,
6     Mr. Ruocco, my deputy, will instruct the parties in the
7     audience to rise, the same as he does for me, because you are
8     every bit as powerful and important as any judge.
9          I want to reintroduce you to the people here in the
10    courtroom.  As I told, you, my name is Paul Gardephe and I'll
11    be the judge presiding over the trial.  The trial will be
12    proceeding in courtroom 26B, which is upstairs on the 26th
13    floor of the courthouse.
14         Your jury room will be 11B, and Mr. Ruocco and the
15    jury staff are going to take you there shortly.
16         You've already met Mr. Adams and his attorneys,
17    Mr. Taylor and Mr. Gregory, and of course the assistant United
18    States attorneys, Ms. Bhaskaran, Mr. Schaeffer, and Mr. Roos.
19         My courtroom deputy, as I indicated, is Mr. Michael
20    Ruocco.  He is the person to speak with if you have any
21    questions or difficulties during the trial.
22         As I mentioned, shortly, you will be taken to Room
23    11B.  That's the jury room for this trial.  That's where you
24    will report each morning for trial.
25         When you're in the jury room today, Mr. Ruocco will

LATAADA1ps

1    give you his telephone number, where you can reach him if there

2    is ever an emergency.  Please give him a telephone number where

3    you can be reached in the evening.

4            Our trial days will begin at 9:30.  They will end at

5    5.  We will take two breaks, in the midmorning and the

6    midafternoon, as well as a lunch break around 12:30 or 12:45.

7            As I mentioned, we will be providing lunch to you each

8    day.

9            If anyone needs a recess at any other time, just raise

10   your hand and we'll take a recess.

11           Please do be on time in the morning and after breaks,

12   because if you are late, you will keep everyone waiting.

13           You now have about ten minutes of preliminary

14   instructions that I must read to you.  And then we're going to

15   take a break and, as I said, they'll take you to the jury room,

16   11B.  And then, after that, you'll be brought to courtroom 26B,

17   and we will hear the opening statements from the lawyers.

18           So let me begin with my preliminary instructions.

19           Members of the jury, in the American system of

20   justice, the judge and jury have separate roles.  My job is to

21   instruct you as to the law that governs or controls this case.

22   I'll give you some instructions now.  I may give you others

23   from time to time as the trial proceeds.  And I will give you

24   detailed instructions at the end of the trial about the law you

25   will have to apply when you deliberate.

1          Your job as jurors is to determine the facts based on

2     the evidence presented at trial.  You are the only triers of

3     fact, and your decisions on the factual issues will determine

4     the outcome of this case.

5          You must not take anything I may say or do during the

6     trial as indicating what your verdict should be.  Please don't

7     be influenced by my taking notes.  What I write down may have

8     nothing to do with the matters that you have to be concerned

9     about with the trial.

10         You must pay close attention to all the evidence

11    presented.  Evidence consists only of the testimony of

12    witnesses, documents, and other things admitted in evidence,

13    and stipulations, which are agreements entered into by the

14    attorneys as to facts or testimony.

15         Much that you will hear during the trial is not

16    evidence, and you must not consider it as evidence.  For

17    example, statements and arguments by lawyers are not evidence,

18    they are simply arguments, in which the lawyers will tell what

19    you they think the evidence will be and how they think you

20    should analyze the evidence.  You should give these arguments

21    only as much weight as is consistent with your open common

22    sense, and you should under no circumstances consider a

23    lawyer's statements and arguments as evidence.

24         Any statement I may make to you is not evidence.

25    Questions by lawyers are not evidence.  Only the answers given

by the witness are evidence.  The questions that the attorney asks are only important insofar as it places the witness's answer in context.  For example, if a witness was asked in cross-examination, it was raining on June 2, wasn't it, and the witness answers no, then based on that question and answer alone, there is no evidence in the case that it was raining on June 2.

Objections to questions are also not evidence. Lawyers have an obligation to make an objection when they believe that evidence being offered is improper under the rules of evidence, but you should not be influenced merely by the making of an objection.  If I sustain the objection, you should ignore the question and any answer that may have been given. If I overrule the objection, you should treat the answer like any other.

Any testimony that I exclude or strike or tell you to disregard during the trial is not evidence, and you must not consider it.  If I instruct you that evidence is only to be considered for a particular purpose, you must follow that instruction.

Anything you may or will see about this case outside the courtroom is not evidence, and you must disregard it.  You are to decide the case based solely on the evidence presented here in the courtroom.

In deciding the facts of the case, you will have to

1    make decisions about the credibility of the witnesses -- that

2    is, how truthful and believable they are.  How do you decide

3    what to believe and what not to believe?  You'll listen

4    carefully to the witnesses, you'll watch them and observe them,

5    and then decide, as you would decide such questions in your

6    ordinary lives:  Did the witness know what he or she was

7    talking about?  Was the witness candid, honest, open, and

8    truthful?  Or did the witness appear to be falsifying,

9    exaggerating, or distorting what happened?  Is there any reason

10    to think the witness might be lying, or just plain mistaken

11    about what the witness is telling you?

12            Sometimes it's not so much what a witness says but how

13    he or she says it that may give you a clue as to whether or not

14    you can accept that witness's version of an incident or an

15    event as credible or believable.

16            In short, the way a witness testifies may play an

17    important role in your reaching a judgment as to whether or not

18    you can accept the witness's testimony as reliable.

19            You must use your common sense and life experience in

20    evaluating each witness's testimony.

21            As the trial proceeds, you may develop impressions of

22    a witness or concerning a particular issue.  You must not allow

23    these impressions to become fixed or hardened.  In other words,

24    you shouldn't make up your mind right away.  If you do, you

25    will prevent yourself from fairly considering the testimony of

LATAADA1ps

1    other witnesses, or other evidence, that may be presented after

2    the witness or witnesses you have heard.  This would be unfair

3    to one side or the other.

4           A case can only be presented step by step, witness by

5    witness.  We know from experience that frequently one person's

6    initial description of an event might sound impressive and even

7    compelling, but when we hear another person's version of the

8    same event, or even the same witness cross-examined about the

9    event, what seemed to be very compelling and impressive may

10   fall apart or become less convincing.

