LB11ADA1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        20 Cr. 494 (PGG)

ROBERT ADAMS,

            Defendant.               Jury Trial
------------------------------x

                                     New York, N.Y.
                                     November 1, 2021
                                     9:17 a.m.


Before:

              HON. PAUL G. GARDEPHE,

                                     District Judge


                   APPEARANCES

A. DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JARROD L. SCHAEFFER, ESQ.
     RUSHMI BHASKARAN, ESQ.
     NICOLAS T. ROOS, ESQ.
     Assistant United States Attorneys

SAMUEL GREGORY, ESQ.
     Attorney for Defendant

TAYLOR & COHEN LLP
     Attorneys for Defendant
BY:  ZACHARY S. TAYLOR, ESQ.

ALSO PRESENT:  ANNIE PHIFER, Paralegal Specialist, USAO
               NICHOLAS TALIERCIO, ESQ.
```

LB11ADA1

1          (In open court; jury not present)

2          THE COURT:  I will now address the government's

3     October 29, 2021 letter (Dkt. No. 49), in which the government

4     renews its application to admit Government Exhibit 407 and

5     Government Exhibit 410.

6          Government Exhibit 407 is a screenshot from Shahada

7     Harris's cellphone.  The screenshot is of an August 23, 2018

8     press release issued by the U.S. Attorney's Office for this

9     district announcing bribery charges against Dario Quirumbay, an

10    MCC correctional officer, arising out of his smuggling of

11    contraband into the MCC.  Harris saved this screenshot to her

12    cellphone on July 7, 2019.

13         Government 410 reflects July 8, 2019 text messages

14    that Harris sent to a friend in which she reports that she had

15    sex with a "Federal officer" and that he had "bribed" her.

16         These exhibits were addressed in a notion *in limine*

17    submitted by the government on September 27, 2021.  (*See* Govt.

18    MIL Br. (Dkt. No. 33) at 5, 9, 9 n. 3)  On October 25, 2021, I

19    reserved decision concerning these exhibits, saying that the

20    government had not demonstrated that they were relevant to a

21    disputed issue in this case.  I also expressed concern that

22    Government Exhibit 407 was likely more prejudicial than

23    probative under Rule 403.  (*See* Oct. 25, 2021 Hearing Tr. at 7)

24         As to Government Exhibit 407, in its October 29, 2021

25    letter, the government argues that Harris's screenshot of the

LB11ADA1

press release "is relevant, non-hearsay evidence of [her] state
of mind," which is in turn circumstantial evidence of Adams's
state of mind and the existence of a corrupt *quid pro quo*
agreement between the two.  The government further argues that
the screenshot is relevant to rebut Adams's expected claim of
recent fabrication.  (Oct. 29, 2021 Govt. Ltr. (Dkt. No. 49)
at 4)

As to the Court's Rule 403 concerns, the government
contends that "nothing about [GX407] is unfairly prejudicial to
the defendant."  *(Id.* at 5)  According to the government, any
risk of prejudice can be addressed by redacting the exhibit to
show only the title of the press release and the general
description of the charges against the other corrections
officer.  (*Id.*) As redacted, the exhibit would "speak only to
the fact that a correctional officer was charged (not
convicted) with the bribery in connection with a smuggling
scheme."  *(Id.)*  The government's arguments are not persuasive.

Government Exhibit 407 could be used as a textbook
example of material that should be excluded under Rule 403.
The title referenced by the government reads as follows:
"Correctional Officer Arrested for Accepting a Bribe to Smuggle
Cellphones into the Metropolitan Correctional Center."  The
press release thus addresses the same crime charged against
Mr. Adams, allegedly committed at the same institution, the
MCC.  Admission of the exhibit would suggest to the jury that

LB11ADA1

1    the MCC has a significant problem with corrections officers

2    facilitating the admission of contraband into the facility.  It

3    would also invite the jury to make a finding of guilt by

4    association.

5         My deputy just informed me that we don't have

6    Mr. Adams in the courtroom.  Mr. Gregory, where is your client?

7         MR. GREGORY:  Judge, I just both called him and texted

8    him.  I got no answer, so I assume --

9         THE COURT:  Sorry.  I can't hear you.

10        MR. GREGORY:  Sorry, Judge.  I just called him on the

11   phone and sent him a text message.  My thought is that he could

12   have gone to 40 Foley first, but I have not -- I turned my

13   phone off.  He has -- I'm hopeful he'll be on the train or here

14   shortly.

15        THE COURT:  We were actually just over in courtroom

16   705.  He was not there.  So I don't think he's at 40 Foley.

17        MR. GREGORY:  Yeah, I had no information, but I

18   assumed that he could have made that error since Mr. Taylor and

19   I discussed whether we should go there first, and obviously

20   we're here.  I'm hopeful he'll be here momentarily.  I did call

21   and got no answer, and I could check again if the Court wants.

22        THE COURT:  Yes.  Go ahead.

23        MR. GREGORY:  For the purposes of this legal argument,

24   I would waive his appearance, Judge.

25        THE COURT:  All right.  Why don't you call and find

LB11ADA1

1 out where he is.

2       MR. GREGORY:  All right.

3       (Pause)

4       MR. GREGORY:  No answer.

5       THE COURT:  All right.  Well, Mr. Gregory, are you

6 waiving his presence for purposes of this legal ruling that I'm

7 making?

8       MR. GREGORY:  Yes.

9       THE COURT:  All right.  Then I will continue.

10       The government argues that the press release shows

11 that -- as of July 7, 2019 -- Harris understood that her

12 interaction with Adams involved a bribe.  (*See* Oct. 29, 2021

13 Govt. Ltr. (Dkt. No. 49) at 4)  The exhibit does not support

14 such an inference, however.  It suggests instead that she may

15 have read a press release about another MCC corrections officer

16 who accepted a bribe.  In order to know whether she

17 independently believed -- before she read the press release --

18 that her interaction with Adams may have constituted a bribe,

19 we would need to know, among other things, the search query

20 that yielded the press release.  The press release could have

21 suggested the bribe idea to Harris rather than vice versa.

22       I have no information before me as to the search query

23 that yielded the press release.

24       In sum, the press release has marginal probative value

25 for the purpose that the government has identified.  The press

LB11ADA1

release, however, presents a risk of substantial unfair

prejudice to Adams, for the reasons I have stated.  Even with

the government's proposed redactions, the press release

suggests that the crime with which Adams is charged is commonly

committed by MCC corrections officers.  It invites the jury to

make a finding of guilt by association.  Such "[g]uilt by

association is just what Fed. R. Evid. 403 was intended to

exclude."  *United States* v. *Wassner*, 141 F.R.D. 399, 405

(S.D.N.Y. 1992).

Accordingly, the government's motion *in limine* is --

as to Government Exhibit 407 -- denied on the grounds that the

"probative value [of this exhibit] is substantially outweighed

by a danger of... unfair prejudice [to the defendant]" under

Fed. R. Evid. 403.

As to Government Exhibit 410, that exhibit reflects

July 8, 2019 text messages that Harris sent to a friend about

her encounter with a "Federal officer."

In the text messages, Harris reports that something

"weird happened to me."  Using a racial epithet, Harris tells

her friend that this man "took the condom off."  The friend

asked, "[w]at you mean 'something weird' he took the pussy?"

Harris replied, "nawh bribed me.  Then pulled the condom off

the last 20 seconds."  When the friend asked Harris who had

done this, Harris replied, "he a officer... Federal officer."

(*See* Oct. 29, 2021 Govt. Ltr. (Dkt. No. 49) at 3)

LB11ADA1

1        The government contends that these text messages are
2   admissible under Fed. R. Evid. 801(d)(1)(b) to rebut a claim of
3   recent fabrication.  (*Id.* at 6) In the defendant's opening,
4   defense counsel asserted that Harris fabricated her allegations
5   against Adams after her arrest in the MCC on August 14, 2019,
6   having been caught smuggling contraband into the MCC.  (Trial
7   Tr. at 59-60, 66)  The government also appears to argue that
8   the text messages may be introduced pursuant to Fed. R. Evid.
9   803(3), because they are probative of Harris's "then-existing
10  mental state" on July 8, 2019.  (Oct. 29, 2021 Govt. Ltr. (Dkt.
11  No. 49) at 5)

12       The record should reflect that Mr. Adams has entered
13  the courtroom.

14       There is no dispute here that Adams and Harris had
15  sex.  Adams admitted this fact in his opening statement.
16  (Trial Tr. at 57)  Accordingly, the disputed issue to which
17  these text messages relate is whether there was a corrupt
18  relationship between the two.

19       As I just noted, the government argues that Adams's
20  state of mind can be proven through evidence showing Harris's
21  state of mind.  (*See* Govt. Oct. 29, 21 Ltr. (Dkt. No. 49) at 4)
22  As I will explain in a moment, I conclude that the government
23  cannot prove Adams's state of mind with respect to the charged
24  bribery and blackmail offenses by showing Harris's state of
25  mind.

LB11ADA1

1      In its October 29, 2021 letter, the government states

2  that Harris will testify that "she viewed the defendant's

3  demand for sex from her in exchange for not reporting as the

4  defendant bribing her."  *(Id.* at 6)  The government argues that

5  "[i]n bribery and extortion prosecutions, courts have

6  recognized that the state of mind of the bribee/victim of

7  extortion is relevant."  *(Id.* at 3)

8      The cases on which the government relies all involve

9  Hobbs Act extortion charges.  (*See id.* (collecting cases))  In

10  a Hobbs Act extortion case, the government must prove that

11  there was an element of "inducement" between the defendant and

12  the victim, which "requires proof as to each party's belief or

13  understanding as to the purpose for which payment is made."

14  *United States v. Silver*, 948 F.3d 538, 549 (2d Cir. 2020); *see*

15  *also United States* v. *McDonough*, 56 F.3d 381, 388 (2d Cir.

16  1995) (explaining that, to prove Hobbs Act extortion under

17  color of official right, "the government must prove... that the

18  victims were motivated to make payments" as a result of the

19  defendant's ability to influence official decisions).

20      But the elements of Hobbs Act extortion are different

21  from the elements of receiving or soliciting a bribe in

22  violation of 18 U.S.C. § 201(b)(1).  To prove bribery under

23  Section 201(b)(1), "the government only has to prove that [the

24  defendant] -- not the bribe giver -- understood that, as a

25  result of the bribe, he was expected to exercise official

LB11ADA1

1    influence or take official action for the benefit of the

2    payor..." *Silver*, 948 F.3d at 552.

3           Thus, to the extent that government seeks to elicit

4    from Harris whether she believed Adams had solicited an illegal

5    bribe from her, that line of questioning will not be permitted.

6    Unlike an extortion case, in which the extortion victim's state

7    of mind goes to an element of the offense, Harris's

8    understanding of whether Adams had solicited a bribe from her

9    is irrelevant to this case.  Only Adams's corrupt intent is at

10   issue, and it is for the jury to decide whether Adams is guilty

11   of bribery, not Harris.

12          The government may, of course, elicit testimony from

13   Harris regarding her interactions with Adams on July 5, 2019,

14   including what he said to her and what she said to him.  But it

15   will be up to the jury to determine whether these interactions,

16   including Adams's words and actions, demonstrate his intent to

17   commit the crime of bribery.  And Harris will not be permitted

18   to express an opinion on that subject, or to testify as to

19   whether she believed that he was soliciting a bribe from her.

20   Such testimony is irrelevant to the crimes with which Adams is

21   charged and would confuse the jury, because such testimony

22   would suggest that what matters here is Harris's state of mind,

23   when what matters is Adams's state of mind.

24          Although I will not permit the government to elicit an

25   opinion from Harris as to whether Adams solicited a bribe from

LB11ADA1

her, I will nonetheless permit Government Exhibit 410 to be
introduced because it is admissible under Rule 801(d)(1)(b) to
rebut a claim of recent fabrication.

As a result of the defense opening, it is now clear
that the defense intends to argue that Harris fabricated her
allegations about Adams after she was detained at the MCC on
August 14, 2019, for smuggling contraband into the MCC.  In
Harris's July 8, 2019 text messages, Harris tells a friend --
three days after her encounter with Adams and more than a month
before her August 2019 detention -- that the sex she provided
to the "Federal officer" was part of a corrupt arrangement
between the two.  To the extent that the defense now contends
that Harris invented her allegations of a corrupt relationship
with Adams after her August 14, 2019 arrest, the July 8, 2019
text messages tend to rebut defendant's claim of recent
fabrication.

Fed. R. Evid. 801(d)(1)(b) provides that a witness's
prior out-of-court statement is not hearsay if it is
"consistent with the declarant's testimony and is offered: (i)
to rebut an express or implied charge that the declarant
recently fabricated it or acted from a recent improper
influence or motive in so testifying; or (ii) to rehabilitate
the declarant's credibility as a witness when attacked on
another ground."

Accordingly, under Rule 801(d)(1)(b)(i), prior

LB11ADA1

1    consistent statements may be introduced to rebut an implication

2    that a witness has fabricated his or her testimony to curry

3    favor with the government. *See, e.g., United States* v. *Davis*,

4    2020 WL 1233771, at *4 (S.D.N.Y. Mar. 12, 2020); *United States*

5    v. *Mack*, 2016 WL 4373695, at *10 (D. Conn. Aug. 15, 2016).

6         However, a witness's prior consistent statement is

7    admissible under Rule 801(d)(1)(b) only when "those statements

8    [were] made before the fabrication or improper influence or

9    motive arose." *Tome* v. *United States*, 513 U.S. 150, 159

10   (1995).

11        Here, the defense has told the jury in its opening

12   that the sex between Adams and Harris was entirely consensual,

13   and that Harris fabricated her allegations of coerced sex only

14   after being arrested at the MCC five weeks after her sexual

15   encounter with Adams.  (Trial Tr. at 59-60)  According to the

16   defense, Harris fabricated her account of coerced sex in order

17   to avoid punishment for her smuggling in of contraband.  *(Id.*

18   at 66)

19        The fact that Harris told a friend on July 8, 2019,

20   that her sexual encounter with Adams arose from a corrupt

21   arrangement between the two is admissible to rebut defendant's

22   claim -- articulated in the defense opening -- that Harris's

23   allegations were recently fabricated.  The text messages are

24   thus admissible under Rule 801(d)(1)(b).  Moreover, because

25   defendant's claim of recent fabrication was made in the defense

LB11ADA1

1    opening, the government will be permitted to introduce the

2    July 8, 2019 text messages during Harris's direct testimony.

3    *See United States* v. *Flores*, 945 F.3d 687, 706 (2d Cir. 2019)

4    (explaining that Rule 801(d)(1)(b) "does not restrict

5    admissibility to statements of one who has already been

6    cross-examined").

7              In sum, the government's motion *in limine* is denied as

8    to Government Exhibit 407 but granted as to Government

9    Exhibit 410 to the extent that Government Exhibit 410 will be

10   admitted to rebut defendant's claim of recent fabrication,

11   pursuant to Fed. R. Evid. 801(d)(1)(b).

12             All right.  Is there anything we need to take up

13   before I bring in the jury?

14             MS. BHASKARAN:  Your Honor, just one point of

15   clarification on your Honor's legal ruling just now.  When the

16   government introduces Government Exhibit 410 on Ms. Harris's

17   direct examination, will it be permitted to ask Ms. Harris what

18   she meant when she said "nawh, bribed me"?

19             THE COURT:  Yes, I will permit you to elicit from her

20   what she meant.

21             MS. BHASKARAN:  Thank you.

22             THE COURT:  Mr. Gregory, do you wish to be heard on

23   that subject?

24             MR. GREGORY:  No, Judge.  Another subject.

25             THE COURT:  Okay.  Go ahead.

LB11ADA1

1          MR. GREGORY:  Judge, I just wanted to note -- I guess

2     I'm asking for an anticipatory ruling -- that if I ask

3     Ms. Harris whether she previously read an article that

4     mentioned the term "bribery" concerning corrections officers,

5     do I open the door to that entire exhibit coming in?

6          THE COURT:  Well, you certainly risk that.  I think

7     it's fair to say that you risk that.  I mean, I don't know

8     where it's going, I don't know what she's going to say, but to

9     the extent that you elicit from her that she read an article

10    about an MCC officer who had been charged with bribery, to the

11    extent you lay that before the jury, yes, I think you do risk

12    admission of the exhibit.  I'll have to see what she says.

13    I'll have to hear what you ask.  But it's certainly a risk that

14    you're opening the door.  I can understand why you might want

15    to open the door for the reason I articulated, which is, while

16    the government wants to argue that bribery was already on her

17    mind, you want to argue, I suspect, that she only thought of

18    bribery after she found the article.

19          MR. GREGORY:  Correct, Judge.  And there is nothing

20    that I saw -- I could have missed it -- in the search history

21    which indicates that, that there was anything that would have

22    brought this article up -- namely, bribery or corruption or

23    anything like that, smuggling.  There was nothing like that in

24    her searches.

25          Judge, there was one other --

LB11ADA1

1    THE COURT:  So anyway, just to finish the point, I

2    can't tell you whether I will admit the exhibit.  I'll have to

3    hear what your questions are and what her answers are, but I

4    put you on notice that there certainly is a chance that by

5    questioning her about the exhibits, if the government moves

6    that the exhibit be admitted, I'll have to give that serious

7    consideration.

8    MR. GREGORY:  I understand.  Judge, can I just confer

9    with the government on one other issue.

10   THE COURT:  Go ahead.

11   (Counsel conferring)

12   MR. GREGORY:  Judge, this is one other issue which I

13   think we have to deal with now; that the government last night,

14   I think probably in response to what I said in the opening --

15   which if I had it over again, I wouldn't have said -- wants to

16   bring in a whole slew of photographs on Mr. Adams's phone.  I

17   guess dirty pictures is what I should say.  There must be 15 or

18   20 of them.  And most of which come from a relationship that

19   was never consummated with a woman named Michelle Rodriguez

20   that the government interviewed, I guess to show that the

21   statement that I made in opening statement that he deleted

22   these messages because he wanted to hide them from his wife is

23   that wasn't so.  And I think, Judge, at this point we should

24   deal with that issue, because I have a proposal which I think

25   cures what I said and leaves the government in a significantly

LB11ADA1

1    better position than they would have been if I had said that,

2    but these pictures shouldn't come in, Judge.  This is a brand

3    new exhibit.  They want to bring in a slew of photographs on

4    his phone that were not part of their exhibits.  They were not

5    argued during the motion *in limine* stage because of the

6    interview they had with Ms. Rodriguez, which she said:  We were

7    never involved with one another.  And so here's my proposal.

8    Rather than let those photographs in, that we not be permitted

9    again to mention that the reason why he deleted the

10    communications with Shahada Harris was to prevent his wife from

11    finding them and that the government has -- and that would

12    obviously partly cure this error, and then the government has

13    free rein during their rebuttal to say:  You remember what

14    Mr. Gregory said in the opening about him hiding this from his

15    wife?  Well, you never heard that argument again, because that

16    argument is a false argument and not a persuasive argument.

17    They cure any error, the one sentence that I put in, and we

18    don't have to have a big fight about these photographs that are

19    just highly prejudicial and terrible, that we never got a

20    chance to deal with through argument, Judge.

21             THE COURT:  So what are the photographs of?

22             MR. GREGORY:  Just photographs of vaginas, naked

23    women.

24             THE COURT:  And what do they have to do with this

25    woman?  Did she take pictures of herself and send them to him?

LB11ADA1

1          MR. GREGORY:  Those are other pictures.  The woman

2    is -- I think the pictures she takes are non-X-rated.  They're

3    pictures of her in suggestive poses with clothes on.  But the

4    other pictures are extremely graphic, and I just don't see that

5    these pictures are particularly relevant, and they're highly

6    prejudicial.  So what I would say is that my proposal cures

7    this error, leaves the government in better shape than it would

8    be if I hadn't said this, and doesn't bring in a whole slew of

9    photographs where we have to fight about that for the next

10   hour, because when the Court sees these, I'm sure the Court's

11   going to feel the same way I do, that the prejudice of these

12   photographs far outweigh any probative value.

13          THE COURT:  All right.  What does the government say?

14          MS. BHASKARAN:  Your Honor, Mr. Gregory is right.  The

15   reason we introduced this exhibit was because during his

16   opening, he said to the jury, the reason Mr. Adams deleted

17   these photos was because he didn't want his wife to see

18   evidence of this quote-unquote affair.

19          THE COURT:  I'm sorry.  The reason why he deleted

20   what?

21          MS. BHASKARAN:  So the reason why Mr. Adams deleted

22   his text messages with Ms. Harris was because he didn't want

23   his wife to know he was having a so-called affair with

24   Ms. Harris, and so the government is entitled to rebut that

25   defense argument, which is out there.  It's out there in the

LB11ADA1

1    ether now, and you really can't take that back.  The

2    government's proposed exhibit is data from the defendant's

3    phone.  It consists of the text messages with a woman named

4    Michelle Rodriguez.  In those text messages, there's evidence

5    that they in fact met up.  There's a text message that says,

6    "On my way down," or like, "On your street," and she says, "I'm

7    on my way down."  They then engage in a series of text messages

8    that are not unlike the text messages that the defendant had

9    with Ms. Harris, where they're sending photographs with each

10   other.

11          In addition to the text messages, the government's

12   exhibit includes other photographs of Ms. Rodriguez that the

13   defendant received through text messages, other photos of

14   perhaps a different woman that appeared to be taken by the

15   defendant's phone, and, in addition, other photographs of

16   Ms. Harris that the defendant saved on his phone but are not

17   connected to any text messages.  We will argue that they're not

18   connected to any text messages, of course, because he deleted

19   it.

20          Mr. Gregory's proposed solution does not cure the

21   issue for the government.  Again, that statement was out there,

22   it was an emphatic statement that he made during his opening,

23   and the government is entitled to rebut that argument.

24          With respect to the prejudice here, there's no unfair

25   prejudice, which is the matter that the Court needs to

LB11ADA1

1      consider.  We are happy to show the Court the exhibit.  We have

2      made efforts to redact the most graphic parts of the photograph

3      so it's not as jarring as it needs to be.  But we think this is

4      important evidence to rebut any argument that the defendant

5      deleted his text messages with Ms. Harris because of some

6      concern of someone else finding out about an affair.

7                THE COURT:  When would you be seeking to introduce

8      this?

9                MS. BHASKARAN:  This would be introduced during our

10      last government witness, through Mr. Enrique Santos.  It's

11      possible we'll get to him today but certainly not until late

12      afternoon.

13                THE COURT:  Mr. Gregory?

14                MR. GREGORY:  Judge, I just think that seems to be

15      overkill to me, that if we don't make that argument again --

16      and we won't, I'll concede to the Court I shouldn't have said

17      it -- we don't make that argument again, they're permitted to

18      call Santos, to bring out that he deleted all the messages

19      between he and Shahada Harris.  We don't ask any questions on

20      that, they sum up, we sum up, we never mention that he deleted

21      these from his wife, and they say:  You see, what Mr. Gregory

22      said in opening statement was a bunch of nonsense.  He deleted

23      these to hide them from the government.  You didn't hear one

24      word, when Santos was on the stand, in summation, or again

25      since opening statements, that he deleted these to cover up for

LB11ADA1

1    his -- from his wife.  You know why, ladies and gentlemen?

2    Because that's not why he covered them up.

3             THE COURT:  I don't think that's adequate,

4    Mr. Gregory.  I mean, I think what might be closer is a

5    stipulation between the parties that the defendant withdraws

6    any argument that the text messages with Harris were deleted

7    because of a concern that his wife would find the messages on

8    the phone.  That would get us closer to addressing the

9    prejudice caused by your opening statement.

10            MR. GREGORY:  I agree to that, Judge.

11            MS. BHASKARAN:  Your Honor, I think that seems like a

12   reasonable compromise, and we'll work on such a stipulation

13   with defense counsel.

14            THE COURT:  I think that's what's necessary to address

15   an argument that is before the jury that they might well find

16   persuasive, and so we've got to address that in some fashion.

17   Obviously I'm cognizant of protecting Mr. Adams's rights.

18   That's why I proposed the stipulation, which will not involve

19   the jury seeing text messages with another woman involving what

20   appears to be an affair or a planned affair or future affair or

21   whatever.

22            So I'd encourage the parties to see whether they can

23   reach agreement on a stipulation and, then we'll discuss the

24   matter further.

25            I expect that the jury is ready, so as soon as my

LB11ADA1

1     deputy tells me that he's brought them up, we will get started.

2              I take it the government has its first witness ready?

3              MR. SCHAEFFER:  That's correct, your Honor.

4              And just as a housekeeping matter, we just wanted to

5     let the Court know that our expected order of witnesses today,

6     which, as Ms. Bhaskaran indicated, it's possible we could get

7     through, are Stanley Jean, Shahada Harris, Qunisha Boyce,

8     Richard Fletcher, Amanda Gildea, and Enrique Santos.

9              Richard Fletcher is a new addition to the government's

10    witness list.  We produced 3500 for him starting on Friday.

11    And the reason that we are calling him is, again, because of

12    some arguments that were made during the openings.  We expect

13    his testimony will be very short, and we do not intend to

14    elicit any testimony approaching the issues that your Honor has

15    already excluded from consideration with Mr. Fletcher.

16             THE COURT:  All right.  While we're waiting for the

17    jury, I should say that I have of course been working on the

18    charge.  I asked my law clerk to transmit to the parties the

19    first 22 pages of the charge, which takes us up to the

20    instructions related to the specific crimes on trial.  I will

21    say that with respect to the misprision of a felony charge, the

22    government wants me to charge something along the lines of,

23    that where a public official has an affirmative duty to report

24    something and doesn't do it, that can constitute concealment.

25    I haven't seen any law that supports that argument up to this

LB11ADA1

1    point.  I continue my research on it.  The First Circuit case

2    that the government cites is not persuasive for a number of

3    reasons.  So I just wanted to put you on notice that it's

4    unlikely that I'm going to charge that a failure to report

5    constitutes concealment, where one has an affirmative duty.  I

6    don't see any support for that in the statute itself, nor have

7    we been able to find any support for it in the case law.

8         In essence, what the government is arguing is that I

9    should hold a public official like Mr. Adams to a higher

10   standard under the statute, and I don't see any support for

11   that in the statute itself nor, as I said, have I been able to

12   find any support for it in the case law.  But we continue our

13   research.  If the government has additional cases it wants me

14   to look at, obviously please submit them.  Same with the

15   defense.  But that's where I'm at right now.

16        I will be giving an instruction with respect to the

17   text messages when they are admitted -- the text messages

18   between Mr. Adams and Ms. Harris -- that the text messages are

19   not being admitted for the truth, but rather to the extent they

20   shed light on Mr. Adams's state of mind or whether he acted

21   with criminal intent, so when we reach the point in

22   Ms. Harris's examination where the text messages are offered, I

23   will be giving an instruction in that regard.

24        MR. ROOS:  Your Honor, is it your preference to have

25   the witness in the box before the jury comes out or call the

LB11ADA1

1    witness in once the jury is seated?

2         THE COURT:  As long as the witness is readily

3    available.  He doesn't have to be sitting up here now, but --

4         MR. ROOS:  We're going to have him right outside.

5         THE COURT:  That seems fine.

6         (Continued on next page)

LB11ADA1                         Jean - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Good morning, ladies and gentlemen.

4              THE JURORS:  Good morning.

5              THE COURT:  We will now begin with the taking of

6    testimony.  The government will call its first witness.

7              MR. SCHAEFFER:  Thank you, your Honor.  The government

8    calls Stanley Jean.

9              THE COURT:  All right.

10             THE DEPUTY CLERK:  Please raise your right hand.

11             (Witness sworn)

12             THE DEPUTY CLERK:  Please be seated.

13             And please state your full name and spell it for the

14   record.

15             THE WITNESS:  Stanley Jean.  S-T-A-N-L-E-Y, J-E-A-N.

16             THE COURT:  Please proceed.

17             MR. SCHAEFFER:  Thank you, your Honor.

18    STANLEY JEAN,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. SCHAEFFER:

23   Q.  Good morning, Mr. Jean.

24   A.  Good morning, your Honor.

25   Q.  Where do you work?

LB11ADA1                          Jean - Direct

1    A.   At the Metropolitan Correctional Center, MCC, New York.

2    Q.   And just before beginning, if you could speak directly into

3    the microphone, I think that might make it a little easier.

4    A.   Yes.

5    Q.   So where do you work, Mr. Jean?

6    A.   At the Metropolitan Correctional Center, MCC, New York.

7    Q.   And what is the MCC?

8    A.   It's a federal Bureau of Prisons.

9    Q.   And where is it located?

10   A.   It's located Manhattan, downtown Manhattan.

11   Q.   Approximately how long have you been employed at the MCC?

12   A.   20 years.

13   Q.   And can you describe for the jury the positions you've held

14   at the MCC during those 20 years.

15   A.   During the 20 years, I held GS11 lieutenant, I held unit

16   team counselor and tool room officer, and custody.

17   Q.   Thank you.  Today I'm going to ask you about your work in

18   2019.  What was your position then?

19   A.   2019, I was the GS11 lieutenant, operational lieutenant.

20   Q.   And what were your duties and responsibilities as a

21   lieutenant?

22   A.   Just running, the orderly running of the institution, for

23   staff and inmates.

24   Q.   Did other correctional officers report to you in your

25   capacity as a lieutenant?

LB11ADA1                        Jean – Direct

1   A.  Yes.

2   Q.  As a lieutenant, did you have any responsibilities

3   concerning contraband?

4   A.  Yes.

5   Q.  And what were those?

6   A.  I mean, we had a strict policy on contraband.  We -- any

7   contraband we find, we confiscate the contraband.

8   Q.  And what is contraband?

9   A.  Contraband is anything that's unauthorized, that's not

10  authorized by the Bureau of Prisons, MCC New York.  It can be

11  cellphone, marijuana, anything that an inmate cannot purchase

12  in commissary.

13  Q.  And why is contraband prohibited from federal prisons like

14  the MCC?

15  A.  Definitely can be -- contraband, like I said, cellphone --

16  cellphone could be used to place any kind of, you know -- bring

17  any harm to staff members.  Basically the inmates have access

18  to look out the window, they could read a staff member license

19  plate.  Or it could be drugs, illegal drugs, such as marijuana

20  that's been laced with fentanyl or K2, which can bring

21  safety -- which can bring harm to inmates or staff, for that

22  matter.

23  Q.  What are some of the ways that contraband can come into the

24  MCC?

25  A.  Come through the visiting area, or we have what we call --

LB11ADA1                         Jean - Direct

1    we have some cadres, inmates that are called cadres.  They have

2    gate passes to go outside.  It could be brought in through

3    them.  But most likely the visiting area also, through

4    visitation.

5    Q.  When visitors enter the MCC, do they enter a particular

6    area?

7    A.  Yes, they enter the front area, which we call the front

8    lobby.

9    Q.  Can you describe those areas briefly for us.

10   A.  Front lobby is basically -- it's in the front entrance of

11   the institution.  Inmate *[sic]* would come in and inmate --

12   there's a sign there, let them know they're not allowed to

13   bring in anything that's not authorized.  Inmate *[sic]* will

14   then leave their cellphones, keys, anything they have, they'll

15   be given a locker; they can place the items in the locker

16   before going upstairs to the visiting area.

17   Q.  When visitors enter the MCC, do they have to go through any

18   screening process?

19   A.  Yes, we have a walk-through -- we have a walk-through metal

20   detector, and an inmate -- and visitors is also wanded, and

21   then they're -- actually, it depends on the stamp, date.

22   They'll be given a stamp on their hand.  Their hand will be

23   stamped before going upstairs.

24   Q.  What do you mean by a wand?

25   A.  Excuse me?

LB11ADA1                        Jean - Direct

1   Q.  What do you mean by a wand?

2   A.  I'm sorry.  I mean a wand, we have a handheld wand, they'll

3   go through a metal detector, they'll be screened.  Any personal

4   item they might have, like paperwork, will go through the

5   scanning machine, and then they'll be stamped, their hand will

6   be stamped before going upstairs.

7   Q.  Are visitors also required to sign in?

8   A.  Yes, they will sign in also.

9             THE COURT:  So I take it the wand is the metal

10  detector also?

11            THE WITNESS:  Yes, a handheld wand.

12            THE COURT:  Okay.  Thank you.

13            Go ahead.

14            MR. SCHAEFFER:  Thank you, your Honor.

15  BY MR. SCHAEFFER:

16  Q.  Are visitors required to fill out any forms when entering

17  the MCC?

18  A.  Yes, there's a visitor form that they do fill out.

19  Q.  Are visitors permitted to bring contraband into the MCC?

20  A.  No.

21  Q.  Are there consequences for doing so?

22  A.  Yes, there are.

23  Q.  If a correctional officer reported finding contraband to

24  you during a shift, what, if any, responsibilities would you

25  have as a lieutenant?

LB11ADA1                          Jean - Direct

1    A.  I mean, first we'll confiscate the item and I'll report the

2    item to the SIS department, and depending if the item was found

3    on a inmate, we'll also report that to the legal department, so

4    that visitor visitation right will be canceled.

5    Q.  What is the SIS department?

6    A.  That's the special investigating unit, department.

7    Q.  If you were on duty as a lieutenant, are there any

8    circumstances under which you would not be told about a

9    contraband discovery?

10   A.  No.

11   Q.  During the time you were working as a lieutenant, was

12   contraband ever discovered in the visiting area?

13   A.  Yes.

14   Q.  And what typically happened when contraband was discovered

15   in the visiting area?

16   A.  We confiscate the item and -- we confiscate the item and a

17   inmate will be escorted to the Special Housing Unit.

18   Q.  In particular who would confiscate the item?

19   A.  Person who first seen -- if it's the visiting room officer,

20   they usually confiscate the items, or if they suspect that the

21   inmate have a item on them and they need extra staff, they'll

22   let us know and we'll go up there.

23   Q.  What, if any, documentation would be generated concerning

24   the discovery of contraband?

25   A.  You have an incident report and memorandum, memo.

LB11ADA1                    Jean - Direct

1    Q.  Are there any circumstances where the discovery of

2    contraband does not need to be written up or documented?

3    A.  No.

4    Q.  Are you familiar with a correction officer named Robert C.

5    Adams?

6    A.  Yes.

7    Q.  And how do you know him?

8    A.  He's an officer at the MCC, MCC New York.

9    Q.  Did Mr. Adams ever work in the visiting area of the MCC?

10   A.  Yes.

11   Q.  I'm going to ask you some questions about the rules and

12   responsibilities for officers working in the visiting area.

13   Are you familiar with those rules and responsibilities?

14   A.  Yes.

15   Q.  How are you familiar with them?

16   A.  I'm the operational lieutenant, and we have -- we have

17   different -- we have post orders, supplements, we have -- we

18   have different -- different ways we could inform ourself,

19   educate ourself on the area.

20   Q.  You mentioned post orders.  What are post orders?

21   A.  Oh, post orders is like a -- they're guidance of your work

22   schedule, what you have to do, your work assignment.

23   Q.  And what are the responsibilities of a correctional officer

24   working in the visiting area?

25   A.  When you come in, I guess you -- when you come in, you

LB11ADA1                          Jean - Direct

1    report to the lieutenant that you're there, and you go to the

2    area that you're -- you go to the visiting floor, I guess you

3    do a -- you do a sweep of the area, you do a sweep of the area

4    to make sure there's no contraband before the visiting begins,

5    and once the area is clean, you, you know, you do the seating

6    arrangements so you could have -- place the inmates where

7    you're going to place them and the visitors where you want to

8    place them in.  That's it.

9    Q.  Are correctional officers working in the visiting area

10   required to monitor visitors and inmates?

11   A.  Yes.

12   Q.  And are post orders available to correctional officers

13   working in the visiting area?

14   A.  Yes, they are.

15   Q.  Where are they located?

16   A.  They'll have it in their work posts, their station, work

17   station, and you also have it in the lieutenant office.

18   Q.  What, if anything, are officers required to do with post

19   orders for their positions?

20   A.  They're required to review it.  After they review it, since

21   their position is quarterly, after they review it, they'll sign

22   the -- they'll sign a -- sign -- there's a sign-in sheet in the

23   back, they'll sign.

24            MR. SCHAEFFER:  If we could pull up, just for the

25   parties and the Court, Government Exhibit 1.

LB11ADA1                        Jean - Direct

1           Your Honor, Government Exhibit 1 is a stipulation

2    between the parties.  The government would offer it at this

3    time.

4           THE COURT:  Is there any objection to Government

5    Exhibit 1?

6           MR. GREGORY:  No, your Honor.

7           THE COURT:  It is received.

8           (Government's Exhibit 1 received in evidence)

9           MR. SCHAEFFER:  Thank you, your Honor.  May it be

10   published to the jury as we read provisions from this?

11          THE COURT:  Yes.

12          MR. SCHAEFFER:  Thank you, your Honor.

13          Ms. Phifer, can we now display Government Exhibit 1

14   for the jury, please.  And specifically, page 4, highlighting

15   paragraph 21.

16          I'll just read this into the record.  Government

17   Exhibit 1, paragraph 21 reads:

18          "Government Exhibit 123 is a true and accurate copy of

19   specific post orders dated December 7, 2018, which were

20   applicable to correction officers on duty in the front lobby

21   and visiting room, subject to formal amendments and

22   modifications from at least December 7, 2018, through July 5,

23   2019."

24          Your Honor, pursuant to the stipulation, the

25   government now offers Government Exhibit 123.

1            THE COURT:  Any objection to 123?

2            MR. GREGORY:  No, your Honor.

3            THE COURT:  123 is received.

4            (Government's Exhibit 123 received in evidence)

5            MR. SCHAEFFER:  Thank you, your Honor.  And may

6   Government Exhibit 123 also be published to the jury?

7            THE COURT:  Yes.

8            MR. SCHAEFFER:  Thank you.

9   BY MR. SCHAEFFER:

10  Q.  Do you see the document labeled Government Exhibit 123?

11  A.  Yes.

12  Q.  And can you describe for us what this document is.

13  A.  That's the visiting room, the front lobby.  It's the post

14  order for the visiting room and front lobby officer.

15  Q.  Are these the post orders you were referring to a few

16  moments ago?

17  A.  Yes.

18  Q.  And do the post orders have any provisions relating to

19  contraband?

20  A.  Yes.

21            MR. SCHAEFFER:  Can we please turn to page 8 of this

22  exhibit, please.

23            Ms. Phifer, can we please turn to page 8 of this

24  exhibit.

25  Q.  Now, Counselor Jean, looking at page 8 and continuing on

LB11ADA1                              Jean - Direct

1    page 9, what is this list here?

2    A.   It's guidance for the post orders.

3    Q.   And is this a list of rules for inmates and visitors in the

4    visiting room?

5    A.   Yes, this is.

6              MR. TAYLOR:  Objection.

7              THE COURT:  What's the objection, leading?

8              MR. TAYLOR:  Yes, your Honor.

9              THE COURT:  Try not to lead.

10             MR. SCHAEFFER:  Yes, your Honor.

11   Q.   Mr. Jean, can you please read Rules 5 and 6 in this list.

12   A.   "Bringing any unauthorized -- bringing any unauthorized

13   items such as medication, weapons, tools, food, or drugs into

14   the institution is a violation of institution regulation and

15   the law.  This infraction may result in the visitor's permanent

16   removal from the visiting list and referral to the proper law

17   enforcement agencies for prosecution."

18             "It is a violation of law for visitors and inmates to

19   introduce or attempt to introduce any unauthorized article onto

20   the grounds or into this institution, to take or attempt to

21   take, or to send or attempt to send any article from the

22   institution without the knowledge and consent of the warden or

23   his duly appointed representative."

24   Q.   Thank you.  Now when this says, "Bringing any unauthorized

25   items into the institution may result in the visitor's

LB11ADA1                          Jean - Direct

1    permanent removal from the visiting list," what does that mean?

2    A.  That means the visitor will no longer have access, will no

3    longer be allowed to enter the facility.

4    Q.  And when this says "referral to the proper law enforcement

5    agencies for prosecution," what does that mean?

6    A.  That means -- depends on the infraction or what the

7    incident -- depends on the contraband or whatever the visitor

8    brought in.  This could be referred to the FBI for prosecution.

9    Q.  Do the post orders say anything about a correctional

10   officer's responsibilities when they observe contraband in the

11   visiting area?

12   A.  Yes, it does.

13           MR. SCHAEFFER:  Ms. Phifer, can we turn to page 5 of

14   this exhibit, please.

15           Can you highlight the first two sentences of the third

16   paragraph.

17   Q.  Can you please read those sentences, Counselor Jean.

18   A.  "If you believe you have observed an inmate ingest or

19   attempt to conceal contraband within or on his/her person, the

20   inmate will be separated from the visitors and escorted into

21   the visual search area.  Staff will conduct a visual search of

22   the inmate and attempt to prevent the inmate from ingesting the

23   contraband, if the contraband is in the inmate's mouth."

24           MR. SCHAEFFER:  Ms. Phifer, can we pull up Exhibit 1

25   for the jury, please, and highlight paragraph 22.

1          I'll read this into the record as well.

2          "Government Exhibit 124 is a true and accurate copy of

3    specific post orders, dated December 7, 2018, which were

4    applicable to correctional officers on duty as Visiting Room

5    No. 1, subject to formal amendments and modifications, from at

6    least December 7, 2018, through July 5, 2019."

7          Your Honor, pursuant to this stipulation, the

8    government would offer Government Exhibit 124.

9          THE COURT:  Any objection to 124?

10         MR. GREGORY:  No.

11         THE COURT:  124 is received.