11          Please remember that there may be another side to any

12   witness's story.  You will use your common sense and good

13   judgment to evaluate each witness's testimony based on all the

14   circumstances.  You must keep an open mind until the trial is

15   over.  You should not reach any conclusions until you have all

16   the evidence before you.

17          Some of you may wish to take notes during the trial,

18   and you're welcome to do so.  If you do take notes, be sure

19   that your note-taking does not interfere with your listening to

20   and considering all the evidence.

21          Also, if you take notes, don't discuss your notes with

22   anyone before or during your deliberations.  Your notes are to

23   be used solely to assist you, and are not to substitute for

24   your recollection of the evidence in the case.

25          The fact that a particular juror has taken notes does

1    not entitle that juror's views to any greater weight than the

2    views of any other juror, and your notes are not to be shown to

3    any other juror during your deliberations.

4         If, during your deliberation, you have any doubt as to

5    any of the testimony, you will be permitted to request that the

6    relevant portion of the trial transcript be sent back to you in

7    the jury room.

8         There are three basic rules about a criminal case you

9    that must keep in mind: first, a defendant is presumed innocent

10   until proven guilty.  The charges alleged against the defendant

11   in an indictment are only accusations, nothing more.  They are

12   not proof of guilt or anything else.  The defendant therefore

13   starts out with a clean slate.

14        Second, the burden of proof is on the government at

15   all times.  A defendant has no burden to prove his innocence,

16   or to present any evidence, or to testify.  Since the defendant

17   has the right to remain silent, the law prohibits you from

18   arriving at your verdict by considering that the defendant may

19   not have testified.

20        Third, the government must prove a defendant's guilt

21   beyond a reasonable doubt.  I will give you further

22   instructions on this point later, but bear in mind that, in

23   this respect, a criminal case has a higher standard of proof

24   than that which applies in a civil case.

25        In order to ensure that you decide the case based

solely on the evidence and that you not be influenced in any

way by anything that might occur outside the courtroom, I must

give you the following instructions:

First, don't discuss this case among yourselves or

with anyone else, including any members of your family or your

friends.  You may tell your family that you're a juror in a

case, but don't tell them anything else, until after you've

been discharged by me.  Also, you may discuss the case among

yourselves only after all the evidence is in and the case is

given to you to discuss and decide in the jury room.

This rule is important because experience has shown

that when you express an opinion about a witness or the case,

you begin to identify more strongly with that opinion.  And

since it's vitally important that you keep an open mind until

you've heard all the evidence, you should not discuss the case

with anyone, including your fellow jurors, or communicate about

the case in any fashion, until the case is given to you at the

end of the trial for you to reach a verdict.

I also want to emphasize that you can't read anything

in the newspapers or over the internet or anyplace else about

this case.  Don't listen to or watch any reporting about the

case if it should be broadcast on TV or over the radio.  Don't

let anyone speak to you about the case.  If you're approached

by someone to speak about it, tell them that the judge has

directed you not to do so.

1          If anyone seeks to contact you or contacts you about

2     the case, you must immediately report that to me.

3          Don't do any research, or any investigation, about the

4     case on your own.  Again, you must decide the case based solely

5     on the evidence you will hear in the courtroom.

6          Be sure that I am informed if anyone you know comes

7     into the courtroom.  This will be a public trial, so that could

8     happen.  But it's important you do not hear from them what may

9     have happened in the courtroom while the jury was not present.

10         So if you should see a friend or relative or

11    acquaintance come into the courtroom, please send a note to me

12    through Mr. Ruocco at your first opportunity.

13         The attorneys, the parties, and the witnesses are not

14    supposed to talk to the jury outside the courtroom even to say

15    a friendly hello.  So if you happen to see any of them outside

16    the courtroom, they will not and should not speak to you.

17    Please don't take any offense.  They'll only be acting properly

18    by doing so.

19         The parties are entitled to have you render a verdict

20    in this case on the basis of your independent evaluation of the

21    evidence presented here in the courtroom.  Obviously, speaking

22    to others about the case or exposing yourself to information

23    outside the courtroom would compromise your jury service and

24    the duty of fairness you owe the parties.

25         Finally, let me say a few words about trial procedure.

LATAADA1ps

The trial has three parts.  First, the lawyers will have the
opportunity to make opening statements to you.  These opening
statements are not evidence.  The purpose of opening statements
is for the lawyers to give you a preview, or a roadmap, of what
they think the evidence will be.  Actual evidence, however,
only comes from the witnesses and the exhibits received in
evidence.

          After the opening statements, you'll hear testimony
from witnesses.  Because the government has the burden of
proof, the government will call its witnesses first.  Each
witness will give direct testimony, and then he or she may be
cross-examined by the defendant's lawyers.  Sometimes there is
redirect testimony and recross-examination.  Exhibits and
stipulations or agreements as to facts may be received in
evidence.  After the government's case, the defendant may, but
is not required to, present witnesses and other evidence.  If
the defense calls witnesses, those witnesses will be examined
and cross-examined just as the government's witnesses were.  If
the defendant presents evidence, it's possible that the
government may then present some rebuttal to that evidence.  Of
course, the defendant never has to testify or present any
evidence at all.  The burden of proof is at all times on the
government.

          After all the evidence has been received, the
government and the defendant will have an opportunity to make

1    closing arguments to you.  The lawyers will review the evidence

2    with you and make arguments as to what conclusions they think

3    you should or should not draw from the evidence.  These

4    arguments also are not themselves evidence, but they may be

5    helpful to you in reviewing the evidence during your

6    deliberations.

7              After these closing arguments, or summations, as they

8    are called, I will give you detailed instructions as to the law

9    that applies and controls in this case, and you must follow my

10   instructions.  Then you will go into the jury room to

11   deliberate and discuss the evidence in order to decide the

12   facts and render your verdict.