12         (Government's Exhibit 124 received in evidence)

13         MR. SCHAEFFER:  Thank you, your Honor.  And may that

14   be published to the jury?

15         THE COURT:  Yes.

16         MR. SCHAEFFER:  Thank you.

17   BY MR. SCHAEFFER:

18   Q.  All right.  Counselor Jean, looking at Exhibit 124, can you

19   tell us what this document is.

20   A.  The post orders for visiting -- for Visiting Officer No. 1.

21   Q.  And can you explain what Visiting Officer No. 1 is.

22   A.  Visiting Officer No. 1 is -- is the -- you said explain

23   what it is?  Or --

24   Q.  Yes.  What is that post?

25   A.  Oh, that post is -- they work on the floor, in the visiting

LB11ADA1                        Jean - Direct

1   floor, along with the Visiting Officer No. 2.

2   Q.  And does this post order set forth duties and

3   responsibilities of that officer relating to contraband?

4   A.  Yes, it does.

5   Q.  Do you recall Mr. Adams ever working the Visit No. 1 post?

6   A.  Yes.

7           MR. SCHAEFFER:  Ms. Phifer, can we go to page 3 of

8   this document, please.

9           And can we zoom in on the 8:30 p.m. End of Tour

10  paragraph.

11  Q.  Counselor Jean, can you see this on your screen here?

12  A.  Yes, I can.

13  Q.  And when this says End of Tour, what does that relate to?

14  A.  End of tour is when the visiting -- when the visiting shift

15  is over, when the visiting post -- when the visiting is over,

16  that's usually end the tour.  After they do what they have to

17  do, they'll notify the operational lieutenant.

18  Q.  I guess for a layperson, what does the word "tour" mean?

19  A.  Shift, end of shift.

20  Q.  And below that can you read what the Visit No. 1 officer is

21  supposed to do at the end of the shift at 8:30?

22  A.  Yes.  "Before departure, ensure all visitors have departed

23  the institution and all inmates back on their assigned housing

24  unit.  Notify the shift lieutenant that the area is secure."

25  Q.  And what do you understand this to mean?

LB11ADA1                    Jean - Direct

A.   When the visiting is over, when the visit -- when the

visitation is over, the inmates will be escorted out the

institution, inmates would then be brought into the visual

search area to be searched for contraband, make sure they don't

have no contraband, and after that, the area, the visiting area

will be swept by the officers.  They'll conduct a sweep of

contraband, making sure no contraband is in the visiting

area -- no.  Let me correct myself.  After they send the

visitors out, yes, visitors *[sic]* will be searched, visitors

*[sic]* will be searched, visitor search area, before entering

the unit, but before that they'll search the area to make sure

there's no contraband first, then they bring the inmates in,

they'll bring -- they'll start searching that visual search of

inmate, bring them one by one back into the institution, back

into the housing unit, and after that, they'll notify the

operational lieutenant that the visiting is -- visiting is

over, and they'll take any -- any remaining trash that's out

there, they'll bring it down, they'll bring it down to the

secure part of the building, to -- they'll bring it down to the

trash area to dispose of the trash.

       MR. SCHAEFFER:  Ms. Phifer, can we go back to

Government Exhibit 123, please.

Q.   And zooming in on the first paragraph, Counselor Jean, do

you see where it says Program Statement and Institution

Supplement on Inmate Visiting Procedures?

LB11ADA1                    Jean - Direct

1    A.  Yes.

2    Q.  What are the Program Statement and Institution Supplement

3    on Inmate Visiting Procedures?

4    A.  Program statement, program -- program statements are

5    guidance for the BOP as a whole, for all BOPs -- for all BOP

6    institution as a whole.  Institution supplement is guidance for

7    that institution, that specific institution that you're in.

8    Q.  Do those documents contain additional rules and policies

9    that officers must follow?

10   A.  Yes, it does.

11          THE COURT:  I wanted to go back to your testimony

12   about what happens at the end of the tour.  Did you say that

13   the visitors are searched?

14          THE WITNESS:  No.  I'm sorry.  I meant the inmates.

15          THE COURT:  The inmates are searched.

16          THE WITNESS:  Yes.

17          THE COURT:  So the inmates are searched after they've

18   had a visit.

19          THE WITNESS:  Yes, the inmates are searched after they

20   had a visit, before -- before entering their unit, before going

21   back onto the unit.

22          THE COURT:  Okay.  Thank you.

23          Go ahead.

24          MR. SCHAEFFER:  Thank you, your Honor.

25   BY MR. SCHAEFFER:

LB11ADA1                          Jean - Direct

1    Q.  Turning back to the Program Statement and Institution

2    Supplement, are they made available to officers?

3    A.  Oh, yes, they are.

4    Q.  And how are they made available?

5    A.  They're made available on a computer, on the -- in the BOP

6    sallyport.  All officers and staff -- all staff has access to

7    that.

8               MR. SCHAEFFER:  Ms. Phifer, can we pull up Government

9    Exhibit 1 for the jury and go to page 2, highlighting

10   paragraph 11.

11              Paragraph 11 reads:

12              "Government Exhibit 111 is a true and accurate copy of

13   BOP Program Statement 3420.11, dated December 6, 2013, which

14   was in effect, subject to formal amendments and modifications,

15   at least from when Robert Adams began his employment with the

16   BOP in September 2015 through 2019."

17              Your Honor, pursuant to this stipulation, the

18   government would offer Government Exhibit 111.

19              THE COURT:  Any objection?

20              MR. GREGORY:  No.

21              THE COURT:  111 is received.

22              (Government's Exhibit 111 received in evidence)

23              MR. SCHAEFFER:  And may that be published, your Honor.

24              THE COURT:  Yes.

25              MR. SCHAEFFER:  Thank you.

LB11ADA1                           Jean - Direct

1    BY MR. SCHAEFFER:

2    Q.   Counselor Jean, on your screen is the document received in

3    evidence as Government Exhibit 111.   What is this?

4    A.   It's a program statement for standards of employee conduct.

5    Q.   Is this the program statement you were referring to a

6    moment ago?

7    A.   Yes.

8    Q.   And who do these standards apply to?

9    A.   All BOP staff.

10              MR. SCHAEFFER:   Ms. Phifer, can we turn to page 5,

11   please.

12              And can we zoom in on the numbered 4 heading.

13   Q.   Can you read this for the jury, please, Counselor Jean.

14   A.   Yes.   General Policy.

15              MR. SCHAEFFER:   All right.   Ms. Phifer, can we go to

16   page 6 please and highlight the first full paragraph.

17   Q.   Can you read that for the jury, please, Counselor Jean.

18   A.   "Every employee is required to immediately report to

19   management any act or omission by any person that could result

20   in a breach of institution security."

21   Q.   Is smuggling contraband into the MCC considered to be a

22   breach of institution security?

23   A.   Yes.

24              MR. SCHAEFFER:   Ms. Phifer, can we please highlight

25   the bottom of page 6, the last two -- or just that paragraph.

LB11ADA1                    Jean – Direct

1    Thank you.

2    Q.  And Counselor Jean, can you please read this paragraph for

3    us.

4    A.  Yes.  Titled Sexual Relationships/Contact with Inmates.

5    "Employees may not allow themselves to show partiality toward,

6    or become emotionally, physically, sexually, or financially

7    involved with inmates, former inmates, or persons known (or who

8    should have been known based on circumstances) to the employee

9    as a family member or close friend of inmates or former

10   inmates."

11   Q.  And what's your understanding of this provision?

12   A.  Meaning you -- you can't commit con -- there can't be a

13   conflict between staff, visitors, or inmates.  You can't have

14   no relationship with -- with any visitors that's going in there

15   to see an inmate.  It's against rules.

16        MR. SCHAEFFER:  Ms. Phifer, can we go to the next

17   page, please.

18        And can we highlight the paragraphs under Additional

19   Conduct Issues.

20   Q.  Can you please read the first two paragraphs here,

21   Counselor Jean.

22   A.  Yes.  "An employee may not offer or give to an inmate or a

23   former inmate or any member of his/her family, or to any person

24   known to be associated with an inmate or former inmate, any

25   article, favor, or service that is not authorized in the

LB11ADA1                    Jean - Direct

1    performance of the employee's duties."

2              "Neither shall an employee accept any gift, personal

3    service, or favor from an inmate or former inmate, or from

4    anyone known to be associated with or related to an inmate or

5    former inmate.  This prohibition includes becoming involved

6    with families or associates of inmates."

7    Q.  And what's your understanding of these provisions?

8    A.  Once again, you cannot have a relationship basically, if

9    you know -- if you know -- let's say you know about a visitor

10   coming in, and that visitor happen to say, well, you know --

11   you know that visitor from a area where you lived at, and that

12   visitor will say:  Well, I have my nephew that's in jail.  Can

13   you give my nephew this for me?  You can't do that.  You can't

14   do no such thing.  And if you have known a visitor and the

15   visitor is visiting an inmate there and you've known the

16   visitor for quite some time, you have to report that to the SIS

17   department, and let them know, write a memorandum saying that,

18   you know, you know this person from the outside and this person

19   have a family member that's in there.

20             MR. SCHAEFFER:  Ms. Phifer, can we turn back to

21   page 5, please, and can you highlight the first paragraph under

22   that General Policy heading.

23   Q.  Can you please read those two sentences for us, Counselor

24   Jean.

25   A.  "While this program statement clarifies the applications of

LB11ADA1                       Jean - Direct

1    those regulations in the bureau, it does not and cannot specify

2    every incident that would violate the standards of conduct."

3    Q.  And the first sentence as well, please.

4    A.  I'm sorry.  "Bureau -- bureau employees are governed by

5    regulations in 5 C.F.R. Part 2635."

6    Q.  Now does this policy define contraband?

7    A.  Yes, it does.

8            MR. SCHAEFFER:  Let's turn to page 9, Ms. Phifer.

9            And can you highlight the first two paragraphs under

10   the heading Introduction of Contraband.

11   Q.  Can you please read those for us, Counselor Jean.

12   A.  "Per 28 C.F.R. 500.1(h), contraband is defined as material

13   prohibited by law, or by regulation, or material which can

14   reasonably be expected to cause physical injury or adversely

15   affect the security, safety, or good order of the institution.

16          "Introducing or attempting to introduce contraband

17   into or upon the grounds of any federal correctional

18   institution, or taking or attempting to take contraband out of

19   it, without the CEO's knowledge and consent, is prohibited."

20           MR. SCHAEFFER:  Let's turn to page 21 of this exhibit.

21           Ms. Phifer, can you highlight the heading on this

22   page, please.

23   Q.  Counselor Jean, it says Standard Schedule of Disciplinary

24   Offenses and Penalties.  What does this attachment contain?

25   A.  Should contain a list of -- it should have a list of

1ADA1

1    disciplinary actions that can be taken.

2              MR. SCHAEFFER:  And can we turn to page 27.  And if we

3    could zoom in on Offense No. 26.

4    Q.  Can you please read that for the jury.

5    A.  "Soliciting gifts, favors, or bribes in connection with

6    official duties."

7              MR. SCHAEFFER:  And can we turn to page 28.

8    Q.  And can you please read No. 27.

9    A.  "Receiving gifts, favors, or bribes in connection with

10   official duties."

11   Q.  And on the same page, can we also look at 31, please.

12   A.  "Improper relationship with inmates, former inmates, their

13   families, or associates."

14             MR. SCHAEFFER:  And then, Ms. Phifer, if we can turn

15   to page 33.  And can we zoom in on No. 50.

16   A.  "Failure to report any breach or possible breach of

17   facility security."

18   Q.  And finally, No. 51, please.

19   A.  "Introduction of contraband."

20   Q.  Do these offenses identify things that correctional

21   officers are prohibited from doing?

22   A.  Yes.

23   Q.  As an MCC employee, were you aware of the fact that these

24   things were prohibited?

25   A.  Yes.

LB11ADA1                    Jean – Direct

1          MR. SCHAEFFER:  Ms. Phifer, can we go back to

2     Government Exhibit 1, please.  And highlight page 2,

3     paragraph 12.

4          Paragraph 12 states:

5          "Government Exhibit 112 is a true and accurate copy of

6     a BOP acknowledgment of receipt form signed by Robert Adams on

7     September 21, 2015."

8          Your Honor, pursuant to this stipulation, the

9     government offers Government Exhibit 112.

10         THE COURT:  Any objection?

11         MR. GREGORY:  No objection, your Honor.

12         THE COURT:  112 is received.

13         (Government's Exhibit 112 received in evidence)

14         MR. SCHAEFFER:  May it be published to the jury, your

15    Honor?

16         THE COURT:  Yes.

17         MR. SCHAEFFER:  Thank you.

18    BY MR. SCHAEFFER:

19    Q.  All right.  Counselor Jean, what is the title of this form?

20    A.  Acknowledgment of Receipt of Standards of Employee Conduct.

21    Q.  And is this form signed?

22    A.  Yes, it is.

23    Q.  When was it signed?

24    A.  September 21, 2015.

25    Q.  And what is the printed name of the person completing the

LB11ADA1                    Jean – Direct

1    acknowledgment form?

2    A.   Robert C. Adams.

3    Q.   Do officers receive any training on the rules and

4    procedures we've discussed?

5    A.   Yes.

6    Q.   What kind of training?

7    A.   We receive annual refresher training.

8    Q.   Are those trainings voluntary or mandatory?

9    A.   They're mandatory.

10   Q.   Have you attended those trainings?

11   A.   Yes, I have.

12   Q.   And based on your participation in those trainings, do they

13   cover what officers are supposed to do when they discover

14   contraband?

15   A.   Yes.

16   Q.   Let's go back to reporting contraband in particular.  Are

17   there standard procedures that are to be followed when

18   contraband is discovered in the visiting room?

19   A.   Yes.

20              (Continued on next page)

21

22

23

24

25

LB1sADA2                    Direct - Jean

1    BY MR. SCHAEFFER:

2    Q.  And can you remind us what they are, please?

3    A.  When an officer finds contraband in the visiting room,

4    first you notify the operation lieutenant, if the contraband is

5    in the visiting area.

6          If the contraband is on an inmate, you definitely

7    confiscate that contraband.  You notify the operation

8    lieutenant.  Also, you notify the operation lieutenant, and

9    that inmate will then be escorted to the special housing unit.

10   Q.  What happens after an officer reports that they found

11   contraband to the lieutenant?

12   A.  Officer will bring the contraband down and SIS will do a

13   chain of custody, but then the officer will write an incident

14   report, write an incident report or a memorandum.

15         MR. SCHAEFFER:  Ms. Phifer, can we go back to

16   Government Exhibit 1 please.

17         Looking at paragraph 24 on page four, paragraph 24

18   reads, Government Exhibit 126 is a true and accurate copy of a

19   BOP incident report form which was in use at the MCC at least

20   from July 5, 2019, through August 14, 2019.

21         Your Honor, pursuant to this stipulation, the

22   government offers Government Exhibit 126.

23         THE COURT:  Any objection?

24         MR. GREGORY:  No objection.

25         THE COURT:  126 is received.

LB1sADA2                          Direct - Jean

1          (Government's Exhibit GX 126 received in evidence)

2          MR. SCHAEFFER:  May it be published, your Honor?

3          THE COURT:  Yes.

4     BY MR. SCHAEFFER:

5     Q.  Counselor Jean, let's look at 126.

6          Do you recognize this document?

7     A.  Yes, I do.

8     Q.  What is it?

9     A.  It's an incident report.

10    Q.  Bear with me.  When might an officer complete an incident

11    report form?

12    A.  The officer that's completing the incident report form, the

13    officer found -- if they had confiscated the contraband, they

14    will write the incident report.  So it's for the disciplinary

15    action on the inmate.

16    Q.  Is there a time frame in which an officer is required to

17    complete an incident report?

18    A.  Yes.  24 hours.

19    Q.  Are there ever instances in which an incident report is not

20    completed within 24 hours?

21    A.  Yes, there are instances where it is not completed.  If the

22    officer stated that he'll complete the incident report the

23    following day, which in circumstances the officer will then

24    probably be connected with day off or something might happen.

25    So he might fell ill and stated that he can't come in.  So we

LB1sADA2                          Direct - Jean

1    often emphasize that the officer complete the incident report

2    before leaving the institution right then and there.

3    Q.  For some reason if an officer does not complete an officer

4    report within 24 hours, does that mean they never have to

5    report finding contraband?

6    A.  No.

7              MR. SCHAEFFER:  Ms. Phifer, can we go back to

8    Government Exhibit 1 please.  And let's look at page four of

9    paragraph 25.  Paragraph 25 reads:

10             Government Exhibit 126 is a true and accurate copy of

11   a BOP chain of custody form, which was in use at the MCC at

12   least to/from July 5, 2019, through August 14, 2019.

13             Pursuant to this stipulation, your Honor, government

14   offers Government Exhibit 127.

15             THE COURT:  Any objection?

16             MR. TALIERCIO:  No objection.

17             THE COURT:  127 is received.

18             (Government's Exhibit GX 127 received in evidence)

19             MR. SCHAEFFER:  May we publish, your Honor?

20             THE COURT:  Yes.

21             MR. SCHAEFFER:  Ms. Phifer, thank you very much.

22   BY MR. SCHAEFFER:

23   Q.  Counselor Jean, do you recognize Government Exhibit 127?

24   A.  Yes.

25   Q.  What is this?

LB1sADA2                    Direct - Jean

1   A.  It's a chain of custody form.

2   Q.  Are correctional officers required to complete this

3   document when they recover physical contraband?

4   A.  Yes, if they find -- yeah, they will come to the lieutenant

5   office.  Lieutenant emphasize that we complete the chain of

6   custody form so that we can pass it on to the SIS department.

7   Q.  In terms of the actual contraband that correctional

8   officers recover, what are they required to do with that?

9   A.  Actual contraband, they will give it to the -- they will

10  give it to the -- they will bring the contraband to the

11  lieutenant office, give it to the operation lieutenant or a

12  lieutenant on shift.

13  Q.  If a correctional officer on duty in a visiting room finds

14  contraband, are they permitted to dispose of it without

15  notifying anyone?

16  A.  No.

17  Q.  What happens with the actual contraband after it's turned

18  over to the lieutenant?

19  A.  Lieutenant will then -- it depends on what the contraband

20  is.  If it is a cell phone, whichever way, we'll pass that

21  contraband on to the SIS department.

22  Q.  And what, if anything, happens to an inmate found to have

23  received contraband?

24  A.  That inmate would be escorted to the special housing unit.

25  Q.  What, if anything, happens to a visitor who brings

LB1sADA2                         Direct - Jean

1    contraband to the MCC?

2    A.   That visitor, the visiting form will be taken, and we will

3    pass that visiting form to the legal department, will pass the

4    visiting form to the legal department for further

5    investigation, and that visitor will be -- will not be

6    permitted to enter the institution.

7         Depending on the contraband, the SIS department could

8    pass that information, pass that on to the FBI for referral,

9    for FBI referral for prosecution.

10   Q.   Did you work shifts with Robert Adams in 2019?

11   A.   Yes.

12   Q.   Do you recall him working in the visiting area of the MCC?

13   A.   Yes.

14   Q.   Did you interact with him during those shifts?

15   A.   Yes.

16   Q.   When you worked shifts with Mr. Adams in 2019, did there

17   ever come a time when he reported to you that he found

18   contraband?

19   A.   Yes.

20   Q.   Did that happen once or more than once?

21   A.   More than once.

22   Q.   Did Mr. Adams follow the procedures for reporting

23   contraband on those occasions?

24   A.   Yes, he did.

25   Q.   What do you recall him doing?

LB1sADA2                        Direct - Jean

1    A.  If he find contraband, he'll notify the lieutenant office
2    and letting us know -- let me know he found contraband.  And
3    he'll bring the contraband down, after.  The inmate will then
4    be escorted to the special housing unit, he'll bring the
5    contraband down, and usually follow through with the incident
6    report or memo.
7            MR. SCHAEFFER:  Ms. Phifer, can we go back to
8    Government Exhibit 1, please.  Can we highlight paragraph 20.
9    Paragraph 20 reads:
10           Government Exhibit 122 is a true and accurate copy of
11   the daily assignment roster for correctional staff at the MCC
12   on July 5, 2019.
13           Your Honor, pursuant to this stipulation, the
14   government offers Government Exhibit 122.
15           THE COURT:  Any objection?
16           MR. GREGORY:  No.
17           THE COURT:  122 is received.
18           (Government's Exhibit GX 122 received in evidence)
19           MR. SCHAEFFER:  May we publish to the jury, your
20   Honor.
21           THE COURT:  Yes.
22   BY MR. SCHAEFFER:
23   Q.  Counselor Jean, looking at Government Exhibit 122, the
24   daily assignment roster for July 25, 2019, were you working
25   that day?

LB1sADA2                          Direct - Jean

1    A.  Yes, I was.

2    Q.  When did you work?

3    A.  I worked day watch shift as operation lieutenant from six

4    to two, and then that was overtime.  And I worked overtime

5    again from two to ten as activities lieutenant.

6    Q.  Looking at the second page of Government Exhibit 122, who

7    was assigned to work the visiting one post on July 5, 2019?

8    A.  Also Robert Adams.

9    Q.  What are the visiting hours in the visiting area of the

10   MCC?

11   A.  12 to eight.

12   Q.  And what shift was Mr. Adams assigned to work?

13   A.  Shift nine.  So that was 12 to eight.

14   Q.  Did Mr. Adams report the discovery of contraband to you

15   during that shift?

16   A.  No.

17   Q.  If a correctional officer finds contraband, how do they

18   alert a lieutenant?

19   A.  Via phone or via radio.  Contact is via phone or radio,

20   BA radio.

21   Q.  Is that something you would have heard as well while you

22   were on duty, if it was reported to the other lieutenant?

23   A.  Yes.  We'll talk about it, contraband was found, that we

24   found contraband in the visiting area.  That would be a topic

25   of conversation.

LB1sADA2                           Direct - Jean

1    Q.  Do you recall hearing Mr. Adams report finding contraband

2    on that date?

3    A.  No, I don't.

4    Q.  Are you aware of any contraband chain of custody forms

5    completed by Mr. Adams during that shift?

6    A.  No, I don't.

7    Q.  Are you aware of any incident report about contraband

8    completed by Mr. Adams during that shift?

9    A.  No, I didn't see one.

10   Q.  Are you aware of any contraband turned over by Mr. Adams

11   during that shift?

12   A.  No.

13   Q.  Do you recall Mr. Adams ever reporting to you that he had

14   discovered contraband possessed by an inmate named Keith

15   Outlaw?

16   A.  No, I don't recall.

17   Q.  Do you recall Mr. Adams ever reporting to you that he

18   discovered contraband smuggled in by someone named Shahada

19   Harris?

20   A.  No, I can't recall.

21           MR. SCHAEFFER:  Thank you.  No further questions, your

22   Honor.

23           THE COURT:  All right.  Cross-examination.

24           Please proceed.

25           MR. TAYLOR:  Thank you, your Honor.

LB1sADA2                          Cross - Jean

 1   CROSS-EXAMINATION

 2   BY MR. TAYLOR:

 3   Q.  Hello, Mr. Jean.  My name is Zachary Taylor.

 4            How are you, sir?

 5   A.  I'm fine, sir.

 6   Q.  Now, when you were a lieutenant at the MCC, you would get

 7   notification all the time from officers that they had recovered

 8   contraband, isn't that right?

 9   A.  Yes.  That they recovered, yes.

10   Q.  And I think you said earlier, you would be notified about

11   the discovery of contraband over the phone or the radio, isn't

12   that right?

13   A.  Yes.  I'm sorry, or in person.  If they come in and let me

14   know they found contraband, yeah.  Usually over the radio,

15   phone, or in person.

16   Q.  There are three ways that you could be informed about the

17   discovery of contraband -- phone, radio, or in person --

18   correct, sir?

19   A.  Yes.

20   Q.  And when you refer to radio, you're talking about a

21   walkie-talkie, right?

22   A.  Yeah.  I'm sorry.  BA, walkie-talkie.

23   Q.  And also, when you're exercising your duties, would you

24   review reports that correctional officers had written up after

25   they had recovered contraband, correct, sir?

LB1sADA2                         Cross - Jean

1   A.  Yes.

2   Q.  Correctional officers were writing  up reports about

3   contraband for your review all the time, isn't that right?

4   A.  Um, recall meaning review as in incident report or, like,

5   yeah.  If they fill out an incident report, if we have a case,

6   if we are doing a packet on an inmate for the contraband, we

7   will see the incident report, or they could fill out an

8   incident report and send it to the lieutenant stating that they

9   found contraband.

10  Q.  And it was quite common for you to review incident reports

11  concerning contraband that officers had discovered at the MCC,

12  correct?

13  A.  Yes.  If they address it to me, they send me an e-mail or

14  they have the incident report, we will review it because

15  usually we have to serve the inmate.  We will have to serve the

16  inmate before they can get served by the unit team, seen by the

17  unit team.

18  Q.  Sir, you would get reports concerning the introduction of

19  contraband from officers quite frequently, correct?

20  A.  Yes.

21  Q.  It would be fair to say that a lot of these reports that

22  you reviewed concerned contraband that had been smuggled into

23  the MCC through the visitor area, correct?

24  A.  A lot of reports that was -- now, the reports we're talking

25  about, incident reports, correct?

1    Q.   Yes.  We're talking about incident reports, sir.

2    A.   Yeah.  If they have an incident report, whether it was

3    visiting area or anywhere, if they had the contraband on the

4    unit, if they had contraband on them, on their person, yeah,

5    they will write an incident report, and I'll review it and

6    serve the incident report.

7    Q.   Now, you testified earlier that there were two primary ways

8    that there was contraband coming into the MCC.

9         Do you remember that, sir?

10   A.   Yes.

11   Q.   You talked about the loading bay as one of the primary

12   ways?

13   A.   Yeah.

14   Q.   And the other way was through the visitor area, correct?

15   A.   Yes, through the visiting area.

16   Q.   So what I'm asking you is, when you were reviewing reports,

17   incident reports, had it been filled out by correctional

18   officers concerning the discovery of contraband, quite a few of

19   those reports related to contraband that had been confiscated

20   in the visitor area, correct, sir?

21   A.   Yeah.  If it -- if it's the visiting area they got the

22   contraband, yes.  But they could also be many places,

23   contraband could be, could have it.  If it's on the unit, if

24   it's in the inmate cell.  So we get every kind of incident

25   report in regards to contraband.

LB1sADA2                              Cross - Jean

1  Q.  Sir, I understand that there is all kinds of places where

2  contraband could be discovered.  I'm just asking you whether a

3  significant proportion of the reports that officers filled out

4  concerning the discovery of contraband related specifically to

5  the visitor room, isn't that right, sir?

6  A.  Once again, yes.  If they found the contraband in the

7  visiting room, they will write an incident report and we will

8  have -- I don't know how many was found in the visit room, to

9  say that they found X amount of contraband in the visiting

10  room, officers would go.  Whenever they found contraband, they

11  reported it to the lieutenant, and the incident report was

12  generated.

13  Q.  Now, when you say you don't know how many such reports you

14  saw, you're saying that because there were quite a few,

15  correct?

16  A.  No.  I can't say it was quite a few.  Whatever the amount,

17  if officers found -- officers was good at it.  If they found

18  contraband, they report the contraband.  If they bring the

19  contraband, they report, the incident report was generated.

20          To say the number, I don't know the number.  I can't

21  call the number exact.

22  Q.  I understand that you don't know the actual number.

23  A.  Um-hmm.

24  Q.  But wasn't it a frequent occurrence in your experience that

25  officers were notifying you of the discovery of contraband

LB1sADA2                        Cross - Jean

1    coming in through the visitor area?

2    A.  Yeah.  Yes, yes.

3    Q.  So you were reviewing incident report after incident report

4    after incident report about attempts to smuggle in contraband

5    through the visitor area, isn't that right?

6    A.  No, not me per, se.  We have -- we have quite a few

7    lieutenants in there.  So if they haven't come -- if I'm on

8    shift and I'm the one that have to serve the incident report,

9    then I reviewed it.

10           Otherwise, other lieutenants could get the same

11   incident reports and they go serve it.  So I wouldn't know how

12   much incident reports for contraband was found in that time on

13   that day.

14   Q.  Now, no matter how many times correctional officers in the

15   MCC discovered and reported contraband that had come in through

16   the visiting area, people tried to keep bringing it in, isn't

17   that right?

18   A.  Yeah.  People will bring contraband in, yes.

19   Q.  Now, when a correctional officer discovers contraband in

20   the visitor's area, he has to inform the lieutenant on duty, is

21   that right, sir?

22   A.  Yes, your shift lieutenant.  We have operation lieutenant

23   or a shift lieutenant, whatever lieutenant.  You can report it

24   to any lieutenant.

25   Q.  The officer should notify a lieutenant as soon as

LB1sADA2                          Cross - Jean

1    practicable, isn't that right?

2    A.   Soon as, yeah, when they get the contraband, they should

3    notify the lieutenant as they receive the contraband.

4    Q.   In other words, you're saying that the officer should

5    inform a lieutenant immediately when he receives the

6    contraband?

7    A.   Yes.  If they receive contraband and it's on an inmate,

8    they need to -- they usually notify the operation lieutenant

9    that we have an inmate with contraband, so forth, that they

10   received contraband in the visiting area.

11   Q.   I believe on your testimony just now, you described the

12   steps that the officer must take after he's informed the

13   lieutenant that he's received contraband, right?

14   A.   I mean, yes.  Yes.

15   Q.   One of those steps is that the officer has to fill out

16   what's called a confiscation form or chain of custody, isn't

17   that right?

18   A.   Yeah.  The lieutenant, the lieutenant when the officer

19   bring the contraband to the lieutenant, the lieutenant usually

20   will fill out the -- the lieutenant will bring -- advise them

21   to fill out the chain of custody form so that the lieutenant

22   could pass it on to the SIS department.

23   Q.   So the lieutenant brings the form to the officer and then

24   the officer has to fill it out, right?

25   A.   No.

LB1sADA2                        Cross - Jean

1          MR. SCHAEFFER:  Objection.

2   A.   The officer comes down to the lieutenant office.  They come

3   down to the lieutenant office, and usually that's -- the

4   contraband that they have, we'll fill out a chain of custody

5   form to pass it on to the -- we either have a drop box to put

6   it in for the SIS department, or we'll seal the contraband in a

7   bag with the form in there for the SIS department.

8          This way they can know -- they can backtrack to know

9   which officer gave the contraband, which officer found the

10  contraband.  This way, if they need to talk to that officer,

11  they can.

12  Q.   Let's just go through the things that the officer has to

13  do --

14  A.   OK.

15  Q.   -- after he informs the lieutenant that he's received

16  contraband.

17  A.   Um-hmm.

18  Q.   One of the things is to fill out, as we said, the

19  confiscation form or chain of custody, right?

20  A.   Yes.

21  Q.   And another thing that has to be done is that the officer

22  has to take pictures of the contraband, correct?

23  A.   No.  The officer don't need to take pictures of the

24  contraband.  They just need to bring -- confiscate the

25  contraband, bring the contraband to the lieutenant office.

LB1sADA2                         Cross - Jean

1  Give it, hand it to the lieutenant.  We usually do the
2  pictures.  We take care of the pictures.
3  Q.  Another thing that has to be done with the contraband is
4  someone has to get a test kit and test it, right?
5  A.  Yeah.  Lieutenant will test the contraband.  Lieutenant or
6  the SIS department will test the contraband.  If it's -- if
7  it's a green, leafy substance, we usually test it to see if
8  it's marijuana or tobacco.
9  Q.  One of the things that you mentioned that the officer has
10 to do is he must write up an incident report, correct?
11 A.  Yes.
12 Q.  Now, once an officer reports a contraband incident, that
13 officer has to stay and fill out the incident report, right?
14 A.  During the shift.  During that shift, the officer would be
15 instructed to write the incident report, to write an incident
16 report, yeah.
17 Q.  Now, you testified earlier that you recall instances when
18 Robert Adams reported contraband in 2019, is that right?
19 A.  Yeah, yes.
20 Q.  Now, in and around that period of July 2019 and before,
21 Officer Adams was often working in the visitor area, correct?
22 A.  Yes, he worked the visiting area.
23 Q.  And you testified that Mr. Adams found contraband during
24 the usual searches after visiting, right?
25 A.  Yes.  He found contraband, whether it was on -- whether the

LB1sADA2                          Cross - Jean

1    contraband was on an inmate or visiting everybody, he was good

2    at it.  He always notified the lieutenant that he found

3    contraband and, you know, procedures was followed.

4    Q.  Now, Officer Adams, sometime in 2019, had a run of

5    instances where he was reporting a lot of contraband, isn't

6    that right?

7    A.  I don't know if he had a run.  But yeah, he found

8    contraband.  If he would find contraband, he reports it.  He

9    was good at it.

10   Q.  Well, in preparation for your testimony today, you met with

11   prosecutors and agents on a number of occasions, isn't that

12   right?

13   A.  Yes.

14   Q.  So your testimony now is that Mr. Adams was not on a run of

15   finding contraband in 2019, correct?

16            MR. SCHAEFFER:  Objection.

17            THE COURT:  Sustained.

18   A.  No, I didn't say --

19            THE COURT:  Sustained.

20   A.  I said he found --

21            THE COURT:  Sustained.

22            When I say "sustained," you just wait.

23            THE WITNESS:  Sorry, your Honor.

24            THE COURT:  Not a problem.  But when I say

25   "sustained," stop.

1              Please rephrase the question.

2              MR. TAYLOR:  I'll move on, your Honor.  Thank you.

3              THE COURT:  OK.

4    BY MR. TAYLOR:

5    Q.  Now, you mentioned a moment ago that Mr. Adams was good

6    about the procedures of what you do after you find contraband,

7    right?

8    A.  Yes.

9    Q.  In other words, he informed a lieutenant after he recovered

10   it?

11   A.  Yes.

12   Q.  And he brought the contraband to the office?

13   A.  Yes.

14   Q.  And he filled out the chain of custody and the incident

15   report, right?

16   A.  Yeah, he filled out the incident report.  Whatever

17   documentation was needed to fill out, he usually took care of

18   it.  He was good.

19   Q.  And even after all of that, on all those occasions, people

20   still kept trying to bring contraband into the facility, right?

21   A.  Yes.

22   Q.  Now let's just talk about, a moment, what contraband is.

23              Contraband is not just things that are illegal.  They

24   could be things that are legal in our day-to-day lives,

25   correct?

LB1sADA2                          Cross - Jean

A.   Contraband is anything that is not authorized by the BOP,
that we don't authorize the inmate to purchase from commissary.
That's contraband.

Q.   In other words, there are things that are not authorized by
the BOP that are not themselves illegal to own, correct?

A.   Could you repeat that?

Q.   There are things that are not authorized by the BOP that
are not illegal to own, correct?

A.   I mean, when we're referring to it, like I said, yeah,
correct.  But, like I said, when we refer to it, visitors
cannot bring anything into the institution for inmates.  So
that's considered contraband.  You can't pass anything through
the visiting floor, bring anything in for the inmates.

          So if an officer see that, they will confiscate
whatever was given to the inmate, and that is labeled as
contraband.

Q.   Maybe it will help to talk about an example.

A.   OK.

Q.   Cell phones are legal, right, sir?

A.   Cell phones are legal or illegal?

          It's illegal for an inmate to have a cell phone, yes.

Q.   It's illegal for an inmate to have a telephone, but it is
legal for you or me to walk around with a cell phone out on the
street, correct?

A.   Down the street, yes.

LB1sADA2                      Cross - Jean

Q.  And then there might be things that are not permitted by
the BOP, depending on the circumstance, isn't that right?
A.  Yes.
Q.  Let's talk for a moment about where the searches are
performed, sir.

          Now, searches in the visitor area are performed in a
smaller room that's located outside the area, is that right?
A.  Yes.  It's performed in a room that's located before you
get into the housing unit, before you enter the housing unit.
From the visiting room, there is a room, then there is a
housing unit.
Q.  In other words, that search area is its own room that is
separate from the rest of the visitor area, correct, sir?
A.  Yes.  It's in the next room.  It's in the next area.  It's
in the area.
Q.  Quite obviously, because of the nature of what is going on
in that room, there is a wall around it where you can't see
into that room from the outside, correct?
A.  Yeah.  From the visiting room, there is a steel door.  Once
that door is closed, you're inside the visiting area, and
usually have -- there is a housing unit.  You usually have a --
there is a cover that you use to cover the glass, so this way
you could visually search the inmate without no one --
Q.  From outside a search room, you can't see into the search
room, right, because of what is going on inside there, correct,

LB1sADA2                          Cross - Jean

1    sir?

2    A.   Yeah.  Once you cover that glass, you can't see in there.

3    Q.   I'm sorry to be belabor the point.  But likewise, when

4    you're inside the search room, you can't see into the visitor

5    area, correct?

6    A.   Correct.

7    Q.   Now, usually two officers perform a search of an inmate

8    after the inmate has completed his visit, correct?

9    A.   Correct.

10   Q.   And that's the policy, the two-to-one ratio, correct?

11   A.   Yes, correct.

12   Q.   In many instances, it could just be one officer?

13   A.   It shouldn't be one officer.  It could be two officers.

14   Q.   I understand it shouldn't be one officer, but in practice,

15   it often was one officer, right?

16   A.   Practice?  If there was one officer, which I'm saying there

17   shouldn't be, it should be two officers, two to one.

18   Q.   I understand, sir, that it should be two.  But in your

19   experience, there were occasions when there was only one

20   officer in that visiting room -- in the search room?

21   A.   No.  On my occasion, there's two officers in there.

22   Q.   So your testimony is that in all instances, there were two

23   officers in the search room with the inmate when the inmate was

24   being searched at the end of the visit?

25            MR. SCHAEFFER:  Objection.

1          THE COURT:  Overruled.

2     A.  Yes.  Whenever an officer -- there should be two officers

3     in there.  On the occasion if there ever was one officer, it

4     shouldn't be.  It should always be two officers in there.  I

5     haven't seen it personally.

6     Q.  So, Mr. Jean, you have spoken to prosecutors and agents in

7     preparation for your testimony today, right?

8     A.  Yes.

9     Q.  And they asked you questions about what you know about the

10    procedures that we've been discussing, correct?

11    A.  Yes.

12    Q.  And you were making an effort to be as accurate as possible

13    in your responses at that time you were talking to them,

14    correct, sir?

15    A.  I'm just answering their question.  Whatever they ask me,

16    I'll answer to my knowledge.

17    Q.  And one of the times that you met with them was about two

18    weeks ago, October 18, correct, sir?

19    A.  If I met with them that day, yes.

20    Q.  And on that day, didn't you tell prosecutors and the agents

21    in this case that while the policy in the search room is two to

22    one, that --

23          MR. SCHAEFFER:  Objection.

24    Q.  -- it could be just one?

25          THE COURT:  Overruled.  Overruled.

LB1sADA2                    Cross - Jean

1    A.  I don't recall telling them that.  I know if they did ask

2    me that, I should have said the same thing I'm telling you,

3    that it should be two to one.  It should be two officers in

4    there when searching an inmate for safetywise.  If they find

5    the contraband, and let's say the inmate is very aggressive, he

6    doesn't want to give that contraband, you need to have two

7    officers in there.  That's the reason why we should have two

8    officers instead of one.

9    Q.  Mr. Jean, if I show you some notes from that conversation

10   that you had with the government on October 18, would that help

11   refresh your recollection about whether the policy is two to

12   one, but that sometimes it would just be one?

13            THE COURT:  Just show him the notes.

14   A.  Yes.

15            MR. TAYLOR:  Mr. Taliercio, can you just bring up --

16   not for the jury, but for the witness and the attorneys and the

17   court -- 3529-005.  Please go to page 24.

18   BY MR. TAYLOR:

19   Q.  Take a look at that, Mr. Jean, and let me know if that

20   refreshes your recollection about whether the policy is two to

21   one, but could be just one?

22   A.  No, I don't recall this.  I don't recall saying that.  I

23   recall saying there was two officers to one.

24   Q.  Mr. Jean, just to be clear, I'm not asking you about the

25   policy.  I understand the policy is two to one.  I'm asking you

LB1sADA2                    Cross - Jean

1   about the practice.

2           In practice, was there occasions when it was just one

3   officer in that room, sir?

4   A.  No.  It should be two officers.  It's usually two officers

5   in the room.

6   Q.  Sir, you keep saying that there should be two officers.

7   A.  No, meaning that -- meaning that I know that there's two

8   officers in that room.  Whenever they search an inmate, it's

9   two officers in the room.

10  Q.  So you're saying at no time, you're telling these people at

11  no time would there just be one officer in that room?

12  A.  If there ever was one officer in the room searching the

13  inmate, then that officer was out of pocket for doing that.

14  Q.  I'm sorry.  I didn't completely hear your response, sir.

15  A.  I said if there ever was one officer in the room with an

16  inmate, visual searching the inmate, that means that officer is

17  wrong, they out of pocket.

18          THE COURT:  Out of pocket.

19  A.  I'm sorry.  Not following -- not following policy.

20          I'm sorry.

21  Q.  Now, short staffing was an issue at the MCC in the time

22  that we're talking about, right, sir?

23  A.  Yeah, short staffing.  They was short staffed.

24  Q.  You mentioned that you were doing a lot of overtime around

25  that time, correct?

LB1sADA2                          Cross - Jean

A.  Yeah, that was me.  My preference, though.  I wanted to do
the overtime.  Volunteering.
Q.  Wasn't it common for officers to be pulling double shifts
all the time?
A.  I mean, if we was short staffed, some officers wanted to
pull double shifts.  But if we were short staffed, we have a
procedure that we do to fill in posts, to fill in any
unassigned posts.  We usually go to the roster, and we'll have
staff that volunteers to work.  And if the staff that placed
their name, that volunteer to work, decided not to work, not to
work when we call them and ask, whether they on shift or at
home, we call them and ask them do they want the overtime.

        If not, then we have another procedure that we go to
that's for mandation, for mandation that we go down a list.
And whatever staff that -- if the staff is in the building,
that's for the staff currently in the building, go down the
list.

        If one staff worked today, they was mandated
yesterday, then most likely they will fall to the bottom.  And
we will go from whichever staff is available according to --
it's a number process that we do.
Q.  All right.  Mr. Jean, I'm not asking you about ways that
you fill in posts when people are missing.  I'm asking you
about whether the institution was short staffed in the period
that we're talking about.

1          Was it or was it not short staffed in 2019, sir?