13             From time to time during the trial it may be necessary

14   for me to talk with the lawyers outside of the hearing of the

15   jury, either by having a conference up at the bench with the

16   jurors present in the courtroom, or by calling a recess.  The

17   lawyers and I will do this as little as possible.  Please

18   understand that while you are waiting, we are working.  The

19   purpose of any conference outside your hearing is not to keep

20   relevant information from you but, rather, for me to decide

21   procedural issues or how proposed evidence should be treated

22   under the rules of evidence.

23             Members of the jury, that completes my preliminary

24   instructions to you.  As I mentioned, Mr. Ruocco and the jury

25   staff are now going to bring you up to room 11B on the 11th

1  floor, where we have our jury room.  Once you're up there, as I

2  mentioned, Mr. Ruocco will give you a number where he can be

3  reached in the evenings, and he will ask you to give him a

4  telephone number where you can be reached.

5         After you have an opportunity to take a little break,

6  Mr. Ruocco and the jury staff will then bring you to our

7  courtroom, which is 26B, and at that time, we will hear the

8  parties' opening statements.

9         Thank you very much, and we'll see you soon.

10        THE COURT:  Could I see the lawyers up at the bench

11  here.

12        (At the bench)

13        THE COURT:  I received a letter this morning from the

14  government, which is docket no. 49.  Has the defense had an

15  opportunity to read the letter from the government?

16        MR. TAYLOR:  Not really, your Honor.  I was able to

17  review it on my phone for a bit.

18        THE COURT:  OK.  Well, in essence, the government has

19  asked me to consider the admission of two exhibits, which are

20  marked as Government Exhibit 407 and Government Exhibit 410.

21  And Government Exhibit 407 is an exhibit discussed before,

22  which is a screenshot of a press release of a bribery

23  prosecution involving another correction officer at the MCC who

24  was charged with a bribery offense for assisting someone in

25  bringing in, I think it was cellphones into the facility.  And

1    let me say that I don't want any reference in the opening

2    statements to Government Exhibits 407 or 410.  And so I'm not

3    going to rule on them at this point.  I just want to make it

4    clear that nobody is to refer to either exhibit.

5            And of course I want to hear the defense arguments

6    about these exhibits before I make any ruling, but let me tell

7    you my reaction to what I've read.  And I haven't had much time

8    to think about the letter either, but I'll give you my

9    reaction, subject to hearing the parties' arguments as well as

10    any submission that the defense wants to make.

11            So I had expressed the view earlier that Government

12    Exhibit 407 presented a significant risk of unfair prejudice to

13    the defendant.  The press release at issue is entitled, and I

14    quote, "Correctional Officer Arrested for Accepting a Bribe to

15    Smuggle Cellphones into the Metropolitan Correctional Center."

16    So obviously exposing the jury to a press release of this sort

17    risks significant unfair prejudice to Mr. Adams.  The obvious

18    parallel between the press release and Government Exhibit 407

19    in this case is that both in the government press release and

20    in this case are allegations that a correctional officer at the

21    MCC had accepted a bribe for purposes of smuggling materials

22    into the MCC.

23            So I remain of the view that there is significant

24    prejudice associated with Government Exhibit 407, and it's

25    highly unlikely that I will admit it.

LATAADA1ps

1          The other piece associated with Government Exhibit 407

2     is testimony that the government wishes to elicit as to

3     whether -- well, I'll just read it, the government's letter.

4     The government says, and I quote, "She's expected to

5     testify" -- this is the witness, Harris -- "she is expected to

6     testify she believed the incident was an act of bribery."

7          Now, let me comment on that for a second.  Obviously

8     the government can bring out all the details about the

9     interaction between Ms. Harris and Adams, what was said.  But

10    on the issue of whether this constitutes bribery, that's

11    ultimately the issue the jury is going to be asked to resolve.

12    And so I am uncomfortable about having the jury essentially

13    offer an opinion as to whether this constitutes bribery.  Now,

14    that may not be what the government intends, but that's the

15    effect of asking this witness, who really is not competent to

16    testify, about what is and what is not bribery, what her

17    opinion is as to whether her interactions were that of bribery.

18    So I'm troubled not only by the press release, for reasons I've

19    explained; I'm also troubled by any attempt to ask Ms. Harris

20    to opine on whether she thought this was, quote, an act of

21    bribery, close quote.

22         With respect to Government Exhibit 410, Government

23    Exhibit 410, as I understand it, is a text message that the

24    witness Harris sent to a friend on July 8.  So July 8, 2019 is

25    three days after Ms. Harris visited the MCC and allegedly

LATAADA1ps

smuggled in contraband and had sex with Mr. Adams later.  In

the text message, Ms. Harris reports to her friend that she had

sex with the defendant, and she says because he had bribed her.

Tangentially I will say that's a somewhat confusing

reference, because the government's theory is not that Harris

was bribed but, rather, that Mr. Adams was bribed.

But setting that aside, I do believe that 410 is

probative in that it indicates, even before Ms. Harris was

stopped at the MCC and detained at the MCC in mid August with

contraband, that she believed even then that her interaction

with Mr. Adams had been corrupt in nature, a corrupt quid pro

quo.  And that seems to me to be probative, because I suspect

there will be an attack on Ms. Harris's credibility, and I

suspect that there will be an assertion made by the defense

that she only manufactured this allegation against Mr. Adams

after she was stopped and detained herself in mid August.

We'll have to wait and see what the openings say on

this point, but I suspect that Ms. Harris's credibility will be

challenged in that regard and an argument will be made that she

fabricated this account once she herself was stopped and

detained at the MCC in mid August.

So my reaction is that 410 is probative on this

subject.  So I just wanted to give you my current sense of

these issues regarding these two exhibits to the extent they're

helpful.  As I said, it's without prejudice to the defendants

LATAADA1ps

1    submitting a letter giving me their views.

2            All right.  Are there other matters that the lawyers

3    want to raise before we head up to 26B?

4            MS. BHASKARAN:  Your Honor, I would just like to note

5    the expected timing of Harris's testimony insofar as it impacts

6    the Court's decision and defense counsel's, any response that

7    they wish to put before the Court.  We expect that she'll be

8    our second witness on Monday.  I do expect that she would start

9    probably sometime mid Monday morning, depending on the length

10   of the first witness's cross-examination.