2     A.   Short staffed, I would say we was hiring.  But I say that

3     all I know is for the posts that we're showing, I usually fill

4     in posts, whatever we was required to fill in the roster.  We

5     were required to fill in the roster.  So the next officer, next

6     lieutenant, would have a full staffing post.

7     Q.   So you're telling these people that the institution was not

8     short staffed, but didn't you tell them just two weeks ago that

9     it was?

10              MR. SCHAEFFER:  Objection.

11              THE COURT:  Sustained.

12    A.   No, I don't recall telling them they was short staffed, no.

13    Q.   Would it help to refresh your recollection --

14              MR. SCHAEFFER:  Objection.

15    Q.   -- of the meeting, sir?

16              THE COURT:  Again, you're welcome to show him whatever

17    you want.  You don't have to ask him.  If you've got something

18    you want to show him, show it to him.

19              MR. TAYLOR:  Mr. Taliercio, please pull up 3529-005 on

20    the screen for the witness, please.

21    BY MR. TAYLOR:

22    Q.   Do you see what it says there?

23              Does that refresh your recollection?

24    A.   I don't have nothing on the screen, sir.

25    Q.   Excuse me, sir?

LB1sADA2                          Cross – Jean

1    A.  There is nothing on my screen.

2             THE COURT:  He doesn't see it on the screen.

3             Do you see it now?

4             THE WITNESS:  No.

5             THE COURT:  He doesn't see it on the screen.

6    A.  This is the same sheet now.  OK.

7    Q.  I'm sorry.  Do you see it now, sir?

8    A.  What was the question again?

9    Q.  The question is whether this refreshes your recollection

10   about whether you told these people that you knew the MCC was

11   short staffed?

12   A.  I have never seen this.  I don't recall this.  No, I never

13   told them it was short staffed.

14   Q.  Would it surprise you to learn, sir, that when Robert Adams

15   performed the search that's at the basis of this case on

16   July 5, 2019, that he was the only officer in the search room?

17            MR. SCHAEFFER:  Objection, relevance.

18   A.  If he --

19            THE COURT:  Wait, wait, wait.

20            THE WITNESS:  OK.

21            THE COURT:  You can answer that question.

22   A.  You said would it surprise me that he was the only officer?

23            Well, he shouldn't be the only officer in the search

24   room searching the inmate.  So I have never known -- I don't

25   recall the story about -- with searching the inmate that day.

LB1sADA2                          Cross - Jean

1   So I wouldn't know, no.

2   Q.  Mr. Jean, I'm not asking you about what should have

3   happened or about what you heard.

4           I'm asking you whether the fact that Mr. Adams was the

5   only officer in the search room on July --

6           THE COURT:  You've got to rephrase the question.  You

7   have to rephrase the question.  It's not a fact.  You're giving

8   him a hypothetical.  OK.  So rephrase the question.

9           MR. TAYLOR:  Thank you, your Honor.

10  BY MR. TAYLOR:

11  Q.  Would it surprise you to learn that, a hypothetical

12  situation where Mr. Adams, on July 5, 2019, was the only

13  officer in the search room with Keith Outlaw, the inmate whom

14  you mentioned on your direct testimony?

15  A.  Yeah, it would be surprise me.

16  Q.  And it would surprise you because you're telling these

17  people that in no instances in your experience were you aware

18  of there being just one officer in the search room with an

19  inmate after a visit?

20          MR. SCHAEFFER:  Objection.

21          THE COURT:  Wait a second.

22  A.  Yeah --

23          THE COURT:  Wait.  Wait.

24          All right.  You can answer that.

25  A.  OK.  Yeah, it would surprise me to find that he was there.

LB1sADA2                        Cross - Jean

1    Q.  Now, sir, there's a reason for the two-to-one ratio, isn't

2    that right?

3    A.  Yes.

4    Q.  It's for the officer's safety, correct?

5    A.  Correct.

6    Q.  If you find contraband on an inmate, the inmate could get

7    violent, right?

8    A.  If you find contraband on the inmate, the inmate may try to

9    ingest the contraband.  You usually need another set of eyes

10   there.  It may -- a lot of things that inmate could do.  They

11   could get aggressive.  They might not want to give the

12   contraband.  They might say, you know what, let me try to run.

13   They might try to ingest the contraband just to not go to the

14   special housing unit.

15          So that is why it's always good to have two to one in

16   there.  That is what's supposed to be there.

17   Q.  Now, in the hypothetical situation where an officer is

18   performing a search without a partner and finds contraband,

19   that officer might wait for an escort to arrive from the unit

20   where the inmate is being sent before informing a lieutenant of

21   the contraband that had been discovered?

22          MR. SCHAEFFER:  Objection.

23          THE COURT:  Overruled.

24   A.  Repeat that again?

25   Q.  In a hypothetical situation where a correctional officer is

LB1sADA2                        Cross - Jean

1    performing a search without a partner and finds contraband on

2    an inmate who has just completed a visit, might that officer

3    wait for an escort to arrive from the unit where the inmate is

4    being sent before informing the lieutenant?

5    A.   Once again, that's dangerous.  The officer shouldn't do

6    that.  The officer should be -- because that's where the danger

7    could happen.  Officer find contraband on an inmate, inmate get

8    aggressive, inmate might want to say, you know what, I'm not

9    going to the special -- I'm not going to the -- I'm referring

10   to that as the hole.  I'm not going to the SHU, special housing

11   unit.

12           A lot could happen it from there.  That's why it's

13   always got to be a two-to-one ratio.  But, you know, it's hard

14   to answer that because it should not be that way.  It has to be

15   two officers there.

16           THE COURT:  Now, the special housing unit, is that a

17   punishment facility of some sort?

18           THE WITNESS:  No.  The special losing unit is not a

19   punishment.  It's basically, if an inmate commits any kind of

20   infraction, an incident, they are usually placed in there.  It

21   could be for anything, fighting, drugs, cell phone, visit.

22   They go to the special housing unit.

23           It could be for the inmate safety also.  We have

24   inmates there for their own safety.  No, it's not there for

25   punishment.

LB1sADA2                         Cross - Jean

1          THE COURT:  But it is a place that people are put if

2     they have committed an infraction?

3          THE WITNESS:  In some cases, yeah, if they commit an

4     infraction.  Like I said, it could be places where inmates that

5     are just coming in the institution, they usually go to special

6     housing first.  So it's not -- it's not always there for

7     infractions.

8          THE COURT:  All right.  Go ahead.

9     BY MR. TAYLOR:

10    Q.  Let's move on, sir.

11         So once the last inmate is removed from the visitor

12    room, the other correctional officer on duty in the visiting

13    area can escort the remaining visitors out of the room, isn't

14    that right?

15    A.  No.  The visiting -- the visitors, they are escorted first.

16    After they are escorted, then they begin -- then they start

17    exiting the inmate back to the unit after their visual search

18    is conducted.

19    Q.  In other words, your testimony is that usually the visitors

20    are taken out of the room before the inmates?

21    A.  If it's -- once visiting is over, if it's during visiting,

22    yes.  The inmate could be escorted during visiting while other

23    inmates are having their visitations.  Inmate is escorted into

24    the visual search area, then placed -- then go in the unit.

25    Q.  OK.  So I think you might have misunderstood my first

LB1sADA2                          Cross - Jean

1    question.

2    A.  Yes, sir.

3    Q.  I'm talking about when the last inmate is done with his

4    visit.

5    A.  Um-hmm.

6    Q.  And that inmate gets taken out of the room.  At that point,

7    another correctional officer can escort whatever visitors

8    remain in the room out of the room so they can exit the

9    building, correct?

10   A.  No.  There's no such thing as the last visitor.  When

11   visitation is over, all visitors will be escorted out first.

12   They will be escorted downstairs by the visiting three officer,

13   and then they will proceed to go on.

14            So visitors will go first.  There shouldn't be no last

15   inmate left.  They all leave at one time.  At the end of

16   visiting, they all leave.

17   Q.  Your testimony is that the visitors leave first while there

18   is still inmates in the visitor room?

19   A.  Visitors will be escorted at the end of the visiting shift.

20   At the end of the visiting hour, they will be escorted down.

21   The remaining visitors will be escorted down.

22   Q.  Does that happen before or after the last inmate is removed

23   from the room?

24   A.  That happens before.  Whatever -- once a time is set, let's

25   say the time is set, visitation is over, the inmates will

LB1sADA2                          Cross - Jean

1    remain in their seat.  Staff will call for the visiting --

2    visiting officer, the visiting escort officer to come, and all

3    visitors will be escorted down.  Once the visitors leave, then

4    they will conduct their visual search of the inmates before

5    putting them back on the unit.

6    Q.  So, in other words, usually when a correctional officer is

7    performing the last visual search of an inmate, there are no

8    visitors left in the visit room at that time?

9    A.  Yeah, correct.

10            MR. TAYLOR:  Let's move on.  Mr. Taliercio, can you

11   bring up GX 122, please.

12            This is in evidence, so may I publish this to the jury

13   as well, your Honor?

14            THE COURT:  Yes, yes.

15   BY MR. TAYLOR:

16   Q.  Mr. Jean.

17   A.  Yes.

18   Q.  Can you see the exhibit?

19   A.  Yes.

20   Q.  And you recognize this from before?

21   A.  Yes.

22            MR. TAYLOR:  Mr. Taliercio, can we shrink that down a

23   little bit.  Just a little more, please.  Thank you.

24   Q.  Now, you see there's the rows across the top, Mr. Jean,

25   where it has times?

LB1sADA2                        Cross - Jean

1   A.  Yes.

2   Q.  And you see in the -- I guess you would call it the fifth

3   column where it says nine?

4   A.  Yes.

5   Q.  Do you see that, sir?

6   A.  Yes.

7   Q.  Do you see where it says 1200 to 2000?

8   A.  Yes.

9   Q.  That refers to a time, right?

10  A.  Yes.

11  Q.  So that's the time of the shift.  It begins at noon and it

12  ends at eight p.m., right, sir?

13  A.  Yes.

14          MR. TAYLOR:  Let's go to the next page, Mr. Taliercio,

15  please.  Can you highlight right there.

16  Q.  Do you see where Mr. Taliercio has highlighted where it

17  says Adams, comma, R?

18  A.  Yes.

19  Q.  So he's assigned to visit one, correct?

20  A.  Correct.

21  Q.  And the time of his shift is noon to eight p.m., right?

22  A.  Yes.

23  Q.  Now, no matter what it says anywhere else, including the

24  post, Mr. Adams' shift on July 5, 2019, ended at eight p.m.

25  that day, correct?

LB1sADA2                         Cross - Jean

1  A.  Yes.

2  Q.  Do you see below where it says Adams, sir?

3         Do you see where it says Coates?

4  A.  Yes.

5  Q.  Officer Coates is a female officer, correct, sir?

6  A.  Correct.

7  Q.  That means that Officer Coates would not be allowed in the

8  search room with an inmate because of her gender, correct, sir?

9  A.  Yes.

10  Q.  Because it's a policy at the BOP that you never have

11  cross-gender searches, correct?

12  A.  Yes.

13  Q.  In preparation for your testimony today, did you review

14  Mr. Adams' work schedule in the month of July 2019, sir?

15  A.  No.

16  Q.  I believe that you said in your testimony on direct that

17  correctional officers in the visit area are not authorized to

18  dispose of contraband without reporting it, right?

19  A.  Yes.

20  Q.  In other words, officers are required to report contraband?

21  A.  Yes.

22  Q.  You can't guarantee that all of them do, right?

23  A.  No, I can't.

24         MR. TAYLOR:  One moment, your Honor.

25         (Pause)

1          Thank you very much, Mr. Jean, for your time.  I have

2     no further questions.

3          THE COURT:  Redirect?

4          MR. SCHAEFFER:  Very briefly, your Honor.

5     REDIRECT EXAMINATION

6     BY MR. SCHAEFFER:

7     Q.  Hello, Counselor Jean.

8     A.  Hello.

9     Q.  Do you recall being asked several questions on

10    cross-examination about completing incident reports?

11    A.  Yeah.  I recall questions being asked, yes.

12    Q.  In your experience, approximately how long does it take to

13    complete an incident report?

14    A.  Take anywhere from half hour to an hour.  Minutes to a half

15    to under an hour.  It depends.

16    Q.  Do you recall being asked several questions on

17    cross-examination about reporting contraband to supervisors?

18    A.  Yes.

19    Q.  In your experience, approximately how long does it take to

20    report finding contraband to a supervisor?

21    A.  Minutes to -- you just call.  You find the contraband, you

22    notify the -- notify shift supervisor that you found

23    contraband.

24         MR. SCHAEFFER:  No further questions, your Honor.

25         THE COURT:  Anything else?

1          MR. TAYLOR:  No questions, your Honor.

2          THE COURT:  All right.  You can step down, sir.

3     Thank you.

4          THE WITNESS:  Thank you.

5          (Witness excused)

6          THE COURT:  Government, call its next witness.

7          MR. SCHAEFFER:  Your Honor, prior to calling the next

8     witness, we would like to read two stipulations into the

9     record.

10         THE COURT:  You may.

11         Before you do that, ladies and gentlemen, you may

12    recall that during my preliminary instructions, I told you that

13    from time to time the lawyers enter into agreements about

14    matters and the lawyer term for that is stipulation.

15         So we have already had a stipulation with respect to

16    certain documents that have been received in evidence.

17    Sometimes there are stipulations as to facts.  If there is a

18    stipulation as to a fact, the jury must regard that fact as

19    true.  Sometimes there are stipulations about what testimony a

20    person would give.  They are referred to as testimonial

21    stipulations.  In that instance, the jury should assume that if

22    the person were called to testify, they would give that

23    testimony referred to in the stipulation.

24         So stipulations are agreements between the parties,

25    generally as to facts or to testimony that would be given by

1   someone if they were called to testify.

2          All right.  Go ahead, sir.

3          MR. SCHAEFFER:  Thank you, your Honor.

4          Ms. Phifer, if we can pull up for the parties and the

5   court Government Exhibit 2.

6          Your Honor, as the court just explained, this is a

7   stipulation between the parties.  The government would offer

8   Government Exhibit 2.

9          THE COURT:  All right.  Any objection to Exhibit 2?

10          MR. GREGORY:  No, your Honor.

11          THE COURT:  It is received.

12          (Government's Exhibit GX 2 received in evidence)

13          MR. SCHAEFFER:  May it be published, your Honor, as I

14   read it?

15          THE COURT:  Yes.

16          MR. SCHAEFFER:  Thank you.

17          It is hereby stipulated and agreed, by the United

18   States of America, through the undersigned Assistant United

19   States Attorneys, and defendant, Robert Adams, by and through

20   his counsel, that in at least July and August of 2019, Adams

21   was employed by the United States Bureau of Prisons as a

22   correctional officer, and was therefore a "public official" as

23   that term is defined in 18 U.S.C. Section 201(a)(1).

24          Would you take that down, Ms. Phifer.

25          If we can bring up for the parties and the Court

LB1sADA2                        Redirect - Jean

1    Government Exhibit 3.

2              Your Honor, the government would offer this

3    stipulation as this time.

4              THE COURT:  Any objection to Government Exhibit 3?

5              MR. GREGORY:  No.

6              THE COURT:  Government Exhibit 3 is received.

7              (Government's Exhibit GX 3 received in evidence)

8              MR. SCHAEFFER:  Thank you, your Honor.

9              May it be published as I read it?

10             THE COURT:  You may.

11             MR. SCHAEFFER:  Thank you.

12             Pursuant to Government Exhibit 3, it is hereby

13   stipulated and agreed, by the United States of America, through

14   the undersigned Assistant United States Attorneys, and the

15   defendant, Robert Adams, by and through his counsel, that while

16   working as a correctional officer at the Metropolitan

17   Correctional Center (MCC), Robert Adams did not prepare or

18   submit any form, report, or memorandum concerning any discovery

19   of contraband on July 5, 2019, nor did Adams inform any

20   supervisor concerning any discovery of contraband on July 5,

21   2019.

22             We can take that down, Ms. Phifer.

23             Thank you, your Honor.

24             THE COURT:  Government, call its next witness.

25             MS. BHASKARAN:  Yes, your Honor.

1          Before we do, we just have two more stipulations to

2     offer.

3          THE COURT:  All right.  Go right ahead.

4          MS. BHASKARAN:  First, the government offers

5     Government Exhibit 4, a stipulation.

6          THE COURT:  All right.  Any objection to Government

7     Exhibit 4?

8          MR. GREGORY:  No, your Honor.

9          THE COURT:  It's received.

10         (Government's Exhibit GX 4 received in evidence)

11         MS. BHASKARAN:  Your Honor, pursuant to Government

12    Exhibit 4, the government offers Government Exhibits 201

13    through 210.

14         THE COURT:  Any objection to Government Exhibit 201

15    through 210?

16         MR. GREGORY:  No.

17         THE COURT:  Government Exhibits 201 through 210 are

18    received.

19         (Government's Exhibits GX 201 through 210 received in

20    evidence)

21         MS. BHASKARAN:  Your Honor, the government offers the

22    stipulation Government Exhibit 5.

23         THE COURT:  Any objection to Government Exhibit 5?

24         MR. GREGORY:  No.

25         THE COURT:  Government Exhibit 5 is received.

LB1sADA2                        Direct - Harris

1            (Government's Exhibit GX 5 received in evidence)

2            MS. BHASKARAN:  Your Honor, the government calls

3    Shahada Harris.

4            THE DEPUTY CLERK:  Please raise your right hand.

5     SHAHADA HARRIS,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8            Please state your full name and spell it for the

9    record.

10            THE WITNESS:  My name is Shahada Marie Harris.

11    S-h-a-h-a-d-a, M-a-r-i-e, last name Harris, H-a-r-r-i-s.

12            THE COURT:  You're going to need to talk directly into

13    the microphone.  You might want to get a little closer to the

14    microphone.

15            THE WITNESS:  OK.  Sure.

16            Shahada, S-h-a-h-a-d-a, Marie, M-a-r-i-e, Harris,

17    H-a-r-r-i-s.

18            THE COURT:  All right.  Please proceed.

19    DIRECT EXAMINATION

20    BY MR. BHASKARAN:

21    Q.  Good morning, Ms. Harris.

22    A.  Good morning.

23    Q.  Ms. Harris, where were you born?

24    A.  Brooklyn, New York.

25    Q.  Where did you grow up?

LB1sADA2                        Direct - Harris

1   A.  I grew up in the Bronx.

2   Q.  Have you gone to any school?

3   A.  Yes.

4   Q.  How much school did you go to?

5   A.  My last grade was college.

6   Q.  What did you study in college?

7   A.  Law.

8   Q.  Did you graduate college?

9   A.  No.

10  Q.  How old are you today?

11  A.  28.

12  Q.  What do you do for a living today?

13  A.  I work at a laundromat.

14  Q.  What do you do at the laundromat?

15  A.  I wash and fold the clothes.

16  Q.  Have you ever heard of something called the MCC?

17  A.  Yes.

18  Q.  What's the MCC?

19  A.  That's a jail.

20  Q.  Have you ever gone to the MCC?

21  A.  Yes.

22  Q.  Why did you go to the MCC?

23  A.  I was visiting my friend.

24  Q.  What was your friend doing at the MCC?

25  A.  He was an inmate.

LB1sADA2                          Direct – Harris

1  Q.  When you visited the MCC, were you told about what types of

2  things you can and can't bring?

3  A.  Yes.

4  Q.  What are some of the things that you were not allowed to

5  bring into the MCC?

6  A.  I was not allowed to bring weapons, drugs, and devices.

7  Q.  What's your understanding of what would happen if you

8  brought those things into the MCC?

9  A.  I would get in trouble.

10  Q.  What kind of trouble?

11  A.  With the law.

12  Q.  And what do you mean trouble with the law?

13  A.  I could face charges.

14  Q.  When you visited the MCC, what, if anything, did you bring

15  with you that you were not supposed to?

16  A.  I came with drugs.

17  Q.  Did you ever get caught?

18  A.  Yes.

19  Q.  How many times did you get caught?

20  A.  Two.

21  Q.  When was the first time that you were caught?

22  A.  I got caught July 5, 2019.

23  Q.  What did you bring with you that day that you were not

24  supposed to?

25  A.  I brung drugs.

LB1sADA2                         Direct - Harris

1   Q.  Who caught you that day?

2   A.  Adams.

3   Q.  Do you know his first name?

4   A.  Robert.

5   Q.  And what does Robert Adams do at the MCC?

6   A.  He's a guard at the jail.

7   Q.  Looking around the courtroom, do you see Robert Adams?

8   A.  Yes.

9   Q.  Can you identify him by where he is sitting and an article

10  of clothing?

11  A.  Um, in front of me.  All black.

12  Q.  Can you identify which table he's sitting in?

13  A.  I don't know the table, the name of the table.

14  Q.  Is it this table right here?

15  A.  Yes.

16          MR. BHASKARAN:  Your Honor, let the record reflect

17  that the witness has identified the defendant.

18          THE COURT:  Any objection?

19          MR. GREGORY:  No objection to that, Judge.

20          THE COURT:  The record will reflect that the witness

21  has identified the defendant.

22          Please proceed.

23  BY MR. BHASKARAN:

24  Q.  Ms. Harris, were you arrested the day that Adams caught

25  you?

LB1sADA2                    Direct - Harris

1  A.  No.

2  Q.  Were you barred from entering the MCC after that?

3  A.  No.

4  Q.  Did you get into any kind of trouble after he caught you on

5  July 5?

6  A.  No.

7  Q.  How did you avoid getting into trouble?

8  A.  By going to the hotel with him.

9  Q.  What did you do with him at the hotel?

10  A.  We had sex at the hotel.

11  Q.  How did having sex with Adams get you out of trouble?

12          MR. GREGORY:  Objection, Judge.

13          THE COURT:  Sustained.

14  Q.  What was your understanding of why you had sex with Adams

15  at the hotel?

16  A.  So I won't get in trouble and I could come back to the

17  jail.

18  Q.  What made you believe that you wouldn't get into trouble if

19  you had sex with Adams?

20  A.  He told me that was the right thing to do so I won't get in

21  trouble.

22  Q.  What did you understand him to mean when he said this was

23  the right thing to do?

24  A.  To go and have sex with him at the hotel so I won't get in

25  trouble.

LB1sADA2                          Direct - Harris

1    Q.  You mentioned a second time you got caught.

2              When was that?

3    A.  I got caught in August 14, 2019.

4    Q.  What did you get caught bringing that time?

5    A.  I got caught bringing drugs.

6    Q.  Who caught you the second time?

7    A.  Another guard.

8    Q.  What happened when you got caught the second time?

9    A.  I got banned and I had to go to the -- meet up with the

10   agents.

11   Q.  What agents are you referring to?

12   A.  The ones that picked me up from when I got caught from the

13   jail.

14   Q.  And have you been to the MCC since then?

15   A.  No.

16   Q.  OK.  Ms. Harris, we'll get back to those events.  First, I

17   want to just ask you some questions of what it was like to

18   visit the MCC.

19             First, what was the time period that you were visiting

20   the MCC?

21   A.  I started visiting the facility in May 2019.

22   Q.  And how old were you at the time that you were visiting the

23   MCC?

24   A.  I was 26.

25   Q.  At that time, what did you do for a living?

1   A.  I was just doing hair.  I had no job.

2   Q.  Can you please describe for the jury what the process was

3   like for you to visit the MCC?

4   A.  Yes.  Um, when you come to the jail, there's a waiting area

5   in the front of the jail.  So you wait there, you sign the

6   paper.  The paper says are you bringing contraband.  So I

7   answered no to everything, which was not truthful.  And then

8   you come inside and then you get searched again.  You put your

9   stuff in the lockers, and then you put your ID at the desk.

10   And then you go through the metal detectors and you sit and

11   wait again after you sign in.

12   Q.  So, Ms. Harris, even before you get to the MCC, what, if

13   anything, do you have to do to be able to visit?

14   A.  Sign -- you have to, um, sign, um, in the -- the, um -- you

15   have to -- what's the word -- check in that you didn't bring in

16   anything on the outside.

17   Q.  So, Ms. Harris, my question is, is there any approval

18   process even prior to getting to the jail on the day that you

19   want to visit?

20   A.  Yes, there is.

21   Q.  And what's that like?

22   A.  They, um -- you speak to the counselor, and the counselor

23   has to approve you into the jail as a visitor.

24   Q.  And then you mentioned a form that you fill out when you

25   get to the jail?

LB1sADA2                        Direct - Harris

1    A.  Yes.

2    Q.  And where at the jail do you fill out that form?

3    A.  On the outside.

4            MR. BHASKARAN:  And, Ms. Phifer, could you please

5    publish Government Exhibit 1, a stipulation, and please go to

6    page four, paragraph 23.

7            I'll read this paragraph.  Government Exhibit 125 is a

8    true and accurate copy of a BOP notification to visitor form

9    which was in issue at the MCC at least from July 5, 2019,

10   through August 14, 2019.

11           Your Honor, the government offers Government Exhibit

12   125.

13           THE COURT:  Any objection to 125?

14           MR. GREGORY:  No, your Honor.

15           THE COURT:  Government Exhibit 125 is received.

16           (Government's Exhibit GX 125 received in evidence)

17           MS. BHASKARAN:  Your Honor, permission to publish

18   Government Exhibit 125.

19           THE COURT:  Yes, you may publish.

20   BY MR. BHASKARAN:

21   Q.  Ms. Harris, do you see that document on the screen in front

22   of you?

23   A.  Yes.

24   Q.  Do you recognize it?

25   A.  Yes, I do.

LB1sADA2                        Direct - Harris

1  Q.  What is this form?

2  A.  That's the form that you sign before you go into it, the

3  jail.

4           MR. BHASKARAN:  OK.  And, Ms. Phifer, can you zoom

5  into the middle of the page.

6           I'll read part of the document into the record.  It

7  says, Please answer the following questions:  Are any of the

8  following items in your possession, or in possession of

9  children in your party under 16 years of age?

10  Q.  Ms. Harris, do you see that?

11  A.  Yes.

12  Q.  And do you see where it says tobacco products?

13  A.  Yes.

14  Q.  And narcotics?

15  A.  Yes.

16  Q.  And marijuana?

17  A.  Yes.

18  Q.  When you visited the MCC, how did you answer those

19  questions?

20  A.  Not truthful.

21  Q.  Well, how did you answer them; yes or no?

22  A.  No.

23  Q.  And what was not truthful about your responses?

24  A.  I had drugs on me.

25  Q.  Now, Ms. Harris, after you filled in this form, you

LB1sADA2                          Direct - Harris

1    mentioned going through security.

2              Can you describe a little bit what the security was

3    like?

4    A.  Yes.  It was, um -- the security, they search your shoes,

5    and then you go through with your body without the shoes on so

6    the metal detector didn't ring.

7    Q.  Ms. Harris, what do you do with your personal belongings

8    when you enter the MCC?

9    A.  You lock them in a locker.

10   Q.  What about your driver's license?

11   A.  You give that to the front desk.

12   Q.  And other than the form that we just looked at, is there

13   anything else that you signed when you went to the MCC?

14   A.  Yes, the log-in book.

15   Q.  And what type of information did you sign into the log-in

16   book?

17   A.  Your name, the date, the time, the inmate's name and

18   number.

19   Q.  Ms. Harris, who was the friend that you were visiting at

20   the MCC?

21   A.  Keith Outlaw.

22   Q.  Can you tell us a little bit about your situation with

23   Mr. Outlaw?

24   A.  Yes.  I knew Outlaw since I was 17.  We used to party

25   together.  A few years after we started being, um, like

LB1sADA2                        Direct - Harris

1    romantically involved.

2    Q.  And what was your relationship with Outlaw at the time that

3    you saw him at the MCC?

4    A.  I still cared about Outlaw, so I was still there for him.

5    Q.  Were you dating at the time?

6    A.  We was talking about it.

7    Q.  How did you feel about him at the time?

8    A.  Yeah, I still -- I still had love for Outlaw.

9            MR. BHASKARAN:  And, Ms. Phifer, can we please publish

10   Government Exhibit 1, paragraph one on page one.  I'll read

11   this paragraph into the record.

12           Government Exhibit 101 is a true and accurate copy of

13   a portion of the MCC's visitor log for Friday, May 31, 2019.

14           Your Honor, the government offers Government Exhibit

15   101.

16           MR. GREGORY:  No objection, Judge.

17           THE COURT:  101 is received.

18           (Government's Exhibit GX 101 received in evidence)

19           MS. BHASKARAN:  Your Honor, permission to publish

20   Government Exhibit 101.

21           THE COURT:  Yes.

22           MR. BHASKARAN:  Ms. Phifer, can you please blow up the

23   bottom portion of the document.

24   BY MR. BHASKARAN:

25   Q.  Ms. Harris, do you see your name here?

LB1sADA2                         Direct - Harris

1    A.  Yes.

2    Q.  And do you recognize the handwriting?

3    A.  Yes.

4    Q.  Whose handwriting is it?

5    A.  That's my handwriting.

6    Q.  And who did you visit?

7    A.  I visited Keith Outlaw.

8    Q.  And what was the date of this visit?

9    A.  May 31, 2019.

10   Q.  Can you tell us a little bit about what you remember about

11   this visit?

12   A.  Yes.  I remember when I went to the visit, he -- um, Keith

13   was talking about coming to bring him some stuff, that he's

14   going to give me some stuff to bring to him.  And, um, he --

15   he, um, was, you know, buttering me up so I can help him out.

16   And I decided to help him even though I didn't want to.

17   Q.  Ms. Harris, you said Mr. Outlaw asked you to bring some

18   stuff?

19   A.  Yes.

20   Q.  What did you understand some stuff to mean?

21   A.  That it was drugs he wanted me to sneak in.

22   Q.  Do you know what kind of drugs he wanted you to sneak in?

23   A.  No.

24   Q.  What kind of drugs had you seen Outlaw do in the past?

25   A.  Marijuana.

LB1sADA2                        Direct - Harris

1   Q.  And then you mentioned that he was buttering you up?

2   A.  Yes.

3   Q.  What do you mean by that?

4   A.  He was saying sweet stuff and saying, like, when he get

5   out, that we're going to be together again, and stuff like

6   that.

7   Q.  And what, if anything, did Outlaw say about what you would

8   get for bringing in the drugs?

9   A.  He said I would get money.

10  Q.  And how did you respond to Outlaw's request?

11  A.  So I said no, but then I changed my mind and said yeah.

12  Q.  Why did you say yes?

13  A.  Because I wanted to help him out.

14  Q.  And what about the money?

15  A.  I would get paid.

16  Q.  Between the money and helping him out, what was the primary

17  motivation?

18  A.  Mainly, helping him out.

19  Q.  Aside from Outlaw, who else was involved in getting drugs

20  into the MCC?

21  A.  One of the girls that visit the jail, Diamond.

22  Q.  Anyone else?

23  A.  And some guy.  Some tall guy.

24  Q.  What was the name of that guy?

25  A.  I didn't know his name.

LB1sADA2                        Direct - Harris

1  Q.  And who provided you money for getting the drugs into the

2  MCC?

3  A.  Diamond.

4  Q.  Anyone else?

5  A.  No.

6  Q.  Prior to July 5 of 2019, about how many times did you visit

7  the MCC?

8  A.  A few times.

9  Q.  And on those occasions, what, if anything, did you bring to

10  Outlaw?

11  A.  Drugs.

12  Q.  And can you describe for the jury how you got the drugs and

13  how you got it to Outlaw?

14  A.  Yes.  I, um -- so I would put it in my pants, and then when

15  I get to the visit and we sit, I would just take it out.

16  Q.  So even before you got to the MCC, tell us, where did you

17  get the drugs?

18  A.  All right.  Outside the jail, I would meet up with Diamond,

19  and she would pass it to me and I would just stuff it in my

20  pants.

21  Q.  What did the stuff look like when you got it from Benson?

22  A.  It was round, it was taped up, and it was just in a ball.

23  Q.  Could you see what was inside of it?

24  A.  No.

25  Q.  About how big were these packages or balls?

LB1sADA2                          Direct - Harris

1    A.  It was smaller than my fist.

2    Q.  You said you put them in your pants?

3    A.  Yes.

4    Q.  And once you got to the visit room, how did you give them

5    to Outlaw?

6    A.  I would dig in my pants from the back and I would take it

7    out.

8    Q.  And at what point would you give it to Outlaw?

9    A.  When he says to pass it to him.

10   Q.  What did Outlaw do with the package once he received it?

11   A.  He would throw is in his jumper.

12   Q.  And can you describe for the jury how you got paid once you

13   got the drugs in?

14   A.  Yes.  Diamond, she Cash App'd money.

15   Q.  And about how much money did you get?

16   A.  500.

17   Q.  For one particular incident or in total?

18   A.  It was for one, I think.

19   Q.  In total, how much money did you make smuggling drugs into

20   the MCC?

21   A.  About 700.

22        MR. BHASKARAN:  Now, Ms. Phifer, you can take down

23   Government Exhibit 101.  Thank you.

24   Q.  Ms. Harris, I would like to turn your attention to July 5,

25   2019.

LB1sADA2                          Direct – Harris

1          THE COURT:  All right.  Ladies and gentlemen, we are

2     going to take our midmorning recess now.

3          Don't discuss the case.  Keep an open mind.  There is

4     more evidence.  We will return shortly.  Thank you all very

5     much.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Is there anything we need to take up?

3              MR. SCHAEFFER:  Not from the government, your Honor.

4              MR. GREGORY:  Nothing.

5              THE COURT:  We'll resume in about ten minutes.  Thank

6    you.

7              MR. SCHAEFFER:  One very minor thing, your Honor.

8    Looks like the jurors are tripping over a cord or something

9    there.

10             MR. GREGORY:  I'm going to put the garbage can like

11   this so that way, we're safe.  They are going to fall down.

12             THE COURT:  I'll mention it to my deputy when he

13   returns.

14             Thank you very much.  We had the same problem at the

15   last trial.

16             (Recess)

17             THE DEPUTY CLERK:  Your Honor, I'm going to go get the

18   jurors.

19             THE COURT:  Yes.

20             MS. BHASKARAN:  Your Honor, what time were you hoping

21   to take a lunch break?

22             THE COURT:  Somewhere between 12:30 and 12:45.

23             MS. BHASKARAN:  May I suggest a logical stopping point

24   at some point in that period?

25             THE COURT:  Absolutely.

LB1sADA2                        Direct – Harris

1              MS. BHASKARAN:  OK.

2         (Pause)

3         (Continued on next page)

LB1sADA2                          Direct - Harris

1          (Jury present)

2          THE COURT:  Please proceed.

3          MS. BHASKARAN:  Thank you, your Honor.

4    BY MR. BHASKARAN:

5    Q.  Ms. Harris, did you visit the MCC on July 5, 2019?

6    A.  Yes.

7    Q.  Before you even got to the jail on July 5, what were you

8    planning to do after your visit?

9    A.  To go back home.

10   Q.  What did you bring with you to the jail that day?

11   A.  Drugs.

12   Q.  Tell us how you got the drugs.

13   A.  I met up with Diamond.

14   Q.  Where did you meet up with Diamond?

15   A.  A block from the jail.

16   Q.  What did she give you?

17   A.  She gave me two round, um, two round balls taped up.

18   Q.  I'm sorry.  You said it was what?

19   A.  Two round, taped-up balls.

20   Q.  What did you do with that object once you got it?

21   A.  I put it in my pants and went to the visit.

22   Q.  And can you describe how you entered the MCC on July 5?

23   A.  Yes.  I, um -- I went and then I sat outside.  I filled the

24   forms out.  I said no on the forms and then went in.  Then I

25   got -- I put my phone in the locker, gave my ID to the desk,

LB1sADA2                    Direct - Harris

1   got searched.  Then signed the book, got searched again, went

2   upstairs to visit.

3   Q.  You mentioned you filled out the form.

4           Is that the same form that we looked at before?

5   A.  Yes.

6   Q.  And you mentioned giving your driver's license to the desk.

7           Who did you give your driver's license to?

8   A.  To one of the officers at the desk.

9   Q.  What did you do with your phone?

10  A.  Locked it in a locker.

11          MR. BHASKARAN:  Ms. Phifer, can we please publish

12  Government Exhibit, 1 and highlight paragraph five on the top

13  of page two.  I'll read this paragraph into the record.

14          Government Exhibit 105 is a true and accurate copy of

15  a portion of the MCC's visitor log for Friday, July 5, 2019.

16          Your Honor, the government offers Government Exhibit

17  105.

18          THE COURT:  Any objection?

19          MR. GREGORY:  No objection.

20          THE COURT:  Government Exhibit 105 is received.

21          (Government's Exhibit GX 105 received in evidence)

22          MS. BHASKARAN:  Your Honor, permission to publish

23  Government Exhibit 105.

24          THE COURT:  You may.

25          MR. BHASKARAN:  Ms. Phifer, then zoom in on the bottom

1    portion of the document.

2    BY MR. BHASKARAN:

3    Q.  Ms. Harris, do you recognize the handwriting?

4    A.  Yes.

5    Q.  What did you write here?

6    A.  I wrote the date, my name, and my visitor's name.

7             MR. BHASKARAN:  I'm now going to read a portion of

8    Government Exhibit 4, which is a stipulation.  Ms. Phifer, can

9    you publish Government Exhibit 4.

10            THE COURT:  Yes.

11            MR. BHASKARAN:  Government Exhibit 201 is a true and

12   accurate copy of a recording from an internal video

13   surveillance system utilized by the MCC, which depicts the

14   lobby and waiting era of the MCC on July 5, 2019, from

15   5:53:15 p.m. to 5:53:41 p.m.

16            Ms. Phifer, if you could please publish for the jury

17   Government Exhibit 201, which was previously received into

18   evidence.

19            (Video played)

20            Mr. Phifer, if you can just stop it once we sit the

21   15 second-mark.

22   BY MR. BHASKARAN:

23   Q.  Ms. Harris, do you recognize the person in the white shirt

24   there?

25   A.  Yes.

1   Q.  Who is that?

2   A.  That's me.

3   Q.  Where are you in this clip?

4   A.  I'm at the metal detector.

5   Q.  Which metal detector?

6   A.  The one that's next to -- the one you put the shoes in.

7   Q.  At the MCC?

8   A.  Yes.

9           MR. BHASKARAN:  Ms. Phifer, can you play the remainder

10  of this clip.

11          (Video played)

12  Q.  Ms. Harris, can you describe for the jury what you were

13  doing during this clip?

14  A.  Yes.  That was after my -- I put my shoes through the metal

15  detector.  So I went through with my shoes off for my full

16  body, and then I sat down to wait for the visit.

17  Q.  Where were the drugs at this point?

18  A.  In my pants.

19          MR. BHASKARAN:  I'm now going to read a portion of

20  Government Exhibit 4, a stipulation.

21          Ms. Phifer, if you can publish that.

22          Government Exhibit 202 is a true and accurate copy of

23  a recording from the internal video surveillance system

24  utilized by the MCC which depicts the lobby and waiting area of

25  the MCC on July 5, 2019, from 6:09:55 p.m. to 6:10:08 p.m.

1              Ms. Phifer, can you please play Government Exhibit 202

2    and stop at around the 15-second mark.

3              (Video played)

4    BY MR. BHASKARAN:

5    Q.  Ms. Harris, can you tell us what is happening here?

6    A.  Yes.  Um, everybody was rushing to the elevators so, and I

7    rushed too so I could be first on the visit.

8    Q.  So where is the elevator relative to that door?

9    A.  It's past that door.

10             MR. BHASKARAN:  I'm now going to read another portion

11   of Government Exhibit 4, a stipulation.

12             Ms. Phifer, if you could go to the second page,

13   please.  Thank you.

14             Government Exhibit 205 is a true and accurate copy of

15   a recording from the internal video surveillance system

16   utilized by the MCC which depicts visiting room one at the MCC

17   on July 5, 2019.

18             Ms. Phifer, can we now please play Government

19   Exhibit 205 for the jury and stop at around the 12-second mark.

20             (Video played)

21   Q.  Ms. Harris, where are you here?

22   A.  I'm about to use the bathroom.

23   Q.  What part of the MCC are you at?

24   A.  The visitor floor.

25   Q.  And where is the elevator relative to this room?

LB1sADA2                          Direct - Harris

1    A.  It's through that other door.  The one that's open over

2    there.

3    Q.  And where were the drugs at this point?

4    A.  In my pants.

5         MR. BHASKARAN:  Ms. Phifer, can you now please play

6    Government Exhibit 206 for the jury and stop at around the

7    15-second mark.

8         (Video played)

9    Q.  Ms. Harris, can you tell us what is happening in this clip?

10   A.  Yes.  I went to sit down to wait for my visitor to come.

11   Q.  Where were the drugs at this point?

12   A.  Still in my jeans.

13        MR. BHASKARAN:  Ms. Phifer, can you now publish for

14   the jury Government Exhibit 207 and stop at around the

15   six-second mark, please.

16        (Video played)

17   Q.  Ms. Harris, do you recognize the person in the orange

18   jumpsuit who just walked in?

19   A.  Yes.

20   Q.  Who is that?

21   A.  That's Keith Outlaw.

22        MR. BHASKARAN:  Ms. Phifer, can you play the remainder

23   of the clip.

24        (Video played)

25   Q.  Ms. Harris, tell us what happened here.

1   A.  We was talking, and we was talking before I passed him the

2   stuff.

3   Q.  OK.  What else did you guys talk about during that visit?

4   A.  Um, we talked about other stuff, like outside stuff, like

5   when he get out and stuff like that.

6   Q.  What was the nature of your conversation with Outlaw that

7   day?

8   A.  Um, it was -- I'm not too -- I don't even remember.  It

9   was -- we was talking about, um, when he get out and stuff.

10  Like, you know, future stuff.

11  Q.  Ms. Harris, what, if anything, did you give to him that

12  day?

13  A.  Drugs.

14  Q.  And tell us how you were able to give him the drugs that

15  day.

16  A.  Yes.  I, um, leaned over and I digged in my pants in the

17  back, and then I pulled it up and put it on the seat, and then

18  I passed it to him.  He through it in his jumper.

19         MR. BHASKARAN:  Ms. Phifer, can you now please play

20  Government Exhibit 208 and pause it around the ten-second mark.

21         (Video played)

22         Ms. Phifer, if you could just play it another few

23  seconds here.

24         (Video played)

25         OK.  If you could pause it here now.  Thank you,

LB1sADA2                          Direct – Harris

 1    Ms. Phifer.

 2    BY MR. BHASKARAN:

 3    Q.  Ms. Harris, do you still see yourself in this clip

 4    somewhere?

 5    A.  Yes.

 6    Q.  Where are you?

 7    A.  I'm still sitting in the same spot.

 8    Q.  Who are you talking to?

 9    A.  To Outlaw.

10    Q.  And did you see the person who walked in through the door

11    in the darker hue-colored shirt?

12    A.  Yes.

13    Q.  Who is that?

14    A.  That's a pregnant girl.

15    Q.  Do you know her?

16    A.  No.

17    Q.  Do you know her name?

18    A.  No.

19    Q.  Were you friends with her back then?

20    A.  No.

21    Q.  Are you friends with her now?

22    A.  No.

23    Q.  When is the last time you saw her?

24    A.  That day or the next visit or something.

25          MR. BHASKARAN:  Ms. Phifer, can you play the rest of

LB1sADA2                        Direct - Harris

1    this clip, please.

2              (Video played)

3              Ms. Phifer, can you now please play Government Exhibit

4    209 and stop at around the seven-second mark.

5              (Video played)

6    BY MR. BHASKARAN:

7    Q.  Ms. Harris, who got up in this clip?

8    A.  Outlaw.

9    Q.  Why did he get up?

10   A.  The visit was over.

11             MR. BHASKARAN:  Ms. Phifer, can you continue to play

12   the clip and pause it around the 13-second mark.

13             (Video played)

14   Q.  Ms. Phifer, do you see the person who opened the door?

15   A.  Um --

16   Q.  Excuse me, Ms. Harris.  Pardon.

17             Ms. Harris, do you see the person who opened the door

18   in the clip?

19   A.  Yeah.

20   Q.  Who is that?

21   A.  Um, that's Adams.

22   Q.  Who was he wearing?

23   A.  His uniform.

24             MR. BHASKARAN:  Ms. Phifer, can you please play the

25   rest of the clip.

1          (Video played)

2     Q.  Now, Ms. Harris, after Outlaw left, why did you just keep

3     sitting there?

4     A.  You have to be escorted downstairs.

5     Q.  Why didn't you just go down by yourself?

6     A.  Um, that's the law in there, in they jail.  They got to

7     take you down.

8     Q.  Around what time of day was this, by the way?

9     A.  Um, it was about seven p.m., probably.

10         MR. BHASKARAN:  Ms. Phifer, can you now please play

11    Government Exhibit 210, and pause it around the eight-second

12    mark.