11           THE COURT:  Yes.  I think I'm going to need, if the

12   defense wants to put something in on this, I'm going to need it

13   by 5 o'clock tomorrow, because I want some time to think about

14   it, and then my plan would be to rule on it at 9 a.m.

15           So we will meet at 9 a.m. Monday morning.  The jury

16   will be instructed to come back at 9:30.

17           Anything else that anyone wants to say before we take

18   a break?

19           MR. GREGORY:  Not from the defense.  Thank you.

20           THE COURT:  All right.  Then I will --

21           Yes, sir.

22           MR. SCHAEFFER:  Just one thing.  Our press office

23   likes to know if there is a telephone line.

24           THE COURT:  If there's a telephone line?

25           MR. SCHAEFFER:  For people to call in.  I think we're

LATAADA1ps

1    making a request, just in case there is one, just to let them

2    know.

3             THE COURT:  We got some kind of communication about

4    that, and I think I was told not to do that.

5             MR. SCHAEFFER:  It's an open courtroom, so --

6             THE COURT:  Yes.  I think I was told for purposes of

7    the criminal cases, now that we have an open court system that

8    anyone can come in, I'm not supposed to be doing the telephone

9    line anymore.  So you can tell your press office, no, there

10   won't be a phone line.

11            MR. SCHAEFFER:  Thank you, your Honor.

12            THE COURT:  If there's nothing else, I will see you,

13   let's say ten minutes, up in 26B.

14            MS. BHASKARAN:  Thank you, your Honor.

15            THE COURT:  Thank you.

16            (Recess)

17            (Jury not present)

18            THE COURT:  Are we prepared to proceed?

19            MR. SCHAEFFER:  Yes, your Honor.

20            MR. GREGORY:  Yes.

21            (Continued on next page)

22

23

24

25

LAT1ADA2                          Opening – Mr. Schaeffer

1              (Jury present)

2              THE COURT:  Ladies and gentlemen, we'll now hear the

3    government's opening statement.

4              Mr. Schaeffer.

5              MR. SCHAEFFER:  Thank you, your Honor.

6              Your Honor, while at the podium, would it be

7    permissible to remove my mask?

8              THE COURT:  Yes.  You can remove your mask.  The

9    lawyers can remove their mask when they're inside the podium.

10             MR. SCHAEFFER:  Thank you, your Honor.

11             This case is about a prison guard who exploited his

12   power to demand sex.  At this trial, you will hear how a

13   correctional officer caught a visitor, a young woman, trying to

14   smuggle drugs into a federal prison not far from this

15   courthouse.  But he never reported her, nor did he stop her

16   from coming back to the prison.  Instead, he exploited his

17   position and his authority to take advantage of her.  Instead

18   of doing his job and following the rules, that officer demanded

19   that she have sex with him or he'd turn her in.  That demand

20   was wrong, it was corrupt, and it was criminal.

21             That officer, ladies and gentlemen, is the defendant,

22   Robert Adams.

23             You'll hear that after threatening her, after

24   threatening to turn her in, the defendant took the young woman

25   to a motel and had sex with her, telling her again that that

1    was what she needed to do in order to avoid getting into

2    trouble.  And after that night, you'll hear that he concealed

3    what he'd done and allowed her to continue returning to the

4    prison.  As you'll learn, that was a crime too.  That's why

5    we're here today, because the defendant disregarded his duty,

6    because he abused his power and his position, because he broke

7    the law.

8            In this opening statement, I'm going to describe what

9    the evidence will prove, summarize the charges against the

10   defendant, and then explain how we'll prove those charges to

11   you.

12           So first, what will the evidence prove?  It will prove

13   that a young woman attempted to smuggle drugs to her former

14   boyfriend, who was an inmate at the Metropolitan Correctional

15   Center, or MCC for short.  Her name is Shahada Harris.  You

16   will learn that although they were no longer together,

17   Ms. Harris still had feelings for that inmate, and she'd

18   brought him drugs at the prison before.  That night, she

19   arrived at the prison with marijuana wrapped in tape and hidden

20   in her pants.  And when she thought no one was looking, she

21   gave it to him in the visiting room.

22           The defendant was on duty in the visiting room that

23   night.  He was responsible for watching the inmates and the

24   visitors, and it was his job to prevent contraband -- which is

25   drugs, tobacco, and any other item that's prohibited in the

1    prison -- from coming into the MCC.  And the evidence will show

2    that when the defendant took the inmate from the visiting room,

3    he found the drugs that Harris had given her former boyfriend.

4         Now the MCC's rules clearly required at that point for

5    the defendant to take the drugs, alert his lieutenant, and

6    report Harris, but he didn't.  Instead, the defendant saw an

7    opportunity.  He never contacted his supervisors; he never

8    turned in the drugs.  He went back to the visiting room, he

9    found Ms. Harris, he told her that he'd found the drugs, and he

10   told her that she was in big trouble.  And he said that she'd

11   better follow his instructions, and he directed her to meet him

12   nearby at a pizzeria.

13        Worried about getting in trouble, Harris did as she

14   was told.  She left the MCC without getting stopped or

15   questioned, and she went and waited as instructed.  Soon after

16   that, the defendant drove up and told her to get in his car.

17   That's when he demanded the bribe that brings us here today.

18   The defendant told Harris that he was taking her to a motel and

19   that if she didn't want to get in trouble, she needed to have

20   sex with him.  And he told her that if she did, she could keep

21   coming to the MCC.

22        So Harris did what the defendant wanted.  She let him

23   take her to a motel.  And when they got there, the defendant

24   repeated that this was the right thing to do if Harris wanted

25   to avoid jail, and wanted to keep visiting the MCC.

1        The defendant got what he wanted, and as a result, he

2   kept his end of the corrupt arrangement.  He never reported

3   Ms. Harris or the contraband that he found that day.  And

4   though he knew her actions should have barred her from the MCC,

5   the defendant kept quiet and let Harris keep coming back to the

6   prison, even as he made thinly veiled comments about her

7   bringing contraband back into the MCC.