13         (Video played)

14    Q.  Ms. Harris, who walked into the room here?

15    A.  Adams.

16    Q.  And was there anyone else in the room?

17    A.  Yes.

18    Q.  Who else was in the room?

19    A.  The pregnant girl.

20    Q.  Where was she seated?

21    A.  Across from me.

22    Q.  Do you see the person -- there's a person at the left of

23    the screen.

24         Do you see that?

25    A.  Yes.

LB1sADA2                        Direct - Harris

1   Q.  Who is that?

2   A.  Standing up?

3   Q.  No, the person seated towards the left of the clip.

4   A.  Oh, the girl, the pregnant girl?  The pregnant girl.

5           MR. BHASKARAN:  Ms. Phifer now continuing playing this

6   clip until about the one minute 54-second mark.

7           (Video played)

8   Q.  Mrs. Harris, how much time had passed between when Outlaw

9   left the room and when Mr. Adams returned?

10  A.  Um, probably, um, it was less than two minutes, probably.

11  Q.  And, Ms. Harris, do you recall what happened during this

12  clip?

13  A.  A little bit, yes.

14  Q.  Tell us what you remember.

15  A.  He, um, Adams came up to me and he said, Yo boy F'd up,

16  that I should meet him at the pizzeria because I'm going to be

17  in trouble if I don't.

18  Q.  You said that Adams said, Your boy F'd up?

19  A.  Yeah.

20  Q.  What did you understand him to mean when he said that?

21  A.  That he got caught with the drugs.

22  Q.  And who gave the drugs to Outlaw?

23  A.  Me.

24  Q.  And I think you mentioned he said that you were in trouble?

25  A.  Yes.

1   Q.  What did you understand him to mean by that?

2   A.  That I could get in trouble and go to jail, yeah.

3   Q.  And you said he said something about a pizzeria?

4   A.  Yes.

5   Q.  What did he say about that?

6   A.  To meet him up the block at the nearest pizzeria.

7   Q.  When did he tell you to go there?

8   A.  Right in that clip, when he came to me.

9   Q.  And what was the pregnant lady doing during all of this?

10  A.  Just listening.

11          MR. BHASKARAN:  Ms. Phifer, can you please continue

12  playing the remainder of this exhibit.

13          (Video played)

14  Q.  Ms. Harris, can you please tell us what happened here at

15  this part of the clip?

16  A.  Yeah.  We was leaving.

17  Q.  OK.  What trouble, if any, did you get into at this point?

18  A.  None.

19          MR. BHASKARAN:  Ms. Phifer, I will now, if you could

20  please publish Government Exhibit 4, the stipulation.  I'll

21  read a portion of this.

22          Government Exhibit 204 is a true and accurate copy of

23  a recording from the internal video surveillance system

24  utilized by the MCC, which depicts the lobby and waiting area

25  of the MCC on July 5, 2019, from 7:55:55 p.m. to 7:58:26 p.m.

LB1sADA2                          Direct – Harris

1          Ms. Phifer, could we now please play Government

2     Exhibit 204, and stop at the six-second mark, please.

3          (Video played)

4     BY MR. BHASKARAN:

5     Q.  Ms. Harris, do you recognize the people in this clip?

6     A.  Yes.

7     Q.  Who are they?

8     A.  That's me and the pregnant girl.

9     Q.  Where were you during this clip?

10    A.  Digging in the locker.

11    Q.  The locker where?

12    A.  In front of me.

13    Q.  OK.  At the MCC?

14    A.  Yes, at the MCC.

15          MR. BHASKARAN:  Ms. Phifer, can you continue to play

16    government 204, please, until the 20-second mark.

17          (Video played)

18    Q.  Ms. Harris, where are you walking toward here?

19    A.  To the desk.

20    Q.  Why did you walk towards the desk?

21    A.  To get my ID.

22    Q.  And who was sitting at the desk?

23    A.  Um, one of the officers.  And Adams was standing up.

24    Q.  And what did you do once you got to the desk?

25    A.  Waited for my ID.

LB1sADA2                        Direct – Harris

1    Q.  OK.  And what, if anything, did they give you?

2    A.  My ID.

3            MR. BHASKARAN:  Ms. Phifer, can you continue to play

4    the remainder of Government Exhibit 204.

5            (Video played)

6            Ms. Phifer, can you stop this right here.

7            Thank you, Ms. Phifer.

8    Q.  Ms. Harris, what are you holding in your hand here?

9    A.  My ID and the pregnant girl ID.

10           MR. BHASKARAN:  Ms. Phifer, can you continue to play

11   the rest of the clip.

12           (Video played)

13           Actually, Ms. Phifer, if you can stop it right here.

14   Q.  Ms. Harris, what are you holding in your hand now?

15   A.  My phone.

16           MR. BHASKARAN:  Ms. Phifer, you can please continue to

17   play the clip.

18           (Video played)

19   Q.  Ms. Harris, at the end of this clip, had you made it

20   outside?

21   A.  Yes.

22   Q.  OK.  Did anyone stop you when you got outside?

23   A.  No.

24   Q.  Before you left the MCC, did anyone search you?

25   A.  No.

LB1sADA2                    Direct - Harris

1   Q.  Did anyone detain you?

2   A.  No.

3   Q.  Did anyone interview you about bringing in drugs?

4   A.  No.

5   Q.  Did anyone ask you to fill out any additional paperwork?

6   A.  No.

7   Q.  Did you see anyone else fill out any additional paperwork?

8   A.  No.

9   Q.  Did anyone ask look at your phone?

10  A.  No.

11  Q.  Did anyone take your phone?

12  A.  No.

13  Q.  Did you speak to any federal agents?

14  A.  No.

15  Q.  Were you arrested?

16  A.  Nope.

17  Q.  Did anyone tell you that you couldn't go back to the MCC?

18  A.  No.

19  Q.  So where did you go after you left the MCC?

20  A.  I went -- I Googled the pizzeria and I went to the pizzeria

21  that was the nearest.

22  Q.  Why did you go to the pizzeria?

23  A.  Because he told me to meet him there at 8:00.

24  Q.  Why did he tell you to go there?

25  A.  So I wouldn't be in trouble.

LB1sADA2                          Direct - Harris

1              MR. GREGORY:  Objection.  Objection, sorry.

2              THE COURT:  Sustained.

3              MR. GREGORY:  I would ask the answer be stricken,

4    Judge.

5              THE COURT:  Yes.  That answer is stricken from the

6    record.

7              Rephrase the question.

8    BY MS. BHASKARAN:

9    Q.  Ms. Harris, why didn't you just go home?

10   A.  Because, um, I didn't --

11             MR. GREGORY:  Objection, Judge.

12             THE COURT:  No.

13             The question is:  Why didn't you just go home?

14             The objection is overruled.

15   A.  Um, I didn't go home because I -- I didn't -- I didn't want

16   to get in trouble.

17   Q.  What kind of trouble were you worried about?

18   A.  Um, the cops taking me or not being able to come back when

19   I come back or, you know ...

20   Q.  When you say not being able to come back, come back where?

21   A.  To MCC.

22             MR. BHASKARAN:  Ms. Phifer, could you please show just

23   for the witness, defense counsel, and the court, Government

24   Exhibit 301.

25   Q.  Ms. Harris, do you recognize what's in this picture?

LB1sADA2                          Direct - Harris

1    A.  Yes.

2    Q.  What is it?

3    A.  The pizza shop.

4    Q.  Which pizza shop?

5    A.  The one that's up the block from the jail.

6    Q.  Is this a fair and accurate picture of the pizza shop that

7    you went to on the evening of July 5?

8    A.  Yeah.  It looks like that, yeah.

9          MR. BHASKARAN:  Your Honor, the government offers

10   Government Exhibit 301?

11         THE COURT:  Any objection?

12         MR. GREGORY:  No.

13         THE COURT:  301 is received.

14         (Government's Exhibit GX 301 received in evidence)

15         MS. BHASKARAN:  Your Honor, permission to publish

16   Government Exhibit 301.

17         THE COURT:  Yes.

18   BY MS. BHASKARAN:

19   Q.  Ms. Harris, how long did it take to you get to the pizzeria

20   from the MCC?

21   A.  Probably four minutes, probably.

22   Q.  Please tell us what happened once you got there.

23   A.  I just stood on the side and waited.

24   Q.  Did you wait inside or outside?

25   A.  On the outside.

LB1sADA2                        Direct - Harris

1    Q.   What happened next?

2    A.   Then about, um, maybe, like, ten minutes after he drove up.

3    And then he said, Shahada.  And then I looked in and he said,

4    Get in.

5    Q.   And when you say "he," who are you referring to?

6    A.   Adams.

7    Q.   What did he drive up in?

8    A.   A black car.

9    Q.   What did he say once he drove in?

10   A.   Shahada.

11   Q.   When did you tell him your name?

12   A.   I didn't tell him.

13   Q.   Um, and incidentally, before he pulled up in his car, had

14   you ever seen Adams around in your neighborhood?

15   A.   No.

16   Q.   Have you ever seen him at a party or a social setting?

17   A.   No.

18   Q.   Have you ever exchanged numbers with him?

19   A.   No.

20   Q.   Have you ever flirted with him?

21   A.   No.

22   Q.   Did you ever talk about going on a date with him?

23   A.   No.

24   Q.   Did you ever discuss having sex with him?

25   A.   No.

LB1sADA2                          Direct - Harris

1    Q.  Did you ever discuss having sex with Adams with anyone

2    else?

3    A.  No.

4    Q.  How did you learn Adams' name?

5    A.  Um, after that day.

6    Q.  OK.  Did you ever see his name written anywhere?

7    A.  Yeah.  On his name tag on his uniform.

8    Q.  So tell us what happened after he drove up and said your

9    name.

10   A.  Then I got in the car.

11   Q.  Why did you get in the car?

12   A.  Because he told me to.

13   Q.  What was he wearing when you got into the car?

14   A.  Black -- black shirt and his uniform pants.

15   Q.  Was anyone else in the car?

16   A.  No.

17   Q.  Where in the car did you sit?

18   A.  In the passenger.

19   Q.  Front or back?

20   A.  Front.

21   Q.  So please tell us what happened once you got in the car.

22   A.  So I got in the car and then he drove off.  And then he,

23   um -- we was talking, and then he brung up -- he asked me why

24   am I bringing stuff to there.  Yeah.

25           And then I said, For my friend.  He was like, He don't

1    love you.  And then eventually I asked him his number.

2    Q.  OK.  And when he said why you bringing something in, what

3    did you understand him to be referring to?

4    A.  The drugs.

5    Q.  And when he said, He don't love you, who did you understand

6    him to be referring to?

7    A.  He was talking about Outlaw.

8    Q.  OK.  And you said you gave him your number?

9    A.  Yes.

10   Q.  Why did you give him your number?

11   A.  I asked for his number.

12   Q.  OK.  What did he tell you about where you were going?

13   A.  Um, to the hotel.

14   Q.  What did he tell you about why you were going to the hotel?

15   A.  He said that that was the right thing to do, by going with

16   him, so I won't get in trouble.  That I could still go to the

17   visit if I want to, because he not going to stop the visits

18   after this.

19   Q.  What did you understand him to mean when he said this was

20   the right thing to do?

21   A.  Um, to have sex with him.

22   Q.  What did he say to you about other prison guards?

23   A.  He said if I got caught by a different guard, I would have

24   been in trouble.

25   Q.  What did he say to you about bringing in contraband?

LB1sADA2                          Direct - Harris

1    A.  Not to bring no more to the jail.

2    Q.  And what, if anything, did he tell you about the drugs that

3    you had brought in that day?

4    A.  He said he threw it away.

5    Q.  What, if anything, did he say to you about whether he had

6    seen you or noticed you before?

7    A.  He said he seen me at another visit.

8    Q.  Can you give us some more detail, if you can recall?

9    A.  Um -- um, how he said it, he said it, like, um -- I can't

10   really describe.

11           MR. BHASKARAN:  Ms. Phifer, if you could please

12   publish Government Exhibit 5.  I'm now going to read a portion

13   of this.

14           Government Exhibit 401 are text messages between

15   Harris and Adams from July 5, 2019, at 8:12 p.m. to August 8,

16   2019, at 4:01 p.m.

17           Your Honor, the government now offers Government

18   Exhibit 401.

19           THE COURT:  Any objection to 401?

20           MR. GREGORY:  No, your Honor.

21           THE COURT:  All right.  401 is received.

22           (Government's Exhibit GX 401 received in evidence)

23           Ladies and gentlemen, these are text messages that are

24   in Government Exhibit 401.  They are between Mr. Adams and

25   Ms. Harris.

1          You may recall that in my preliminary instructions to
2     you, I mentioned that from time to time evidence might be
3     received subject to certain limitations.  This is one of those
4     times.

5          The statements made in the text messages are not being
6     received for the truth of the matters asserted in the messages.
7     For example, when Mr. Adams or Ms. Harris say they are doing or
8     have done certain things, the messages can't be relied on to
9     establish the truth of those statements.

10          Instead, the text messages have been admitted and may
11     be relied on you only to the extent that you conclude that they
12     shed light on Mr. Adams' state of mind at the time he allegedly
13     committed the charged offenses and whether he acted with
14     criminal intent.  The text messages may be considered by you
15     for no other purpose.

16          You will see that certain material in the text
17     messages has been deleted.  Lawyers refer to these deletions as
18     redactions.  The redacted material is irrelevant, that's why
19     it's been deleted.  You are to concern yourself only with the
20     part of the exhibit that has been admitted into evidence.  You
21     should not speculate about what was deleted or why it was
22     deleted.

23          MR. BHASKARAN:  Your Honor, if you are looking for a
24     place to break for lunch, now would be an OK time.

25          THE COURT:  All right.  Ladies and gentlemen, we are

LB1sADA2                        Direct - Harris

1    going to take our luncheon recess now.  Your lunch has been

2    delivered to the jury room.

3              Please don't discuss the case and do keep an open mind

4    because there is more evidence.  We will resume at 1:35.  Thank

5    you all very much.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB1sADA2                    Direct - Harris

1              (Jury not present)

2              THE COURT:  Is there anything we need to discuss

3      before we break for lunch?

4              MR. SCHAEFFER:  Not from the government, your Honor.

5              MR. GREGORY:  No, your Honor.  Thank you.

6              THE COURT:  All right.  We will resume at 1:35.

7              Thank you all very much.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB11ADA3                          Harris – Direct

AFTERNOON SESSION

1:46 p.m.

1    (In open court; jury present)

2    THE COURT:  Please be seated.

3    Ms. Harris, you remain under oath.

4    Please proceed.

5    MS. BHASKARAN:  Thank you, your Honor.

BY MS. BHASKARAN:

Q.  Ms. Harris, before the break, you were testifying about the
car ride that you took with Mr. Adams on the evening of
July 5th; am I correct?

A.  Yes.

Q.  Oh, Ms. Harris, may you please remove your mask now that
you're in the box.  Thank you.

So you were testifying about your car trip with
Mr. Adams on July 5th, correct?

A.  Yes.

Q.  Okay.  Where did Mr. Adams say that you were going?

A.  To the hotel.

Q.  Did he say which hotel or motel?

A.  No.

Q.  What did he say to you about why you were going to the
motel?

A.  He said that -- he said it was the right thing to do so I'm
gonna -- so I don't get in trouble and he's not gonna stop my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB11ADA3                      Harris - Direct

1    visits.

2    Q.  And when he said "right thing to do," how did you

3    understand that?

4    A.  Understood.  That's all.

5    Q.  What did you understand him to mean?

6    A.  I understood that he wanted me to go with him.

7    Q.  And do what?

8    A.  And have sex.

9    Q.  And when he said trouble, what did you understand that to

10   mean?

11   A.  The law, with the law.

12   Q.  And in particular, what did you have in mind, trouble with

13   the law?

14   A.  I knew I could possibly go to jail.

15   Q.  Ms. Harris, you also mentioned that you texted him in the

16   car before the break, correct?

17   A.  Yes.

18          MS. BHASKARAN:  Ms. Phifer, could you please publish

19   Government Exhibit 401 for the jury, the top part of the

20   document, on page 1.

21          Ms. Phifer, can you zoom in so you can get the top

22   part of the document as well.  Thank you.

23   Q.  Ms. Harris, do you see the document on your screen?

24   A.  Yes.

25   Q.  And do you see where it says RA?

LB11ADA3                      Harris - Direct

1    A.  Yes.

2    Q.  What's RA?

3    A.  Robert Adams.

4    Q.  How did you save Robert Adams on your phone?

5    A.  I put it RA.

6    Q.  And do you see there's a text message that says "Shahada"

7    in green?

8    A.  Yes.

9    Q.  Who sent that text message?

10   A.  Me.

11   Q.  When did you send the text message?

12   A.  In the car.

13   Q.  And at what point when you got -- how far -- how much time

14   had passed when you got in the car did you send that text

15   message?

16   A.  Probably about -- probably 10 minutes, 15 minutes.

17   Q.  Why did you send him that text message?

18   A.  I asked him for his number and did he -- he didn't have his

19   phone, he said he left it at the -- the jail, and then I told

20   him I want to just text him still.

21   Q.  Why did you ask him for his number?

22   A.  I don't remember.

23   Q.  And you testified that he didn't have his phone, in the

24   car?

25   A.  Yeah.

LB11ADA3                          Harris - Direct

1    Q.   What, if anything, did you do with your phone when you were

2    in the car?

3    A.   He used it to GPS something real quick.

4    Q.   When you were in the car, where, if anywhere, did Adams

5    stop along the way?

6    A.   Liquor store.

7    Q.   And what, if anything, did you see Adams get from the

8    liquor store?

9    A.   A bottle of liquor.

10   Q.   After the liquor store, where did you go next?

11   A.   Straight to the hotel.

12   Q.   What did the hotel look like?

13   A.   It was -- it was bright lights, it was like the ones

14   that's -- the doors is already on the outside, you don't have

15   to walk into the building, like that.

16   Q.   Okay.  Did you see any signs along the way when you went to

17   the hotel?

18   A.   On the highway, like I saw Hutchinson River, something like

19   that, or other signs and stuff on the highway, but that was it.

20             MS. BHASKARAN:  Your Honor, pursuant to Government

21   Exhibit 5, the parties' stipulation, the government offers

22   Government Exhibit 422.

23             MR. GREGORY:  No objection.

24             THE COURT:  Government Exhibit 422 is received.

25             (Government's Exhibit 422 received in evidence)

LB11ADA3                        Harris - Direct

1              MS. BHASKARAN:  Your Honor, permission to publish

2     Government Exhibit 422.

3              THE COURT:  Yes.

4              MS. BHASKARAN:  Ms. Phifer?  Thank you.

5     BY MS. BHASKARAN:

6     Q.  Ms. Harris, do you see that picture on the screen?

7     A.  Yes.

8     Q.  How, if at all, does the building in this picture compare

9     to the hotel that you went to with Mr. Adams that evening?

10    A.  It looks similar, the lights, 'cause the lights, and how

11    the doors is.

12    Q.  And what do you mean by the doors?

13    A.  Like on the outside, you don't have to walk into, like, the

14    place.

15             THE COURT:  I'm sorry.  I can't hear you, Ms. Harris.

16             THE WITNESS:  Sorry.  You don't have to walk into the

17    place.  It's similar 'cause it's -- on the outside, the doors

18    is on the outside, and the lights and stuff.

19             MS. BHASKARAN:  I'm now going to read from Government

20    Exhibit 5, a stipulation.  I believe this is on page 2.

21             "The government exhibits listed below are true and

22    correct copies of images found on a Motorola cellphone

23    belonging to Robert Adams, which the government seized on or

24    about August 16, 2019."

25             And -- thank you, Ms. Phifer.

1          "Government Exhibit 422 is a photograph of the

2     Hutchinson Whitestone Motel from the Adams phone."

3     BY MS. BHASKARAN:

4     Q.  Ms. Harris, once you got to the motel, what happened?

5     A.  He paid for the room, and --

6     Q.  Okay.  I apologize.

7     A.  -- I waited in the car.  He paid for the room.

8     Q.  Okay.  And after he paid for the room, where did you go

9     next?

10    A.  Into the room.

11    Q.  And tell us what happened once you got into the room.

12    A.  So we're in the room, he said a few words, and then

13    eventually he said get undressed.

14    Q.  Tell us about the few words that he said to you.

15    A.  He said -- he was -- I know he said again that that was the

16    right thing to do, about coming with him to the hotel so I

17    won't get in trouble, and he said get undressed after that.

18    Q.  I'm sorry, Ms. Harris.  I couldn't understand the last

19    thing you just said.  Could you repeat that.

20    A.  He -- yeah.  He said that's the right thing to do about

21    coming with him, so I won't get in trouble, and then eventually

22    he said to get undressed.

23    Q.  What if anything did he say about your visits when you were

24    in the hotel room with him?

25    A.  He said that he not gonna stop the visits.

LB11ADA3                    Harris - Direct

1    Q.  And you then said he told you to get undressed?

2    A.  Yes.

3    Q.  What happened after that?

4    A.  He asked for oral, and then after that, we had sex.

5    Q.  What did you do, if anything, in response to his request

6    for oral?

7    A.  I did it.  I gave him oral.

8    Q.  And did you then start having sex after that?

9    A.  Yes.

10   Q.  Did you want to have sex with Adams that night?

11   A.  No.

12   Q.  So why did you?

13   A.  So I won't get in trouble.

14   Q.  What kind of trouble?

15   A.  The -- with the law, going to jail.

16   Q.  What about your visits?

17   A.  And I wanted to keep my visits.

18   Q.  Why did you want to keep your visits?

19   A.  'Cause I wanted to be able to see Outlaw.

20   Q.  And why did you want to be able to see Outlaw?

21   A.  'Cause I was still on Outlaw, yeah.

22   Q.  What about the smuggling of the drugs?

23   A.  Yeah, he wanted me to be able to bring it so I didn't -- I

24   just did it so I could still come.

25   Q.  And when you say "did it," what's the "it" referring to?

LB11ADA3                        Harris - Direct

1   A.   Had sex with Adams.

2   Q.   When you had sex with Adams, did you use any protection?

3   A.   Yes.

4   Q.   Who brought the protection?

5   A.   I think he did.

6   Q.   Okay.  And tell us about that.

7   A.   Yeah, so we was having sex and then he -- when he was ready

8   to finish, he said he gonna take the condom off, and he asked

9   was I good, I said yeah.  And after that, he -- when we was

10  about to leave, he said if I'm lying about my health, that I

11  could get in trouble.

12  Q.   Ms. Harris, let me just back you up a little bit.

13  A.   Yes.

14  Q.   You said -- I think you just testified that Mr. Adams asked

15  you if you was good.

16  A.   Yes.

17  Q.   What did you understand that question to mean?

18  A.   Healthwise.

19  Q.   Healthwise in which way?

20  A.   Like a STI.

21  Q.   And at any point in time, did he take off the condom at a

22  certain point?

23  A.   Yes.

24  Q.   What, if any, permission did he ask you for?

25  A.   No permission.

LB11ADA3                          Harris - Direct

1   Q.   Okay.  And then you said he made a comment to you

2   afterwards about your health.  Can you just describe that for

3   us again.

4   A.   Yeah.  He said if I'm lying that I could get in trouble.

5   Q.   And when he said if you're lying, what did you understand

6   that to mean?

7   A.   That if I had something.

8   Q.   Okay.  And when he said you could get in trouble, what did

9   you take that to mean?

10  A.   With the law.

11  Q.   What did you make of that comment?

12  A.   That he would get in me in trouble, or he would try to get

13  me in trouble or something.

14  Q.   What was your understanding of what Mr. Adams's job was?

15  A.   He was a -- he had a -- he was a guard at the jail.

16  Q.   And what, if any, power did you understand him to have if

17  he caught someone bringing in drugs to the jail?

18  A.   He could get them in trouble.

19  Q.   And what kind of trouble?

20  A.   They could go to jail and get banned from the jail.

21  Q.   What happened after you had sex with Mr. Adams that night?

22  A.   He took me home.

23  Q.   And how much time did you spend in the hotel together after

24  you finished having sex?

25  A.   None.  We left.

LB11ADA3                         Harris - Direct

1    Q.  And after you finished having sex did you do anything else

2    before you went home?

3    A.  No.

4    Q.  Grab a bite to eat?

5    A.  No.

6    Q.  Where did he drop you off?

7    A.  One block from my building.

8    Q.  How did he know where you lived?

9    A.  'Cause I told him where to go.

10   Q.  Ms. Harris, after you had sex with Adams, who, if anyone,

11   did you tell about what had happened between you and him?

12   A.  I told like three of my friends.

13   Q.  Which friends did you tell?

14   A.  I told Naomi, I told Stags and I told Delly.

15   Q.  And you mentioned a friend named Naomi.  What's your

16   relationship with Naomi?

17   A.  Naomi is one of my best friends.

18   Q.  How long have you known her for?

19   A.  About 10, 12 years.

20   Q.  How did you guys meet?

21   A.  When we was young, she was friends with my other friend.

22   Q.  And when did you tell Naomi about what happened between you

23   and Adams?

24   A.  I think about a week after, or two.

25   Q.  And was this conversation before or after you got caught in

LB11ADA3                          Harris - Direct

1   August smuggling contraband?

2   A.  It was before August.

3   Q.  And how did you tell Naomi about what happened?

4   A.  I told her that I'm gonna go to the doctor.

5   Q.  But was it by phone or text or --

6   A.  Text message.

7          MS. BHASKARAN:  Your Honor, pursuant to Government

8   Exhibit 5, the government now offers Government Exhibit 410.

9          MR. GREGORY:  No objection.

10          THE COURT:  410 is received.

11          (Government's Exhibit 410 received in evidence)

12          MS. BHASKARAN:  Actually, Ms. Phifer, before you put

13   that up, I'm now going to read from the stipulation, Government

14   Exhibit 5.

15          And if you could go to the next page.

16          "Government Exhibit 410 are text messages between

17   Harris and a contact saved as Naomi Sky from July 8, 2019, from

18   the Harris phone 1."

19          Thank you, Ms. Phifer.  And if you could now go to

20   Government Exhibit 410.

21   BY MS. BHASKARAN:

22   Q.  Ms. Harris, is Naomi Sky the same friend as Naomi that you

23   mentioned before?

24   A.  Yes.

25   Q.  And do you see the picture on the screen in front of you?

1    A.  Yes.

2    Q.  And what does this show?

3    A.  It's our text messages.

4    Q.  But when you say "our," who are the parties?

5    A.  Me and Naomi.

6    Q.  Okay.  And some of these messages are in blue and some of

7    them have a gray background.  Which ones -- who's speaking in

8    blue?

9    A.  So I'm in the blue, and she's in the gray.

10   Q.  All right.  So can you read the first message that you

11   wrote on the top.

12   A.  Yeah.  It says, "I'm bouta go to the clinic."

13   Q.  What were you referring to when you said that?

14   A.  Me going to the clinic.

15   Q.  What kind of clinic?

16   A.  To get STD check.

17   Q.  Why did you go to get an STD check?

18   A.  'Cause when we ended at the hotel, he took off the condom.

19   Q.  Can you read your friend's next response in gray.

20   A.  She said why.

21   Q.  What did you say after that?

22   A.  I said, something weird happened to me, the guy took off

23   the condom, so I gotta get a check up cause of that.

24   Q.  When you said the guy took the condom off, who are you

25   referring to?

LB11ADA3                    Harris - Direct

1    A.  To Adams.

2    Q.  Okay.  And then what is this photograph that your friend

3    sent you in response?

4    A.  She was showing me a bag she wanted to get for her

5    birthday.

6            MS. BHASKARAN:  Okay.  Ms. Phifer, can you now go to

7    the next page of this exhibit.

8    Q.  And then can you just read your friend's responses at the

9    top of that page.

10   A.  Yeah.  The whole thing or just about --

11   Q.  The whole thing, yes.

12   A.  She said those -- she said those was the slippers she gonna

13   get and she said, I'll just wear something orange.

14   Q.  What's that about?

15   A.  The bag she sent, the shoes she's wearing is orange too.

16   Q.  Can you read the next one.

17   A.  "Wat you mean something weird, he took the pussy?"

18   Q.  And what did you understand her to mean when she said "he

19   took the pussy"?

20   A.  She was asking me did I get raped.

21   Q.  And if you could please then read your next response.

22   A.  Then I told her that the bag and the shoes was fire, then I

23   said in a -- "I got bribed.  Then he took off the condom the

24   last 20 seconds."

25   Q.  Can you actually read your response that begins with

LB11ADA3                    Harris - Direct

1    "nawh."

2    A.   Yes.   "Nawh bribed me."

3    Q.   What did you mean when you said, "nawh bribed me"?

4    A.   Well --

5              MR. GREGORY:   Objection, Judge.

6              THE COURT:   Do you want to approach.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  The assistant had indicated she was going

3    to ask the witness for her understanding of what she meant.  I

4    didn't hear you say anything at the time.  Why are you

5    objecting now?

6           MR. GREGORY:  Judge, you know, I could have

7    misinterpreted the Court's ruling.  I thought what the Court

8    said -- I might have missed that -- the Court said she was --

9    the Court was not going to let the witness define what "bribe"

10   meant and that I supposed that's what they're doing now, and I

11   probably should have objected before and it got by me, which --

12          THE COURT:  So what will the witness say?

13          MS. BHASKARAN:  Something along the lines of what she

14   said before is that in order to have sex with the defendant --

15   let me take that back.  The defendant had her have sex with him

16   in order to avoid going to jail because of the drugs she

17   smuggled in.

18          MR. GREGORY:  Judge, I'll withdraw the objection on

19   the record.

20          THE COURT:  All right.  Thank you.

21          (Continued on next page)

22

23

24

25

1              (In open court)

2              MR. GREGORY:  Judge, that objection is withdrawn.

3              THE COURT:  All right.  Please proceed.

4              MS. BHASKARAN:  Thank you, your Honor.

5    BY MS. BHASKARAN:

6    Q.  So Ms. Harris, you see where you wrote, "nawh bribed me"?

7    A.  Yes.

8    Q.  What did you mean when you said that?

9    A.  That's what I felt like happened to me, with Adams.

10   Q.  What happened between you and Adams?

11   A.  Since -- all right.  So when he told me to have sex with

12   him so I won't get in trouble, I took that as a bribe.  That's

13   why I told her that.

14   Q.  What, if anything, did you get in return for having sex

15   with Adams?

16   A.  I wouldn't get in trouble.

17   Q.  Anything else?

18   A.  Yeah.  And I still was coming to the visits.

19   Q.  Ms. Harris, then you see your friend respond -- let me step

20   back.

21             You then wrote, "then pulled the condom off the last

22   20 seconds."  What are you referring to there?

23   A.  In the hotel.

24   Q.  And what specifically at the hotel?

25   A.  When he took the condom off.

1   Q.  Your friend then -- what is your friend's response to that?

2   A.  She said "whose they?"  I said "the nigga."

3   Q.  And what did you say after that?

4   A.  Then she says "shaking my head."  I said, "he's like 30

5   something."

6          MS. BHASKARAN:  And Ms. Phifer, can you please turn to

7   next page of this exhibit.

8   Q.  And your friend wrote, "u going today?"

9   A.  And I said, "yeah, on my way.  I stayed up all night."

10  Q.  When you said "on my way," where were you on the way to?

11  A.  The clinic.

12  Q.  And what did your friend say after that?

13  A.  She said "hopefully you don't got nothing."

14  Q.  What did you say in response?

15  A.  I said "most likely not."  And I'm like "he's a officer."

16  Q.  And your friend said what in response to that?

17  A.  She said "police officer?"

18  Q.  And how did you respond to that?

19  A.  I said "Federal officer."

20  Q.  What "Federal officer" were you referring to?

21  A.  Adams.

22  Q.  Ms. Harris, what, if anything, did you tell Outlaw about

23  what happened between you and Adams on the night of July 5th?

24  A.  I didn't tell him what happened.

25  Q.  Why didn't you?

1    A.  'Cause I didn't know how he was gonna take it.

2    Q.  Did you have concerns that he would take it in a certain

3    way?

4    A.  Yeah, I thought he'd be angry at me.

5    Q.  Why did you think he would be angry at you?

6    A.  'Cause I had sex with somebody.  Yeah, so I didn't --

7    Q.  I'm sorry, Ms. Harris.  I couldn't hear the last thing you

8    said.

9    A.  I said I think he'd be angry 'cause I had sex with

10   somebody.

11   Q.  Ms. Harris, after you had sex with Adams on July 5th, how

12   many times did you visit the MCC again?

13   A.  A few more times after that.

14   Q.  What, if anything, did you sign when you got to the MCC on

15   those visits?

16   A.  The login book.

17           MS. BHASKARAN:  Ms. Phifer, can we please publish

18   Government Exhibit 1 and highlight paragraph 6 on page 2.

19           I'll read this for the record.

20           "Government Exhibit 106 is a true and accurate copy of

21   a portion of the MCC's visitor log for Friday, July 12, 2019."

22           Your Honor, the government offers Government

23   Exhibit 106.

24           MR. GREGORY:  No objection.

25           THE COURT:  106 is received.

LB11ADA3                        Harris - Direct

1          (Government's Exhibit 106 received in evidence)

2          MS. BHASKARAN:  Your Honor, permission to publish

3    Government 106 for the jury?

4          THE COURT:  Yes.

5          MS. BHASKARAN:  Ms. Phifer, can you zoom in like

6    middle right -- left.  Thank you.

7    BY MS. BHASKARAN:

8    Q.  Ms. Harris, do you see your name there?

9    A.  Yes.

10   Q.  Whose handwriting is that?

11   A.  Mine's.

12   Q.  Who did you visit?

13   A.  Outlaw.

14   Q.  What, if any, issues did you encounter in trying to get

15   into the MCC on July 12th?

16   A.  None.

17         MS. BHASKARAN:  Ms. Phifer, we can take that down.

18   Thank you.

19         And could we please publish Government Exhibit 1 and

20   highlight paragraph 7 on page 2.

21         I'll read paragraph 7 into the record.

22         "Government Exhibit 107 is a true and accurate copy of

23   a portion of the MCC's visitor log for Friday, July 26, 2019."

24         Your Honor, the government offers Government

25   Exhibit 107.

1        THE COURT:  Any objection?

2        MR. GREGORY:  No objection, Judge.

3        THE COURT:  107 is received.

4        (Government's Exhibit 107 received in evidence)

5        MS. BHASKARAN:  Ms. Phifer, can you please publish

6   Government Exhibit 107 for the jury.

7        And zoom in on that bottom portion.  Thank you.

8   BY MS. BHASKARAN:

9   Q.  Ms. Harris, do you see your name here?

10  A.  Yes.

11  Q.  Whose handwriting is that?

12  A.  Mine's.

13  Q.  Who did you visit?

14  A.  Outlaw.

15  Q.  And what, if any, issues did you encounter in trying to get

16  into the MCC that day?

17  A.  None.

18        MS. BHASKARAN:  Thank you, Ms. Phifer.

19        THE COURT:  Could you elicit what day this is.

20  Q.  Ms. Harris, what is the date of this visit?

21  A.  That was July 26, 2019.

22        MS. BHASKARAN:  Ms. Phifer, we can take that down.

23  Thank you.

24        Ms. Phifer, could we please publish Government

25  Exhibit 1 again and highlight paragraph 8 on page 2.

LB11ADA3                        Harris - Direct

1          I'll read this paragraph into the record.

2          "Government Exhibit 108 is a true and accurate copy of

3     a portion of the MCC's visitor log for Wednesday, August 7,

4     2019."

5          Your Honor, the government offers Government

6     Exhibit 108.

7          THE COURT:  Any objection?

8          MR. GREGORY:  No objection.

9          THE COURT:  108 is received.

10         (Government's Exhibit 108 received in evidence)

11         MS. BHASKARAN:  Ms. Phifer, could you please publish

12    Government Exhibit 108.

13    BY MS. BHASKARAN:

14    Q.  Ms. Harris, do you see your name there?

15    A.  Yes.

16    Q.  What was the date of your visit?

17    A.  That was August 7th, 2019.

18    Q.  Who did you visit?

19    A.  Outlaw.

20    Q.  What, if any, issues did you encounter trying to get into

21    the MCC that day?

22    A.  None.

23         MS. BHASKARAN:  Ms. Phifer, you can take that down.

24    Thank you.

25    Q.  Ms. Harris, what did Adams tell you about bringing in drugs

LB11ADA3                    Harris - Direct

1   after he caught you on July 5th?

2   A.   He told me do not come back with no more.

3   Q.   What did you do?

4   A.   I still came back with it.

5   Q.   And why?

6   A.   Outlaw told me to.

7   Q.   What, if any, discussions did you have with Outlaw about

8   bringing in drugs after you got caught?

9   A.   I told him that we shouldn't 'cause he got caught and he

10  said that we're not gonna get in trouble 'cause he said Adams

11  never pay us any mind.

12  Q.   And what, if anything, had you told Outlaw about whether

13  you had sex with Adams?

14  A.   I didn't tell him.

15  Q.   On any of the visits that we just discussed was Adams

16  working?

17  A.   He was working on I think those two visits, the 12th and I

18  think 26th.

19  Q.   Of July?

20  A.   Yes.

21  Q.   On any of those visits did there come a time when you had a

22  conversation with Adams?

23  A.   I think the 26th, I think.

24  Q.   Okay.  And tell us about that conversation.

25  A.   I think it was that one.  I think that's when I could

1  not -- I don't know if it was that one, but I couldn't get in

2  one of the times, and then we spoke about why I couldn't get

3  in.  He said that the inmates had a -- another inmate had a

4  problem with Outlaw, so he didn't want to bring him out and

5  then get into an altercation on the visitor floor, so he said

6  he couldn't bring him, but when he took me down, he was talking

7  to me, there was no camera there, in the elevator.

8  Q.  Let me back you up a little bit.  You said you couldn't get

9  in.  How far through the visit process had you made it before

10 you were told --

11 A.  I made it upstairs.

12 Q.  To the visit room.

13 A.  Yes.

14 Q.  Okay.  And once you made it to the visit room, at what

15 point did Adams tell you about why you couldn't see Outlaw?

16 A.  It -- I was there for a long time.

17 Q.  And after he told you you couldn't visit Outlaw, who took

18 you out of the visit room?

19 A.  He did, and --

20 Q.  And were you in the elevator together with him?

21 A.  Yes.

22 Q.  Who else was in the elevator with you?

23 A.  Just me and him.

24 Q.  Tell us what happened in the elevator.

25 A.  So in the elevator, he said, I knew you had a dry month,

1  and he smacked or rubbed my butt in the elevator.

2  Q.  And when he made the comment about a dry month, what did

3  you understand that to mean?

4  A.  Well, I took it as he knew I couldn't sneak in the drugs

5  'cause he said don't, so I took it like that.

6  Q.  When you couldn't get drugs into the MCC, what, if any,

7  financial consequences were there for you?

8  A.  I didn't have enough money.

9  Q.  Ms. Harris, after you had sex with Adams, did you

10  communicate with him?

11  A.  Yes.

12  Q.  How did you communicate with him?

13  A.  Text message.

14  Q.  How about by phone?

15  A.  He called probably twice.

16  Q.  And can you describe generally what you and Adams talked

17  about over your texts.

18  A.  Just sexual stuff.

19  Q.  What kinds of things did you send him by text message?

20  A.  Nudity, nude pictures of myself.

21        MS. BHASKARAN:  Ms. Phifer, can you please publish

22  Government Exhibit 401, the first page.

23  Q.  Ms. Harris, do you see that picture on the screen --

24  A.  Yes.

25  Q.  -- the photograph in the text message?  Who's the person in

LB11ADA3                        Harris - Direct

1    that photograph?

2    A.  Me.

3    Q.  Who did you send this photo to?

4    A.  To Adams.

5    Q.  And can you see on the screen when you sent that message?

6    A.  Yeah.  It says Monday, July 8, 2019.

7    Q.  So about three days after you and Adams had sex, correct?

8    A.  Yes.

9    Q.  Why did you send him this photo three days after what

10   happened on July 5th?

11   A.  I had texted him my name and he didn't text back, so I just

12   text him again, with a photo.

13   Q.  And why did you want to reach out again because he hadn't

14   texted back?

15   A.  I didn't want to get in trouble, on my next visit.

16   Q.  And why did you think by texting him back you wouldn't get

17   in trouble?

18   A.  I was trying to get on his good side.

19   Q.  Why did you want to be on his good side?

20   A.  So he can't stop the visits or get me in trouble.

21          MS. BHASKARAN:  Ms. Phifer, can you please scroll

22   through this exhibit slowly, and then why don't you stop around

23   page 5.

24          Actually, why don't you stop there.

25   Q.  Ms. Harris, do you see this picture in the middle of these

1    texts?

2    A.  Yes.

3    Q.  Who's that?

4    A.  Me.

5    Q.  And who sent that photo?

6    A.  Me.

7    Q.  And do you see above where someone wrote, "nice, wear a

8    skirt tonight"?

9    A.  Yes.

10   Q.  Who wrote that?

11   A.  Adams.

12   Q.  Did you ever end up meeting with him again?

13   A.  No.

14          MS. BHASKARAN:  Ms. Phifer, can you please continue to

15   scroll.

16          Keep going.  Sorry.  Thank you.

17          All right.  Why don't you stop right here, Ms. Phifer,

18   if you could, and if you could do this page and the following

19   page side by side.

20   BY MS. BHASKARAN:

21   Q.  Ms. Harris, do you see on the screen on the left, there's a

22   photograph of someone wearing a white shirt?

23   A.  Yes.

24   Q.  And who's that?

25   A.  Me.

1    Q.  And part of the photograph is blocked out.  Do you know

2    what that's blocking out?

3    A.  Yes, my chest.

4    Q.  And on the right side of the screen there's another

5    photograph embedded in the text messages.  Who is in that

6    photograph?

7    A.  Me.

8    Q.  And again, there's something that's blocked off.  Do you

9    know what that's blocking out?

10   A.  Yes, it's blocking off my thongs and my chest.

11   Q.  And whose idea was this to send those photos?

12   A.  It was mine's.

13   Q.  And why did you decide to do that?

14   A.  To try to stay on his good side.

15          MS. BHASKARAN:  Ms. Phifer, can you continue to scroll

16   a little bit further, maybe stop at page 7.

17          You can keep scrolling, actually, Ms. Phifer.  Thanks.

18          Why don't we stop right here, Ms. Phifer.  Thank you.

19   Q.  Ms. Harris, do you see there's some emojis in the middle of

20   the screen?

21   A.  Yes.

22   Q.  Did you send Mr. Adams an emoji?

23   A.  Yes.

24   Q.  And did he send you one in return?

25   A.  Yes.

LB11ADA3                          Harris - Direct

1   Q.  How did you interpret the icon that he sent you?

2   A.  Well, I just took it as -- I sent him an emoji 'cause I was

3   going to sleep and then he just sent it back.  I just took it

4   like we just sent emojis.

5   Q.  And what were you hoping to accomplish by sending him

6   photos like these, and these emojis?

7   A.  Hoping he don't bother me when he see me at the visits.

8   Q.  I'm sorry.  You were hoping he wouldn't what?

9   A.  Won't bother me on no visits, at the visits.

10  Q.  And why were you concerned that he might bother you?

11  A.  Well, 'cause he -- he didn't get me in trouble but he could

12  have always changed his mind.

13  Q.  And when you sent him these messages, to what extent, if at

14  all, did you want him to be your boyfriend?

15  A.  None.

16          MS. BHASKARAN:  Ms. Phifer, can you please continue to

17  scroll through this exhibit slowly and stop when you reach

18  page 17.

19          Thank you, Ms. Phifer.  You can stop right there.

20  Q.  Ms. Harris, do you see the text message that begins, "I can

21  dig it"?

22  A.  Yes.

23  Q.  Who sent that?

24  A.  Adams.

25  Q.  Can you please read that.

1    A.  "I can dig it.  If I come out tonight I'm going to call

2    you, but I'm definitely coming tomorrow around 4/5 p.m., and I

3    want to c u."

4    Q.  Can you please read your responses.

5    A.  So I said, "Ok, you trying to give me something I need $50

6    for myself."

7             MS. BHASKARAN:  Ms. Phifer, can you please scroll to

8    the next page.

9    Q.  And Ms. Harris, can you please read beginning with "not

10   sure."

11   A.  He said, "not sure yet, I do want to get nasty with you."

12   Q.  Could you please read your response.

13   A.  And I said, "I know you do."

14   Q.  And Mr. Adams's response right after.

15   A.  He said, "I got you when I come through."

16   Q.  Ms. Harris, do you see where you said, "you trying to give

17   me something, I need $50 for myself"?

18   A.  Yes.

19   Q.  What were you trying to do there?

20   A.  Get money from him.

21   Q.  And why did you ask him for money?

22   A.  'Cause I wanted money.

23   Q.  What made you think that you could get money from Adams?

24   A.  I didn't -- I wasn't sure.  I just asked to see what he

25   said, what he'd do.

1  Q.  What role did money play when you had sex with him on

2  July 5th?

3  A.  It was none, that day.

4          MS. BHASKARAN:  Ms. Phifer, can you please continue to

5  scroll through the rest of this exhibit.

6          Thank you, Ms. Phifer.  You can take that down.

7          Ms. Phifer, if you could now publish Government

8  Exhibit 5, a stipulation.

9          And turn to page 2, I believe.

10          I'm now going to read from the stipulation.

11          "Government Exhibit 406 is a photograph of an unsent

12  Cash App request to Robert Adams saved on July 6, 2019, at

13  7:18 p.m. from the Harris Phone 1."

14          Your Honor, the government offers Government