8        About one month later, Harris again snuck drugs into

9   the MCC.  This time, however, the defendant wasn't there.  And

10  unlike the defendant, the people on duty that day did their

11  jobs.  They stopped Harris, they seized the drugs she was

12  carrying, and they reported her.  And when Harris confessed to

13  what she'd done, she also revealed what the defendant had done

14  to her.  That's what the evidence will show.

15       For his crimes, the defendant is charged with three

16  charges:

17       Bribery, for corruptly demanding sex in exchange for

18  not reporting Harris;

19       Blackmail, for threatening to turn her in unless she

20  had sex with him; and

21       Misprision of a felony, for concealing and failing to

22  report another crime -- here, Harris's attempt to smuggle drugs

23  into the prison, which the defendant later used as leverage

24  over her.

25       How will we prove those crimes to you beyond a

1    reasonable doubt?  You'll see several different kinds of

2    evidence at this trial.  You will hear testimony from witnesses

3    to these events, including a lieutenant who was on duty that

4    day at the MCC, who will confirm the clear, simple steps the

5    defendant was required to take, duty bound to take, but did

6    not.  He will tell you how the defendant was required to report

7    any contraband he found that day and that he'd done so in the

8    past, and you'll see documents setting forth the rules and

9    procedures the defendant ignored.

10            You'll hear from a woman who was in the MCC visiting

11    room that evening, someone who wasn't acquainted with Harris or

12    the defendant.  She'll tell you how she overheard the defendant

13    order Harris to meet him at the pizzeria, and you'll see video

14    footage from the MCC's security cameras showing that

15    confrontation.

16            You'll hear from a federal agent who later interviewed

17    the defendant.  She'll tell you that when she showed the

18    defendant a photo of Harris, he suddenly denied ever letting

19    contraband into the MCC, even though no one had said a word

20    about contraband, or even told the defendant why he was being

21    shown her photo.

22            And you'll hear from Shahada Harris, who will take

23    that witness stand and tell you how the defendant used his

24    position to demand sex.

25            Now let's be clear about something.  As she herself

LAT1ADA2                    Opening – Mr. Schaeffer

1    will tell you, it was wrong to bring drugs into the MCC.  In

2    fact, it's a crime.  But while her actions were wrong, that

3    doesn't make the defendant's actions right.  As you'll learn,

4    MCC rules required Harris to be reported and banned from the

5    institution, not threatened and taken to a motel for sex, not

6    to be exploited by a corrupt officer who abused his authority

7    to take advantage of her mistakes.

8              Pay close attention to Harris's testimony.  She will

9    describe in detail what happened on the day in question -- how

10   she brought drugs to the MCC, how the defendant confronted her,

11   and how he threatened to get her in trouble and ban her from

12   the MCC unless she had sex with him.  She'll also tell you what

13   happened in the following weeks.  You'll hear that the

14   defendant continued texting and flirting with Harris, trying to

15   arrange another sexual encounter.  And Harris, who wanted to

16   stay on the defendant's good side, will tell you how she

17   flirted back, sharing details about herself, sending nude

18   pictures, and even asking the defendant for favors.  You'll

19   hear that she did these things because as an officer at the

20   MCC, the defendant still had power over her.  She needed him to

21   keep liking her, to keep her secret, and to keep letting her

22   into the MCC.

23             As you'll learn, Harris entered into the agreement

24   with the government which says that she won't be prosecuted as

25   long as she cooperates and testifies truthfully at this trial.

1    Keep that in mind as you evaluate her testimony and look for

2    ways in which the other evidence that you'll see at this trial

3    corroborates her account -- evidence like the testimony from

4    the woman in the MCC's visiting room that night, which I just

5    described; prison logs confirming that Harris visited the MCC

6    on various dates; text messages showing Harris's communications

7    with the defendant; and evidence obtained from the defendant's

8    cellphone, which shows that he selectively deleted messages

9    with Harris to conceal his crimes.

10            This won't be a long trial, but it is an important

11   one.  Federal correctional officers have an important job, and

12   corrupt officers who abuse their position to take advantage of

13   the very people and institutions they're supposed to protect

14   threaten those very people and institutions.

15            So over the next few days I want to ask you to do just

16   three things: first, pay close attention to the evidence;

17   second, follow Judge Gardephe's instructions on the law; and

18   third, just use your common sense, the same common sense you

19   use every day in your own lives when deciding issues that are

20   important to you.  And if you do those three things, you will

21   see that the evidence in this case is clear, and you will reach

22   the only verdict consistent with that evidence, that the

23   defendant is guilty.

24            THE COURT:  Will the defense be offering an opening

25   statement?

1          MR. GREGORY:  Yes, I would, your Honor.  Thank you.

2          THE COURT:  Please proceed.

3          MR. GREGORY:  Good afternoon, ladies and gentlemen.

4     I'm glad I can see you now.  Before you were behind me.

5          I'd just like to thank you on behalf of Mr. Zach

6     Taylor, who is with me, and assisting, Mr. Nicholas Taliercio,

7     and Mr. Adams.  I'd like to thank you all for sitting on this

8     case.

9          Shahada Harris and Robert Adams went to the Hutchinson

10    Whitestone Motel on July 5, 2019, when they had sex.  That

11    encounter was 100 percent mutual and consensual.  And the

12    government's not going to be able to prove this case because

13    the actions that were taken by both of these people show that

14    this was a consensual sexual liaison, and what happened in the

15    days after was really a continuation of what happened on the

16    5th.

17         And why do I say that?  The evidence is going to show

18    that the first communication, contrary to what the government

19    just said, comes from Shahada Harris in the form of a text

20    message, less than three days after Mr. Adams and Ms. Harris

21    went to the motel together and consensually had sex.  And that

22    text message is a picture of Ms. Harris in a very revealing

23    negligee, and she's looking over her shoulder in an inviting

24    way.  She had Mr. Adams's number.