15  Exhibit 406.

16          THE COURT:  Any objection?

17          MR. GREGORY:  No objection.

18          THE COURT:  406 is received.

19          (Government's Exhibit 406 received in evidence)

20          MS. BHASKARAN:  Ms. Phifer, could you please publish

21  Government Exhibit 406.

22  BY MS. BHASKARAN:

23  Q.  Ms. Harris, do you recognize this?

24  A.  Yes.

25  Q.  What is it?

LB11ADA3                    Harris - Direct

1   A.  That was Cash App on my phone.

2   Q.  And what does this show?

3   A.  I put Adams's name in the Send box to request and then I

4   put the reason why, for bills, and then I didn't request it,

5   though.

6   Q.  And why did you create this?

7   A.  I wanted to send it to like request it, but I didn't do it.

8   Q.  Why didn't you do it?

9   A.  I wanted money.

10  Q.  And why didn't you ultimately send it?

11  A.  Oh, because I just didn't -- I didn't send it.  I just -- I

12  don't know.

13  Q.  Ms. Harris, just switching gears now, I want to turn your

14  attention to August 14, 2019.  Did you visit the MCC that day?

15  A.  Yes.

16  Q.  And what did you bring with you that day?

17  A.  Drugs.

18          MS. BHASKARAN:  Ms. Phifer, can we please publish

19  Government Exhibit 1 and highlight paragraph 9 on page 2.

20          I'll read this paragraph into the record.

21          "Government Exhibit 109 is a true and accurate copy of

22  a portion of the MCC's visitor log for Wednesday, August 14,

23  2019."

24          Your Honor, the government offers Government

25  Exhibit 109.

LB11ADA3                          Harris - Direct

1           THE COURT:  Any objection?

2           MR. GREGORY:  No, your Honor.

3           THE COURT:  109 is received.

4           (Government's Exhibit 109 received in evidence)

5           MS. BHASKARAN:  Ms. Phifer, could you please publish

6    Government Exhibit 109.

7           And could you zoom in -- thank you.

8    BY MS. BHASKARAN:

9    Q.  Ms. Harris, do you see your name there?

10   A.  Yes.

11   Q.  And whose handwriting is that?

12   A.  Mine's.

13   Q.  What was the date of this visit?

14   A.  It was August 14, 2019.

15   Q.  Who were you visiting?

16   A.  Outlaw.

17   Q.  Did you see Adams on the day of this visit?

18   A.  No.

19   Q.  And you mentioned that you brought drugs with you, correct?

20   A.  Yes.

21   Q.  Where did you get those drugs?

22   A.  Diamond.

23   Q.  Where did Diamond give them to you?

24   A.  She gave it to me outside the jail.

25   Q.  What did they look like when you got them?

LB11ADA3                          Harris - Direct

1    A.  It was round, taped up.

2    Q.  Could you see what was inside of it?

3    A.  No.

4    Q.  And how did they look compared to the other drugs that

5    you'd brought previously?

6    A.  Similar.

7    Q.  What did you do with the drugs once Benson gave it to you?

8    A.  I took it.

9    Q.  Where did you put it?

10   A.  In my pants.

11   Q.  And tell us what happened when you tried to enter the MCC

12   on August 14th.

13   A.  I was turned down to go upstairs and then they said they

14   wanted to search me.

15   Q.  So at what point in the visit process did they turn you

16   down?

17   A.  When I walked in.

18   Q.  Was it before or after you went through the metal detector?

19   A.  It was after I went through the metal detector.

20   Q.  But before you went upstairs.

21   A.  Yes.

22   Q.  And who pulled you over?

23   A.  A guard, a woman.

24   Q.  And what did she say to you?

25   A.  She said let her search me.

LB11ADA3                              Harris – Direct

1   Q.  And what did they find?

2   A.  They found drugs.

3   Q.  And what happened after the guards searched you?

4   A.  They did paperwork.

5   Q.  Who did you see get involved after the guards found drugs

6   on you?

7   A.  Captains and other people.

8   Q.  What did they do with your phone?

9   A.  They took it and went in it and then they called the Feds.

10  Q.  And at some point during this situation did you mention

11  Adams?

12  A.  Yes.

13  Q.  What prompted you to mention Adams?

14  A.  Well, the guard was talking to me separately, and she just

15  was saying like, don't be scared to say something, so I just

16  told her that I -- I was asking her, did he tell on me, and she

17  said that why do I feel like he told on me, scared to say it,

18  and I'm saying --

19              MR. GREGORY:  Objection, Judge.

20              THE COURT:  Give me a moment.

21  A.  Let me think.  All right.  So --

22              THE COURT:  Wait, wait, wait.

23              MS. BHASKARAN:  One second.

24              THE COURT:  What are the grounds?

25              MR. GREGORY:  Judge, I think --

LB11ADA3                        Harris – Direct

1          THE COURT:  She's reporting what she said at this

2     point.  The witness is reporting what she said.

3          MR. GREGORY:  But she's also reporting what was said

4     to her by other people.  That's the objection.

5          THE COURT:  Can you elicit from the witness what she

6     said.

7          MS. BHASKARAN:  Yes, your Honor.

8     BY MS. BHASKARAN:

9     Q.  Ms. Harris, what did you tell the guard?

10    A.  Okay.  I told her that I got robbed by him.

11    Q.  Ms. Harris, after the guards stopped you and after you saw

12    them filling out paperwork, what, if any, federal agents came

13    by?

14    A.  Two of them.

15    Q.  And what did they do with you?

16    A.  They took me.

17    Q.  They what?

18    A.  They took me with them.

19    Q.  Where did they take you?

20    A.  To interview me.

21    Q.  And did you speak with the agents that day?

22    A.  Yes.

23    Q.  And during that interview did you discuss smuggling drugs

24    into the MCC?

25    A.  Yes.

LB11ADA3                        Harris – Direct

1    Q.  Did you tell them everything you knew about the smuggling?

2    A.  Yes.

3    Q.  Did you tell them about everyone who was involved?

4    A.  Yes.

5    Q.  Did you mention Benson?

6    A.  Yes.

7    Q.  In your first interview, Ms. Harris?

8    A.  No.

9             MR. GREGORY:  Objection, Judge.  Well, withdrawn.

10   Q.  What, if anything, did you mention about Benson during your

11   first interview?

12   A.  I didn't mention her in the first one.

13   Q.  And why didn't you?

14   A.  I wasn't trying to get her into nothing.

15   Q.  You weren't trying to what?

16   A.  Get her into nothing.

17   Q.  And after you went home that day, did you delete anything

18   off of your phone?

19   A.  Yes.

20   Q.  What did you delete?

21   A.  Stuff from me and Diamond.

22   Q.  And why did you do that?

23   A.  'Cause I didn't want to get her into nothing.

24   Q.  After you deleted those messages, did there come a point in

25   time when you started to cooperate with the government?

LB11ADA3                      Harris - Direct

1    A.  Yes.

2    Q.  How many times have you met with the government?

3    A.  A lot of times.

4    Q.  In those meetings what did you tell the government about

5    what happened between you and Adams?

6            MR. GREGORY:  Objection.

7    A.  The truth.

8            THE COURT:  Wait, wait.  Do you want to approach on

9    this?

10           MS. BHASKARAN:  Let me rephrase the question, perhaps,

11   your Honor.

12           THE COURT:  All right.

13   BY MS. BHASKARAN:

14   Q.  In those meetings did you discuss your interactions with

15   Mr. Adams?

16   A.  Yes, I told them the truth.

17           THE COURT:  Wait.  Just yes or no question.

18   A.  Yes.

19           THE COURT:  All right.  Next question.

20   Q.  And in those meetings did you discuss smuggling contraband

21   into the MCC?

22   A.  Yes.

23   Q.  In those meetings did you discuss how you lied on

24   government forms?

25   A.  Yes.

1   Q.  At the time you did all those things did you know that they

2   were wrong?

3   A.  Yes.

4   Q.  Did you enter into an agreement with the government after

5   that?

6   A.  Yes.

7   Q.  Under the agreement what did the government agree not to

8   do?

9   A.  To lock me up.

10  Q.  And is it possible for you to violate your agreement?

11  A.  Is it possible?

12          MR. GREGORY:  Objection, Judge.

13          THE COURT:  Grounds?

14          MR. GREGORY:  Possible.

15          THE COURT:  Can you rephrase the question.

16          MS. BHASKARAN:  Certainly, your Honor.

17  BY MS. BHASKARAN:

18  Q.  Ms. Harris, what's your understanding of how you could

19  violate your agreement?

20  A.  If I don't appear.

21  Q.  Anything else?

22  A.  If I do a crime, another crime.

23  Q.  How about your testimony?

24  A.  And if I lie.

25  Q.  And what's your understanding of whether the outcome of

LB11ADA3                          Harris – Cross

1    this case affects your agreement?

2    A.  It doesn't.

3    Q.  Ms. Harris, just a few more questions.

4            When was the last time you saw Keith Outlaw?

5    A.  August 14, 2019.

6    Q.  When was the last time you went to the MCC?

7    A.  August 14, 2019.

8            MS. BHASKARAN:  No further questions, your Honor.

9            THE COURT:  All right.  Cross-examination.

10           MR. GREGORY:  Yes, your Honor.  Thank you.

11   CROSS EXAMINATION

12   BY MR. GREGORY:

13   Q.  Good afternoon, Ms. Harris.

14   A.  Good afternoon.

15   Q.  You testified on direct examination that when you first met

16   with Keith Outlaw at the MCC, that it was in May of 2019,

17   right?

18   A.  Yes.

19   Q.  May 31st.

20   A.  Yes.

21   Q.  And I believe you testified on direct examination that the

22   first time you met with Keith, he asked you to bring stuff in,

23   right?

24   A.  Yes.

25   Q.  And that he told you that it was drugs, right?

1    A.  He -- yeah.

2    Q.  So on direct examination when they asked you did he tell

3    you what it was, you said yes, he told me it was drugs, right?

4    A.  No, I don't -- yeah.

5    Q.  Well, when you met with the government just about a month

6    ago, on September 27th --

7    A.  Yeah.

8    Q.  -- you talked to them about the first time you went to the

9    MCC, right?

10   A.  Yes.

11   Q.  And it would be fair to say that when you spoke to these

12   prosecutors and these agents, you told them that he told you

13   the first time it was tobacco, correct?

14   A.  Yes.

15   Q.  And so when you said that to them, that wasn't true, right?

16   A.  Tobacco is a drug to me.

17   Q.  Okay.  By the way, you testified -- I'm just going to talk

18   about a couple things you testified to on direct.  But you

19   testified on direct examination that when Mr. Adams removed

20   Keith Outlaw from the visit room, he came back about two

21   minutes later.  Do you recall that?

22            THE COURT:  What day are we talking about?

23            MR. GREGORY:  July 5th.  Sorry, Judge.  On July 5th.

24   A.  Yes.

25   Q.  And did you discuss that answer or that question with

1  respect to how long Adams was gone on July 5th between the time

2  he took Outlaw out and the time he came back?  Did you discuss

3  that with these people over the weekend, or at any time?

4  A.  Yes.

5  Q.  And did you say it was two minutes?

6  A.  I said it was longer than that.

7  Q.  And you came into -- you told them that it was more than

8  that, and yet you came in today and you testified it was two

9  minutes, right?

10 A.  No.

11 Q.  Well, didn't you say on direct examination that he was gone

12 about two minutes?

13 A.  I said about -- I think I said five minutes.

14 Q.  Have you looked at the tape to see how long it was?

15 A.  Yeah.

16 Q.  It would be fair to say it was 4 minutes 22 seconds,

17 correct?

18 A.  On the tapes -- honestly, when I see the tape, it looks

19 longer than what it felt.  That's why I don't remember.

20 Q.  Now you testified on direct examination that you never had

21 any discussion with anybody about having sex with Mr. Adams,

22 correct?

23 A.  No.

24 Q.  Pardon me?

25 A.  No.

LB11ADA3                          Harris - Cross

1    Q.  Didn't you testify to that on direct examination, that you

2    never had a discussion with anybody about having sex with

3    Mr. Adams?

4    A.  I told my friends --

5              MS. BHASKARAN:  Your Honor, objection as to the time

6    frame of the question.

7              THE WITNESS:  Okay.

8              MR. GREGORY:  Sorry, Judge.

9    Q.  At any time before you went to the motel with Mr. Adams,

10   you never had that discussion, correct?

11   A.  Oh, yeah, correct.

12   Q.  Well, did you ever -- be fair to say that you did have a

13   discussion with Keith Outlaw about whether or not you should

14   have sex with Mr. Adams, correct?

15   A.  No.

16   Q.  Well, when you spoke to the government yesterday, do you

17   remember telling the government that you didn't think you had

18   that discussion?  Do you remember that?

19   A.  Yes.

20   Q.  And between yesterday and today, you went from "I don't

21   think I had that discussion" to "I didn't have that

22   discussion," correct?

23   A.  Yes.

24   Q.  And when you said --

25             MR. GREGORY:  Judge, I'm going to get my water, all

LB11ADA3                    Harris - Cross

1    right?

2                THE COURT:  Yes.

3    Q.  When you said to the government yesterday that you didn't

4    think that you had had that discussion with Keith Outlaw with

5    respect to having sex with Mr. Adams, did the government bring

6    any documents to you to show you about any previous interviews

7    you had had?

8    A.  No.

9    Q.  And so it's your testimony when you told the government

10   that you didn't believe you had had that discussion that there

11   was no effort on the part of the government to show you

12   anything to try to help you refresh your recollection, correct?

13   A.  Say that again?

14   Q.  Well, when you said yesterday -- were you in the

15   government -- were you at the U.S. Attorney's Office yesterday?

16   A.  Yes.

17   Q.  And so you were there and this issue came up, about whether

18   or not you had had a discussion with Keith Outlaw with respect

19   to having sex with Mr. Adams, correct?

20   A.  Yes.

21   Q.  And you said you didn't think you had had that discussion,

22   right?

23   A.  Yeah.

24   Q.  Did they show you any paperwork or any previous interviews

25   that might help you remember that?

LB11ADA3                    Harris - Cross

1    A.  No.

2    Q.  Well, you met with the government on numerous occasions

3    shortly after your arrest, correct?

4    A.  Yes.

5    Q.  And it would be fair to say that you met with the

6    government back in August of 2019, right, just a couple weeks

7    after -- withdrawn -- just a week after you were arrested,

8    correct?

9    A.  Yes.

10   Q.  And it would be fair to say that at that time, on

11   August 22nd, when you went to the government, you were assigned

12   an attorney, right?

13   A.  Yes.

14   Q.  And the prosecutors were there, correct?

15   A.  Yes.

16   Q.  And you tried to be as accurate as you could and honest as

17   you could with respect to what you told the government,

18   correct?

19   A.  Yes.

20   Q.  And would it be fair to say, Ms. Harris, that on

21   August 22nd of 2019, that you told the government that you knew

22   Outlaw would not have approved of you having sex with Adams

23   because you asked Outlaw if you should have sex with Adams in

24   order to help get product in?  Didn't you tell the government

25   that?  Do you remember that?

1    A.  I don't remember that.

2    Q.  Well, if I showed you the --

3         MR. GREGORY:  Could you put up the interview.

4    Q.  Take a look at these notes.

5         THE COURT:  You have to give an exhibit number.

6    What's the exhibit number?

7         MR. GREGORY:  It's 3501-14, page 9.

8    Q.  Does that refresh your recollection with respect to whether

9    or not you told the agent --

10   A.  No, but if I did say that, it probably was after Adams

11   already took me to the hotel.

12        MS. BHASKARAN:  Objection.

13   Q.  So now it's your testimony that if you did say that, it

14   would have been after you went to the motel, right?

15   A.  'Cause I didn't think about none of that, in the beginning.

16   Q.  But you do agree that you said that to the agent, correct?

17   A.  No.  I don't remember.

18   Q.  Okay.  So yesterday you said, "I might have said it, I

19   don't believe I did," today you started by saying, "I didn't

20   say it," and now it's your testimony if you did say it, you

21   would have been talking about a conversation you would have had

22   with Outlaw after you went to the motel, correct?  That's your

23   testimony?

24   A.  I don't remember telling Outlaw nothing about that.  I

25   mean, asking him.

1          MR. GREGORY:  Sorry, Judge.  I can't hear that.

2    A.  I don't remember asking him.

3    Q.  Say it again, please?

4    A.  I don't remember asking Outlaw that.

5    Q.  You don't remember that.

6    A.  No.

7    Q.  Well, do you remember telling the agents that you were

8    afraid to tell Outlaw about having sex with Adams because you

9    were worried he would punch Adams?

10   A.  Yes.

11   Q.  And do you remember telling the agents that you were

12   worried that Outlaw might be mad at you?

13   A.  Yes.

14   Q.  And you don't remember asking Outlaw if you should have sex

15   with Adams to help -- so he could help you get product in;

16   that's your testimony?

17   A.  Yeah.

18   Q.  So you remember everything else about this particular part

19   of the conversation with the agents; the only thing you don't

20   remember is whether you discussed having sex with Adams to help

21   you get stuff in, correct?

22   A.  Yes.

23   Q.  And that's a discussion that you had just yesterday with

24   these government agents, correct?

25   A.  Yes.

LB11ADA3                         Harris - Cross

1    Q.  Now you testified on direct examination that all of the

2    text messages that you had after the 5th of July 2019 with

3    Mr. Adams were about sex, correct?

4    A.  Yes.

5    Q.  Well, do you recall that Mr. Adams discussed with you the

6    hours he --

7         MS. BHASKARAN:  Your Honor, can you ask Mr. Gregory to

8    remove the exhibit from the screen.

9         THE COURT:  Yes.  Can you take the -- yes, thank you.

10        MR. GREGORY:  Sorry, Judge.

11        THE COURT:  Go ahead, Mr. Gregory.

12        MR. GREGORY:  Thank you.

13   BY MR. GREGORY:

14   Q.  Be fair to say that you and Mr. Adams discussed how busy he

15   was and that's why he couldn't see you, correct?

16   A.  Yes.

17   Q.  And it would be fair to say that you told Mr. Adams that

18   you were going to do your niece's hair the next day, correct?

19   A.  Yes.

20   Q.  And he said that was cute, correct?

21   A.  Yes.

22   Q.  And you had discussed with Mr. Adams about Mr. Adams not

23   being able to meet you because his mother had fallen down,

24   correct?

25   A.  Yes.

LB11ADA3                        Harris - Cross

1              MS. BHASKARAN:  Objection.

2              THE COURT:  Sustained.

3   Q.  So it would be fair to say that the discussions that you

4   had with Mr. Adams went beyond sex, right?

5   A.  I guess, yes.

6   Q.  Pardon?

7   A.  Yes.

8   Q.  Okay.  Now you said that you decided to get involved in

9   smuggling contraband in when you met with Outlaw on the 31st of

10  May, correct?

11  A.  Yes.

12  Q.  You were out of work at the time.

13  A.  Yes.

14  Q.  And this was a risky thing to do, right?

15  A.  Yes.

16  Q.  But you also knew that you could make money doing it,

17  correct?

18  A.  Yes.

19  Q.  And in fact, the money was quite good, right?

20  A.  Yeah.

21  Q.  I mean, you got -- you brought a load of contraband in on

22  June 26th, right?

23  A.  I think so.  I don't remember.

24  Q.  Let me see if I could give you a hand without going into

25  the exhibit.

LB11ADA3                          Harris - Cross

1           Diamond Benson Cash App'd you or Venmo'd you $500,

2    correct?

3    A.   Yes.

4    Q.   That was for bringing in contraband, correct?

5    A.   Yes.

6    Q.   That was on the 28th of June 2019, correct?

7    A.   Yes.

8    Q.   Now on the 14th of August, the day of your arrest, you were

9    expecting to make as much as $1,000, correct?

10   A.   I didn't have a -- a actual amount.

11   Q.   Well, did you discuss this issue with the government at all

12   before you came in today, this thousand dollar number?

13   A.   No.

14   Q.   So it never came up in your discussions with the

15   government --

16   A.   I didn't --

17   Q.   -- these people, before today.

18   A.   No.

19   Q.   Pardon me?

20   A.   Not that amount, no.

21   Q.   Well, it would be fair to say that when you spoke to the

22   agents after your arrest on the 14th, that you told them that

23   you were going to make -- expected to make somewhere around a

24   thousand dollars, for the drugs that you were bringing in on

25   the 14th, correct?

LB11ADA3                    Harris - Cross

1   A.  Not that day, though.  I was not gonna -- no.

2   Q.  Ms. Harris, you were asked by the agent, "And how much

3   money were you getting paid to do this?"  And you said,

4   "Different prices.  It depends.  I probably -- today, probably

5   would have been a thousand, probably.  I don't know."  Did you

6   say that to the agents?

7   A.  Yeah, 'cause I don't know.

8   Q.  Pardon me?

9   A.  I said I probably did, but I don't know.

10  Q.  The truth is is that's what you said to the agents because

11  that's what you expected to get that day, right?

12  A.  I -- I didn't --

13  Q.  Yes or no?

14  A.  No.

15  Q.  So then why then, if you didn't expect to get a thousand

16  that day, why did you say to the agents, "Today, probably would

17  have been a thousand, probably"?  Why did you say that to them

18  if it wasn't --

19              MS. BHASKARAN:  Objection.

20              THE COURT:  Sustained.

21  Q.  Now when you're involved in -- when you were involved in

22  smuggling drugs into the MCC, be fair to say you have to act

23  calm when you're pretty nervous, right?

24  A.  Yes.

25  Q.  And you have to be able to deceive people who work there,

1  right?

2  A.  Say it again?

3  Q.  You have to be able to fool the people, deceive the people

4  into thinking you don't have anything on you when you do,

5  correct?

6  A.  Yeah.

7  Q.  And when you get upstairs and you have the contraband, you

8  want to look as normal as possible, right?

9  A.  Yeah.

10  Q.  And when the CO is not looking, that's when you slip the

11  contraband over, correct?

12  A.  Yes.

13  Q.  And then the way this worked is you went out and you got

14  paid after the contraband was successfully passed, right?

15  A.  Yes.

16  Q.  Now you said that you started to visit Outlaw on the 31st,

17  correct?

18  A.  Yes.

19  Q.  And you went to the MCC from May 31st until your arrest on

20  August 14th, every week, correct?

21  A.  Yes.

22  Q.  And it was a few times you didn't get in, but you went

23  there every week, correct?

24  A.  Yes.

25  Q.  And it would be fair to say that every time you went there,

LB11ADA3                    Harris - Cross

1   you saw this man, Robert Adams, right?

2   A.  Yes.

3   Q.  And you also saw Mr. Adams interacting with other visitors,

4   correct?

5   A.  Yes.

6   Q.  And he was flirtatious, he flirted with the women visitors,

7   right?

8   A.  He was --

9   Q.  Yes or no question.

10  A.  Oh.  No.

11  Q.  Did he flirt with the women visitors, Ms. Harris?

12          I can't hear you.

13  A.  No, no.

14  Q.  No?

15  A.  No.

16  Q.  Well, did you tell agents from the government that you saw

17  Adams --

18  A.  Yes.

19  Q.  Do you remember -- hold on.  Let me finish the question.

20  A.  Oh, I'm sorry.

21  Q.  Do you remember telling the agents and the government that

22  you saw Adams talking to and flirting with women visitors?

23  A.  Yes.

24  Q.  Did you say that to them?

25  A.  Yes.

LB11ADA3                    Harris - Cross

1   Q.  And what you said to them was true, correct?

2   A.  Yes.

3   Q.  Now it would be fair to say that you saw that on a regular

4   basis, right?

5   A.  No.

6   Q.  Pardon me?

7   A.  No.

8   Q.  You only saw it one time.

9   A.  Maybe twice.

10  Q.  Maybe twice.  And it would be fair to say that he flirted

11  with you too, correct?

12  A.  No.

13  Q.  So it's your testimony that you were a visitor, right?

14  A.  Yes.

15  Q.  You saw him flirting with other female visitors, right?

16  A.  Yeah.

17  Q.  But that he never flirted with you.

18  A.  Not at every visit, no.

19  Q.  Now you did at some point during your ride on the 5th of

20  July -- well, withdrawn.

21         It would be fair to say that you believed yourself to

22  be somebody that men go crazy over, right?

23  A.  Yeah.

24  Q.  But Adams showed no interest in you, he showed interest in

25  other female visitors; is that the testimony you've given?

LB11ADA3                        Harris – Cross

1    A.  No.

2    Q.  Okay.  So what is it?  Did he show interest in you, before

3    the 5th?

4    A.  No.

5    Q.  Okay.  Now you were caught bringing the contraband in on

6    August 14th, right?

7    A.  Yes.

8    Q.  And Adams didn't assist you in any way, correct?

9    A.  Correct.

10   Q.  And Adams had nothing to do with you bringing in contraband

11   in that day, right?

12   A.  Correct.

13   Q.  You got the contraband from Diamond Benson, right?

14   A.  Yes.

15   Q.  And you were getting paid by Diamond Benson, right?

16   A.  Yes.

17   Q.  And in fact, Robert Adams had told you not to bring

18   contraband into the MCC, correct?

19   A.  Yes.

20   Q.  And it would be fair to say that you had avoided bringing

21   contraband to the MCC when you thought he was working, correct?

22   A.  Yes.

23   Q.  Because you believed that he was serious when he said don't

24   bring anything in, correct?

25   A.  Yes.

LB11ADA3                         Harris - Cross

1   Q.   Now when you went to the MCC on the 14th, it would be fair

2   to say that you had a plan if you were arrested, that you would

3   bring Adams up in order to avoid responsibility, correct?

4   A.   No.

5   Q.   Well, you had taken -- you had a 1:00 visit, correct?

6   A.   I don't remember the time.

7   Q.   Pardon me?

8   A.   I don't remember the time.

9   Q.   Okay.  Well, do you remember what time you got to the MCC?

10  A.   No.

11  Q.   Do you have any memory of what time you might have arrived?

12  A.   No.  I just remember it was daytime.

13  Q.   Well, you'd taken the train from the Bronx, correct?

14  A.   Yes.

15  Q.   And did you sign in that day?

16  A.   Yes.

17  Q.   If I showed you the sign-in sheet, might it help you

18  remember what time your visit was?

19  A.   If the time is up there, yes.

20  Q.   I can't hear you.

21  A.   If I wrote the time down, yes.

22  Q.   Take a look at Exhibit 109.  Does that refresh your

23  recollection that you signed in at 1:15 so your visit was

24  sometime around that time?

25  A.   Yes.

LB11ADA3                         Harris - Cross

1    Q.  Now you said that you took -- I'm going to ask you, you

2    took the train from the Bronx, correct?

3    A.  Yes.

4    Q.  And I think you testified you didn't have any thought that

5    you might be caught that day, correct?

6    A.  Correct.

7    Q.  Now you had visited Outlaw the week before, correct?

8    A.  Yes.

9    Q.  And that was on 8/7, right?

10   A.  Yes.

11   Q.  By the way, just so we can clarify, from May 31st to

12   August 2nd, you visited every Friday, correct?

13   A.  Yes.

14   Q.  And then on August 2nd, Mr. Outlaw's visits changed from

15   Friday to Monday, correct?

16   A.  Yes.

17   Q.  So that rather than a week, you went to visit five days

18   after the previous visit, you went on the 7th, which was a

19   Wednesday, correct?

20   A.  Yes.

21   Q.  Do you remember that visit?

22   A.  On the 14th?

23   Q.  On the 7th, the week before your arrest.

24   A.  Not -- not really.  I don't remember.

25   Q.  Well, you know that you did get upstairs, correct?

LB11ADA3                          Harris - Cross

1    A.  Yes.

2    Q.  Because you'd looked at the sign-in sheet with the

3    government, correct?

4    A.  Yes.

5    Q.  And did you have contraband on your person that day?

6    A.  Yes.

7    Q.  And when you spoke to the agents on the -- couple hours

8    after this, it would be fair to say that you told the agents

9    you didn't have anything with you, correct, on the 7th?

10   A.  Yeah.

11   Q.  And so when you said that to the agents, that wasn't true,

12   right?

13   A.  No.

14   Q.  You mean it wasn't true, right?

15   A.  I mean yes.

16   Q.  Okay.  So you lied to the agents about what happened on the

17   7th, correct?

18   A.  Well, I kind of forgot at that time.

19   Q.  And you were able to visit Mr. Outlaw on the 7th?

20   A.  Yes.

21   Q.  And you've told the government in the past that you got

22   upstairs but you never got to visit him, correct?

23   A.  I don't remember the exact days when I couldn't see him.

24   Q.  Well, you visited him, and did you pass contraband to him?

25   A.  On the 7th?

LB11ADA3                        Harris - Cross

1    Q.  Yes.

2    A.  I actually don't remember.  I think I did though.

3    Q.  You think you did, correct?

4    A.  Mm-hmm.

5    Q.  Pardon me?

6    A.  Yes.  Yes.

7    Q.  And it would be fair to say after that visit had ended, you

8    and Mr. Outlaw spoke on the phone between the 7th and the 14th,

9    correct?

10   A.  Yes.

11   Q.  And be fair to say that Mr. Outlaw told you that they found

12   lubricant in his buttocks, in his anal area, correct?

13   A.  No.

14   Q.  He never told you that.

15   A.  No.

16   Q.  So it would be your testimony that there was nothing

17   unusual about the visit that took place on the 7th, right?

18   A.  Yeah, it was nothing unusual.

19   Q.  And that when you came down on the 14th, it was just

20   another day of you coming to the MCC to deliver contraband and

21   make money, correct?

22   A.  Yes.

23   Q.  And on the 14th, you came down with three packets, correct?

24   Pardon me?

25   A.  I don't remember.

LB1sADA4                         Cross – Harris

1   Q.  Now you testified that you met Diamond Benson and got the

2   drugs that day, correct?

3   A.  Yes.

4               (Continued on next page)

1    BY MR. GREGORY:

2    Q.  And the purpose of you meeting her was to get the product,

3    right?

4    A.  Yes.

5    Q.  Now, after you met with Diamond Benson on the date of your

6    arrest, August 14, do you remember what happened next?

7    A.  Um, no.

8    Q.  Well, did Diamond Benson go into the MCC?

9    A.  I don't remember.

10   Q.  Well, do you remember if you and Diamond Benson were

11   texting during the time that she was there and you were there?

12   A.  Oh, yeah, yeah, yeah.  She was there.

13   Q.  You remember that now, correct?

14   A.  Yeah.

15   Q.  Because, in fact, you and Diamond Benson were in very close

16   touch during the time that you were both going to visit,

17   correct?

18   A.  Close what?

19   Q.  You were in very close touch by text during the time you

20   were actually going into the MCC, correct?

21   A.  Oh, yeah, yeah, yeah.

22   Q.  And you were texting about what was happening outside of

23   the MCC, correct?

24   A.  Yes.

25   Q.  In fact, you were acting as lookouts for one another,

1   correct?

2   A.  No.

3   Q.  Well, so it's your testimony that you weren't acting as

4   lookouts for each other, correct?

5   A.  Yeah.

6   Q.  Well, when you came to the MCC and you walked up, do you

7   remember texting Diamond Benson?

8   A.  Yes.

9   Q.  Let me just get to the question.

10          By the way, the week before, just to go back on the

11  7th, the officer that was in the visiting room was Fletcher,

12  right?

13  A.  Yeah.

14  Q.  Do you remember texting Diamond Benson, Fletcher out here?

15          MS. BHASKARAN:  Objection, your Honor.

16          THE COURT:  Ground?

17          MS. BHASKARAN:  He appears to be reading from a

18  document not in evidence.

19          THE COURT:  Just ask a question.  OK.

20          MR. GREGORY:  OK, fine, Judge.

21  Q.  Fair to say that you and Diamond Benson are going in,

22  correct?

23  A.  Yes.

24  Q.  You are in text message communication, correct?

25  A.  Yes.

LB1sADA4                          Cross - Harris

1   Q.  You're discussing what is happening in realtime, what you

2   can see, correct?

3   A.  Yes.

4   Q.  By the way, did you discuss these text messages with the

5   government?

6   A.  Not those.  Not those, no.

7   Q.  Pardon me?

8   A.  No.

9   Q.  So it would be fair to say, as you sit here now, you've met

10  with the government on ten separate occasions, correct?

11  A.  Yeah.

12  Q.  And you never once told the government that on the day of

13  your arrest, you were in touch in realtime texting with your

14  coconspirator, Diamond Benson, correct?

15  A.  Correct.

16  Q.  And you never told them, Hey, you didn't find these text

17  messages, let me show you these text messages, correct?

18  A.  Correct.

19  Q.  Because you went over text messages that happened later in

20  the day with Diamond Benson, but these text messages you never

21  discussed with them, correct?

22  A.  Correct.

23  Q.  Because you wanted to deceive them, correct?

24  A.  Not necessarily, no.  No, not correct, no.

25  Q.  So you texted, Fletcher's out here, and Diamond Benson

LB1sADA4                        Cross - Harris

1   texted back, Be careful of him, correct?

2   A.   Yes.

3            MS. BHASKARAN:  Objection.

4            THE COURT:  All right.  Let's approach on this.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  All right.  I don't think any of this is

3    being offered for the truth, so I don't really understand the

4    basis for the objection.  He is trying to show it was simply

5    her state of mind.

6          What's the basis for the objection?

7          MS. BHASKARAN:  Well, your Honor, it does appear he

8    was offering the fact that Fletcher was there for the truth of

9    the matter asserted.

10          THE COURT:  I don't think so.

11          What do you have to say?

12          MR. GREGORY:  No, I'm not offering that.  It's her

13    state of mind.

14          THE COURT:  It doesn't really matter whether Fletcher

15    is there or not.  It's totally irrelevant.  I think what he's

16    trying to demonstrate is that she is conspiring with her

17    coconspirator Benson to assist in this drug-smuggling operation

18    before she goes in.

19          Right?

20          MR. GREGORY:  Yes.

21          THE COURT:  So, I mean, it goes to her state of mind.

22    He's also suggested that she deceived you by not telling you

23    that she was engaged in this criminal conduct just before she

24    went in on the day of her arrest.

25          So, to me, it goes to state of mind, and I don't think

LB1sADA4                    Cross - Harris

1    it is about whether she's right or wrong about whether Fletcher

2    is there.  I think that's totally irrelevant.

3            Make whatever argument you want.

4            MS. BHASKARAN:  All right.  We'll withdraw the

5    objection for now, your Honor.

6            THE COURT:  OK.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Go ahead, Mr. Gregory.

3     BY MR. GREGORY:

4     Q.  After Ms. Benson said, Be careful of him, you wrote, He

5     seemed serious, correct?

6     A.  Yes.

7     Q.  But it's your testimony here that Fletcher was in the room

8     on the 7th, when you passed the contraband to Outlaw, correct?

9     A.  Yes.

10    Q.  And it's your testimony that Outlaw never told you that

11    Fletcher had found lubricant in his buttocks, correct?

12         MS. BHASKARAN:  Objection.

13         THE COURT:  Overruled.

14    A.  No, he never told me.

15    Q.  He never told you that?

16    A.  No, he never told me.  Yes, he never told me.

17    Q.  By the way, you were using emojis that day, correct?

18    A.  Yes.

19         THE COURT:  On what day?

20         MR. GREGORY:  Sorry about that.

21    Q.  On the 14th, when you were text messaging?

22         I apologize.

23    A.  Yes.

24    Q.  And it would be fair to say that when you wrote, He seemed

25    serious, the emoji you put was hand on the head concerned,

1  right?

2  A.  Shaking my head.

3  Q.  Pardon me?

4  A.  Yeah, I was shaking my head.

5  Q.  That means you were concerned, correct?

6  A.  Yeah.  Yes.

7  Q.  And the reason why you were concerned is because you knew

8  on that day that there was a chance you were going to be

9  searched and found out based upon what happened on the 7th,

10  correct?

11  A.  No.

12  Q.  Now, at the end of the text chain, you're inside, correct?

13  A.  Yes.

14  Q.  And Benson and you were texting back and forth, right?

15  A.  Yes.

16  Q.  And she says to you, Tell them not to check you, right?

17  A.  Yes.

18  Q.  And she says, And walk out, correct?

19  A.  Yes.

20  Q.  And she says, Say you don't want the visit, right?

21  A.  Yeah.

22  Q.  So she's working with you as a coconspirator, correct?

23  A.  Um.

24  Q.  She's working with you as somebody who is helping bring in

25  product to the MCC, right?

LB1sADA4                        Cross - Harris

1    A.  Yes.

2    Q.  And, nevertheless, you never once mentioned these text

3    messages in all the meetings you had with the government,

4    correct?

5    A.  Correct.

6    Q.  And they had told you that if you wanted to help yourself,

7    you have to be honest, right?

8    A.  Yes.

9    Q.  And they had told you that being honest meant not just

10   telling the truth, but not omitting things, right?

11   A.  Yes.

12   Q.  But you intentionally omitted that so they wouldn't find

13   it, correct?

14   A.  No.

15   Q.  So it's your testimony in front of this jury that you

16   forgot that you and Diamond Benson were texting on that day, is

17   that what you're telling these people?

18   A.  Yes.

19           MS. BHASKARAN:  Objection, your Honor.

20           THE COURT:  Grounds?

21           MS. BHASKARAN:  Argumentative.

22           THE COURT:  Overruled.

23   Q.  Now, when you were detained at the MCC sometime later, some

24   agents came, correct?

25   A.  Yes.

LB1sADA4                        Cross - Harris

1    Q.  And they spoke to you about the events that had occurred

2    preceding your arrest, right?

3    A.  Yes.

4    Q.  And they said, Look, if want to help yourself, you have to

5    be honest, right?

6    A.  Yes.

7    Q.  And you can't lie to us, right?

8    A.  No.

9    Q.  They said that to you, right?

10   A.  Yes.

11   Q.  And they asked you whether or not you knew who had given

12   you the drugs, right?

13   A.  Yes.

14   Q.  And you said, I don't know the people, I don't know their

15   names, correct?

16   A.  Correct.

17   Q.  That was a lie, right?

18   A.  I don't know their names.

19   Q.  Well, didn't Diamond Benson give it to you that day?

20   A.  I know Diamond name from the Cash App.

21   Q.  So it's your testimony that you know Diamond Benson from

22   Cash App?

23   A.  When -- because when I met her, I never knew her name.

24   Q.  I can't hear you.  Say it again.

25   A.  When I met up with her, I never knew her name.

LB1sADA4                        Cross - Harris

1    Q.  So it's your testimony when, the first time you met her,

2    you didn't know her name?

3    A.  Yes.

4    Q.  And you only knew her from the MCC, correct?

5    A.  Well, I didn't know she was visiting when I first came.

6    Outlaw sent me to her.  He never said her name.

7    Q.  So it's your testimony that you met Diamond Benson at the

8    MCC during this conspiracy, correct?

9    A.  Yes.

10           MR. GREGORY:  One moment, your Honor.

11           THE COURT:  Yes.

12           (Pause)

13           MR. GREGORY:  They will put this up in a moment.

14   Q.  But you went through the process of being interviewed,

15   right?

16   A.  Yes.

17   Q.  And eventually you were released, right?

18   A.  Yes.

19   Q.  No bail, right?

20   A.  No bail.

21   Q.  No judge?

22   A.  No.

23   Q.  No case?

24   A.  No.

25   Q.  Just go home, right?

LB1sADA4                        Cross - Harris

1    A.  Yes.

2    Q.  And you were texting with your coconspirator, Diamond

3    Benson, that afternoon or early evening, correct?

4    A.  Yes.

5    Q.  And you were talking about what had occurred, correct?

6    A.  Yes.

7    Q.  And it would be fair to say you went back and forth,

8    correct?

9    A.  Yes.

10            MR. GREGORY:  Do we have it?

11   Q.  And you talked about, with Ms. Benson, about the

12   investigation being over tomorrow, right?

13   A.  Yes.

14   Q.  And you said s-h-i-n-g, I'm shitting, the investigation is

15   going to be over tomorrow, right?

16   A.  Yeah.

17   Q.  And Ms. Benson wrote back to you, Laugh out loud, just like

18   the old days, correct?

19   A.  I don't remember that.

20   Q.  You don't remember that?

21           Let me see if I can refresh your recollection,

22   Ms. Harris.

23   A.  Yes.

24   Q.  Do you have it?  Look at line 181.

25   A.  Yeah.

LB1sADA4                          Cross - Harris

1   Q.  Do you recall her writing to you, Laughing my ass off, just

2   like back in the old days?

3          Do you remember that?

4   A.  Yeah, I remember the message.

5   Q.  Well, the truth is that you just lied in front of these

6   people when you said you met Diamond Benson at the MCC, didn't

7   you?

8   A.  No.

9   Q.  You've known Diamond Benson for years, and that is why she

10  said, Just like back in the old days, correct?

11  A.  Incorrect.

12  Q.  Now, back to the 14th in the interview.

13          The agents asked you whether or not you had a number

14  of the people who were giving you the drugs, right?

15  A.  Yes.

16  Q.  And you told them, I don't have any numbers, right?

17  A.  Yes.

18  Q.  You didn't say that to them?

19  A.  Yeah, I said that.

20  Q.  It was a lie, right?

21  A.  Um, not really, no.  I didn't have a number.

22  Q.  Diamond Benson had given you the drugs, right?

23  A.  That's one person.

24  Q.  You had her number, didn't you?

25  A.  Yeah.  I got her number after that.

LB1sADA4                        Cross – Harris

1    Q.  So it's your testimony that you got her number after the

2    agents?

3    A.  No, after the first visit I'm talking about.

4    Q.  Well, they asked you whether or not you had any text

5    messages between you and the people who had given you the

6    drugs, correct?

7    A.  I told them, yeah.

8              MR. GREGORY:  Judge, I can't hear this witness.  I

9    don't hear that well.  But in the box, I just can't hear.

10             THE COURT:  Please, Ms. Harris, if you can please try

11   to keep your voice up, please.

12             THE WITNESS:  Yes.

13             MR. GREGORY:  Judge, I think I might have asked a

14   question, but I'm not sure.  Maybe I could have it read back?

15             THE COURT:  Yes.

16             (Record read)

17   BY MR. GREGORY:

18   Q.  You said to them, Yes, I have texts with the people that I

19   exchanged the drugs with, is that what you're saying here?

20   A.  Um, I think at the first interview, I told them only the

21   Diamond girl.

22   Q.  Would it be fair to say that when you spoke to the agents

23   on the 14th, you said, They never text, they only call, I don't

24   have any text messages, correct?

25   A.  That's because I was telling them, in the beginning, that

LB1sADA4                          Cross - Harris

1   day I texted Diamond on the 14th.  I just got her number the

2   week before that.

3           THE COURT:  I can't hear you.

4   A.  I just got Diamond's number the week before the 14th.  The

5   week before that, something like that.

6   Q.  So you were lying to them when you said you didn't have any

7   text messages, correct?

8   A.  Yeah.

9   Q.  You texted with Diamond Benson from 11:30 until the time

10  that you were detained at the MCC, correct?

11  A.  Yeah.

12  Q.  So when you say you didn't have any text messages between

13  you and the people who gave you the drugs, that was a lie,

14  right?

15  A.  Yeah.

16  Q.  And that was after they had told you that you can't lie,

17  you have to tell the truth, right?

18  A.  No.

19  Q.  Pardon me?

20  A.  Um, I don't remember that part.  I don't remember if they

21  said that at that time.

22  Q.  Now, before you left the Bronx on the 14th, the day of your

23  arrest, you made a short Snapchat video, correct?

24  A.  Yeah.

25  Q.  And it would be fair to say that you were singing in the

LB1sADA4                          Cross - Harris

1    Snapchat video something to the effect of, I'm going to expose

2    you, correct?

3    A.  Yes.

4    Q.  And would it be fair to say that that was just before you

5    got on the train to go to the MCC, correct?

6    A.  Yes.

7    Q.  And it would be fair to say that that was about Robert

8    Adams, correct?

9    A.  No.

10   Q.  And so it's your testimony that it's just a coincidence

11   that you were singing that, and lo and behold, you brought up

12   Adams a couple hours later, correct?

13   A.  Yes.

14   Q.  Now, who was it you were singing about?

15   A.  I was talking about my ex-boyfriend.

16   Q.  And was he tall and have short hair and small eyes?

17   A.  No.

18   Q.  No.  OK.  Now, by the way, who was Chewy?

19   A.  Who was what?

20   Q.  Chewy?

21   A.  Chewy?  Chewy?  I don't know who that is.

22   Q.  When you were texting with Diamond Benson outside of the

23   MCC on August 14, do you recall texting her, I'm going to be

24   good, tell Chew to tell him to make sure he don't drop nothing?

25   A.  Oh, yeah, yeah, yeah.  I remember that message.

1    Q.  So you know who Chew is, right?

2    A.  No.  That was the person Diamond, she called me and she

3    told me something that the boy said.  He told -- I mean, Outlaw

4    had sent a message to him.  He told Diamond to tell me, Diamond

5    told me, and that's what I said back.

6    Q.  Well, so it's your testimony in front of this jury that you

7    have no idea who Chew is, right?

8    A.  Yeah.  No, I don't -- I'm not saying I have no idea.  I

9    don't know him.  I never spoke to him.  I know who it is.

10   Q.  Do you know what his name is?

11   A.  No.

12   Q.  Wasn't it the person --

13   A.  She just said -- she just said it to me.

14           THE COURT:  You can't talk over each other.  Let him

15   ask his question and then you answer.

16           THE WITNESS:  Sorry.

17           THE COURT:  What's your question?

18   BY MR. GREGORY:

19   Q.  Wasn't Chew the person that Diamond Benson was visiting

20   when she saw you at the MCC, every time she was visiting the

21   same guy, Chew, Matthew?

22   A.  I don't know his name.  I just know she called me right

23   before that message and said his name.  I said it back in the

24   message.

25   Q.  So it's your testimony that the very first time you ever

LB1sADA4                          Cross - Harris