25         The messages that follow on July 9th, which was just

1    four days after this incident, this consensual sex, show that

2    Robert Adams and Ms. Harris very much want to continue this

3    relationship.  At one point on the 9th, Ms. Harris says she's

4    laying in bed, and Adams says, "I'd be right there with you."

5    These are text messages.  And she gives him a thumbs up sign.

6    Adams sends both sexually explicit and warm and kind and

7    friendly text messages.  And on the 9th, Ms. Harris follows up

8    with a picture of her laying in bed with her shirt pulled up

9    and her breasts showing.  And then she sends a picture of her

10   standing up in her panties only.  There are so many hearts and

11   kisses in these text messages that you'd think it's Valentine's

12   Day.  Adams finishes up -- one of the last texts he sends on

13   the 9th, four days after this happened, is, "Good night, my

14   love."

15              These communications are between two people who are

16   having an affair, not a blackmailer and a victim.

17              The government will try to use the fact that Robert

18   Adams, as a correction officer, didn't report Ms. Harris for

19   bringing in contraband, and that he violated the rules and

20   regulations of the MCC.  Mr. Adams isn't charged with violating

21   the regulations of the MCC, and he's not charged with being a

22   flawed person, who gave in to a carnal desire.  He's charged

23   with federal crimes, ladies and gentlemen.  And Mr. Adams is

24   innocent of those crimes.

25              39 days after going to the motel and having that

1    mutual encounter with Mr. Adams, Shahada Harris goes to the

2    MCC, on August 14th.  She gets caught bringing in a load of

3    contraband on that day.  She's doing it for money.  She stands

4    to make as much as a thousand dollars for that trip.  Mr. Adams

5    was in no way involved in any way, shape, or form in Ms. Harris

6    bringing that contraband to the MCC on that day.  Had nothing

7    to do with it.

8        When it's discovered, the contraband is found on her,

9    she immediately brings up Robert Adams.  And that's to escape

10   responsibility.  She knew she had a problem.  She knew that the

11   way to deal with the problem is to in effect shift the blame.

12   She's involved in a conspiracy with other people.  The money is

13   astronomical.  And she knows it's illegal, and if she gets

14   caught, she's going to have a problem.  After all, she's making

15   a thousand dollars for just a few hours' work.  She doesn't

16   have a job.  This is big money.

17       She gets arrested.  She tells the authorities, after

18   all these text messages that demonstrate the complete opposite,

19   she says that Adams had forced her to have sex, that in essence

20   he said to her:  If you don't have sex with me, I'm going to

21   report you.  That was just a lie, ladies and gentlemen.  And

22   you're going to see, during the course of Ms. Harris's

23   examination, I think most vividly on cross-examination, that

24   Ms. Harris does this a lot.  She does it all the time.  She

25   lies in order to get an advantage.  And in fact, ladies and

1  gentlemen, these very people at this table, she's lied to

2  repeatedly in their office.  She really -- Ms. Harris is a

3  human being, and she's a survivor.  Some people survive in

4  different ways.  I don't want to judge her, but she lives by a

5  different set of rules.  I mean, the rules she lives by are:

6  Say and do anything right now as long as it helps you at this

7  moment, and the consequences and the truth have no bearing.

8          Well, on August 14th, when she said that Robert Adams

9  had forced her to have sex, that lie, it worked.  She was home,

10 uptown in the Bronx, texting with a co-conspirator by the early

11 evening, free as a bird; no bail, no case; never was charged,

12 with any federal crimes.  Ms. Harris knows the street.  She's

13 not stupid, ladies and gentlemen.  She knew that as a

14 corrections officer, that Robert Adams isn't supposed to be

15 having sex with her, and she knew that when they separated that

16 day, that she had something on him.  She knew he was

17 compromised from the very beginning.  And in fact, ladies and

18 gentlemen, sometime later, she texted a friend, "I bagged one

19 of the feds."  "I bagged one of the feds."  She was figuring

20 out ways to turn this mutual, consensual sexual encounter to

21 her advantage.

22          Let me just talk a little bit about this conspiracy.

23 And I think the evidence is going to show we don't know

24 everything about the conspiracy because she's lied so many

25 times to the government that they don't even know all the ins

LAT1ADA2                    Opening – Mr. Gregory

1    and outs of this conspiracy.  But we know that Keith Outlaw was

2    a resident, inmate at the MCC, and he was the receiver of this

3    contraband; that he was Ms. Harris's person who received the

4    contraband when she brought it in.  The way in which they

5    communicated was that Keith Outlaw, as an inmate at the MCC,

6    would call her from smuggled-in cellphones, or a smuggled-in

7    cellphone.  The evidence is going to show that right around the

8    time of this liaison, this sexual encounter, that was

9    consensual, that Outlaw had his own private cellphone, illegal

10   cellphone.  It's obvious to everybody you're not supposed to

11   have a cellphone when you're in jail.  He had his own private

12   cellphone in the MCC from June 1st to July 16th.  Remember,

13   this happened July 5th.  So during that period of time he has

14   his own private cellphone.  And he and Ms. Harris, who's

15   smuggling in contraband, have over 250 communications during

16   that period of time, all unauthorized, all secret.  They also

17   have multiple text messages.  And during these communications,

18   they're talking business.  They're in business together, ladies

19   and gentlemen.  This is a conspiracy to introduce contraband

20   into the MCC.  And they're doing it to make money.

21          Ms. Harris and the inmate Mr. Outlaw, in the interest

22   of making as much money as they can possibly make, have a

23   discussion at some point about whether Ms. Harris should have

24   sex with Robert Adams to enlist him into their conspiracy.  Let

25   me say it again.  Ms. Harris and Keith Outlaw, the inmate, have

1    a discussion about whether she should have sex with Robert

2    Adams in order to enlist him into their conspiracy so they can

3    make money bringing in contraband.  Why Robert Adams?  Well,

4    the evidence is going to show that every time Shahada Harris

5    went from May 31st, all the way to July 5th -- I could name the

6    dates, but it was essentially every Friday, May 31st, June 7th,

7    June 14th, June 21st, right through the 5th -- I think she

8    missed one visit -- he was working either downstairs or in the

9    visitor room.  So they saw each other multiple times.  Adams

10   was -- he was an easy guy at the jail.  You're going to hear

11   that he was outgoing, that he talked to the visitors, that some

12   of the COs were just nasty and mean, that he wasn't like that;

13   that Adams was chatty, he flirted with the women.  And

14   Ms. Harris, you're going to see here, is a very attractive

15   woman, and she knew, as to quote her, the men go crazy about

16   her.