```
 1   heard the name Chew, or Matthew Spruill, was when she called
 2   you just before you sent this message, right?
 3   A.  She called him Chewy, yes.
 4   Q.  My question is, the first time you ever heard that name was
 5   right before she called you, is that what you're telling these
 6   people?
 7   A.  Yes.
 8   Q.  And yet you said to him, Tell Chew to tell Outlaw not to
 9   drop it this time, correct?
10   A.  Yes.
11   Q.  OK.  Fair to say, as you sit here right now, you know Chew
12   was in charge of the entire operation, correct?
13   A.  I don't know.
14   Q.  And that he's Diamond Benson's connection to the MCC,
15   correct?
16   A.  That's correct, yeah.
17   Q.  I can't hear you.
18   A.  That's correct, yeah.
19   Q.  Pardon me?
20   A.  Yeah, correct.
21   Q.  And you knew that before you started testifying and a
22   minute ago said you didn't know who he was, correct?
23   A.  I don't know who he is.
24   Q.  You knew he was in charge of this operation, correct?
25   A.  No.
```

LB1sADA4                          Cross – Harris

1    Q.  Didn't you just say in the last sentence he was?

2    A.  No.  I answered to the part you said that Diamond, he was

3    Diamond's connect.

4    Q.  I'm going direct your attention to July 5.

5    A.  Yes.

6    Q.  Now, you come through security on the first floor, right?

7    A.  Yes.

8    Q.  You get up to the visit floor, correct?

9    A.  Yes.

10   Q.  And this is a Friday visit, right?

11   A.  Yes.

12   Q.  And by the way, the clips that we saw, just to be clear,

13   and I should have asked you this before, are short clips of a

14   much longer version, the videos, correct?

15   A.  I'm not sure.

16   Q.  Well, your visit with Outlaw ordinarily would have been

17   about an hour, correct?

18   A.  Yeah.

19   Q.  So when we saw that short clip video, that didn't show an

20   hour visit, right?

21   A.  No, it didn't.

22   Q.  OK.  So on the 5th, you passed the contraband to Outlaw,

23   right?

24   A.  Yes.

25   Q.  Adams comes in, he takes Outlaw out, correct?

LB1sADA4                          Cross – Harris

1  A.  Yes.

2  Q.  And this is at the end of the visit, correct?

3  A.  Yes.

4  Q.  And you said that it was sometime around seven o'clock,

5  right?

6  A.  Yeah.

7  Q.  It would be fair to say that it was significantly later

8  than seven o'clock, right?

9  A.  Yeah.

10  Q.  Because you know that you were downstairs at that video at

11  around, I think it was, 7:57, right?

12  A.  Yes.

13  Q.  So the time that Adams removed Outlaw from the visit room

14  would have been sometime around 7:50, correct?

15  A.  Yeah.

16  Q.  7:45?

17  A.  Yes.

18  Q.  OK.  Now, so this is the end of the visit, right?

19  A.  Yes.

20  Q.  It's you and the other lady that you described as the

21  pregnant lady, correct?

22  A.  Yes.

23  Q.  And when Adams comes back in, the first thing he says is,

24  Your boy fucked up, right?

25  A.  Yes.

1    Q.  And then he said to you, You can't bring drugs into the

2    MCC, correct?

3    A.  No, not right there he didn't say it.

4    Q.  And he said to you, if you recall, If somebody else had

5    caught you, you would be in big trouble, right?

6    A.  He said that, yes.

7    Q.  I didn't hear that answer.

8    A.  Yes, yes.

9    Q.  He said, If somebody else had caught you, you would be in

10   big trouble, right?

11   A.  Yes.

12   Q.  And then he said to you, I'm going to let it slide, right?

13   A.  Yes.

14   Q.  And at one point he said, It smells good, right?

15            He starting making jokes about it, right?

16   A.  I don't remember that.

17   Q.  And he told you, you should meet him at the pizzeria,

18   right?

19   A.  Yes.

20   Q.  You went down and got your ID, right?

21   A.  Yes.

22   Q.  Took your stuff out of the locker and you left, right?

23   A.  Yes.

24   Q.  And it would be fair to say that when you walked out that

25   door, you considered keeping on going, correct?

LB1sADA4                         Cross - Harris

1   A.  Keeping on going where?

2   Q.  To leave, get on the train, and go home?

3   A.  No.

4   Q.  Well, did you, when you came out, call Diamond Benson?

5   A.  Yes.

6   Q.  And it would be fair to say that you called Diamond Benson

7   at 8:02, correct?

8   A.  Yes.

9   Q.  And you said to Diamond Benson, This guy wants to meet me,

10  and she said, I would leave, correct?

11  A.  Yes.

12  Q.  And you decided not to leave, right?

13  A.  Yeah.

14  Q.  Correct?

15  A.  Yes.

16  Q.  And you didn't say anything to Diamond Benson about being

17  threatened, correct?

18  A.  No.

19  Q.  Pardon me?

20  A.  That's correct.

21  Q.  And so at that point, when she said just leave, you decided

22  to meet Adams, correct?

23  A.  Yes.

24  Q.  And it would be fair to say that what was on your mind then

25  was the visits, right?

LB1sADA4                      Cross - Harris

1  A.  Yes.

2  Q.  Because really, the most important thing to you was that

3  you wanted to keep your visits with Outlaw, correct?

4  A.  Yes.

5  Q.  And Adams shows up sometime around ten minutes after you

6  left, right?

7  A.  Yeah.

8  Q.  Withdrawn.  I should clarify that.

9       Ten minutes after you walked out of the MCC, Adams

10  showed up, right?

11  A.  Yes.

12  Q.  And he's in a car, correct?

13  A.  Yes.

14  Q.  And, by the way, in between the time that you called

15  Diamond Benson and the time Adams came out, you texted Keith

16  Outlaw, correct?

17  A.  No.

18  Q.  You sure about that?

19  A.  I'm not sure.

20       MR. GREGORY:  Bring it up.

21       Judge, I should have done this before I started, and I

22  apologize to the court and jury and the government.  We should

23  have read these stipulations in before I started the cross.

24       Would you mind if we did it now?

25       THE COURT:  Go right ahead.

LB1sADA4                         Cross - Harris

1                MR. GREGORY:  Thank you.

2                MR. TAYLOR:  Your Honor, may we publish Defense

3     Exhibit C3 to the court.  My apologies, your Honor.

4                THE COURT:  What is the exhibit that you have?

5                MR. TAYLOR:  It's a stipulation.

6                THE COURT:  OK.  It's defense exhibit what?

7                MR. TAYLOR:  C, as in cat, three, your Honor.

8                THE COURT:  C3.

9                Are you offering it?

10               MR. TAYLOR:  Yes, your Honor.

11               THE COURT:  All right.  Is there any objection to C3?

12               MS. BHASKARAN:  No, your Honor.

13               THE COURT:  It's received.

14               (Defendant's Exhibit C3 received in evidence)

15               MR. TAYLOR:  May I read it, your Honor, and publish

16     it?

17               THE COURT:  You may.

18               MR. TAYLOR:  It is hereby stipulated and agreed by the

19     United States of America, through the undersigned Assistant

20     United States Attorneys, and defendant, Robert Adams, by and

21     through his counsel, that if called to testify, a

22     representative of Verizon wireless, henceforth Verizon, would

23     state as follows:

24               1.  He or she is familiar with the recordkeeping

25     practices of Verizon, which is a cellular telephone service

1    provider.

2              2.  Defense Exhibit C1 consists of a true and accurate

3    copy of records relating to certain phone calls to or from the

4    cellular telephone number 646-891-9397.  That's defined as call

5    detail records.

6              3.  Defense Exhibit C2 consists of a true and accurate

7    copy of records relating to certain text messages to or from

8    the cellular telephone number 646-891-9397, in quotes "text

9    message detail records."

10             4.  These records were made at or near the time of

11   their creation by, or from information transmitted by, a person

12   with knowledge of the matters set forth in the records, and

13   were kept in the course of a regularly conducted activity of

14   Verizon as a regular practice of that activity.

15             It is further stipulated and agreed that the

16   subscriber for the cellular telephone 646-891-9397 throughout

17   the dates and times reflected in the call detail records and

18   text message detail records was Shahada Harris.

19             It is further stipulated and agreed that this

20   stipulation, as well as defense Exhibits C1 and C2 may be

21   received and admitted as defense exhibits at trial.

22             That's dated October 25, 2021, and it's signed by the

23   parties.

24             At this time, your Honor, we also wish to admit into

25   evidence Defense Exhibits C1 and C2.

1          THE COURT:  Any objection?

2          MS. BHASKARAN:  No, your Honor.

3          THE COURT:  Defense Exhibits C1 and C2 are received.

4          (Defendant's Exhibits C1 and C2 received in evidence)

5          MR. TAYLOR:  Your Honor, there is a second

6     stipulation.  This one has been marked as Defendant's

7     Exhibit E.

8          May I publish it?

9          THE COURT:  Are you offering Defense Exhibit E?

10         MR. TAYLOR:  May I offer it, your Honor?

11         THE COURT:  Yes.

12         Is there any objection to Defense Exhibit E?

13         MS. BHASKARAN:  No, your Honor.

14         THE COURT:  Defendant's Exhibit E is received.

15         (Defendant's Exhibit E received in evidence)

16         MR. TAYLOR:  Thank you, your Honor.

17         May I publish it and read it into the record?

18         THE COURT:  You may.

19         MR. TAYLOR:  It is hereby stipulated and agreed by the

20    United States of America, through the undersigned Assistant

21    United States Attorneys, and defendant, Robert Adams, by and

22    through his counsel, that:

23         1.  The defense exhibits listed below are true and

24    correct copies of communications, documents, images, and data

25    found on an Apple iPhone 7 plus belonging to Shahada Harris,

1    which the government seized on or about August 16, 2019.

2              It refers to Exhibit A, contact saved as Keiffy,

3    telephone number 646-515-6616.

4              Exhibit B, image for Keiffy contact.

5              Exhibit D, screenshot of Cash App request to Robert

6    Adams, created on July 6, 2019, at 7:18 p.m.

7              It is further stipulated and agreed that this

8    stipulation, and Defense Exhibits A, B, and D, may be received

9    and admitted as defense exhibits at trial.

10             It's signed, dated October 29, 2021, and signed by the

11   parties.

12             At this time, we ask the court to admit into evidence

13   Defense Exhibits A, B, and D.

14             THE COURT:  Any objection?

15             MS. BHASKARAN:  No, your Honor.

16             THE COURT:  Defense Exhibits A, B, and D are received.

17             (Defendant's Exhibits A, B and D received in evidence)

18             MR. TAYLOR:  Thank you, your Honor.

19             MR. GREGORY:  Mr. Taliercio, could you put up

20   Exhibit C, line 126.

21             C2.  I'm sorry.

22   BY MR. GREGORY:

23   Q.  Ms. Harris, I'm showing you what's been marked in evidence

24   as Defense Exhibit C2.  I would ask you to go to line 126.

25             By the way, this is your number and Keith Outlaw's

LB1sADA4                          Cross - Harris

1    number in the two columns where the phone numbers appear,

2    correct?

3    A.   Yes.

4    Q.   Pardon me?

5    A.   Yes.

6    Q.   And that's a text message that you sent to Keith Outlaw on

7    July 5 at 8:06 p.m., correct?

8    A.   Yes.

9    Q.   So when you said a minute ago that you didn't text him, you

10   were either mistaken or you were untruthful, because you did

11   text him at 8:06, correct?

12   A.   Yeah.

13   Q.   Now, I'm just -- before I talk about the 5th, just talk

14   about communications between you and Outlaw.

15          It would be fair to say that between June 1 of 2019

16   and July 16 of 2019, that you and Keith Outlaw spoke on the

17   phone 250 times, approximately, correct?

18   A.   I'm not sure.

19   Q.   Well, if I showed you a document, might it help you be

20   sure?

21   A.   Yeah.

22          MR. GREGORY:  If you could show the phone logs.

23   Judge, this is C1.

24          THE COURT:  All right.

25   Q.   All of these are phone calls between you and Keith Outlaw,

LB1sADA4                          Cross - Harris

1    correct?

2    A.  Yeah.

3    Q.  And it would be fair to say, if we go to the bottom, that

4    there is approximately 268 phone calls, correct?

5    A.  Yeah.

6    Q.  Some of them are voice messages, but that's how many times

7    somebody tried to call somebody from June 1 to July 16,

8    correct?

9    A.  Yeah.

10   Q.  And this is at a time when Mr. Outlaw is in jail at the

11   MCC, correct?

12   A.  Yes.

13   Q.  And he's got his own private cell phone in his cell,

14   correct?

15   A.  Yes.

16   Q.  And it would be fair to say that you're also texting with

17   Mr. Outlaw, correct?

18   A.  Yes.

19   Q.  And it also would be fair to say that you met with the

20   government and agents numerous times from the date of your

21   arrest, which was August 14, 2019, until well into September

22   and October of this year, 2020, correct?

23   A.  Yeah.

24   Q.  And it would be fair to say that you talked about all

25   different kinds of things, correct?

LB1sADA4                          Cross - Harris

1    A.  Yes.

2    Q.  But mostly was about this case, communications, Adams, and

3    what was happening, correct?

4    A.  Yes.

5    Q.  And it would be fair to say that you never told the

6    government that you and Keith Outlaw had had hundreds of phone

7    calls and hundreds of text messages, correct?

8    A.  Yeah.

9    Q.  It wasn't until Thursday, October 21, when the government

10   confronted you with these list of phone calls that you first

11   told them, yes, we were in touch 250 times, correct?

12   A.  Yeah.

13   Q.  Because you were deceiving the government from the very

14   first day until they had to confront you about your

15   communications with Keith Outlaw, correct?

16   A.  Um, I had forgot.

17   Q.  Oh, so it's your testimony in front of this jury that you

18   forgot that Keith Outlaw had his own phone in the MCC and that

19   you had 250 phone calls and hundreds of text messages?

20          You forgot that, is that what you're telling these

21   people?

22   A.  I forgot how many times we actually spoke.

23          MR. GREGORY:  Judge, I couldn't hear that.

24   A.  I forgot how many times we actually spoke.

25   Q.  Well, you never told them he had his own cell phone in

1   there, did you?

2   A.  I told them that he reached me through a phone.

3   Q.  He used to call you from all different phones is what you

4   said, correct?

5   A.  Yeah.

6   Q.  But I never saved the numbers, correct?

7   A.  Um, yeah.

8   Q.  That's what you told them?

9   A.  Yeah.  Yeah, I did say that, yeah.

10  Q.  But, in fact, you knew that he had called you hundreds of

11  times and you had hundreds of text messages, but you kept it

12  from these people until they confronted you with the text

13  messages and the phone calls, correct?

14  A.  Yeah.

15  Q.  Now, you meet Adams and you said that you asked for his

16  number approximately ten to 15 minutes after you got in the

17  car, right?

18  A.  Yeah.

19  Q.  But you know now that when -- let's put the government's

20  exhibit up -- that the text message you sent to him when you

21  asked for his number and sent your name occurred at 8:12,

22  correct?

23  A.  Yeah.

24  Q.  Which means that it happened within just a couple of

25  minutes after you met him, correct?

LB1sADA4                        Cross - Harris

1    A.   Yeah.

2    Q.   Because you know that you got in the car and you asked for

3    his number right away, correct?

4    A.   Um, I didn't really remember.

5    Q.   Pardon me?

6    A.   I didn't really remember.

7    Q.   You don't remember that?

8    A.   No, I remember.  But I didn't remember how many minutes

9    really.

10   Q.   Well, when you testified on direct examination that it was

11   ten to 15 minutes, did you remember it then?

12   A.   Yeah, I said --

13   Q.   Pardon me?

14   A.   Yeah, I said that, yeah.

15   Q.   Now, when you walked out of the MCC before you met Adams,

16   as we said, you called Diamond Benson and you decided to meet

17   Adams, correct?

18   A.   Yeah.

19   Q.   And it was really the visits that were on your mind,

20   correct?

21   A.   Yes.

22   Q.   And the money was good?

23   A.   Yes.

24   Q.   And you say you were stuck on Outlaw?

25   A.   Yes.

LB1sADA4                         Cross - Harris

1    Q.  And so you went out there to speak to Adams to try to

2    preserve these visits, right?

3    A.  Yes.

4    Q.  And when you got out there, Adams said to you, This guy is

5    taking advantage of you, correct?

6    A.  Um, I can't remember.

7    Q.  Well, didn't you say that he said to you, This guy doesn't

8    love you?

9    A.  Yes.

10   Q.  And didn't he say to you, What are you doing with this guy?

11   A.  Yes.

12   Q.  And didn't he say, Do you have a job?

13   A.  Well, I don't remember everything he said.

14   Q.  Well, you remembered that he was telling you that what you

15   were doing was not productive or helpful to you as a person,

16   correct?

17   A.  Yes.

18   Q.  Now, I don't know if I asked you this, but he said to you,

19   meaning Robert Adams said to you -- withdrawn.

20          The subject of visits came up, right?

21   A.  Yes.

22   Q.  And that was what you were concerned about, right?

23   A.  Yes.

24   Q.  And Adams said, You can visit, but you can't bring anything

25   in, correct?

LB1sADA4                         Cross - Harris

1    A.  Yes.

2    Q.  And it would be fair to say that, at that time, you knew he

3    was serious, correct?

4    A.  Yes.

5    Q.  And you didn't bring anything in when you thought he was

6    working, right?

7    A.  Yes.

8    Q.  And the next three visits were Friday visits, right?

9    A.  Yes.

10   Q.  The 12th, the 19th, and the 26th, right?

11   A.  Yes.

12   Q.  And you didn't bring anything in those three visits,

13   correct?

14   A.  I'm not sure.

15   Q.  Well, now, you were in the car with Adams and you asked for

16   his number?

17   A.  Yes.

18   Q.  And he said, Do you want to hang out, right?

19   A.  No.

20   Q.  And you said, Sure, right?

21   A.  Yeah.

22   Q.  And when you were traveling to the motel, you didn't say

23   that Adams, hey, I don't want to do this, don't do this?

24   A.  I didn't say that.

25   Q.  You didn't say, Man, you're better than this, don't do this

LB1sADA4                    Cross - Harris

1    to me, right?

2    A.   Right.

3    Q.   The reason why is because you wanted to go to the motel

4    with him, right?

5    A.   No.

6    Q.   No?

7    A.   No.

8    Q.   Now, you and Adams had sex, right?

9    A.   Yes.

10   Q.   And I'm going to apologize in advance for asking these

11   questions, but I have to.

12        It would be fair to say that when you were having sex

13   with Adams, that you were holding off orgasm in order to make

14   it stronger, correct?

15   A.   No.

16   Q.   Well, did you tell your friends that, I hate when Ns take a

17   condom off when I be edding?

18            MS. BHASKARAN:  Objection.

19            THE COURT:  Grounds?

20            MS. BHASKARAN:  412.  403.

21            THE COURT:  All right.  Ladies and gentlemen, we're

22   going to take our midafternoon recess.

23        Don't discuss the case.  Keep an open mind.  There's

24   more evidence.  We'll be back to you shortly.

25            (Continued on next page)

1          (Jury not present)

2          THE COURT:  The witness can step down.

3          (Witness temporarily excused)

4          All right.  You want to explain the basis for your

5     objection?

6          MS. BHASKARAN:  Yes, your Honor.

7          I believe Mr. Gregory is quoting a text message that

8     the witness sent to her friends, I believe, on August 15 or

9     16th.  It was a text message that was not in reference to

10    Mr. Adams, and it was a text message when she is explaining

11    that she was complaining about how men, not just including

12    Adams, but men generally have removed condoms when she was

13    having sex with them, and how she disliked that.  And the

14    reference to "I be edding" is something, basically, to the

15    effect of, I need to learn my lesson and not let people do

16    this to me.

17         Now, this is obviously material that falls under

18    Rule 412(t).  It relates to her sexual behavior outside of the

19    offense that is charged in this case.  Your Honor has --

20         THE COURT:  Stop there.

21         So based on your question, I thought this had to do

22    with Adams.

23         It doesn't have to do with Adams?

24         MR. GREGORY:  Absolutely, that is who it has to do

25    with.

1           THE COURT:  The assistant just represented it doesn't

2    have to do with Adams.

3           MR. GREGORY:  Judge, what happened was that -- I'll

4    just refer the court to the appropriate place.

5           THE COURT:  I'm sorry?

6           MR. GREGORY:  On the 12th of September, Ms. Harris

7    interviewed with the government.  And she said -- she was asked

8    about this text message.

9           We will pull it up for the court.

10           She was directed to this text message.  And she said a

11    few men she had had sexual intercourse with, to include Adams,

12    had taken condoms off before they ejaculated.

13           So it's certainly later she said it didn't have

14    anything to do with Adams, but in the initial interview, she

15    said --

16           THE COURT:  Well, that excerpt you just read doesn't

17    support your point.

18           Do you have something else?

19           MR. GREGORY:  About?

20           I'm not sure what the court thinks my point is.

21           THE COURT:  Your point was that she doesn't like it

22    when --

23           I don't know what your point is.  Maybe you can tell

24    me what your point is.

25           MR. GREGORY:  I will, Judge.

LB1sADA4                          Cross - Harris

1              My point is that at the time that she wrote this text
2      message, she was talking about edging, where --
3              THE COURT:  She was talking about what?
4              MR. GREGORY:  Edging.  It's a common term that has to
5      do with holding off orgasm in order to make it stronger.  That
6      is what she is talking about.  Because later, when she is asked
7      about it, she says that it means, edding means I didn't learn
8      my lesson, which makes no sense in the context of that
9      sentence.
10             THE COURT:  I don't understand what point you're
11     trying to make.
12             MR. GREGORY:  The point is, if she's edging and
13     holding off orgasm while she is with Adams, it is a
14     consensual --
15             THE COURT:  Yes, but what you've shown me so far
16     doesn't demonstrate she was talking about Adams.  What you
17     showed me had to do with him taking off a condom, which is
18     already in the record.
19             MR. GREGORY:  Judge, what I'm showing you, I hope
20     you're looking at the sentence that has --
21             THE COURT:  It's not on the screen anymore.  I have
22     nothing to look at.  It's not on the screen anymore.
23             MR. GREGORY:  Can you put that up?
24             We'll show you that and the text message.  I think
25     you've seen the text messages, because I think that was a point

1    of litigation earlier.

2              Is it up?

3              (Counsel confer)

4              THE COURT:  Now on the screen is the 3500 material.

5    All that has to do with taking the condom off.  That's already

6    in the record.

7              MR. GREGORY:  But in order to understand the question

8    here, we have to go to 74437, which we're going to bring up

9    right now.

10             That's it.

11             THE COURT:  Yes.  The basic problem is there isn't any

12   indication on the text message that this has anything to do

13   with Adams.

14             MR. GREGORY:  But, Judge, she said later that this had

15   to do with Adams when she was asked about it.  She said, I'm

16   talking about other people, including Adams.  You're right the

17   text doesn't say that, but she confirms it has to do with

18   Adams.

19             THE COURT:  I'm excluding it.

20             Anything else we need to take up?

21             MR. GREGORY:  Not from us.

22             MR. SCHAEFFER:  Maybe just one question.

23             Actually, I was just going to inquire about how much

24   longer the cross is going to be so we can plan for other

25   witnesses being here.

LB1sADA4                         Cross - Harris

1              THE COURT:  Yes.

2              How much longer do you expect to be, Mr. Gregory?

3              MR. GREGORY:  Judge, I'm going to truncate it.  I

4      think it's already too long.  I would say my guess would be no

5      more than 25 minutes.

6              THE COURT:  All right.

7              MR. SCHAEFFER:  We'll have witnesses ready then.

8              THE COURT:  Just to be clear, I'm excluding the line

9      of -- I don't know if it is a line of questioning -- I'm

10     excluding the question on 403 grounds as more prejudicial than

11     probative.

12             (Recess)

13             As my deputy was taking the jurors downstairs to the

14     jury room, Alternate Juror No. 2 asked to speak with him

15     separately.  My deputy assumed that she had some administrative

16     matter that she wanted to talk about, but instead she said

17     that, something along the lines of, I'm really getting pissed

18     off at the defense lawyer.  At that point, my deputy stopped

19     her and said, If you have anything to say, put it in a note to

20     the judge.

21             So I wanted to make that disclosure.

22             (Pause)

23             The witness should retake the stand.

24             MR. SCHAEFFER:  They went to get her, Judge.

25             I'll go check.

LB1sADA4                         Cross - Harris

1              (Witness resumed)

2              I have received a note, which I'm marking as Court

3     Exhibit 1.

4              MR. SCHAEFFER:  Your Honor, would you like us to have

5     the witness exit the courtroom?

6              THE COURT:  Yes.

7              Would the witness please step down.

8              (Witness temporarily excused)

9              The note bears today's date, November 1, 2021.  There

10    is a number of initials at the top.  It's hard for me to read

11    them, and I'm not sure what they signify.  It looks like either

12    J or LWIMC.

13             The note goes on to say:  As I sit and listen to this

14    case, I find myself getting annoyed at the tone of the defense

15    attorney (white hair).  He is trying to establish Ms. H's

16    character as less than exemplary.  He seems to push words and

17    ideas on her to have us believe that her character is flawed.

18    My feelings about this are frustration and aggravation, as even

19    if she is "street" (his words during opening statements), her

20    issues, choices, and relationships do not make Mr. A look

21    better, exclamation mark.  My mind is open toward the case, but

22    the attorney, not so much, exclamation mark.

23             Signed number 45, R. Austin.

24             All right.  Are the parties prepared to proceed?

25             MS. BHASKARAN:  Yes, your Honor.

1          MR. GREGORY:  Your Honor, is the court not going to

2     engage in any inquiry?

3          THE COURT:  What would you have me ask her?

4          MR. GREGORY:  Perhaps, I think we could ask her

5     whether or not she shared these feelings with other jurors.

6          THE COURT:  Well, the conversation she had with

7     Mr. Ruocco took place separately, so no juror would have

8     overheard that.  I don't have any reason to believe that she

9     shared the contents of her note with other jurors.

10         MR. ROOS:  Your Honor, the government would have no

11    objection to you having the instruction you gave at every break

12    at the end of every day, you know, don't discuss the case, etc.

13         THE COURT:  Well, actually, what I was about to say is

14    that jurors are, of course, directed not to discuss the case,

15    and it's my belief that they follow that instruction.  But

16    given that they can't talk about the case, sometimes they do

17    talk about the lawyers, precisely because they can't talk about

18    the case.

19         And so, Mr. Gregory, if I were to ask her, well, have

20    you shared your views about the defense lawyer with the other

21    jurors and she were to say yes, I'm not sure where the

22    discussion goes at that point.

23              (Continued on next page)

24

25

LB11ADA5

1          MR. GREGORY:  Fair enough.

2          THE COURT:  She hasn't violated any instruction

3     because she hasn't talked about the case.  But jurors are not

4     instructed they can't talk about the lawyers, and in fact, I

5     think they do talk about the lawyers.  Now I, of course,

6     contain a standard instruction in my charge, which you already

7     have, which tells the jury that they can't take into account

8     their views about the lawyers, whether they're favorable or

9     unfavorable, so there's certainly an instruction already in the

10    charge that goes to the issue of, if you disapprove of how a

11    lawyer is trying a case, you're not to take that into account

12    in any fashion in making your decision.

13         But with respect to this juror, who's an alternate,

14    obviously, if we were to ask her, well, have you shared your

15    views about the defense lawyer with other jurors and she was to

16    say yes, as I said, I'm not sure where the inquiry goes from

17    there, because I don't think she's violated any instruction on

18    my part.

19         MR. GREGORY:  Except that she's talking about the

20    character of the witness, which is in part about the case.

21         Judge, I'm going to withdraw it.  I think maybe just

22    give a standard instruction that makes it particularly

23    pronounced that they're not supposed to discuss the case

24    amongst each other or with anybody else, and I think that would

25    cover it for now.  I don't see --

LB11ADA5                        Harris - Cross

1          THE COURT:  All right.  Well, we're about to break, in

2     about 45 minutes, so as I always do, I will tell them not to

3     discuss the case, and I can underline that by saying the case,

4     the witnesses, any of the evidence.  I certainly can make it a

5     slightly expanded instruction.  But I think the gist of her

6     note is that she's unhappy about the cross-examination, and I

7     think that's what she's talking about here.  I don't think

8     she's made any judgment about the witness.  It's all about the

9     tone of the cross-examination and the method by which it's

10    being conducted, and she expresses frustration and aggravation

11    about that.

12         In any event, Mr. Gregory, if you don't have any other

13    requests at this point, I will instruct the jurors, as I always

14    do at every break, not to discuss the case with anyone,

15    including other jurors, and that that instruction includes the

16    witnesses and any of the evidence they may have seen.

17         Do you have anything else you want me to say at this

18    point?

19         MR. GREGORY:  No, that's all right.

20         THE COURT:  We need the witness.

21         (Continued on next page)

22

23

24

25

LB11ADA5                        Harris – Cross

1                  (Jury present)

2                  THE COURT:  Please be seated.

3                  Please continue, Mr. Gregory.

4                  MR. GREGORY:  Thank you, your Honor.

5      BY MR. GREGORY:

6      Q.  I'm almost finished, Ms. Harris.

7                  So Mr. Adams dropped you off about a block from your

8      house sometime a little after 10:00, correct?

9      A.  I don't remember the time.

10     Q.  Well, it would be fair to say that you left the area of the

11     MCC sometime around 8:10, correct?

12     A.  Yes.

13     Q.  Drove through the Bronx, correct?

14     A.  Yes.

15     Q.  On the way Mr. Adams stopped and got some liquor?

16     A.  Yes.

17     Q.  Went to the motel?

18     A.  Yes.

19     Q.  And then left the motel and he dropped you off.

20     A.  Yes.

21     Q.  So would 10:00 be a pretty good estimate?

22     A.  Yeah.

23     Q.  And it would be fair to say that after he dropped you off,

24     you first phone call you made was to Keith Adams at about

25     10:19 -- I'm sorry -- Keith Outlaw, correct?

LB11ADA5                    Harris - Cross

1    A.  Yes.

2    Q.  And why did you call Mr. Outlaw as soon as you left

3    Mr. Adams?

4    A.  'Cause he was calling me and I wasn't answering, and then

5    when I got home, I called him.

6    Q.  And it would be fair to say that you communicated with

7    Mr. Outlaw about Robert Adams, correct?

8    A.  About what happened, early on when he called me earlier,

9    yes.

10   Q.  And you knew at that time that it was against the rules for

11   a corrections officer, like Adams, to have sex with a visitor,

12   correct?

13   A.  Yes.

14   Q.  And that night into the morning, July 5th into the morning

15   of the 6th, you were Googling various subjects, correct?

16   A.  Yes.

17   Q.  And that was to try to figure out a way to get an advantage

18   against Mr. Adams, correct?

19   A.  No.

20   Q.  Well, sometime later when you spoke to some friends, you

21   used the term, "I bagged one of the Feds," correct?

22   A.  Yes.

23   Q.  And what you meant by that term was that you had one of the

24   Feds right where you wanted him, correct?

25   A.  Not -- no.

LB11ADA5                    Harris - Cross