17             So let's talk a little about July 5th.

18             The visit session ends at the MCC.  Everybody's

19   supposed to be out sometime before 8:00, 8 p.m.  Shahada Harris

20   has come through security on the first floor.  She's up in the

21   visitor room.  She's successfully passed the contraband to

22   Outlaw.  The visit's over.  Adams takes Keith Outlaw, the

23   inmate, out of the visitor room, to the back, search room.  He

24   recovers the contraband, close to the end of the shift.  The

25   rule says -- and the government's right.  The rule says you're

1  supposed to immediately call a lieutenant and report that he

2  found contraband on an inmate.  He didn't do it.  He should

3  have done it, ladies and gentlemen.  The evidence is going to

4  show, through their witnesses, that he had recovered contraband

5  on multiple occasions before this, and it was still coming in.

6  He violated the rules.

7           After he finds the contraband, he makes the decision

8  not to report it, because he's supposed to report it right

9  away.  He comes out about four and a half minutes after he's

10  taken Outlaw out of the visitor's room, done the search.

11  Outlaw presumably goes back to his unit.  Adams comes out from

12  the search room, and the visitors are still there.  They

13  haven't been taken down by another officer, which very well

14  could have happened here.

15           The evidence is going to show Adams approaches Shahada

16  Harris, and he says:  "Your boy fucked up.  You can't bring

17  drugs into the MCC.  If anybody else had caught you, you'd be

18  in big trouble."  There's a witness there.  There's some other

19  conversation back and forth.  He does say:  "I want you to meet

20  me at the pizzeria outside."

21           Ms. Harris goes downstairs.  She gets out of the MCC

22  before Adams goes down.  She walks out the front door.

23           Now remember, this woman, she's street.  She knows her

24  way around.  She's not somebody who was born yesterday from

25  Minnesota.  She's from the Bronx.  She knows when she walks out

1   of that building, she's free as a bird.  She could have skipped

2   on out of there and gone to the train and that's it.  But what

3   the government isn't going to tell you is that she had one

4   interest in mind, and it wasn't fear of Robert Adams.  That's

5   not why she went to meet him.  She went to meet Adams because

6   she wanted to continue the visits.  Now whether it was money,

7   the money was good, but whether or not it was love, we don't

8   know.  We can't trust what she says.  But we do know the reason

9   why she went out there was that she wanted to be able to

10  continue to visit the MCC.

11          They meet outside.  Adams says to her:  What are you

12  doing?  What are you doing with a guy like Keith Outlaw, who

13  makes you bring drugs into the MCC?  Keith Outlaw doesn't love

14  you if he's making you bring drugs into the MCC.  In essence he

15  tells her, it's not worth it, and that he's cut her a break.

16  Can't stand to see a young woman throwing her life away.

17          Also, there's no question that Ms. Harris is a very

18  attractive woman.  He violated the policy.  He didn't commit a

19  crime.

20          Within minutes, ladies and gentlemen -- the government

21  didn't tell you this.  Within minutes, Shahada Harris asked

22  Robert Adams for his phone number.  At that moment she's

23  letting Adams know, I'm interested.  After all, she says later

24  in the ride, men go crazy about her.  She's in the car with

25  Adams -- he has a car -- and the subject that she's concerned

1   about comes up shortly after they start the ride.  And Adams

2   gives her a quid pro quo, the only one in the case.  It's not

3   sex, ladies and gentlemen.  No.  He says:  You can continue the

4   visits, but you can't bring anything into the MCC.  You can

5   continue the visits, but you can't bring any contraband in.

6   You know what, ladies and gentlemen, the government didn't tell

7   you?  When she thought Adams was working, she didn't bring

8   anything into the MCC.  She came to do her visits, she came to

9   see Outlaw, but she didn't come with any contraband.  She knew

10  Adams meant what he said when he said you can't bring anything

11  in.

12          During the time they were together, Adams confided in

13  Ms. Harris that he was married.  And you know that because it

14  was on the questionnaire.  Well, you knew one of them was

15  married.  I suggest that it's the last thing you say to

16  somebody that you just coerced into having sex.  They shared

17  intimate details about their lives.

18          They go to the motel; they engage in sex.  Adams drops

19  Shahada Harris off sometime close to 10:00.  We don't know

20  exactly what time.  Guess who Shahada Harris calls at 10:22,

21  shortly after she's dropped off?  She calls Keith Outlaw,

22  ladies and gentlemen, who's got his own private cellphone in

23  the MCC.

24          The next day, on the 6th, Harris is on the phone with

25  Keith Outlaw -- I believe he calls her, from his private

LAT1ADA2                    Opening - Mr. Gregory

1    cellphone -- at 12:50 p.m.  They have a 3-minute-and-39-second

2    phone call.  She gets off the phone with Outlaw, and who do you

3    think she calls, couple minutes later?  Robert Adams.  This

4    isn't a coincidence, ladies and gentlemen.  She's on the phone

5    with the same guy that she had a conversation with about the

6    potential of enlisting this guy into her conspiracy by using

7    sex.  Ladies and gentlemen, Shahada Harris wanted something out

8    of this relationship.  She wanted the same thing that she was

9    getting out of smuggling drugs.  She wanted money.  She makes

10   it clear from the very beginning that's what she's after.

11        On the 6th of July, at 7:18 p.m., less than 24 hours

12   after she met him outside the MCC, she draws up a request for a

13   hundred dollars, through Cash App for a hundred dollars.  She

14   doesn't send it, but it shows what's in her mind.  Sometime

15   later she texts Adams asking him for money.  Adams never gave

16   her any money.  Chances are, if he'd given her money, he

17   wouldn't be sitting right there, ladies and gentlemen.