```
1    Q.  Well, when you say, "I bagged one of the Feds," it means
2    you got him, right?
3    A.  Just about, yes.
4    Q.  Pardon me?
5    A.  I said yes.
6    Q.  And it would be fair to say, Ms. Harris, that the next day,
7    after Mr. Adams dropped you off on the 6th, you drew up that
8    Cash App request for a hundred dollars, correct?
9    A.  I don't remember the day.
10   Q.  Let me see if I can give you a hand with the date.
11            MR. GREGORY:  If you could put up the Cash App and the
12   stipulation.
13   A.  Yeah.
14   Q.  It was on July 6th in the evening, 7:18, correct?
15   A.  Yes.
16   Q.  So that was less than 24 hours after you had gone to the
17   motel with Mr. Adams, right?
18   A.  Yes.
19   Q.  And the reason why you did that is you wanted to get money
20   from him, right?
21   A.  Yes.
22   Q.  And you testified on direct examination that you had
23   discussed with a friend Naomi, you said he bribed you, right?
24   A.  Yes.
25   Q.  "Bribe" would not be a term that you would use in your
```

LB11ADA5                        Harris - Cross

1    everyday life, correct?

2    A.  Correct.

3    Q.  You would say "he booked me," right?

4    A.  It depends.

5    Q.  All right.  Or "I got played," right?

6    A.  Yeah.

7    Q.  So that's a term that you don't ordinarily use, as you say,

8    correct?

9    A.  Yeah, correct.

10   Q.  Now the next day, on the 6th, you received a call just

11   before 1:00 from Keith Outlaw, right?

12   A.  Yes.

13   Q.  And you've gone through these phone calls with the

14   government, right?

15   A.  Yes.

16   Q.  And that phone call at 12:50 lasted about three and a half

17   minutes, 3 minutes and 29 seconds, to be exact, correct?

18   A.  Yes.

19   Q.  And you hung up the phone, and it would be fair to say

20   within just a couple minutes, you called Robert Adams, right?

21   A.  I don't remember.

22   Q.  Let me see if I can refresh your recollection.

23           MR. GREGORY:  No. 16, please.

24   Q.  Do you see that?

25   A.  Yeah.

LB11ADA5                        Harris - Cross

1   Q.  Called --

2               MS. BHASKARAN:  Your Honor --

3   Q.  -- at 12:57 --

4               MS. BHASKARAN:  -- can you direct defense counsel to

5   identify this document.  This is not something we've ever seen

6   before.

7               MR. GREGORY:  Let me ask the right question.  I asked

8   the wrong question.

9   Q.  Does that refresh your recollection as to whether or not

10  you called Robert Adams right after you --

11              THE COURT:  All right.  So the AUSA has made a

12  request:  Where is this coming from?  Is this a document that

13  you've given them or --

14              MR. GREGORY:  It's a call detail record, Judge.

15              THE COURT:  Okay.  Do they have it or --

16              MR. GREGORY:  I don't know whether they have it,

17  Judge.

18              THE COURT:  Do they have the underlying data?

19              MR. GREGORY:  Yes, they do, Judge.

20              THE COURT:  Okay.  Is this part of one of the exhibits

21  that you put in?

22              MR. GREGORY:  Yes.

23              MS. BHASKARAN:  Your Honor, it's --

24              MR. GREGORY:  Judge, let me clarify.  This particular

25  document is only being used to refresh her recollection.

LB11ADA5                          Harris - Cross

1                THE COURT:  I understand that.

2                MR. GREGORY:  It's a snippet of a larger document.

3                THE COURT:  I understand that.

4                MS. BHASKARAN:  Judge, we still haven't seen it before

5    or know what the source data is that it was -- that it comes

6    from.

7                THE COURT:  All right.  I have to see the lawyers at

8    sidebar.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB11ADA5                          Harris - Cross

1          (At the sidebar)

2          THE COURT:  So I'd asked whether this was from data

3    that has already been received in evidence.  The answer to that

4    was yes.  Are you saying you don't have it?

5          MS. BHASKARAN:  I would imagine this is data we

6    produced to them, so I'm not suggesting it's data we don't

7    have, but there's voluminous data.  It's a snippet of that

8    data.  They've previously sent us exhibits where they've taken

9    out data and synthesized and they've showed it to us and we've

10   come to an agreement.  This is something brand new.  And they

11   should be marking this as an exhibit, at the very least, so we

12   can have an identification for it in the record.

13         THE COURT:  Well, it should be marked as an exhibit.

14   Obviously it's not going to be received, but anything shown to

15   the witness has to have an exhibit number.

16         MR. GREGORY:  Judge, I should tell the Court that --

17   Mr. Taylor corrects me -- it's not in evidence.  It was part of

18   the discovery we received.

19         THE COURT:  Okay.

20         MR. GREGORY:  So it's not a composite of phone calls

21   that are in evidence.

22         THE COURT:  All right.  So what the government is

23   saying is they don't know whether this is accurate or not.  I

24   don't know whether it's accurate or not.  And so are you in a

25   position to demonstrate that it's accurate?  Because the point

1    is, we could be misleading the witness.  If the exhibit is

2    correct, then you're not misleading her; if it's incorrect,

3    this could well be misleading.

4          MR. GREGORY:  Judge, I'm confident that it is correct

5    because we received it from the government, and the call was

6    made right after she got off the phone with Outlaw.

7          MS. BHASKARAN:  Again, Judge, it is a summary that

8    they made of data that we've produced to them.  We have no

9    idea -- I'm not suggesting that there's any intentional effort

10   for them to present misleading data.  The point is we haven't

11   seen it.  It's being shown to the witness for the first time --

12         THE COURT:  It's cross-examination.  He doesn't have

13   an obligation to show it to you.  It's cross-examination.  So

14   he wasn't obligated to show it to you ahead of time.  The only

15   issue is whether it's accurate or not.  That's the only issue.

16   And on that point, you're saying as you stand there today, you

17   don't know whether on July 6th, shortly after she spoke with

18   Outlaw, she put in a call to Adams?  You don't know that,

19   whether that's true or false?

20         MS. BHASKARAN:  I mean, I just have to go back to the

21   underlying data and look, your Honor, to confirm that that's

22   accurate.  I don't have the information in front of me.

23         MR. ROOS:  We know that the fact in general is true,

24   it's just the time zone, the specific time, things like that.

25   Because it's not a call detail record from, for instance,

1   Verizon or AT&T; it's just a summary that's been created.

2             THE COURT:  Well, I can't resolve now whether your

3   exhibit is accurate or not.  And so the government has

4   suggested that it's misleading the witness in some way.  Until

5   you show me that it's accurate, I'm going to have to sustain

6   the objection.

7             MR. GREGORY:  So, Judge, I think what we'd like to

8   do -- I mean, if she doesn't remember making the call, we'd

9   like to make it an exhibit that we'll introduce when she's done

10  testifying.  Because we got this call from the phone records

11  that were produced by the government.

12            THE COURT:  Okay.  You should be able to enter into a

13  stipulation about this.

14            MS. BHASKARAN:  That's fine.

15            THE COURT:  Okay.

16            MR. GREGORY:  Fine.  Thank you.

17            THE COURT:  Yes.

18            MR. GREGORY:  Judge, we just want to clarify that she

19  doesn't remember this call before I move on, okay?  Can I do

20  that much?  "You don't remember calling him right after you got

21  off the phone with Outlaw?"  And then I'll move on.  Just that

22  one question.

23            THE COURT:  Right.  And you're not going to refer to

24  this exhibit at this point, are you?

25            MR. GREGORY:  No.

1              THE COURT:  Okay.  Just so we do have a record, it

2    should be marked.  So when you get back to the podium, I'll ask

3    you what the exhibit number is, just so there's a record of

4    what's being shown, okay?

5              MR. GREGORY:  Okay.

6                   (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LB11ADA5                      Harris - Cross

1              (In open court)

2              THE COURT:  Mr. Gregory, what was the exhibit number

3      for that exhibit that you showed the witness to refresh

4      recollection?

5              MR. GREGORY:  F.

6              THE COURT:  Defense Exhibit F.  All right.  Thank you.

7      You may proceed.

8      BY MR. GREGORY:

9      Q.  And so just to clarify, you remember that you spoke to

10     Keith Outlaw on the 6th at 12:50, but you don't remember

11     calling Robert Adams right after that, correct?

12     A.  Correct.

13     Q.  Now over the course of the next number of days, and into a

14     couple weeks, you sent numerous messages back and forth with

15     Robert Adams, correct?

16     A.  Correct.  Correct.

17     Q.  And without going into each one, some of them that you saw

18     on direct were pictures you sent to him, revealing pictures of

19     yourself in various states of dress, correct?

20     A.  Yes.

21     Q.  And some of the messages were affectionate messages, for

22     example, on the 9th.  And you've looked at these messages,

23     correct?

24     A.  Yes.

25     Q.  On the 9th, if we could pull that up, one of the last

1  things that Mr. Adams says to you is, "GN," which means good

2  night, correct?

3  A.  Yes.

4  Q.  "My love," right?

5  A.  Yes.

6  Q.  You finished the text messages on the 9th sometime in the

7  early morning, after 4:30, correct?

8  A.  Yes.

9  Q.  And you get up the next day and the first thing you do is

10 reach out to Mr. Adams by texting him, correct?

11 A.  Yes.

12 Q.  And the reason why you did that was because you wanted to

13 see him again, correct?

14 A.  No.

15 Q.  Well, you did ask him when you could get together numerous

16 times during these text messages, correct?

17 A.  Yeah.  Yeah.

18 Q.  For example, when he said -- you said to him you were

19 laying in bed, and he said, "right there with you if I could,"

20 you sent a thumbs up, right?

21 A.  Yeah.

22 Q.  It's 'cause you wanted to see him, right?

23 A.  No.

24 Q.  Well, when you -- later he said, "let's get together on

25 Monday," you texted thumbs up, right?

1  A.  Yeah.

2  Q.  All right.  You didn't have to respond to these text

3  messages, correct?

4  A.  Correct.

5  Q.  And by the way, during the period of time that we're

6  talking about, when you're texting with Robert Adams and

7  communicating with Mr. Adams about getting together and sending

8  pictures, you're also in touch with Mr. Outlaw by phone and

9  text, correct?

10  A.  Yes.

11  Q.  Now on the 9th, you had the final text, and there was no

12  communication on the 10th of July, the 11th of July, and the

13  12th of July, correct?

14  A.  Yes.

15  Q.  And it would be fair to say that you kind of lost touch

16  during that period of time, right?

17  A.  Yes.

18  Q.  For three days.  And you texted him, "good morning," right?

19  A.  Yes.

20  Q.  Because you wanted to see what he was doing and whether or

21  not you could see him, correct?

22  A.  No.

23  Q.  Well, certainly you did reach out to him, correct?

24  A.  Yes.

25  Q.  And you did say, "good morning," right?

LB11ADA5                    Harris - Cross

1   A.  Yes.

2   Q.  Now at some point you said to Robert Adams, "I miss you,"

3   right?

4   A.  Yeah.

5   Q.  But you didn't miss Robert Adams, did you?

6   A.  No.

7   Q.  You were playing him, right?

8   A.  I was trying to get on his good side.

9   Q.  Pardon me?

10  A.  I was trying to stay on his good side.

11  Q.  Well, you were trying to get money from him, correct?

12  A.  Yes.

13  Q.  So when you say you were trying to stay on his good side,

14  it's just not that you wanted to stay on his good side, you

15  wanted to get money, right?

16  A.  Yes.

17  Q.  By the way, during all these communications you never said,

18  you know, you shouldn't have done what you did, you should

19  apologize, or suggested he did anything wrong, correct?

20  A.  Correct.

21  Q.  And the reason why is because the interaction you had on

22  the 5th was really consensual, right?

23  A.  Yeah.

24  Q.  You agreed to go with him, right?

25  A.  Yeah.

1    Q.  I don't want to go through every statement you made, but

2    you met with the government numerous times shortly after your

3    arrest, correct?

4    A.  Yes.

5    Q.  And they asked you a bunch of questions, right?

6    A.  Yes.

7    Q.  And they told you that you had to be honest, right?

8    A.  Yes.

9    Q.  And you weren't honest with them, correct?

10   A.  I was honest.

11   Q.  Well, for example, they asked you who gave you drugs on the

12   5th, and you told them it was a tall guy with short hair and

13   small eyes, right?

14   A.  Yeah.

15   Q.  It was Diamond Benson, right?

16   A.  No.  On the 5th?

17   Q.  There was never a tall guy with short hair, small eyes,

18   right?  You made it up, correct?

19          You have to be honest, Ms. Harris.  Right?

20   A.  No.  There was a tall guy with short hair.

21   Q.  Where did you see the guy with the short hair?

22   A.  The train.

23   Q.  Didn't you tell the jury earlier that you met Diamond

24   Benson outside the jail and that's where you got the drugs?

25   A.  You talking about the 5th or a different day?

1          THE COURT:  I'm sorry.  I can't hear you.

2    A.  You talking about the 5th or a different day?

3    Q.  Ms. Harris, you covered for Diamond Benson numerous times,

4    correct?

5    A.  Yeah.

6    Q.  'Cause you didn't want her to get in trouble, right?

7    A.  Yeah.

8    Q.  And what you're doing right here in front of these people

9    is covering up for yourself so you don't get in trouble and

10   shifting the blame to this guy, right?

11   A.  Yeah.

12          MR. GREGORY:  No further questions.

13          THE COURT:  Redirect?

14          MS. BHASKARAN:  Yes, your Honor.

15   REDIRECT EXAMINATION

16   BY MS. BHASKARAN:

17   Q.  Good afternoon, Ms. Harris.

18   A.  Good afternoon.

19   Q.  Ms. Harris, do you recall defense counsel showing you some

20   notes on the screen about your meetings with the government?

21   A.  Today?

22   Q.  Today, yes.

23   A.  Yes.

24   Q.  Did you take those -- did you write up those notes or type

25   them up?

1   A.  No.

2   Q.  Did anyone ever ask you to review those notes or those

3   reports after you met with the government?

4   A.  No.

5   Q.  Before defense counsel showed them to you today had you

6   ever seen them before?

7   A.  No.

8   Q.  Ms. Harris, defense counsel asked you about a Snapchat

9   video that you posted on August 14.  Do you remember those

10  questions?

11  A.  Yeah.

12  Q.  What were you doing in that video?

13  A.  I was singing a song that's one of my favorite songs, and

14  it just happened to fit the situation with me and my ex.

15  Q.  Okay.  And what song were you signing?

16  A.  Fantasia, "Without Me."

17  Q.  What was the situation with you and your ex at the time?

18  A.  Well, I felt like he couldn't do certain shit -- stuff

19  without me, and he exposed me on Facebook.

20  Q.  And when you say he exposed you on Facebook, what did he

21  do?

22  A.  He said negative stuff, put nudity pictures of me, called

23  me names, and then I said I will expose him back.

24  Q.  Ms. Harris, do you recall being asked questions about a

25  comment that you made that you "bagged a Fed"?

1    A.  Yes.

2    Q.  And did you say that to your friends at some point in time,

3    or --

4    A.  Yes, I said it to three of my friends.

5    Q.  And those friends that you made that comment, did they know

6    about what happened between you and Adams on July 5th?

7    A.  No.

8    Q.  Why did you tell your friends that you "bagged a Fed"?

9    A.  I wrote -- I think I told them that after me and Adams was

10   texting back and forth.

11   Q.  And when you made that comment, did you mean that having

12   sex with Adams on July 5th was your idea?

13   A.  Yeah, get his number and texted him, yeah.

14   Q.  My question, Ms. Harris, is:  When you made that comment to

15   your friend, did you mean that having sex with Adams on

16   July 5th was your idea?

17   A.  No.

18   Q.  Now, Ms. Harris, you were asked several questions about

19   smuggling drugs into the MCC, correct?

20   A.  Yes.

21   Q.  How much money did you make in total?

22           MR. GREGORY:  Objection.  Asked and answered.

23   A.  About 700.

24           THE COURT:  Overruled.  Overruled.

25   Q.  I'm sorry.  I couldn't hear your answer.

1  A.  About 700.

2  Q.  And about how many times do you think you successfully

3  brought in contraband into the MCC?

4  A.  I think three times.

5  Q.  What was the main reason why you brought contraband into

6  the MCC?

7  A.  Because Outlaw told me to.

8  Q.  And why did you care what Outlaw told you?

9  A.  'Cause I was really just dumb for Outlaw, like, yeah.

10  Q.  Now, Ms. Harris, you were asked several questions about

11  your meeting or your interview with the government on

12  August 14.  Do you remember those questions?

13  A.  Some of them.

14  Q.  And when you met with the agents on August 14th, what did

15  they do to your phone?

16  A.  They took it.

17  Q.  And did you give them consent to look at it?

18  A.  Yes.

19  Q.  And the phone that you had on August 14th, did it have the

20  Cash App application on it?

21  A.  Yes.

22  Q.  During the interview did there come a point in time when

23  they asked you who was paying you to smuggle in drugs?

24  A.  Yes.

25  Q.  And during that interview did you go through your Cash App

1  and identify some of the payments?

2  A.  Yes.

3  Q.  Were one of the payments that you identified a payment that

4  Benson had made to you for smuggling in contraband?

5  A.  Yes.

6  Q.  Now, Ms. Harris, in your meetings with the government, did

7  the government ask you questions about when you picked up

8  contraband?

9  A.  Yes.

10  Q.  And did they ask you questions about which dates you

11  actually brought the contraband into the MCC?

12  A.  Yes.

13  Q.  Now during your meetings with the government did you have

14  access to your phone?

15  A.  No.

16  Q.  And when the government asked you questions about dates

17  that you picked up drugs or dates that you brought in

18  contraband, what, if any, difficulty did you have remembering

19  when you did those things?

20  A.  I had a lot of difficulty remembering.

21  Q.  Why did you have difficulty?

22  A.  'Cause I was just -- like I was doing stuff and to just

23  like -- just doing stuff and forgetting, just living life, just

24  going day by day.

25  Q.  And what, if anything, have you been able to do or are you

1    able to look at to have a better recollection of when you

2    picked up drugs and when you delivered them to the MCC?

3    A.  I was able to see dates, times, and when I logged in the

4    book, when I went there and stuff, so I started remembering.

5    Q.  And when you don't have those things in front of you, how

6    easy or difficult is it for you to remember who gave you drugs

7    or when you brought them?

8    A.  Well, I have to -- I'd be having to think about it if I

9    don't, like, see it.

10   Q.  Now other than Diamond Benson, was there anybody else who

11   gave you drugs to bring into the MCC?

12   A.  Yeah, some guy for her, tall guy.

13   Q.  Do you know his name?

14   A.  No.

15   Q.  Where did he give you the drugs?

16   A.  The train.

17   Q.  Now, Ms. Harris, you were asked some questions about

18   July 5th, your encounter on July 5th, 2019, correct?

19   A.  Yes.

20   Q.  And in the visit room Mr. Adams told you that Outlaw had

21   f'd up, as you testified, right?

22   A.  Yes.

23   Q.  And he told you to go to the pizzeria, correct?

24   A.  Yes.

25   Q.  What, if anything, did Adams say to you about why you

1  should go the pizzeria?

2  A.  He just said that he messed up, to go there, to talk to

3  him.

4  Q.  And what was your understanding, what was your

5  understanding of why you should go there?

6  A.  To -- he wanted to talk to me 'cause he dropped the stuff,

7  so I went to see what he was going to say.

8  Q.  And what, if anything, were you hoping to avoid?

9  A.  Jail.

10  Q.  Now do you recall that defense counsel asked you some

11  questions about whether or not you said no to Mr. Adams, in the

12  car?

13  A.  Say it again?

14  Q.  Do you recall being asked questions about whether you ever

15  told Mr. Adams no, I don't want to have sex with you?

16  A.  Yeah, they asked me, yeah.

17  Q.  And they asked you questions about whether you consented to

18  having sex with Mr. Adams, correct?

19  A.  Yeah.

20  Q.  On July 5th, Ms. Harris, how did you see your choices or

21  your options?

22  A.  I felt like I had to go do it.

23  Q.  Why did you feel like you had to go do it?

24  A.  Because I knew Outlaw would have been mad that I couldn't

25  come back.

1  Q.  And if you hadn't done it, then what do you think would

2  happen?

3  A.  I would not have been able to come back, probably.

4  Q.  And what was the basis of your understanding that you

5  wouldn't be able to come back if you didn't have sex with

6  Adams?

7  A.  I wouldn't be able to drop the drugs off and make money.

8  Q.  Were you worried about anything else other than your

9  visits?

10         MR. GREGORY:  Objection, Judge.  Asked and answered.

11         THE COURT:  Overruled.

12  A.  No, just the visits.

13  Q.  Anything else?

14         MR. GREGORY:  Objection, Judge.

15         THE COURT:  Overruled.

16  A.  Getting in trouble.

17  Q.  What kind of trouble?

18  A.  Going to jail.

19  Q.  Now, Ms. Harris, after Mr. Adams dropped you home, you

20  testified on your cross-examination that you ran some searches

21  on the internet, correct?

22  A.  Yes.

23  Q.  What did you search for?

24  A.  I looked up Adams's name, his address, and other stuff,

25  based on the jail.

1   Q.  And what?

2   A.  Stuff about the jail.

3   Q.  What about stuff on the jail?

4   A.  About smuggling.

5   Q.  And why did you look that up?

6            MR. GREGORY:  Objection, Judge.

7   A.  'Cause I --

8            THE COURT:  Wait.

9            THE WITNESS:  Sorry.

10           THE COURT:  Wait.

11           MR. GREGORY:  Judge, could we have a sidebar?

12           THE COURT:  Yes.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. GREGORY:  Judge, they have the searches.  There's

3     nothing about smuggling.  I'm not sure who said it, but as soon

4     as I heard that word, I said objection.  It might have been

5     her, but it might have been the government.  I don't know.

6          MS. BHASKARAN:  She testified to smuggling.

7          Your Honor, the reason I'm asking these questions is

8     because defense counsel on cross-examination questioned

9     Ms. Harris about being with Adams to get an advantage, so I

10    think I'm entitled to rehabilitate her on the stand as to what

11    exactly she was looking for and why she was looking for it.

12         THE COURT:  But he just represented that they have the

13    searches and there isn't anything about smuggling.  Is that

14    true?

15         MS. BHASKARAN:  Of what remains on the phone it's

16    true, yes.  It's not -- beyond what we could find was Federal

17    Officer Robert Adams, in various permutations.

18         MR. GREGORY:  There's nothing about smuggling, Judge.

19    It's an unfair question.

20         MS. BHASKARAN:  I mean, we do have the results of it.

21    What she would say is that the result of a short search,

22    looking for some type of bribery, we're saying that door has

23    been opened now based on the line of cross.

24         MR. GREGORY:  Judge, if we can respond to that,

25    because I don't think you have all the information.  I think

1    that's an incomplete representation.  Mr. Taylor will take it

2    from here.

3             MR. TAYLOR:  The government has produced to us the

4    search history as well as the web history of Ms. Harris on her

5    phone, and there is no web history or search history that is

6    immediately connected to that screenshot of an article about

7    Dario Quirumbay.  One can only speculate about how that article

8    ended up, you know, in her saved images.  It may have been sent

9    to her.  It's possible.

10            THE COURT:  Yes.  I can't allow -- well, I can't allow

11   the jury to be misled about what she searched for, so, you

12   know, if you're going to elicit from her that she searched for

13   smuggling or bribery, the defense is going to have to be

14   permitted to point out that the search history doesn't reflect

15   any mention of smuggling or bribery or anything like that.

16   Because otherwise the jury might be left with a false

17   impression of what the evidence is as to the searches she

18   conducted.  So how do you wish to proceed, given that?

19            MS. BHASKARAN:  I think we'll just move on, your

20   Honor.

21            THE COURT:  Okay.

22            MR. TAYLOR:  I think we want to have it stricken.

23            MR. GREGORY:  Yes, strike the question and answer.

24   Can you strike the question and answer, Judge?

25            THE COURT:  Well, I'm going to have to strike the last

1    reference because she said smuggling.

2                MS. BHASKARAN:  Okay.

3                THE COURT:  Okay.

4                (Continued on next page)

1          (In open court)

2          THE COURT:  Ladies and gentlemen, the last part of the

3   witness's answer in which she made reference to smuggling, that

4   answer is stricken from the record and you will disregard it.

5          Go ahead, Ms. Bhaskaran.

6          MS. BHASKARAN:  Thank you, your Honor.

7   BY MS. BHASKARAN:

8   Q.  Ms. Harris, I just have a few more questions for you.

9          So defense counsel left off by saying that you're

10  lying to protect yourself.  Is that true?

11  A.  No.

12  Q.  You have an agreement with the government, correct?

13  A.  Yes.

14  Q.  Does the outcome of this case affect if you're prosecuted?

15         MR. GREGORY:  Objection, Judge.  Beyond the scope.

16         THE COURT:  Overruled.

17  Q.  Does the outcome of this case affect if you're prosecuted?

18  A.  No.

19  Q.  If you tell the truth on the stand and Robert Adams is

20  found not guilty, can the government prosecute you?

21  A.  No.

22  Q.  If you lie on the stand and Robert Adams is found guilty,

23  can the government prosecute you?

24  A.  Yes.

25  Q.  Ms. Harris, is it true that Adams told you that you had to

LB11ADA5                        Boyce - Direct

1  have sex with him in order not to get in trouble?

2  A.  Yes.

3            MS. BHASKARAN:  No further questions, your Honor.

4            THE COURT:  All right.  Recross?

5            MR. GREGORY:  No, Judge.

6            THE COURT:  Okay.  The witness can step down.

7            (Witness excused)

8            THE COURT:  How long is the government's next witness?

9            MR. SCHAEFFER:  Very brief, your Honor.

10           THE COURT:  Okay.  Call your next witness.

11           MS. BHASKARAN:  The government calls Qunisha Boyce.

12           THE DEPUTY CLERK:  Please raise your right hand.

13           (Witness sworn)

14           THE DEPUTY CLERK:  Please be seated.  Oh, you are

15  already.  I'm sorry.

16           Please state your full name and spell it for the

17  record.

18           THE WITNESS:  Qunisha Boyce.

19           THE DEPUTY CLERK:  Please spell it for the record.

20           THE WITNESS:  Oh.  Q-U-N-I-S-H-A, B-O-Y-C-E.

21           MS. BHASKARAN:  Your Honor, may I inquire?

22           THE COURT:  Yes.

23   QUNISHA BOYCE,

24       called as a witness by the Government,

25       having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB11ADA5                           Boyce - Direct

1    DIRECT EXAMINATION

2    BY MS. BHASKARAN:

3    Q.  Good afternoon, Ms. Boyce.

4    A.  Good afternoon.

5    Q.  And Ms. Boyce, if you could just try to speak into the

6    microphone.

7    A.  All right.  Good afternoon.

8    Q.  Ms. Boyce, where were you born?

9    A.  Bronx, New York.

10   Q.  And where have you lived in your life?

11   A.  The Bronx.

12   Q.  What do you do for a living?

13   A.  Paraprofessional.

14        THE COURT:  I'm sorry.  I can't hear you, ma'am.

15   A.  Paraprofessional.

16   Q.  What's that?

17   A.  Like I go, like, around the school with the kids that has

18   autism.

19   Q.  How long have you been doing that for?

20   A.  I just started that August.

21   Q.  Ms. Boyce, are you familiar with something called the MCC?

22   A.  Yes.

23   Q.  What's that?

24   A.  A federal prison.

25   Q.  Have you ever been there?

1    A.  Yes.

2    Q.  Why did you visit the MCC?

3    A.  I was visiting my son's father.

4    Q.  When was it that you were visiting your son's father at the

5    MCC?

6    A.  Like April, May, June, July.

7    Q.  Of what year?

8    A.  2018, '19.  I don't know which it was.

9    Q.  2019?

10   A.  Yeah, 2019.

11   Q.  What's the process like of visiting the MCC?

12   A.  Not good.

13   Q.  Well, generally speaking, what do you have to do in order

14   to get up to the visit room?

15   A.  Oh, so you have to go inside like a booth thing and you got

16   to fill out a form, with your name, and who the person you're

17   talking to, like the person who you're coming to see, your

18   address, you got to sign the bottom, then you give it to one of

19   the officers, with your ID, then you wait until they call your

20   name; then when they call your name, you go inside, you put

21   your belongings inside one metal detector and then you get a

22   key for a locker, and then you go through another -- sorry --

23   another metal detector, and they scan your whole body; then you

24   supposed to wait for somebody to come and get you to go on the

25   elevator.  After you do that, you go and you wait till the

LB11ADA5                          Boyce - Direct

1  person you're supposed to come and see come out, and then you

2  visit the person.

3  Q.  Now, Ms. Boyce, just turning your attention to July of

4  2019, do you recall visiting the MCC that month?

5  A.  Yeah.

6          MS. BHASKARAN:  I'm just going to read from a

7  stipulation, Government Exhibit 1.  Ms. Phifer, if you could

8  kindly publish that.

9          "Government Exhibit 105 is a true and accurate copy of

10  a portion of the MCC's visitor log from Friday, July 5, 2019."

11          And Ms. Phifer, if you could please go to Government

12  Exhibit 105, which was previously received into evidence.  And

13  go to page 2.

14  BY MS. BHASKARAN:

15  Q.  Ms. Boyce, can you see that on the screen?

16  A.  Yes.

17  Q.  Do you see your name there?

18  A.  Yes.

19  Q.  And who's handwriting is that written in?

20  A.  Mine.

21  Q.  What date did you visit the MCC?

22  A.  The 5th of July.

23  Q.  Of what year?

24  A.  2019.

25  Q.  Who were you visiting?

1   A.  My son's father.

2          MS. BHASKARAN:  Now, Ms. Phifer, you can please take

3   that down.

4          And can you please play Government Exhibit 203, and

5   stop it at the 20-second mark.

6          (Video played)

7   Q.  Ms. Boyce, did you recognize the person in the dark shirt

8   who just walked through the metal detector in that clip?

9   A.  Yeah.

10  Q.  Were you pregnant in this clip?

11  A.  Yeah.

12  Q.  How pregnant were you?

13  A.  Nine months.

14          MS. BHASKARAN:  Ms. Phifer, can you please play

15  Government Exhibit 208.

16          (Video played)

17          MS. BHASKARAN:  Ms. Phifer, if you could pause it

18  right there.

19  Q.  Ms. Boyce, do you see the person who walked through the

20  door there?

21  A.  Yes.

22  Q.  Who's that?

23  A.  Me.

24          MS. BHASKARAN:  And Ms. Phifer, can you play the rest

25  of this clip, please.

1          (Video played)

2    Q.  Ms. Boyce, where did you stay seated during the course of

3    this visit?

4    A.  Like, by the door, on the left-hand side.

5    Q.  Did you move from that location during --

6    A.  No.  No.

7          MS. BHASKARAN:  Ms. Phifer, could you please play

8    Government Exhibit 210.

9          (Video played)

10          MS. BHASKARAN:  All right.  Let's pause for a second.

11   Q.  Ms. Boyce, can you recognize where in the clip you're

12   sitting?

13   A.  Yes.

14   Q.  Where are you sitting?

15   A.  The same spot.

16          MS. BHASKARAN:  Ms. Phifer, can you please continue

17   playing it.

18          (Video played)

19          MS. BHASKARAN:  Could you please stop it right there,

20   Ms. Phifer.

21   Q.  Ms. Boyce, do you recognize the person who walked in the

22   door there?

23   A.  Yes.

24   Q.  Who's that?

25   A.  The officer.

LB11ADA5                          Boyce - Direct

1    Q.  Officer?  What kind of officer?

2    A.  A correctional officer.

3            MS. BHASKARAN:  Okay.  Ms. Phifer, could you play --

4    continue to play this clip.

5            (Video played)

6            MS. BHASKARAN:  Ms. Phifer, can you stop it right

7    here.

8    Q.  Ms. Boyce, do you see the woman in the white shirt?

9    A.  Yeah.

10   Q.  Do you know her?

11   A.  No.

12   Q.  Have you ever talked to her before?

13   A.  No.

14   Q.  Do you have any relationship with her?

15   A.  No.

16   Q.  Were you friends with her at the time?

17   A.  No.

18           MS. BHASKARAN:  Ms. Phifer, can you continue to play.

19           (Video played)

20           MS. BHASKARAN:  Ms. Phifer, why don't you please stop

21   it right there.

22   Q.  Ms. Boyce, do you remember this encounter in the visiting

23   room?

24   A.  Yes.

25   Q.  Can you tell the jury what you remember about it.

A.   So something happened inside the facility so the inmates
had to go back, so he let out two persons that was
incarcerated, like wait till the last moment or whatever.  So I
guess she was smuggling drugs, so he came back and he was like,
"This shit smell good.  Where did you get it from?  But you
could get in trouble.  I'll give it back to you.  You can meet
me at the pizza shop."  He was trying to describe where the
pizza shop was at.  And that was it.
Q.   All right.  Your reference to "he," who's the "he" that
you're referring to?
A.   The officer.
Q.   And he said -- he made some reference to drugs?
A.   Yes.
Q.   What was the reference that he made?
A.   "This shit smell good."  Sorry.
Q.   And you said the guard said something about getting in
trouble?
A.   Yes.
Q.   What did he say to the woman about getting in trouble?
A.   Like:  You could do jail time for it 'cause you're
smuggling drugs.
Q.   And then you said he said something about a pizzeria.
Could you tell us a little bit more about that.
A.   He said that:  You could meet me at the pizzeria down the
block.  I guess there's a pizzeria next to MCC and -- that was

1    it.

2    Q.  Do you recall what he said about why the woman should go to

3    the pizzeria?

4    A.  So he could give it back.

5    Q.  Give what back?

6    A.  The drugs.

7    Q.  At one point it looked like he gestured to you.  Do you

8    remember saying anything during this incident?

9    A.  I don't remember if I did, but mostly -- most likely it was

10   about the pizza shop.  That's it.  Nothing more.

11   Q.  Apart from the reference to the drugs, the getting in

12   trouble, and the pizza shop, do you remember anything else

13   about that encounter?

14   A.  No.

15           MS. BHASKARAN:  Ms. Phifer, can you continue to play

16   the clip, and perhaps you can kind of fast forward to the end,

17   or just scroll it up.

18           (Video played)

19           MS. BHASKARAN:  Yeah, that's good.  Thank you.

20           (Video played)

21           MS. BHASKARAN:  Thank you, Ms. Phifer.

22   BY MS. BHASKARAN:

23   Q.  Ms. Boyce, what's happening here?

24   A.  Waiting for the person to take us downstairs.

25   Q.  Okay.  And what happened after you went downstairs?

LB11ADA5

1    A.  I was going to get my belongings.

2    Q.  Okay.  And what happened after you got your belongings?

3    A.  I went to the 2 train.

4    Q.  And what did you see the woman in the white shirt do?

5    A.  Go straight to the pizza shop.

6    Q.  Did you see her walk to the pizza shop?

7    A.  She walked in that direction.

8              MS. BHASKARAN:  Your Honor, I believe it's 5:00.  I

9    think this would be a good place to stop.

10             THE COURT:  Are you going to do a cross on her?

11             MR. GREGORY:  Judge, Mr. Taylor is going to.  It's not

12   that short.

13             THE COURT:  All right.  Ladies and gentlemen, we'll

14   break for the day.  Don't discuss the case with anyone,

15   including your fellow jurors, please.  Don't discuss any aspect

16   of the case, including the witnesses, the evidence you have

17   heard.  This is vitally important, so please do follow this

18   instruction to the letter.  As always, please keep an open

19   mind, because there's more evidence for you to hear.

20             Have a pleasant evening.  We'll resume at 9:30

21   tomorrow morning.  Thank you all very much.

22             THE DEPUTY CLERK:  All rise.

23             (Jury not present)

24             THE COURT:  You can step down, ma'am.

25             (Witness not present)

LB11ADA5

1          THE COURT:  Please be seated.

2          All right.  So what can we expect tomorrow?  How long

3   do you think the cross-examination is going to be?

4          MR. TAYLOR:  Estimate it's around 10 minutes, your

5   Honor.

6          THE COURT:  Okay.  All right.  What's next after this

7   witness?

8          MS. BHASKARAN:  Your Honor, after this witness, we

9   have Richard Fletcher, Amanda Gildea, and Enrique Santos.  Each

10  of those direct examinations are fairly short.  And

11  Mr. Santos's direct examination will be even shorter than we

12  expected because of another update for the Court.  We reached a

13  stipulation on that issue of the deleted messages, which will

14  substantially shorten Mr. Santos's testimony.  Assuming

15  relatively or equal length cross-examinations of those

16  witnesses, I would expect that the government will rest before

17  lunch tomorrow.

18         THE COURT:  All right.  Is there going to be a defense

19  case?

20         MR. GREGORY:  Judge, we don't know.  If I had to bet,

21  I would bet no.

22         THE COURT:  Okay.  All right.  So we're going to

23  endeavor to get you the rest of the charge this evening.  If in

24  fact the government does rest around lunchtime and if in fact

25  there is not a defense case, I will send the jury home at that

LB11ADA5

1    point, we'll have our charge conference in the afternoon, and

2    then closing arguments will be on Wednesday morning.

3            Is there anything else we should discuss before we

4    break for the evening?

5            MS. BHASKARAN:  Not from the government, your Honor.

6            MR. GREGORY:  No, your Honor.  Thank you.

7            THE COURT:  All right.  So we'll resume at 9:30

8    tomorrow morning.  If something comes up overnight, just let me

9    know.  We can always meet at 9 a.m. instead.  Okay?

10            MS. BHASKARAN:  Thank you, Judge.

11            MR. TAYLOR:  Thank you, your Honor.

12            (Adjourned to November 2, 2021, at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                          Page

 STANLEY JEAN

Direct By Mr. Schaeffer  . . . . . . . . . . . .93

Cross By Mr. Taylor  . . . . . . . . . . . . 125

Redirect By Mr. Schaeffer  . . . . . . . . . 152

 SHAHADA HARRIS

Direct By Mr. Bhaskaran  . . . . . . . . . . 157

Cross By Mr. Gregory . . . . . . . . . . . . 237

Redirect By Ms. Bhaskaran  . . . . . . . . . 317

 QUNISHA BOYCE

Direct By Ms. Bhaskaran  . . . . . . . . . . 331