18        She needed an escape when she got found out on

19   August 14th.  She needed to shift responsibility and blame.

20   And necessity, ladies and gentlemen, is the mother of

21   invention.  This consensual encounter became a forced

22   encounter.  She got in a lot deeper than what she thought she

23   would.  As I said earlier, the way she lives life is, say

24   whatever benefits me now and I'll worry about what's gonna

25   happen later, later.  Here, she got in a lot deeper than she

1    ever thought she would get in.

2          She's had multiple meetings with the government.

3    She's been dishonest repeatedly.  She meets them on the day

4    that she was found out, she was arrested, on August 14th, and

5    she says she doesn't know who's given her the drugs to bring

6    into the MCC.  It's a lie.

7          She meets them on the 22nd of August, eight days

8    later; they ask her questions about the conspiracy.  She's

9    told:  You just have to be honest.  You just have to tell the

10   truth.  And she lies.

11         She comes in on September 12th, I think it was, 2020.

12   It's an important meeting.  She's got a lawyer there.  She's

13   told:  Just be honest.  She lies.

14         Ladies and gentlemen, that's an innocent man.  There's

15   no doubt he didn't follow the procedures.  Any one of you know

16   without being told that if you're a CO, you're required to

17   report the introduction of contraband.  These people are going

18   to introduce stacks and stacks of rules and regulations and put

19   on testimony after testimony about rules and regulations.  He

20   should have reported it.  He didn't report it.  They will act

21   as though Mr. Adams, in not reporting this, indicates he must

22   have used his authority over Ms. Harris to have sex.  No.  He

23   gave her a break, and after meeting her and explaining to

24   Ms. Harris how she was being used by Outlaw, who was having her

25   bring in drugs, Shahada Harris asked him for his phone number.

LAT1ADA2                    Opening - Mr. Gregory

1    She took it down, she put it in her phone at 8:12 p.m.  That

2    was her way of saying, I'm interested.  Shortly after that,

3    they're on their way to a motel, to engage in an affair.

4            He deleted some messages, the government says to hide

5    his culpability from law enforcement.  Well, anybody, any

6    child, any person on this jury knows if you're cheating on your

7    wife, you get rid of the evidence off your phone because that's

8    where it's going to be found.  So that's my answer to that

9    allegation.

10           There's three charges here -- bribery, blackmail,

11   misprision of a felony.  The judge is going to tell you -- and

12   I don't want to get into the law, but -- the bribery charge is

13   that he took -- Mr. Adams took or failed to take an official

14   act in return for something of value; namely, sex.  Blackmail,

15   that he told Ms. Harris if she didn't give him sex, that he

16   would report her.

17           And then there's the misprision of a felony.  And this

18   is the "Hail Mary" charge.  And the prosecution adds this

19   charge because they have a flimsy case.  They can't prove this

20   either, because the gravamen of that charge is that Robert

21   Adams not only failed to report that which he was required to

22   report, and they make out that element, but that he took some

23   affirmative act to conceal the crime that he didn't report,

24   like erasing the tape or like lying about it.  They say, well,

25   when he was approached and shown a photograph of Ms. Harris, he

LAT1ADA2

1    right away said:  I never let any contraband come in and I

2    never met anybody else bringing it in.  Guess what, ladies and

3    gentlemen?  That was true.  He knew what Shahada Harris was

4    doing, and the truth was, he never let any contraband come in

5    and he never let anybody else bring any contraband in.

6           I'm going to ask all of you to keep an open mind.

7    Please remember, the judge is going to instruct you that the

8    prosecution has the burden in this case.  And they have to

9    prove this case beyond a reasonable doubt.  Be fair and follow

10   the rules, and at the end of this case, you'll find this

11   innocent man not guilty of all charges.

12          Thank you.

13          THE COURT:  All right.  Ladies and gentlemen, we're

14   going to break a little early today.  It's been a long day.

15   Please don't discuss the case with anyone over the weekend.

16   Please do keep an open mind.  You haven't heard any evidence

17   yet.  You've just heard arguments from the lawyers.  Have a

18   pleasant weekend, and we'll resume at 9:30 on Monday morning.

19   Thank you all very much.  Have a pleasant weekend.

20          (Jury not present)

21          THE COURT:  Please be seated.

22          As I said downstairs, we will meet at 9 a.m. on Monday

23   morning so that I can issue a ruling with respect to Government

24   Exhibits 407 and 410.  The defense will put in a letter by 5:00

25   tomorrow, if it wishes, with respect to these exhibits.

LAT1ADA2

1    Are there other matters the lawyers want to raise now?

2    MS. BHASKARAN:  Yes, your Honor.  Just one matter.  I

3    realize we just opened, but I just thought I would raise the

4    issue of the scheduling of our charge conference.  I think it's

5    conceivable that we could be ready for closing arguments on

6    Tuesday, and if we want to be ready for that, the government

7    would be prepared for a charge conference Monday after the

8    close of business.

9    THE COURT:  Does the defense have a sense of whether

10   there will be a defense case here?

11   MR. GREGORY:  Judge, we're not a hundred percent sure.

12   We don't know yet, but if we do, it will be very short.

13   THE COURT:  All right.  Well, that's very helpful in

14   terms of scheduling.  We'll certainly be working on the charge

15   this weekend.  I can't tell you now when the charge conference

16   will be, but it seems unlikely it will be on Monday.  Perhaps

17   Tuesday morning we'll have the jury come in late.  I'm not

18   sure.  But I appreciate you telling me that the case may move

19   very quickly because we will certainly focus on the jury charge

20   over the weekend.

21   Anything else the lawyers want to say before we break?

22   MR. GREGORY:  Nothing from us, your Honor.  Thank you.

23   THE COURT:  All right.  So we'll resume at 9 a.m. on

24   Monday morning.  Thank you.

25   (Adjourned to November 1, 2021, at 9:00 a.m.)