```
 1                        GOVERNMENT EXHIBITS
       Exhibit No.                                    Received
 2     GX 201 through 210  . . . . . . . . . . . . 156
       1  . . . . . . . . . . . . . . . . . . . 101
 3     GX 2   . . . . . . . . . . . . . . . . . . 154

 4     GX 3   . . . . . . . . . . . . . . . . . . 155

 5     GX 4   . . . . . . . . . . . . . . . . . . 156

 6     GX 5   . . . . . . . . . . . . . . . . . . 157

 7     GX 101  . . . . . . . . . . . . . . . . . . 167

 8     GX 105  . . . . . . . . . . . . . . . . . . 176

 9     106  . . . . . . . . . . . . . . . . . . . 217

10     107  . . . . . . . . . . . . . . . . . . . 218

11     108  . . . . . . . . . . . . . . . . . . . 219

12     109  . . . . . . . . . . . . . . . . . . . 230

13     111  . . . . . . . . . . . . . . . . . . . 109

14     112  . . . . . . . . . . . . . . . . . . . 115

15     GX 122  . . . . . . . . . . . . . . . . . . 122

16     123  . . . . . . . . . . . . . . . . . . . 102

17     124  . . . . . . . . . . . . . . . . . . . 105

18     GX 125  . . . . . . . . . . . . . . . . . . 164

19     GX 126  . . . . . . . . . . . . . . . . . . 118

20     GX 127  . . . . . . . . . . . . . . . . . . 119

21     GX 301  . . . . . . . . . . . . . . . . . . 191

22     GX 401  . . . . . . . . . . . . . . . . . . 195

23     406  . . . . . . . . . . . . . . . . . . . 228

24     410  . . . . . . . . . . . . . . . . . . . 209

25     422  . . . . . . . . . . . . . . . . . . . 202
```

DEFENDANT EXHIBITS

Exhibit No.                                        Received

C1 and C2   . . . . . . . . . . . . . . . 283

A, B and D  . . . . . . . . . . . . . . . 284

C3    . . . . . . . . . . . . . . . . . 281

E   . . . . . . . . . . . . . . . . . . 283