LB2sADA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                            20 Cr. 494 (PGG)

5   ROBERT ADAMS,

6            Defendant.                    Jury Trial
    ------------------------------x
7
                                          New York, N.Y.
8                                         November 2, 2021
                                          9:55 a.m.
9

10  Before:

11              HON. PAUL G. GARDEPHE,

12                                        District Judge

13
                        APPEARANCES
14
    A. DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  JARROD L. SCHAEFFER, ESQ.
         RUSHMI BHASKARAN, ESQ.
17       NICOLAS T. ROOS, ESQ.
         Assistant United States Attorneys
18
    SAMUEL GREGORY, ESQ.
19       Attorney for Defendant

20  TAYLOR & COHEN LLP
         Attorneys for Defendant
21  BY:  ZACHARY S. TAYLOR, ESQ.

22  ALSO PRESENT:  NICHOLAS TALIERCIO, ESQ.

23

24

25

LB2sADA1

1          (Trial resumed; jury not present)

2          THE COURT:  We learned this morning that alternate

3   Juror No. 1 has been exposed to someone who tested positive for

4   COVID.  So we have directed her not to come in this morning,

5   and we will proceed without her.  I will tell the same to the

6   jury when they come out.

7          All right.  I understand there is an issue the lawyers

8   want to raise?

9          MS. BHASKARAN:  Yes, your Honor.

10          This relates to a chart of certain call records

11   involving Harris, Adams and Outlaw that was the subject of

12   Harris' cross-examination yesterday.

13          As the court may recall, the government objected to

14   the use of that exhibit because we didn't know whether that

15   exhibit accurately reflected the underlying source data from

16   where it came.  Late last night we received the source

17   information and we saw that it omitted some 50 entries which we

18   thought would be misleading.

19          And so defense counsel has now revised the exhibit to

20   correct that issue, so the issue as to the authenticity and the

21   correctness of the data is not the issue now.  The issue is to

22   what purpose the defense can introduce this information to the

23   jury.

24          We understand that there potentially could be two

25   reasons, and we don't think that either of them are

LB2sADA1

```
 1    permissible.

 2              The first is --

 3              THE COURT:  Do you actually have the exhibit?

 4              MR. TAYLOR:  Hold on a minute.  I'll hand it up to

 5    your Honor.

 6              THE COURT:  All right.  I've been handed something

 7    that's marked Defense Exhibit F.  It's entitled call detail

 8    records for (347) 926-2389.  It shows a call from (646)

 9    891-9397 to (347) 926-2389, as the call direction is inbound.

10    As the start date, it is July 6, 2019, at 12:56.  Duration is

11    25 seconds, and the call type is voice.

12              All right.  Go ahead, Ms. Bhaskaran.

13              MS. BHASKARAN:  So, your Honor, one purpose seems to

14    be impeachment, and I'm referring now to page 312 of the

15    transcript.  Mr. Gregory said at line nine:  So just to

16    clarify, you remember that you spoke to Keith Outlaw on the 6th

17    at 12 --

18              THE COURT:  Can you use the microphone, please?

19              MS. BHASKARAN:  Apologies, your Honor.

20              So Mr. Gregory said at line nine of page 312:  You

21    remember that you spoke to Keith Outlaw on the 6th at 12:50,

22    but you don't remember calling Robert Adams right after that,

23    correct?

24              Ms. Harris answers:  Correct.

25              So one purpose of offering the exhibit would be for
```

1    impeachment purposes.  That would seem to run afoul of 608(b),

2    if I'm remembering correctly, where we can't offer extrinsic

3    evidence for impeachment purposes.

4           For some of the same reasons that the court has

5    already excluded extrinsic evidence that the defense wished to

6    introduce based on that rule, it seems as if this exhibit

7    cannot be offered for impeachment purposes.

8           The second potential purpose the defense counsel

9    raised to us as to why they should be able to introduce this

10   exhibit, they said it was relevant with respect to Harris'

11   state of mind.  Based on my understanding of the court's ruling

12   yesterday morning concerning the relevance of Harris' state of

13   mind, we believe that the court has stated quite unequivocally

14   that state of mind is not relevant.

15          It is unclear to us how this could be introduced as

16   relevant as to Harris' state of mind when the court has already

17   stated that her state of mind is not relevant in this case.

18          THE COURT:  Well, it goes to her credibility, and the

19   defense has a theory that she and Outlaw were conspiring as to

20   how they could use Harris' relationship with Adams to their

21   advantage.

22          So I'll hear from Mr. Gregory in a moment, but I

23   suspect what I'll hear from him is that they think that the

24   fact that she called Adams in such close proximity to her call

25   with Outlaw supports that view.

1          Mr. Gregory.

2          MR. GREGORY:  Yes, Judge.  Thank you.

3          That's right.  I think you're correct, Judge.  I

4    just --

5          THE COURT:  Could you use the microphone, please.

6          MR. GREGORY:  Sorry, Judge.

7          I would also add that the original exhibit was really

8    not misleading.  It just was unnecessary to put the substantive

9    calls in.  so we left just the one call.  And the court has it

10   exactly right.

11         THE COURT:  Just so the record is clear, the 646

12   number, that's Harris' phone?

13         Is that Harris' phone?

14         MS. BHASKARAN:  Yes, your Honor.

15         THE COURT:  And the 347 number, that's Outlaw?

16         MS. BHASKARAN:  Correct.  I'm sorry, no.  Excuse me.

17   It's Adams.

18         THE COURT:  OK.  I need to know who was calling who.

19         MR. GREGORY:  Judge, Harris was calling Adams, I

20   believe.

21         THE COURT:  OK.  So this reflects a call to Adams.

22         MR. GREGORY:  Correct.

23         THE COURT:  OK.  But I thought the point was to show

24   that she called Adams immediately after she spoke with Outlaw,

25   right?

LB2sADA1

1          MR. GREGORY:  Right.  And the Outlaw call is at 12:50

2     for three minutes and 39 seconds, and this call is 12:56 and

3     change.

4          THE COURT:  OK.  All right.  Ms. Bhaskaran.

5          MS. BHASKARAN:  Nothing else, your Honor, apart from

6     our arguments before.

7          THE COURT:  All right.  Well, I do think it's relevant

8     evidence because it goes to --

9          Well, let me say that I think that there is a

10    significant issue as to whether any arrangement, discussion,

11    conspiracy between Harris and Outlaw could have any bearing on

12    whether there is a defense here as to the charges against

13    Mr. Adams.

14          Having said that, the defense wants to make an

15    argument that what was happening between Harris and Adams was

16    actually being directed by Outlaw and Harris and not by Adams.

17    That's an argument that they want to make to the jury.  And

18    that what happened here was not at Mr. Adams' direction, but

19    really was something that was being directed by Outlaw and

20    Harris working together to exploit this connection with Adams.

21          Given that the call records are what they are and I

22    think in order for this -- let me step back.  Do we know, is

23    there a call record that shows the call between Outlaw and

24    Harris?

25          Do we have that or do we just have testimony on this?

LB2sADA1

1          MR. GREGORY:  You have the call log.

2          THE COURT:  You have the call log.

3          So we know exactly when Harris and Outlaw spoke, and

4     we know when Harris called Adams.  So these facts are not

5     subject to dispute, and once admitted, the defense can make any

6     argument that it wants on that proximity between these calls.

7     I think they should be allowed to make that argument.

8          So whether it comes in as impeachment of Harris or

9     whether it comes in on the defense case, I think is really not

10    a huge issue, but I think it should come in.  And I think it

11    should come in, in the fashion that shows both calls.

12         MR. GREGORY:  Do you want us to update that exhibit

13    and make sure both calls are in?

14         THE COURT:  Yes, subject to what the government has to

15    say.

16         Do you have anything you want to say, Ms. Bhaskaran?

17         I mean, what I've said is premised on the fact that

18    there is no authenticity issue about the records.  I mean, the

19    government is not disputing that there was a call between

20    Outlaw and Harris at approximately 12:50, or whatever it was.

21    Mr. Gregory said and then there was a call from Harris to Adams

22    at 12:56.

23         If the government is not disputing that, then I think

24    the exhibit should come in showing those two calls.  Either now

25    or on the defense case.  I'm agnostic as to when.

LB2sADA1

| | |
|---|---|
| 1 | MS. BHASKARAN:  That sounds fine, your Honor. |
| 2 | Thank you. |
| 3 | THE COURT:  All right.  I think it more properly comes |
| 4 | in on the defense case. |
| 5 | What I would suggest, Mr. Gregory, is that you prepare |
| 6 | a version that shows the two calls and then offer the exhibit |
| 7 | on your case. |
| 8 | MR. GREGORY:  Yes, we will.  Thank you. |
| 9 | THE COURT:  OK.  Other issues? |
| 10 | MS. BHASKARAN:  Not from the government, your Honor. |
| 11 | MR. GREGORY:  Judge, we do have one issue, that's we |
| 12 | don't have a printer.  Maybe we could get a hand on that if we |
| 13 | get it to you? |
| 14 | I hate to have you doing all the work, Judge, but... |
| 15 | THE COURT:  My deputy will work with you on that. |
| 16 | MR. GREGORY:  Thank you very much. |
| 17 | THE COURT:  So are we picking up with the |
| 18 | cross-examination of Ms. Boyce? |
| 19 | MS. BHASKARAN:  Yes, your Honor. |
| 20 | The government doesn't have any further questions on |
| 21 | direct. |
| 22 | THE COURT:  OK.  If there is nothing else then, we |
| 23 | will get the jury. |
| 24 | MS. BHASKARAN:  Your Honor, should we get the witness |
| 25 | in the box? |

LB2sADA1

1          THE COURT:  Please.  Thank you.

2          Yes.  My deputy wants to know whether we should order

3     lunch for the jury.  That turns on whether the lawyers think

4     the evidence will continue until 12:30 or so.

5          What's the government's view?

6          The time now is five past ten.

7          MS. BHASKARAN:  Ultimately, your Honor, I think it

8     depends on whether there is a defense case.  The government's

9     case will probably be done by 11 or so, I would imagine.

10         THE COURT:  By 11.

11         MS. BHASKARAN:  11, 11:30.

12         THE COURT:  OK.

13         MR. GREGORY:  No case.

14         THE COURT:  All right.  So I guess the answer is no,

15    Mike.

16         THE DEPUTY CLERK:  Perfect.  Thank you.

17         Your Honor, I'll get the jury.

18         THE COURT:  All right.

19         (Continued on next page)

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Ladies and gentlemen, I wanted to tell you

3    that we will be proceeding without Alternate Juror No. 1.  We

4    learned this morning that Alternate Juror No. 1 has been

5    exposed to someone who tested positive for COVID.  So pursuant

6    to our protocols, we have directed her not to come in, so we

7    will be proceeding without her.

8           All right.  We are in the middle of the examination of

9    the witness Ms. Boyce.

10          Ms. Boyce, you remain under oath.  We will now hear

11   the cross-examination of Ms. Boyce.

12    QUNISHA BOYCE, resumed.

13          MR. TAYLOR:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. TAYLOR:

16   Q.  Good morning, Ms. Boyce.

17   A.  Good morning.

18   Q.  My name is Zachary Taylor.  I'm one of the attorneys for

19   Robert Adams.  It's good to see you this morning.

20   A.  Hello.

21   Q.  I only have a few questions for you.  I promise that you'll

22   be out of here before you know it.  OK?

23          Ms. Boyce, when you testified yesterday, you were

24   shown some videos.

25          You remember that, right?

1    A.   Yes.

2    Q.   I'm sorry.  Could you speak into the microphone, please?

3    A.   Yes.

4    Q.   Thank you.

5         And when you watched those videos, you were asked to

6    identify the officer in the video.

7         Do you remember that?

8    A.   Yes.

9    Q.   But you didn't identify the officer by name, right?

10   A.   No.

11        MR. TAYLOR:  With the court's permission, your Honor,

12   I would like for Mr. Adams to be allowed to remove his mask

13   briefly so that Ms. Boyce can see him.

14        Is that all right?

15        THE COURT:  All right.

16   Q.   Ms. Boyce, you recognize Officer Adams, right?

17   A.   Yes.

18   Q.   You used to see him at the MCC back in 2019, when you were

19   visiting, right?

20   A.   Yes.

21   Q.   Now, at the times when you saw him, he was typically

22   working in the visit area, correct?

23   A.   Yes.

24   Q.   And it's fair to say you remember him well, right?

25   A.   Yes.

1    Q.  Is there something in comparison to the other guards at the

2    MCC that makes you remember Officer Adams?

3    A.  Um, he was nice.  That's it.

4    Q.  How was he nice, ma'am?

5           MS. BHASKARAN:  Objection.

6           THE COURT:  Overruled.

7    A.  Um, he was more, like, sociable.  Like, he had

8    conversations with us.  Like, he wasn't acting the way the

9    other officers was acting.

10   Q.  Now, Ms. Boyce, do you recall when Ms. Bhaskaran asked you

11   yesterday to describe the process of visiting the MCC?

12   A.  Yes.

13   Q.  And your initial answer was, Not good.

14          Do you remember that?

15   A.  Yes.

16   Q.  Was one of the reasons the process of visiting the MCC was

17   not good that many of the guards there could be mean to you and

18   the other visitors?

19          MS. BHASKARAN:  Objection.

20          THE COURT:  Relevance?

21          MS. BHASKARAN:  Yes.

22          THE COURT:  I don't see the relevance, Mr. Taylor.

23   BY MR. TAYLOR:

24   Q.  Ms. Boyce, let's focus now on the incident that occurred on

25   July 5, 2019.  OK?

LB2sADA1                    Cross - Boyce

1          So Officer Adams came into the visitor room after your

2     visit was over while you were there with another female

3     visitor, right?

4     A.   Um-hmm, yes.

5     Q.   And Officer Adams and the other female visitor had a

6     conversation in front of you, right?

7     A.   Yes.

8     Q.   Now, Officer Adams closed the door and the first thing he

9     told the other visitor is that you can't bring drugs into the

10    MCC, right?

11    A.   No.

12    Q.   Pardon, ma'am?

13         What was your answer?

14    A.   I said no.

15    Q.   So over the last couple of months, you have spoken to

16    agents and prosecutors about this case multiple times, is that

17    right, ma'am?

18    A.   Yes.

19    Q.   But the very first time you spoke to any agents was quite a

20    long time ago, just a few months after the incident, is that

21    right, ma'am?

22    A.   Yes.

23    Q.   Would it be fair to say that that conversation occurred in

24    mid January 2020?

25    A.   I don't remember.

LB2sADA1                    Cross - Boyce

1    Q.  Do you not remember, ma'am?

2    A.  No.

3            MR. TAYLOR:  Mr. Taliercio, could you just bring up

4    3528-001, please.

5            Mr. Taliercio, can you just highlight just that first

6    sentence.

7    Q.  Ma'am, does this refresh your recollection as to when your

8    first conversation with agents about this case took place?

9    A.  Yeah.

10   Q.  And that conversation occurred on January 14, 2020?

11   A.  Yes.

12   Q.  Would it be fair to say that at that time, your memory

13   about what had occurred in July 2019 was fresher than later

14   times, is that right?

15   A.  Yes.

16   Q.  Because like most people, your memory fades over time,

17   right, ma'am?

18   A.  Kind of.

19   Q.  And in that meeting or during that conversation in

20   January 14, 2020, didn't you tell the agent that when

21   Officer Adams closed the door, he told the other visitor that

22   she could not bring drugs into the MCC?

23   A.  He said that, but that was the first thing he had said.

24   Q.  I see.  So going on with that conversation, Officer Adams

25   told the visitor that he would let her go for bringing drugs

1    into the MCC, but if someone else caught her, she could face

2    charges, right?

3    A.  Yeah.

4    Q.  And Officer Adams told the visitor that the authorities

5    could come to her house and arrest her, right?

6    A.  Um-hmm.

7            THE COURT:  You need to answer yes or no, ma'am.

8    A.  Yes.

9    Q.  But Officer Adams told the visitor that he was going to let

10   it slide, right?

11   A.  Yes.

12   Q.  And Officer Adams told the visitor, Meet me down the block

13   and you're good, right?

14   A.  At the pizza shop, yes.

15   Q.  He told her, like he just said to meet him at a pizza shop

16   near the MCC, correct, ma'am?

17   A.  Yes.

18   Q.  And he even asked you to help explain to her the directions

19   to the pizza place, is that right?

20   A.  I said it was down the block, yes.

21   Q.  I'm sorry?

22   A.  I said it's down the block, yes.

23   Q.  Oh, yeah.

24           But didn't Officer Adams ask you to explain to the

25   visitor where that pizzeria was?

LB2sADA1                    Cross - Boyce

1    A.  I don't remember if he asked me to explain or if I knew

2    where it was.  I don't remember.

3            MR. TAYLOR:  Mr. Taliercio, can you bring up 3528-11,

4    please.

5            (Counsel confer)

6    BY MR. TAYLOR:

7    Q.  Ms. Boyce, does this help refresh your recollection, ma'am?

8            Does this help refresh your recollection that Officer

9    Adams asked you if you knew where that pizza place was?

10   A.  Yeah.

11   Q.  I'm sorry.  I couldn't hear.

12   A.  I said yes.

13   Q.  Thank you.

14           Officer Adams also made some jokes to the visitor,

15   didn't he?

16   A.  Um-hmm, yes.

17   Q.  I think you said yesterday he said that the marijuana

18   smelled good, right?

19   A.  Yes.

20   Q.  And he asked the visitor where he could get some, right?

21   A.  Yes.

22   Q.  And you understood those to be jokes, correct?

23   A.  Yes.

24           MS. BHASKARAN:  Objection, your Honor.

25           THE COURT:  Overruled.  It's for her understanding.

1   Overruled.

2   Q.  Did you hear the question, ma'am?

3   A.  I said yes.

4   Q.  Sorry, I didn't hear you.  I apologize.

5          At no point during that conversation was Officer Adams

6   mean to the visitor, was he?

7   A.  No.

8          MR. TAYLOR:  Thank you, ma'am.  I have no further

9   questions.

10          THE COURT:  Any redirect?

11          MS. BHASKARAN:  No redirect, your Honor.

12          THE COURT:  You can step down, ma'am.

13          (Witness excused)

14          Government, call its next witness.

15          MR. SCHAEFFER:  Thank you, your Honor.

16          The government calls Richard Fletcher.

17    RICHARD L. FLETCHER,

18       called as a witness by the Government,

19       having been duly sworn, testified as follows:

20          THE DEPUTY CLERK:  Please be seated.

21          Please state your full name and spell it for the

22   record.

23          THE WITNESS:  Richard L. Fletcher.  R-i-c-h-a-r-d L.

24   F-l-e-t-c-h-e-r.

25          THE COURT:  Please proceed.

1          MR. SCHAEFFER:  Thank you, your Honor.

2     DIRECT EXAMINATION

3     BY MR. SCHAEFFER:

4     Q.  Good morning, Mr. Fletcher.

5     A.  Good morning.

6     Q.  Where do you work?

7     A.  I work at the MCC, Metropolitan Correctional, in Manhattan.

8     Q.  I think while you're in the box, Mr. Fletcher, you can

9     remove your mask to testify.

10    A.  OK.

11    Q.  Do you mind repeating your answer to that question?

12    A.  Sure.

13          I work at MCC, New York, Metropolitan Correctional

14    Center.

15    Q.  And what is the MCC?

16    A.  It's Metropolitan Correctional Center.

17    Q.  Is that a federal prison or jail?

18    A.  Yes.

19    Q.  How long have you been employed at the MCC?

20    A.  I've been employed there 25 years and one month and

21    five days.

22    Q.  I'm going to ask you about your work in 2019.

23          What was your position then?

24    A.  I was the OIC, visiting room officer.  That stands for

25    officer in charge.

1  Q.  And are you familiar with a correctional officer named

2  Robert Adams?

3  A.  Yes.

4  Q.  How do you know him?

5  A.  I was his coworker.

6  Q.  I'm sorry?

7  A.  As a coworker.

8  Q.  And just yes or no to this question.

9        Are you aware of an incident on August 14, 2019, when

10  a female visitor at the MCC was stopped?

11  A.  Yes.

12  Q.  Did you ever have any conversations with Mr. Adams

13  concerning that incident?

14  A.  Repeat it one more time?

15  Q.  Did you ever have any conversations with Mr. Adams

16  concerning that incident?

17  A.  Yes.

18  Q.  Was it one conversation or more than one conversation?

19  A.  I believe that it was one, but it may be more.  I'm not

20  sure.

21  Q.  Approximately when did the conversation occur that you

22  recall?

23  A.  When I found out through other staff that, you know, later

24  on that day when we left, you know, when our shift was over

25  with, um -- we were, um, informed that the female visitor --

1          MR. GREGORY:  Objection.

2          THE COURT:  Sustained.

3   Q.  Mr. Fletcher, the conversation with Mr. Adams,

4   approximately when did that occur in relation to the incident

5   on August 14?

6   A.  Um, maybe a week after.

7   Q.  And during that conversation, what did Mr. Adams --

8          What did you say to Mr. Adams and what did Mr. Adams

9   say to you?

10  A.  As a concerned worker, he was my coworker.  I knew what

11  happened, and I haven't seen him.  And when I did see him, I

12  asked him, I said, Hey, um, are you OK?  What's going on?  I

13  heard that a female, you know, visitor said some things about

14  you.  And, um, he -- um, you know, he told me that he knew her

15  and, you know, he, um -- basically, um, said that he doesn't

16  know why, you know, about -- about him and her.  Um, he stated

17  that he had, I believe, saw her at one point, and he told her

18  that she could not come back here because he personally knew

19  her.  And I told him to just write a memo.

20  Q.  Did Mr. Adams say how he knew her?

21  A.  She lived in the neighborhood.

22  Q.  And so just to be clear, was it your understanding that

23  Mr. Adams had met the woman prior to seeing her at the MCC?

24  A.  Yes.

25  Q.  And based on your conversation with Mr. Adams, did you

1    understand the woman and Mr. Adams to have a prior

2    relationship?

3    A.  No.

4    Q.  Based on your understanding or based on your conversation

5    with Mr. Adams, what was your understanding of the relationship

6    between Mr. Adams and this woman?

7    A.  Well, maybe that -- that he personally knew her.  And if

8    they hung out, you know, whatever.  But my interpretation of

9    the conversation was that he, you know, he just knew somebody

10   from, you know, the neighborhood.  And if they hung out, they

11   hung out.  And I didn't get into details with him with that.

12   Q.  During that conversation, did Mr. Adams say whether he and

13   the woman had ever dated or had a sexual relationship?

14   A.  Not in general, but it was -- it was more, like, you know,

15   you know, like, I don't know, when guys talk.  But specifically

16   like, oh, did I have sex with her and this and that?  I just

17   know that he -- he knew her very well.

18   Q.  Did Mr. Adams tell you whether he had caught the woman with

19   contraband at the MCC?

20   A.  No.

21   Q.  Did Mr. Adams tell you that he had sex with the woman after

22   he found contraband on her at the MCC?

23   A.  No.

24           MR. SCHAEFFER:  No further questions, your Honor.

25           THE COURT:  Cross-examination.

1   CROSS-EXAMINATION

2   BY MR. GREGORY:

3   Q.  Good morning, Officer Fletcher.

4   A.  Good morning.

5   Q.  You and Adams were friendly on the job, correct?

6   A.  Correct.

7   Q.  And you stayed in touch when you were outside of work,

8   correct?

9   A.  He would text me.  You know, he would text me, you know,

10  like, to say what's up, but, like, we really never hung out

11  after work.

12  Q.  It would be fair to say that it was your understanding that

13  Mr. Adams and this female visitor had had a little fun in the

14  past, correct?

15  A.  Yes.

16          MR. GREGORY:  No further questions.

17          THE COURT:  Any redirect?

18          MR. SCHAEFFER:  No, your Honor.

19          THE COURT:  All right.  You can step down, sir.

20          THE WITNESS:  Thank you.

21          (Witness excused)

22          THE COURT:  Government, call its next witness.

23          MR. SCHAEFFER:  The government calls Amanda Gildea.

24   AMANDA GILDEA,

25      called as a witness by the Government,

LB2sADA1                    Direct - Gildea

1          having been duly sworn, testified as follows:

2                THE DEPUTY CLERK:  Please be seated.

3                Please state your full name and spell it for the

4     record.

5                THE WITNESS:  Amanda Gildea, A-m-a-n-d-a G-i-l-d-e-a.

6                THE COURT:  Please proceed.

7                MR. SCHAEFFER:  Thank you, your Honor.

8     DIRECT EXAMINATION

9     BY MR. SCHAEFFER:

10    Q.  Good morning, Ms. Gildea.

11    A.  Good morning.

12    Q.  Now, you stated and spelled your name for the record, but

13    did you go by a different name in 2019?

14    A.  Yes.

15    Q.  And what name was that?

16    A.  Amanda Moore.

17    Q.  What was the reason for the change?

18    A.  I got married.

19    Q.  Can you remove your mask?  Thank you.

20                Where do you currently work, Ms. Gildea?

21    A.  Um, with the FBI here in New York.

22    Q.  And how long have you been employed there?

23    A.  I've been employed with the FBI for 17 years.

24    Q.  And what is your current position?

25    A.  Special agent.

1    Q.  Are you assigned to any particular division or unit?

2    A.  Yes.  The violent crimes task force.

3    Q.  And what are your duties and responsibilities in that role?

4    A.  I investigate certain violations of the law, kidnappings,

5    bank robberies, fugitives, that kind of thing.

6    Q.  During the course of your work with the FBI, did there come

7    a time when you encountered the defendant Robert Adams?

8    A.  Yes.

9    Q.  Approximately when was that?

10   A.  August 2019.

11   Q.  Where was the defendant employed at that time?

12   A.  MCC.

13   Q.  How was he employed?

14   A.  As a corrections officer.

15   Q.  How did you come to encounter the defendant?

16   A.  I was interviewing him regarding another ongoing

17   investigation.

18   Q.  And that investigation did not involve Mr. Adams, correct?

19   A.  Correct.

20   Q.  Do you recall that interview with the defendant?

21   A.  Yes, I do.

22   Q.  How would you characterize the length of that interview?

23   A.  It was a relatively short interview.

24   Q.  During the course of that interview, did you show anything

25   to the defendant?

1    A.  Yes.

2    Q.  And what was that?

3    A.  It was a picture of a female named Shahada Harris.

4          MR. SCHAEFFER:  Ms. Phifer, if we can please bring up

5    for the parties and the witness, as well as the court, what's

6    been previously marked as Government Exhibit 601.

7    Q.  Special Agent Gildea, do you recognize what is on the

8    screen as Government Exhibit 601?

9    A.  Yes.

10   Q.  And how do you recognize it?

11   A.  That's the picture that we showed Mr. Adams.

12   Q.  Is this a true and accurate copy of that picture?

13   A.  Yes.

14         MR. SCHAEFFER:  Your Honor, the government offers

15   Government Exhibit 601.

16         THE COURT:  Any objection?

17         MR. GREGORY:  No objection, Judge.

18         THE COURT:  601 is received.

19         (Government's Exhibit GX 601 received in evidence)

20         MR. SCHAEFFER:  May it be published to the jury, your

21   Honor?

22         THE COURT:  Yes.

23         MR. SCHAEFFER:  Ms. Phifer, if you could please zoom

24   in on the picture itself.

25   Q.  So, Special Agent Gildea, this is the image that you showed

1    the defendant during the interview?

2    A.   Yes.

3    Q.   During that interview, did you tell the defendant the name

4    of the person in this photo?

5    A.   No.

6    Q.   Based on your observation of him, did the defendant appear

7    to recognize the person in the photo?

8    A.   Yes.

9    Q.   How, if at all, did the defendant react upon seeing this

10   photo?

11   A.   Um, he appeared to be surprised.

12   Q.   Did the defendant say anything after seeing this photo?

13   A.   Yes.  He said something to the effect of, Let me be clear,

14   I never brought anything into the jail or allowed anything in.

15   I never did that.

16   Q.   What was your reaction when the defendant said that?

17             MR. GREGORY:  Objection, Judge.

18             THE COURT:  Sustained.

19   Q.   Prior to the defendant making those statements, had he been

20   asked any questions about bringing any stuff into the MCC?

21   A.   No.

22   Q.   Had you asked him any questions about allowing stuff into

23   the MCC?

24   A.   No.

25   Q.   Before the defendant made those statements, had you

LB2sADA1                    Direct - Gildea

1    discussed contraband at all during the interview?

2    A.  No.

3              MR. SCHAEFFER:  No further questions, your Honor.

4              THE COURT:  All right.  Cross-examination.

5              MR. GREGORY:  No cross-examination, Judge.

6              THE COURT:  All right.  You can step down, ma'am.

7    Thank you.

8              (Witness excused)

9              Government, call its next witness.

10             MR. SCHAEFFER:  Your Honor, at this time, the

11   government would like to offer a stipulation.

12             THE COURT:  Yes.

13             MR. SCHAEFFER:  Ms. Phifer, if we could please pull up

14   Government Exhibit 1.

15             I apologize, your Honor, just an exhibit pursuant to a

16   stipulation.

17             If we could go to paragraph 18, please, Ms. Phifer.

18             Paragraph 18 reads:  Government Exhibit 120 is a true

19   and accurate copy of a memorandum concerning the attempt by

20   Shahada Harris to bring contraband, including marijuana, into

21   the MCC for inmate Keith Outlaw on August 14, 2019, which was

22   completed by Lieutenant Jermaine Durant.

23             Pursuant to this stipulation, your Honor, the

24   government offers Government Exhibit 120.

25             THE COURT:  Any objection?

1          MR. GREGORY:  No, Judge.

2          THE COURT:  120 is received.

3          (Government's Exhibit GX 120 received in evidence)

4          MR. SCHAEFFER:  Thank you, your Honor.

5          MS. BHASKARAN:  Your Honor, the government calls

6    Enrique Santos.  I believe he is just walking in right now.

7     ENRIQUE SANTOS,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10          THE DEPUTY CLERK:  Please be seated.

11          Please state and spell your full name and spell it for

12    the record.

13          THE WITNESS:  Enrique Santos, E-n-r-i-q-u-e

14    S-a-n-t-o-s.

15          THE COURT:  Please proceed.

16    DIRECT EXAMINATION

17    BY MS. BHASKARAN:

18    Q.  Good morning, Mr. Santos.

19    A.  Good morning.

20    Q.  Mr. Santos, where do you work?

21    A.  The U.S. Attorney's office for the Southern District of

22    New York.

23    Q.  What is your job title there?

24    A.  I'm an investigative analyst.

25    Q.  For how long have you worked for the U.S. Attorney's

1    office?

2    A.   13 years.

3    Q.   What are your job responsibilities?

4    A.   I perform forensic examinations of mobile devices, such as

5    cell phones, GPS devices, and computer tablets, and I also

6    operate an evidence vault.

7    Q.   What do you mean by forensic examinations?

8    A.   It means that we employ technology and the scientific

9    principle in order to conduct examinations of devices that are

10   usually evidence in criminal cases.

11   Q.   What kind of devices, again, did you forensically exam?

12   A.   Cell phones, GPS devices and tablets.

13   Q.   Have you received training in the forensic examination of

14   cell phones?

15   A.   Yes.

16   Q.   Can you describe some of that training?

17   A.   I currently have approximately 160 hours' worth of formal

18   classroom training.  I've received certifications for each of

19   the forensic tools that I operate.  And I've regularly attended

20   webinars forensics related conferences and things of that

21   nature.

22   Q.   What kind of data off of a cell phone can the forensic

23   tools that you know how to use extract from a particular cell

24   phone?

25   A.   So depending on the specific device, it's generally data,

1    such as call histories, text messages, photos, videos,

2    web-browsing history, notes, things like that.

3    Q.  How often do you deal with forensic cell phone extractions?

4    A.  Just about every single day.

5    Q.  And I just used the word extraction.

6           Can you describe what that word means in your

7    practice?

8    A.  Sure.  An extraction is usually the result of a download of

9    a cell phone or GPS device or whatever it is.  Usually, that's

10   just the data that we get back when we connect the device to

11   our forensic tools and it downloads the data off of it.

12   Q.  In your review of forensic extractions, have you

13   encountered situations in which data has been deleted?

14   A.  Yes.

15   Q.  What are some of the ways in which you can determine with

16   forensic tools that data has been deleted?

17   A.  So depending on the device and the type of extraction

18   that's performed, we can or the forensic tools can sometimes

19   recover deleted data.  Deleted data doesn't always just go away

20   from a device, it sort of lingers in the background in the

21   phone's memory.  And when the phone's operating system decides

22   that it needs the space for new data, it will override it.

23          But in the meanwhile, it still kind of lingers in the

24   background.  And when it is ready, I'm using the forensic tool,

25   we can recover some of that data.

LB2sADA1                    Direct - Santos

1   Q.  In the reports that you generate that show the extraction

2   of a particular cell phone, how, if at all, does the report

3   indicate whether the data was deleted?

4   A.  Well, if you're looking at a PDF or HTML version of the

5   report, there is a column that describes whether an item was

6   deleted.  If it was deleted, it will say the word 'yes' in

7   red text.

8   Q.  In your experience, what are some of the reasons why data

9   could appear to be deleted off of a phone?

10  A.  Usually someone can choose to manually delete data if they

11  no longer see it or want to see it.  They can manually delete

12  it.  You also have settings in the phones.  Depending on the

13  phone model, you can set your phone, for example, to only keep

14  the most recent text messages or e-mails, for example.  And you

15  can set it to delete messages that are older than maybe two or

16  three weeks, if that is what you choose.  Those are just two of

17  the reasons that I can think of.

18  Q.  What about the system malfunction or corruption?

19  A.  Yes.  There is also a chance that the operating system

20  could malfunction and accidentally cause a deletion.

21  Q.  In situations where you see an indication that data has

22  been deleted, to what extent can you tell when that particular

23  data was deleted?

24  A.  That, I can't tell.

25  Q.  Can you tell whether or not the data was deleted before you

1    began your examination of the phone?

2    A.  It would have to be before my examination began.  As part

3    of the forensic extraction process, our tools don't write any

4    data to the phones.  That's just part of conducting a forensic

5    examination.  We want to keep the data that we examine sort of

6    in pristine condition.  We want to examine what was already

7    there.  We don't want to introduce new artifacts into the

8    phones that we're examining.

9    Q.  Mr. Santos, I would now like to switch gears and talk to

10   you about your role in a particular case.

11           Did there come a time when you became aware of a

12   prosecution or investigation involving Robert Adams?

13   A.  Yes.

14   Q.  What was your initial role in the case?

15   A.  I examined Mr. Robert -- I examined the Motorola phone

16   related to this case.

17   Q.  To whom did that phone belong to, the Motorola phone?

18   A.  Mr. -- I'm sorry.  Just remind me.

19   Q.  Who did that phone belong to?

20   A.  Um, I'm sorry.  The defendant's name, whose name is

21   escaping me right now.

22   Q.  And, Mr. Santos, did you bring with you a CD with you of a

23   forensic extraction?

24   A.  Yes.  I have a flash drive with the original forensic image

25   and the original report that I created for this case.

LB2sADA1                    Direct - Santos

Q.   OK.   Mr. Santos, we're going to mark that exhibit for

identification as Government Exhibit 4.

        Can you just hold it up?

A.   I'm sorry.   The name was Mr. Adams, was the --

Q.   And how do you recognize that that is the forensic

examination of Mr. Adams' phone?

A.   So I created this flash drive.   I loaded the data on it

myself, and then I initialed it so that I could recognize it in

court.

        MR. BHASKARAN:   Ms. Phifer, could you please publish

the previously admitted stipulation, Government Exhibit 5.   If

you could go towards the end to where the next page.

        Thank you, Ms. Phifer.   I'm now going to read a

portion of this exhibit.

        Government Exhibit 423 is a forensic extraction report

of communications between Adams and Harris from the Adams'

phone.

        Your Honor, the government offers Government Exhibit

423.

        THE COURT:   Any objection?

        MR. GREGORY:   No objection.   Sorry, Judge.

        THE COURT:   423 is received.

        (Government's Exhibit GX 423 received in evidence)

        MS. BHASKARAN:   Thank you, your Honor.

        Permission to publish Government Exhibit 423?

LB2sADA1                    Direct - Santos

1            THE COURT:  Yes.

2      BY MS. BHASKARAN:

3      Q.  Mr. Santos, do you see that report in front of you?

4      A.  Yes.

5      Q.  When did you create this particular report?

6      A.  This specific report was created October 15, 2021.

7      Q.  Who asked you to create the report?

8      A.  The prosecution.

9      Q.  And how do you create the --

10           What does the report contain?

11     A.  It contains data from Mr. Adams' phone, calls, contacts,

12     and messages.

13     Q.  Specifically, how did you generate the data that appears on

14     this particular report?

15     A.  I went back to the original forensic image that I created

16     for this phone and pulled the data from that.

17     Q.  What did the prosecution ask you to look for on the phone?

18     A.  Any sort of contact with two iPhones related to a

19     Ms. Harris.

20           MR. BHASKARAN:  Ms. Phifer, could we please go to page

21     three of this document.

22           Could you zoom in on the upper portion of the document

23     where it says instant messages.

24           Thank you.

25     BY MR. BHASKARAN:

LB2sADA1                    Direct - Santos

1    Q.  Mr. Santos, what does this section of the report show?

2    A.  Messages between this phone and a contact saved as Shahada.

3    Q.  How many text messages did the forensic tools find on the

4    Adams phone between Harris and Adams?

5    A.  So, it's one message, but it technically appears as two

6    entries on the phone just because it happens to appear in two

7    different databases.  But it is one message.

8    Q.  What is the date of the message?

9    A.  August 8, 2019.

10   Q.  Based on this report, can you tell whether there is any

11   attachments to that message?

12   A.  No.

13           MR. BHASKARAN:  Ms. Phifer, you can take that down,

14   please.  Thank you.

15   Q.  Mr. Santos, in addition to the Adams phone, what, if any,

16   other phones were you asked to look for in connection with your

17   involvement in this case?

18   A.  I took a look at two iPhones related to a Ms. Harris.

19   Q.  And what format did you review the phones related to

20   Ms. Harris?

21   A.  I went back to the original forensic images that were

22   created for those phones and looked through the data from

23   there.

24           MR. BHASKARAN:  Ms. Phifer, if you could please

25   publish Government Exhibit 5, again.

1          I think on the second page.  Thank you.  I'm going to

2    now read a portion of the stipulation.

3          Government Exhibit 412 is a forensic extraction report

4    of communications between Harris and Adams from Harris phone I.

5          Your Honor, the government offers Government Exhibit

6    412.

7          THE COURT:  Any objection?

8          MR. GREGORY:  No objection.

9          THE COURT:  412 is received.

10         (Government's Exhibit GX 412 received in evidence)

11         MS. BHASKARAN:  Permission to publish, your Honor?

12         THE COURT:  Yes.

13   BY MS. BHASKARAN:

14   Q.  Mr. Santos, do you recognize this report?

15   A.  Yes.

16   Q.  Who created it?

17   A.  I did.

18   Q.  Who asked you to create it?

19   A.  The prosecution.

20   Q.  What did you do to create this report?

21   A.  I went back to the original forensic image and pulled out

22   some of the data that the prosecution asked me for.

23   Q.  What data did the prosecution ask you to pull out?

24   A.  Communications between this phone and Mr. Adams' phone.

25   Q.  Does this report include any data from the Adams phone that

1    we previously discussed?

2    A.   I believe there was at least one message.

3    Q.   My question, Mr. Santos, was does this particular report

4    draw from your forensic examination of Mr. Adams' phone?

5    A.   No.  This data is solely from the Harris iPhones.

6            MR. BHASKARAN:  Ms. Phifer, could we please go to

7    page 15 of Government Exhibit 412.

8            Could you just please zoom in on the bottom portion of

9    the document where it says timeline and include the first two

10   rows of data.

11   Q.   Mr. Santos, do you see the timeline section?

12   A.   Yes.

13   Q.   What does the timeline section of this report signify?

14   A.   The timeline section is a section of the report that

15   gathers data from all the different sections of the report and

16   just lists them in chronological order so that you can see

17   events as they occurred.

18   Q.   What is the first event that you found in your forensic

19   examination of the Harris phone between Harris and Adams?

20   A.   There is an outgoing text message from the Harris phone to

21   a phone number saved with a contact named RA and the text

22   message says Shahada.

23   Q.   What is the timestamp associated with that text message?

24   A.   July 5, 2019, at 8:12 p.m.

25   Q.   Mr. Santos, if you could look at the second row of data.

1          Could you describe for the jury what that row of data

2    means?

3    A.   It means a contact was saved on July 6, 2019, at 7:09 p.m.

4    with the name RA.

5    Q.   Thank you, Mr. Santos.

6          Just to switch gears again, have you done a comparison

7    of data between the Adams phone and the Harris iPhones?

8    A.   Yes.

9    Q.   What data did or what data did you use to make those

10   comparisons?

11   A.   I pulled data from each of the reports that were created

12   for the phones, and then I just compared whether each phone had

13   a contact saved for the other in their phone, as well as the

14   call histories and the messages that were sent across each of

15   those phones.

16          MR. BHASKARAN:  Ms. Phifer, if you could please show

17   the witness the court and defense counsel what's been marked

18   for identification as Government Exhibit 430.

19   Q.   Mr. Santos, do you recognize what's in front of you?

20   A.   Yes.

21   Q.   How do you recognize it?

22   A.   This is a chart that I created to summarize some of the

23   data that I analyzed from the three phones.

24   Q.   Who made this chart?

25   A.   I did.

1           MR. BHASKARAN:  Ms. Phifer, could you just flip to the

2     next page two.

3     Q.   Do you recognize this page?

4     A.   Yes.

5     Q.   What is it?

6     A.   This is another chart that I also created that summarizes

7     some of the call history and message histories between the

8     phones on very specific dates.

9     Q.   What are the sources of data in this document?

10    A.   The phone reports.

11    Q.   How many phones?

12    A.   Three.

13    Q.   Is that data voluminous?

14    A.   Yes.

15    Q.   Could all of that data fit on pages like this?

16    A.   It would be thousands and thousands of pages.

17           MS. BHASKARAN:  Your Honor, the government offers

18    Government Exhibit 430 as a summary chart.

19           MR. GREGORY:  No objection, Judge.

20           THE COURT:  430 is received.

21           (Government's Exhibit GX 430 received in evidence)

22           MR. BHASKARAN:  Ms. Phifer, could you please publish

23    page one of Government Exhibit 430.

24    BY MR. BHASKARAN:

25    Q.   Mr. Santos, what analysis is reflected in this chart?

1    A.  So the first two rows will tell you whether or not each

2    phone had the other phone -- the other person's contact saved

3    in their contact list, which yes, they were.

4            The third row will tell you the number of calls that

5    occurred between each of the devices.

6            And the last row will tell you the number of messages

7    found on each of the phones from the other person's phone

8    number.

9    Q.  Mr. Santos, was the Harris phone number saved on the Adams

10   phone?

11   A.  Yes.

12   Q.  Was the Adams number saved on the any of the Harris phones?

13   A.  Yes.

14   Q.  How many phone calls did you see between Adams and Harris

15   on the Harris phone?

16   A.  Three.

17   Q.  How many phone calls between Adams and Harris did you see

18   on the Adams phone?

19   A.  Two.

20   Q.  How many text messages did you see between Adams and Harris

21   on the Harris phones?

22   A.  151.

23   Q.  How many text messages did you find between Harris and

24   Adams on the Adams phone?

25   A.  One

1          MR. BHASKARAN:  Ms. Phifer, could you please go to the

2     next page of this exhibit.

3          Thank you.

4     Q.  Mr. Santos, what analysis is reflected on this chart?

5     A.  So, of the text messages that we found on the Harris

6     phones, I was asked to look at some very specific dates and

7     just sort of summarize how many calls occurred on those dates,

8     how many appear on the Harris phones, and how many appear on

9     the Adams phone.  So this is a sort of summary of that.

10          And on the last column, there is also a summary of

11     some of the other activity that occurred on those dates.

12     Q.  With respect to the third column of data on your chart,

13     where does that data come from?

14     A.  From the phone report.

15     Q.  For which phone?

16     A.  The Adams phone.

17     Q.  All right.  So let's look at some of these lines of data.

18          On July 5, 2019, how many texts between Harris and

19     Adams did you find on the Harris phone?

20     A.  One.

21     Q.  On that same day, how many texts between Harris and Adams

22     did you find on the Harris phone?

23     A.  Zero.

24     Q.  On that same date, how many text messages on the Adams

25     phone did you find with individuals other than Harris?

A.   54.

Q.   Let's just skip down a couple of days.

        Why don't we look at July 17.  On July 17, 2019, how many text messages between Harris and Adams did you find on the Harris phone?

A.   26.

Q.   On that same date, how many text messages did you find between Harris and Adams on the Adams phone?

A.   Zero.

Q.   On that same date, how many text messages on the Adams phone did you find with individuals other than Harris?

A.   153.

Q.   Let's look at just one more line of data here.

        July 18, 2019, how many text messages between Harris and Adams did you find on the Harris phone?

A.   13.

Q.   How many text messages did you find between Harris and Adams on the Adams phone?

A.   Zero.

Q.   How many text messages did you find on that date on the Adams phone with individuals other than Harris?

A.   169.

Q.   Mr. Santos, based on your forensic examination of the Adams phone, did you see any indication that Adams had any sort of auto-delete function turned on?

1   A.  Not that I could tell.

2   Q.  But based on your analysis and examination of the Adams

3   phone, did you see any indication of a systemwide malfunction

4   or corruption that would result in the loss of data?

5   A.  Not that I could tell.

6           MR. BHASKARAN:  Your Honor, I would now like to read a

7   stipulation into the record, or an offer an stipulation,

8   Government Exhibit 7.

9           THE COURT:  All right.  Any objection to Government

10  Exhibit 7?

11          MR. GREGORY:  No, your Honor.

12          THE COURT:  Government Exhibit 7 is received.

13          (Government's Exhibit GX 7 received in evidence)

14          MS. BHASKARAN:  Ms. Phifer, could you please publish

15  Government Exhibit 7, and zoom in on the first paragraph.

16          I'm now going to read a portion of this stipulation:

17  It is hereby stipulated and agreed, by the United States of

18  America, through the undersigned Assistant United States

19  Attorneys, and defendant, Robert Adams, by and through his

20  counsel, that Adams did not delete text messages with Shahada

21  Harris from his cell phone out of concern that they would be

22  discovered by his wife or would be evidence of an affair.

23          (Continued on next page)

24

25

1        MS. BHASKARAN:  Your Honor, no further questions for

2   Mr. Santos.

3        THE COURT:  All right.  Cross-examination?

4        MR. GREGORY:  No questions, your Honor.

5        THE COURT:  All right.  You can step down, Mr. Santos.

6        THE WITNESS:  Thank you.

7        THE COURT:  Does the government have additional

8   evidence it wishes to offer?

9        MR. ROOS:  Your Honor, if we could just have maybe two

10  or three minutes to just confer.  We don't have any additional

11  witnesses.

12       THE COURT:  All right.

13       (Pause)

14       MR. SCHAEFFER:  Your Honor, the government would like

15  to offer one more stipulation.

16       THE COURT:  All right.

17       MR. SCHAEFFER:  Ms. Phifer, if you could please pull

18  up Government Exhibit 6.

19       And your Honor, the government intends to offer and

20  then read Government Exhibit 6.

21       THE COURT:  All right.  Any objection to Government

22  Exhibit 6?

23       MR. GREGORY:  No objection to that, Judge.

24       THE COURT:  Government Exhibit 6 is received.

25       (Government's Exhibit 6 received in evidence)

1          MR. SCHAEFFER:  May it be published to the jury, your

2     Honor?

3          THE COURT:  Yes.

4          MR. SCHAEFFER:  Ms. Phifer, if you could please zoom

5     in on the first paragraph.

6          "It is hereby stipulated and agreed, by the United

7     States of America, through the undersigned assistant United

8     States attorneys, and defendant, Robert Adams, by and through

9     his counsel, that events relevant to the charged offenses

10    occurred within the Southern District of New York, and

11    therefore that venue in the Southern District of New York is

12    proper in this case."

13         THE COURT:  All right.  Does the government rest?

14         MS. BHASKARAN:  Yes, your Honor.

15         THE COURT:  All right.  Mr. Gregory, do you need a

16    break at this point?

17         MR. GREGORY:  Yes, Judge.  We do have that one thing

18    to prepare.  We could bring it tomorrow morning if the Court

19    likes, and that way we won't --

20         THE COURT:  No.  We'll take care of it now,

21    Mr. Gregory.

22         MR. GREGORY:  Okay.

23         THE COURT:  Ladies and gentlemen, I want to take a

24    brief recess.  Don't discuss the case.  Keep an open mind.

25    We'll be back to you shortly.  Thank you all very much.

LB21ADA2

1          THE DEPUTY CLERK:  All rise.

2          (Jury not present)

3          THE COURT:  Please be seated.

4          Mr. Adams, I need to address you about whether you're

5   going to be taking the stand or not.  I've been advised by your

6   lawyer, Mr. Gregory, that you have decided not to testify in

7   this case, and I need to ask you some questions about that

8   decision.

9          So first of all, Mr. Adams, do you understand that you

10  have an absolute right to testify in your own defense at this

11  trial?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  Do you understand you have that right?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  And have you carefully consulted with your

16  attorneys as to whether it's in your interest to testify at

17  this trial?

18         THE DEFENDANT:  I have, your Honor.

19         THE COURT:  And have you decided, after consultation

20  with your attorneys, that it is not in your interest to

21  testify?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  All right.  Thank you.

24         So Mr. Gregory, you have an exhibit that you want to

25  introduce on your case, right?

1          MR. GREGORY:  Yes, Judge.

2          THE COURT:  But you need help in getting that

3     formatted.

4          MR. GREGORY:  Mr. Taylor is trying to get the

5     stipulation together, which he's very good at, and we can

6     review it with the government and hope that they will agree.

7          THE COURT:  All right.  My deputy can help you with

8     the printing out of that.  So we'll take a brief recess to

9     allow you to put that stipulation together.

10         And Mr. Gregory, is that the only evidence you intend

11    to offer?

12         MR. GREGORY:  I think so.  Yes.

13         THE COURT:  All right.  So after you do that, the

14    defense will rest, I will tell the jury that I'll be meeting

15    with the lawyers this afternoon to go over the jury

16    instructions and that they are excused for the rest of the day,

17    with instructions to return at 9:30 tomorrow morning for

18    closing arguments and the jury charge.

19         All right.  We'll take a recess so that we can get the

20    stipulation worked out, and then we'll resume.

21         (Recess)

22         (in open court; jury not present)

23         THE COURT:  So is the stipulation prepared?

24         MR. TAYLOR:  It is, your Honor.  I'm in the process of

25    emailing it to your deputy at this moment.

1    (Pause)

2    THE COURT:  All right.  Do we have the stipulation?

3    MR. TAYLOR:  Yes, your Honor.

4    THE COURT:  Is it signed?

5    MR. TAYLOR:  It is, your Honor.

6    THE COURT:  Okay.  And is it going to be a defense

7 exhibit?

8    MR. TAYLOR:  That's correct, your Honor.

9    THE COURT:  What is it?

10    MR. TAYLOR:  So Defense Exhibit G.

11    THE COURT:  Okay.

12    MR. TAYLOR:  And there's an exhibit, the call logs,

13 and that's Defense Exhibit F.

14    THE COURT:  F as in Frank?

15    MR. TAYLOR:  Yes, sir.

16    THE COURT:  Okay.  So we're prepared to proceed?

17    MR. TAYLOR:  Yes, your Honor.

18    THE COURT:  All right.  Please bring in the jury.

19    (Jury present)

20    THE COURT:  Please be seated.

21    Sorry for the delay, ladies and gentlemen.

22    Mr. Taylor is the defense prepared to proceed?

23    MR. TAYLOR:  Yes, your Honor.

24    THE COURT:  All right.  Please do.

25    MR. TAYLOR:  Thank you, your Honor.

1      Your Honor, the defense would like to offer a

2  stipulation that's been marked as Defendant's Exhibit G into

3  evidence.

4      THE COURT:  Any objection to Defense Exhibit G?

5      MS. BHASKARAN:  No, your Honor.

6      THE COURT:  It is received.

7      (Defendant's Exhibit G received in evidence)

8      MR. TAYLOR:  Thank you, your Honor.

9      Mr. Taliercio, can you bring up Exhibit G, please.

10      May I read it into the record, your Honor?

11      THE COURT:  Yes.

12      MR. TAYLOR:  Thank you.

13      "It is hereby stipulated and agreed, by the United

14  States of America, through the undersigned assistant United

15  States attorneys, and the defendant, Robert Adams, by and

16  through his counsel, that:

17      "1.  Defense Exhibit F consists of a true and accurate

18  copy of records relating to certain phone calls to or from the

19  cellular telephone numbers 646-515-6616, 646-891-9397, and

20  347-926-2389 ('call detail records').

21      "2.  These records were made at or near the time of

22  their creation by, or from information transmitted by, a person

23  with knowledge of the matters set forth in the records, and

24  were kept in the course of a regularly conducted activity of

25  the cellular service providers as a regular practice of that

LB21ADA2

1    activity.

2            "It is further stipulated and agreed that 646-515-6616

3    is the cellular telephone number saved on Shahada Harris's

4    iPhone 7 as 'Keiffy.'

5            "It is further stipulated and agreed that the

6    subscriber for the cellular telephone number 646-891-9397

7    throughout the dates and times reflected in the call detail

8    records was Shahada Harris.

9            "It is further stipulated and agreed that the

10   subscriber for the cellular telephone number 347-926-2389

11   throughout the dates and times reflected in the call detail

12   records and text message detail records was Robert Adams.

13           "It is further stipulated and agreed that this

14   stipulation as well as Defense Exhibit F may be received and

15   admitted as defense exhibits at trial."

16           Dated November 2, 2021, and it's signed by the

17   parties.

18           THE COURT:  All right.  And is the defense offering

19   Defense Exhibit F at this point?

20           MR. TAYLOR:  Yes, your Honor, we do.

21           THE COURT:  Any objection?

22           MS. BHASKARAN:  No, your Honor.

23           THE COURT:  Defense Exhibit F is received.

24           (Defendant's Exhibit F received in evidence)

25           MR. TAYLOR:  Thank you, your Honor.

1          THE COURT:  Mr. Taylor, does the defense have any

2     additional evidence it wishes to present?

3          MR. TAYLOR:  No, your Honor, we do not.

4          THE COURT:  Does the defense rest?

5          MR. TAYLOR:  Yes, your Honor.

6          THE COURT:  Does the government have any additional

7     evidence?

8          MS. BHASKARAN:  No, your Honor.

9          THE COURT:  Ladies and gentlemen, that is the end of

10    the evidence.  At this point I need to meet with the lawyers to

11    talk about the jury instructions that I'll be delivering to

12    you, and so what we're going to do is adjourn for the day, have

13    you return at 9:30 tomorrow morning, at which time we will hear

14    the closing arguments from the lawyers, I will give you my

15    instructions as to the law, and then you will retire to the

16    jury room to deliberate and reach your verdict.

17         As always, don't discuss the case with anyone.  Please

18    do keep an open mind, because you haven't heard the closing

19    arguments or my instructions on the law.  Have a pleasant

20    evening, and please return at 9:30 tomorrow morning.  Thank you

21    all very much.

22         THE DEPUTY CLERK:  All rise.

23         (Jury not present)

24         THE COURT:  Please be seated.

25         In the charge that we sent around last night, I had

LB21ADA2

1    deleted the instruction for summary charts because I didn't

2    think actually any summary charts were going to be introduced,

3    but we had one introduced today, so I'll be putting back into

4    the charge an instruction with respect to summary charts.

5         What's the government's position as to false

6    exculpatory statement?

7         MR. SCHAEFFER:  Your Honor, we think that it applies

8    here, given the testimony of Amanda Gildea.  However, we don't

9    object to your Honor not giving that charge.  I think we can go

10   either way on that.  We had proposed it, given how we expected

11   the evidence to come in.  We think it would be appropriate.

12   And also because of the testimony from Mr. Fletcher.  But we

13   don't think that the Court needs to give it if the Court is not

14   inclined to do so.

15        THE COURT:  Well, let me say as to Gildea, I don't

16   understand the argument.  So Agent Gildea testified that she

17   spoke with Mr. Adams about a different investigation -- I think

18   she said it was in August of 2019 that she interviewed him --

19   and that she showed him a photograph of Ms. Harris and then

20   Mr. Adams immediately said -- despite the fact there had been

21   no reference to contraband or smuggling anything into the MCC

22   in their conversation up to that point, he immediately said

23   something to the effect that he had never allowed anyone to

24   bring contraband into the MCC.  So the reason why I don't view

25   that as a false exculpatory statement is, I'm not aware of any

LB21ADA2

| | |
|---|---|
| 1 | evidence that Mr. Adams did permit contraband to enter the MCC. |
| 2 | Do you wish to address that point? |
| 3 | MR. SCHAEFFER: Just briefly, your Honor. |
| 4 | I think that if your Honor recalls Shahada Harris's |
| 5 | testimony about coming to the MCC after that encounter with |
| 6 | Mr. Adams when he slapped her buttocks and said, "It's a dry |
| 7 | month for you," when she was trying to see Mr. Outlaw, I think |
| 8 | in our view, the statement serves two functions -- to Special |
| 9 | Agent Gildea serves two functions: (1) it demonstrates |
| 10 | consciousness of guilt; but (2) it is falsely exculpatory |
| 11 | because he says he never let contraband in, but he was clearly |
| 12 | letting Ms. Harris come back with the knowledge that she was |
| 13 | likely, if not definitely, bringing contraband in, which was |
| 14 | reciprocal of the bribery exchange. |
| 15 | THE COURT: Well, but do we know that he actually knew |
| 16 | that she had brought contraband in? |
| 17 | MR. SCHAEFFER: I think that his statement to her that |
| 18 | it was a dry month because she was unable to see Mr. Outlaw |
| 19 | demonstrates his knowledge that she was doing something for |
| 20 | which she would be paid. |
| 21 | THE COURT: Right. But my question was a different |
| 22 | one. Do we know or is there evidence that he knew, Mr. Adams |
| 23 | knew, that she had brought drugs into the MCC? You just |
| 24 | pointed out that he said it was a dry month, so that would tend |
| 25 | to suggest that he believed she had not brought drugs in over |

1    the past month.  So my question to you is:  Is there evidence

2    that he knew that she had brought drugs into the MCC on a

3    specific occasion, other than the one where he seized the

4    contraband?

5              MR. SCHAEFFER:  No, your Honor.  I do think there is

6    an inference to be made that, because of the "dry month"

7    comment, he was bringing her back down because he was not able

8    to bring Mr. Outlaw to the visiting room at that time, but she

9    had come in planning to see him, and since all of that occurred

10   at the same time, I think the inference, the appropriate

11   inference, is that she was carrying contraband with her at the

12   time and that he believed her to be doing that.

13             THE COURT:  Well, listen, I think you can argue that.

14   I don't see it as something that qualifies as a false

15   exculpatory statement.

16             With respect to Mr. Fletcher, I think the analysis is

17   somewhat different.  So the testimony that came in today

18   through Mr. Fletcher is that he had made inquiries to Mr. Adams

19   about allegations that a female had made about him, and as I

20   recall it, the gist of Mr. Fletcher's testimony about his

21   conversation with Mr. Adams, who was a co-worker at the MCC and

22   actually was the officer in charge of the visiting area at

23   which Mr. Adams worked, my recollection is that Mr. Fletcher

24   testified that when he asked Mr. Adams about the female visitor

25   who had made allegations about him, that Mr. Adams said to

1    Mr. Fletcher that he knew her from the neighborhood.  And the

2    jury could certainly find that he didn't know Ms. Harris from

3    the neighborhood but instead he knew her in large part because

4    he had determined that she had smuggled in contraband to an

5    inmate at the MCC.  So that to me could be regarded as a false

6    exculpatory statement.  Does the defense wish to address the

7    issue?

8         MR. GREGORY:  Judge, I'm not quite sure I understand.

9    I'm not trying to be flippant, but I don't understand how

10   that's a false exculpatory statement.

11        THE COURT:  Okay.  So when he's asked by a supervisor

12   at the MCC about the allegations that a female visitor has

13   brought against him, his response was simply that he knew her

14   from the neighborhood.  And then I think on cross-examination,

15   Mr. Gregory, I think you brought out from Mr. Fletcher that

16   Fletcher had had an impression from his conversation with Adams

17   that the female visitor and Adams had had "fun together in the

18   past."  So the point is that Mr. Adams indicated to

19   Mr. Fletcher that he knew the female visitor as a result of

20   contact in the neighborhood in which they both lived, and when

21   in fact the jury could find that Mr. Adams knew Ms. Harris and

22   had a relationship with her as a result of discovering that she

23   had smuggled in contraband to the MCC, that that was the basis

24   for their relationship, not that he knew her from the

25   neighborhood.  So the jury could find that it was false, the

LB21ADA2

statement that he knew her from the neighborhood, that that was false, and they could also find it's a false exculpatory statement because to the extent Adams told Fletcher that he just knew her from the neighborhood as opposed to knew her because he had discovered that she had smuggled in contraband, that's an exculpatory explanation of how he knew Harris as opposed to the truthful explanation of how he knew Harris, which is that he had discovered she had smuggled contraband into the MCC.

MR. GREGORY: Yeah, I understand now. My question would be: How is how he knew her necessarily the ultimate issue in the case? In other words, let's assume that he said he made a false statement about how he knew her, but he wasn't asked about whether or not he went to the motel with her, whether or not he forced her to have sex with him. How would the fact that he was dishonest about how he knew Ms. Harris be a false exculpatory statement? I don't understand that.

Judge, I think in addition, I mean, I know that there's no evidence -- and the only evidence in the case is that Ms. Harris did not know him from the neighborhood, and I'm not sure if it came out that they're both from the same -- from Mott Haven. I'm not sure if it came out.

THE COURT: I don't think there's any evidence suggesting that they knew each other from the neighborhood.

MR. GREGORY: Well, Ms. Harris was asked that and she

LB21ADA2

1   said that they didn't.

2           THE COURT:  I'm sorry?

3           MR. GREGORY:  Ms. Harris was asked that and she said

4   she did not know him from the neighborhood, so the Court is

5   right about that a hundred percent.  The only thing is, I'm not

6   sure that where he knew her from necessarily goes to

7   inculpation or exculpation.  I'm not sure how that would be a

8   false exculpatory statement since we're not talking about the

9   act with which he's charged.

10          THE COURT:  All right.  Well, let's play that out.

11  Let's play that out for just a second.  So when Fletcher made

12  this inquiry, he said:  Oh, I know her from the neighborhood.

13  The jury could find the truthful answer was that he knew her

14  because he caught her smuggling contraband into the MCC, and

15  that's a very important step towards proving all of the crimes

16  with which the defendant is charged.  So to me, the truthful

17  answer to the question about the allegation that Mr. Fletcher

18  had asked Mr. Adams about, the truthful response would have

19  been:  I know her because I caught her smuggling contraband

20  into the MCC.  And that is the premise on which the misprision

21  claim is based in large part, that he didn't report that

22  Ms. Harris had smuggled contraband into the MCC, and of course

23  that discovery of contraband is a very important part of the

24  bribery and blackmail charges as well.  So to me, a truthful

25  answer to the question about the allegations would have been

1    highly inculpatory of Mr. Adams.  I don't think that the false

2    exculpatory instruction turns on whether what the defendant

3    said makes out all the elements of the offense.  I don't think

4    that's the standard.  I think, actually, the standard is

5    whether the truthful answer would have tended to inculpate the

6    defendant, and to me it seems clear that the truthful answer

7    here would have inculpated him.

8         MR. GREGORY:  Judge, I don't remember what he was

9    asked, which would probably be helpful if I knew that, but --

10        THE COURT:  What Mr. Fletcher was asked?

11        MR. GREGORY:  What Fletcher asked Adams.

12        THE COURT:  Okay.  So, I mean, you should look at the

13   transcript, obviously, but in essence what Mr. Fletcher said

14   today, what he testified to, is that he had a conversation with

15   Mr. Adams about a week after the incident, which was on

16   August 14th, and Fletcher testified that he asked Mr. Adams:

17   Are you okay?  And what's going on?  And:  I heard that a

18   female visitor said things about you.  And in response,

19   Mr. Adams said that he knew her, that he had seen her once at

20   the MCC, told her not to come back because he personally knew

21   her from the neighborhood.  They had hung out.  So again, from

22   my perspective, the statement that he knew her from the

23   neighborhood as opposed to he knew her because he caught her

24   smuggling contraband into the MCC was exculpatory, and a

25   truthful answer as to how he knew her would have been

1    inculpatory.

2            MR. GREGORY:  Judge, are you reading the minutes now

3    or do you remember that?

4            THE COURT:  That's my notes.  I take pretty detailed

5    notes.

6            MR. GREGORY:  You got me on that one, Judge, because

7    I'm not sure that he said -- Fletcher, that is, said --

8            THE COURT:  Okay.  Well, you know, listen, you should

9    look at the transcript, and if my notes are wrong, you'll bring

10   that to my attention.  But my sense that Mr. Adams's

11   explanation was exculpatory, that's based on the notes I took

12   of Mr. Fletcher's testimony, and so if I'm wrong about that,

13   about the substance of his testimony, you should let me know,

14   but that's what my notes indicate, and obviously we can check

15   the transcript.

16           MR. GREGORY:  I know he did ask him, and I recall it:

17   Are you okay?  I didn't realize he asked, did you have a

18   problem, or, I heard you had a problem with a female visitor.

19   And Ms. Bhaskaran is nodding her head, which means he probably

20   did, because both of you are saying the same thing.  So I'll

21   take a look.

22           THE COURT:  All right.  So what I would suggest is we

23   meet at 2:00 to have our charge conference.  Is there anything

24   that the lawyers would like me to focus on between then and now

25   that is going to come up at the charge conference?

1          MR. SCHAEFFER:  Your Honor, the government, on the

2     whole thinks the charge is good as is, with the exception of

3     the issue we just talked about.  There are just two small

4     issues we would flag.

5          One is, with respect to the definition of official

6     duties, there's just a few additional steps we wanted to take

7     to check the case law on that before taking a position.

8          And the second is even smaller, with respect to venue.

9     Because venue was agreed in this case, conceded, and in fact

10    there's a stipulation, we think that under *United States* v.

11    *Sutton*, 13 F.3d 595 (2d Cir. 1994), it's actually not necessary

12    for the Court to instruct on it, and so we just raise that for

13    the Court's consideration, but of course if the Court wanted to

14    instruct on it, there would be no harm.

15          THE COURT:  All right.  I'll take a look at *Sutton*.  I

16    mean, I'll give you my gut reaction.  My gut reaction is that I

17    probably will feel more comfortable telling the jury they have

18    to find it.  I will point out there's a stipulation on the

19    matter.  And in fact, what is the number of the stipulation?

20          MR. SCHAEFFER:  It's Government Exhibit 6, your Honor.

21          THE COURT:  6.

22          MR. SCHAEFFER:  We'd also note that in that same vein,

23    there's a stipulation that Mr. Adams was a public official as

24    well.

25          THE COURT:  Right.  And what's the stip on that?

1          MR. SCHAEFFER:  That is Government Exhibit 2.

2          THE COURT:  2.  Okay.  All right.  My inclination

3    would be to cite both of the stipulations with respect to these

4    issues, but let me think about it, and obviously I will take a

5    look at the *Sutton* decision.

6          And on the defense side, are there things that you

7    want me to focus on between now and 2?

8          MR. GREGORY:  Yes, Judge.  I think this won't take you

9    a long time, but just the issue of missing witnesses on the

10   prior consistent statements.

11         THE COURT:  What do you want me to say other than what

12   I have said about prior inconsistent statements?  Or is it

13   prior consistent statements that you said?

14         MR. GREGORY:  Correct.  Ms. Harris said she told three

15   people --

16         THE COURT:  Could you use the microphone, please.

17         MR. GREGORY:  Sorry about that, Judge.

18         Ms. Harris said there were three people that she told

19   about this incident.  None of them appeared.  So I would ask

20   the judge to take a peek at that charge.  We realize the issue

21   of the control of the witnesses is obviously something --

22         THE COURT:  You're going to ask for what charge?

23         MR. GREGORY:  Missing witness charge.

24         THE COURT:  Oh, missing witness charge.  And your

25   theory is that the government should have brought in the other

| | |
|---|---|
| 1 | people that Ms. Harris told about the July 5th incident? |
| 2 | MR. GREGORY:  Correct. |
| 3 | THE COURT:  All right.  Do you have specific language |
| 4 | you want me to consider, Mr. Gregory? |
| 5 | MR. GREGORY:  Judge, we'll have it a little later.  I |
| 6 | believe the research was done last night by my esteemed |
| 7 | co-counsel. |
| 8 | THE COURT:  All right.  If you can get that to my |
| 9 | chambers before 2:00, that would be helpful. |
| 10 | MR. TAYLOR:  Your Honor, if it's helpful, we're |
| 11 | referring to the missing witness charge called Absence of |
| 12 | Witness in § 14:15 of *Federal Jury Practice and Instructions*, |
| 13 | August 2021, O'Malley, et al. |
| 14 | THE COURT:  So what I have in the charge now is, in |
| 15 | essence, the jury is not to speculate about witnesses whose |
| 16 | names came up but who were not called, and I remind the jury |
| 17 | that the government has the burden and the defendant has no |
| 18 | burden at all.  So I'll take a look at your citation to |
| 19 | O'Malley and then we'll talk more about it at 2:00. |
| 20 | Anything else? |
| 21 | MR. GREGORY:  Nothing, your Honor. |
| 22 | MR. SCHAEFFER:  Not from the government, your Honor. |
| 23 | THE COURT:  So we'll do the charge conference here, |
| 24 | okay?  All right.  I'll see you at 2:00. |
| 25 | (Luncheon recess) |

1                    AFTERNOON SESSION

2                       2:30 p.m.

3          (Jury not present)

4          THE COURT:  My law clerk is going to hand you an

5     updated version of the charge.  I will tell you the changes in

6     it.

7          First of all, I have added a charge, standard

8     instruction about summary charts, because there was a summary

9     chart that was introduced today.

10         With respect to false exculpatory statements, as I

11    indicated to you earlier, I do believe a charge regarding the

12    false exculpatory statements is appropriate here based on

13    Mr. Adams' statements to Richard Fletcher, the supervisor of

14    the visiting room at the MCC, in which in these statements

15    Mr. Adams told Mr. Fletcher that he knew Shahada Harris "from

16    the neighborhood."  and I believe that that statement, a jury

17    could find, was made in order to divert suspicion from

18    Mr. Adams.

19         With respect to the argument that it's not exculpatory

20    of the crime in that it doesn't go to a specific element of

21    bribery or blackmail or misprision of a felony, I believe that

22    such a charge is appropriate where a jury could find that the

23    false statement was made in order to divert suspicion from a

24    defendant.  And the context here suggests that that's what was

25    happening.

1      Mr. Fletcher was the officer in charge of the visiting

2  room at the MCC.  He approached Mr. Adams to ask about the

3  allegations made by a female visitor, and in responding to

4  Mr. Fletcher's queries about the female visitor who was making

5  allegations against him, Mr. Adams said that he knew her from

6  the neighborhood.  As I said earlier today, a reasonable jury

7  could find that he knew her not from the neighborhood, but

8  rather as a result of discovering that she had smuggled in

9  contraband to the MCC.

10      The language that I've chosen, which is in the updated

11 draft that you've just been handed, is drawn from Sand,

12 instruction 6-11, and it contains the language that has been

13 approved which tells the jury they can, but are not required

14 to, infer that Mr. Adams believed he was guilty.  The standard

15 language which I have used goes on to say, you may not,

16 however, infer on the basis of this statement alone that

17 Mr. Adams is, in fact, guilty.

18      So I'll hear anything anyone wants to say about the

19 proposed false exculpatory statement instruction, but I am

20 inclined to give it for the reasons I've already explained.

21      MR. GREGORY:  Judge, I understand that, and I'm going

22 to try to speak without the mic.

23      But when we went upstairs, we had some thoughts, and

24 perhaps we should have thought of earlier and shared with the

25 court, that is that there is really not conclusive proof in the

case that Mr. Adams had not been familiar with Ms. Harris

previous to this trial.  The only evidence of that is from

Ms. Harris.  And as an officer of the court, I can tell you

that I was Googling Mr. Adams' address and Ms. Harris' address,

and Googled it again on March 21 to March 22 of 2021, because

he had said he had seen her around the neighborhood.

We have in the case, in the discovery, we have an

address which we'll share with the court now and with the

government, which was provided, which gives the address at 205

Alexander Avenue, which is .4 miles from where Ms. Harris was

living.  In addition to that, your Honor, Mr. Alvarado, the

other correction officer, I think his name was mentioned during

the trial, said in his 302 that Adams was from the Bronx and he

knows all kinds of people from the Bronx.

So I think really, before we can determine that this

charge should be given, the first step is to have conclusive

proof that this was a false statement.  The only way for us to

prove it's not a false statement would be to put Adams on.

This is not like a calendar or like a mathematical equation.

The only evidence of this is coming from Shahada Harris.  There

is no other evidence that they know each other, Judge.

I don't think it's been proven that they don't know

each other.  And the court will recall, I think, that I asked a

question:  You've seen him around the Bronx?  And she said, No,

she hadn't, but certainly that --

1    I think I asked that question.  I see Mr. Roos shaking

2  his head.  Mr. Taylor said I did ask that question.  Certainly,

3  Judge, I can tell you that that was an issue that we looked at

4  in some detail, and I have the Google searches of the two

5  addresses in the phone right here going back to March of 2021.

6  I know there was one done way back in October of 2020, but I

7  didn't see it.  This one I did see.

8    So I don't think that's been proven, Judge.  I think

9  they first have to prove it's a false statement before this

10  charge can be given.

11    THE COURT:  Well, let me make a couple observations.

12    First, the issue is not whether he passed her by in

13  the neighborhood or he saw her walking on the street.  That's

14  not what this statement goes to.

15    What he said was not that he saw her in the

16  neighborhood or that he passed her in the neighborhood or that

17  he drove by her as she was walking down the street of the

18  neighborhood.  That's not what he said.  He told Fletcher he

19  knew her from the neighborhood.

20    So this is someone that he told Fletcher he had a

21  relationship with, not that he, you know, passed her by.  He

22  knew her from the neighborhood.  And I have to rely on the

23  evidence that was received at trial.  And the evidence at

24  trial, which is unrebutted and therefore undisputed, is that

25  they didn't know each other.  That was her testimony.  There is

1    no contrary evidence.

2            So a reasonable jury would be entitled to find that

3    they didn't know each other.  So when Mr. Fletcher told -- was

4    told by Mr. Adams that he knew her from the neighborhood, a

5    reasonable jury could find that that was false.  He didn't know

6    her from the neighborhood.  He knew her because he discovered

7    that she had smuggled in contraband.

8            So I'm not persuaded by your argument.  I believe a

9    jury could find, contrary to what you're saying, that his

10   statement about how he knew Ms. Harris was false and that it

11   was made in order to divert suspicion from himself, which is

12   exactly what Sand's model instruction 6-11 is focused on.

13           A statement, a false statement made in order to divert

14   suspicion, I believe that's why he told Mr. Fletcher he knew

15   her from the neighborhood.  I'm going to give the false

16   exculpatory statement instruction in the form that you'll see

17   in the updated instructions.

18           MR. SCHAEFFER:  Your Honor.

19           THE COURT:  Yes.

20           MR. SCHAEFFER:  If I may, I just want to add something

21   to what your Honor just said.  I think all of that is exactly

22   correct, and for that reason, we think that your instruction is

23   correct.

24           I would just like to respond briefly to one point that

25   Mr. Gregory just made, which was the suggestion that the only

1  way to rebut the false exculpatory is for the defendant himself

2  to testify.  That is emphatically not true.  They could have

3  offered, for instance, if there were such evidence, evidence of

4  communications, text messages, testimony of any other

5  individuals who would have seen the meeting or recognized that

6  they had a relationship.  So it's not a situation where we are

7  asking the defendant himself to give testimony.

8          THE COURT:  OK.  I also wanted to address the

9  defendant's application that I give a missing witness

10  instruction.  This is based on testimony that Ms. Harris gave

11  at page 208 of the trial transcript.

12          At that point, Ms. Harris was asked by the government,

13  and I quote, this is from page 208, line 10:

14  "Q.  Ms. Harris, after you had sex with Adams, who, if anyone,

15  did you tell about what had happened between you and him?

16  "A.  I told, like, three of my friends.

17  "Q.  Which friends did you tell?

18  "A.  I told Naomi, I told Stags" -- S-t-a-g-s -- "and I told

19  Delly."  D-e-l-l-y.

20          And then she goes on to explain that she has known

21  Naomi for ten to 12 years, and Naomi is one of her best

22  friends, and she says how they met, etc., etc.  Nothing more is

23  said about Stags and Delly.

24          Mr. Gregory told me earlier today that I should give a

25  missing witness instruction because the government didn't call

1   Stags and Delly.  And analysis of whether a missing witness

2   instruction is appropriate essentially turns on two inquiries.

3   One is was the government in the best position to call the

4   person.  And here, I can't find that the defendant had the

5   ability to call Stags and Delly because their names aren't

6   there.  So if they wanted to call Stags and Delly, I'm not sure

7   how they exactly would have gone about it.

8           So presumably the government could have asked

9   Ms. Harris for more details about who Stags and Delly are and

10  could have followed up with them.  So it seems to me that the

11  government was in a better position to produce these people,

12  was in a better position to produce them than the defense was.

13          The second part of the inquiry is whether these

14  uncalled witnesses could have given material testimony.  I

15  should say that I'm referencing Sand's model instructions on

16  missing witness, and specifically instruction 6-5.

17          So on the issue of whether Stags and Delly could have

18  given material testimony, it's not clear to me that they have

19  material testimony to offer.  We do have the text message that

20  Harris sent her friend Naomi about her encounter with Adams.

21  And she reports to Naomi that she had sex with this federal

22  officer, and Naomi asks questions, which Harris explained to

23  us, as to whether she had been raped or not.

24          I'm not going to use the language.  It involved some

25  obscene words.  But what Harris explained to us in her

testimony was that Naomi was asking her:  Were you raped?  And

Harris responded, No, he bribed me.  And we talked before about

how her use of bribe in that context is somewhat confusing.

But that's why she used that word at that point.  Naomi asked

her whether she was raped and Harris wrote back, that, nawh,

n-a-w-h -- and I don't have the language exactly before me --

but it was nawh, n-a-w-h, and then, he bribed me.

        So the question is whether there is reason to believe

that the communications with Stags and Delly, whether they

would involve some use of bribed or some suggestion of a

corrupt relationship between her and Adams or not, I suppose.

I don't have any reason to believe that they would because the

reason why they came up with Naomi, because Naomi asked, in

essence, were you raped.  And it was in response to Naomi's

question that Harris went on to explain, No, she wasn't raped,

the federal officer had bribed her.

        So in order to give this missing witness charge, I

have to find that Stags and Delly were in a position to give

material testimony.  And while I think it is clear that both

could testify that Harris had told them that she had had sex

with a federal officer, that's not in dispute.  The defendant

opened on that, that he had had sex with Harris, so that's not

in dispute.  I don't have any basis at this point to find that

it's likely that anything else about the circumstances of the

sex that Harris and Adams had would have been mentioned.

1          Now, the charge that I already have with respect to

2     uncalled witnesses allows the defense to make an argument that

3     the government should have called Stags and Delly.  So the

4     charge says there is some names of other people who didn't

5     appear at trial.  It tells them not to speculate about what

6     they would have said because, again, we don't want juries

7     making decisions based on speculation.  It tells them that

8     absence should not affect your judgment in any way.  However,

9     it does remind the jury that while the defendant doesn't have a

10    burden to do anything, to call any witnesses or produce any

11    evidence, the government does.

12         To the extent the government didn't call these two

13    people Stags and Delly, and to the extent that the defense

14    believes that their failure to do so suggests a flaw in the

15    government's theory or a weakness in their theory, of course

16    they can point out that the government didn't call the two

17    other people that Harris told about having sex with the federal

18    officer.

19         So the charge doesn't preclude you, Mr. Gregory or

20    Mr. Taylor, from making the argument that you heard about Stags

21    and Delly.  But they didn't show up to testify and you can make

22    that argument and you can use that argument to suggest that the

23    government hasn't met its burden here.  But for me to give a

24    missing witness instruction, telling the jury these people

25    could have offered material testimony, honestly, I have no idea

1    whether they could have offered material testimony or whether

2    it would just be cumulative of the testimony that's already in

3    the record about the fact that the defendant had sex with

4    Ms. Harris.

5           So based on what I've heard so far, I'm not inclined

6    to give a missing witness instruction.  But, Mr. Gregory or

7    Mr. Taylor, I'm happy to hear anything more you want to say

8    about the subject.

9           MR. GREGORY:  Nothing more, your Honor.

10          THE COURT:  All right.

11          MR. SCHAEFFER:  Your Honor, if we may?

12          THE COURT:  Please.

13          MR. SCHAEFFER:  Just very quickly, we agree that the

14   missing witness charge is inappropriate.  We do object to its

15   inclusion in the charge, to the extent that it was proposed.

16          Just with respect to the government's connection to

17   these witnesses.  I want to note that in advance of trial, in

18   early September, the government produced to defense counsel a

19   full extraction of Ms. Harris' phone, which contained contact

20   details including contact information and phone numbers as well

21   as the messages in question.

22          The defense was fully capable of tracking down those

23   individuals in the same way that the government would have to

24   have done.  These are not individuals who were interviewed by

25   the government.  These are not individuals who were informants

1    or CIs.  The government has no particular power or control over

2    them.

3         I would note that your Honor's ruling is perfectly

4    consistent with United States v. Caccia, 122 F.3d 136 (2d Cir.

5    1997).  There, one of the issues was whether recorded phone

6    calls were sufficient or whether the government should have

7    called another individual who was on those phone calls.  The

8    court said no because the recorded phone calls were better.

9         Here, we have the exact messages referencing the only

10   known relevant discussions with these individuals, and those

11   are already in evidence.  And then lastly, I would just note

12   that the government agrees that anything that these witness

13   would say would likely be repetitive or cumulative.

14        THE COURT:  All right.  With respect to the public

15   official issue, I have added language that directed the jury's

16   attention to the stipulation of the parties.  The new language

17   reads:  The parties have stipulated in Government Exhibit 2

18   that in "at least July and August of 2019, Adams was employed

19   by the United States Bureau of Prisons as a correctional

20   officer and was, therefore, a public official, as that term is

21   defined with respect to the crime of bribery."

22        Similarly, with respect to venue, I have added the

23   following sentence:  The parties have stipulated in Government

24   Exhibit 6 that events relevant to all three offenses charged in

25   the indictment "occurred within the Southern District of New

1   York and, therefore, the venue in the Southern District of New

2   York is proper in this case."

3           So that addresses the new material that I added.  I'm

4   happy now to take comments you have on the original version of

5   the charge that we sent out yesterday.

6           Why don't we do it section by section.  Any changes

7   on the first portion of the charge, which is just general

8   instructions?

9           Does the government have anything?

10          MR. SCHAEFFER:  I think I can short circuit for the

11  government, your Honor.  We have no objections to the revised

12  charge.

13          THE COURT:  OK.  Mr. Gregory?

14          MR. GREGORY:  Judge, same position, with the exception

15  of one small thing which Mr. Taylor is going to address in the

16  misprision charge.

17          THE COURT:  OK.  What page should I be looking at,

18  Mr. Taylor?

19          MR. TAYLOR:  In the new version, your Honor, page 34,

20  where it says, An affirmative step to conceal, for example,

21  falsely denying knowledge of a crime, giving an untruthful

22  statement to authorities, or disposing of evidence.

23          It is just that last example to which we object.

24          THE COURT:  What's the basis for your objection?

25          MR. TAYLOR:  The basis is that it is calling for the

1    jury to speculate about facts not in evidence, i.e., disposal

2    of evidence.  I think the example likely concerns, you know, a

3    whole panoply of possible ways in which someone could be

4    accused of disposing of evidence.  To my knowledge, there is no

5    such evidence in this case.  That's calling for speculation.

6         THE COURT:  It might be that my recollection is wrong,

7    but my recollection is that Harris testified that Adams told

8    her that he had disposed of the marijuana.

9         Did I get that wrong?

10        MS. BHASKARAN:  No, your Honor.

11        THE COURT:  So there is testimony from Harris that she

12   told him that he had disposed of the marijuana.  That's why,

13   actually, Mr. Taylor, I included that language, because I felt

14   it was supported by the evidence.

15        MR. TAYLOR:  Very well, your Honor.

16        In that case, this example appears to us to be

17   conflating the initial failure to report with the affirmative

18   act.  In other words, Mr. Adams is accused of failing to report

19   this crime, but this all ends up just being rolled into one.

20   He didn't report it unless he leaves that evidence on the

21   supervisor's desk, he's also committed an affirmative act.

22        THE COURT:  Well, the reason why this is an element is

23   that the courts have told us that mere silence is not good

24   enough for a conviction under the misprision statute that

25   something more than mere silence is necessary.

1        Here, we have evidence that the defendant disposed of

2    the evidence, which is the essence -- I mean, it's hard to

3    think of a better example of what someone would do to conceal a

4    crime.  I mean, as I sit here, it's hard for me to think of

5    something that more effectively demonstrates an attempt to

6    conceal a crime than disposing of the evidence of that crime.

7        Here, the evidence that was concealed was the

8    marijuana, the contraband that Ms. Harris had smuggled into the

9    MCC and given to her inmate boyfriend Keith Outlaw.  So I

10   believe the government is allowed to argue that Mr. Adams'

11   disposal of that evidence constitutes an effort to conceal

12   Ms. Harris' commission of a federal felony, in this case,

13   smuggling contraband into a Bureau of Prisons facility.

14       MR. GREGORY:  Judge, it seems to me that what that

15   effectively would do is, anytime any officer failed to report a

16   crime, namely the introduction of contraband, unless as

17   Mr. Taylor said, unless they somehow left the contraband on the

18   floor of the search room, they would automatically be guilty.

19       I thought when I read the cases, and I looked at this

20   case, that there had to be an additional step.  It seems to me

21   that not reporting it is sticking the drugs in his pocket and

22   not writing up a report, and that you have to take an

23   affirmative step like lie or like, you know, conceal evidence

24   afterwards, erase a tape or something like that.

25       They use the example, I think, in the Trump campaign

1      that they had been told not to communicate with the Russians.

2      They ignored that advice, didn't come forward, which was

3      passive concealment, which is what Adams did.  He didn't come

4      forward with drugs.  And then when they were asked about it,

5      they lied and said it had to do with deductions.  So that was a

6      misprision felony.

7              But here, Judge, I think that means every time

8      somebody doesn't report a cigarette coming into the institution

9      and sticks it in their pocket and throws it in the garbage,

10     they are guilty for misprision of a felony.  That doesn't

11     follow.

12             Judge, I have to say that that is charging him out of

13     the case.  Because, you know, unless there is some other act

14     independent of not reporting that and putting the drugs in your

15     pocket or throwing it in the garbage is part and parcel of not

16     reporting it, there is no additional overt act of concealment.

17             THE COURT:  Well, I mean, on that we differ.  I

18     actually view the disposal of the evidence as a very

19     significant step to conceal the smuggling contraband offense

20     that Ms. Harris committed.

21             I mean, again, without the evidence -- think about it

22     for a second.  Without the evidence of the contraband that she

23     smuggled in, how do you go about proving the felony against

24     Ms. Harris?

25             MR. GREGORY:  Well, you couldn't, Judge.  But the

1    problem I have with that is that, as I say, that that means

2    anytime somebody cuts somebody a break, they are guilty of a

3    felony, of a misprision of a felony.  It seems to me that the

4    failure to report and the non-turning over of the marijuana is

5    the same act.  Those two things go hand in hand.  There has to

6    be some other overt act.  I mean, to me --

7                THE COURT:  But it goes beyond not turning it over.  I

8    mean, he didn't put the marijuana in his locker at work.  OK.

9    He did more than not turn it over.  He threw it away.  He threw

10   the evidence away.

11               I mean, I don't know how that is not an affirmative

12   step to conceal that another person committed a felony, when

13   you threw the evidence away.

14               MR. GREGORY:  But putting it a locker would also be an

15   affirmative step.  No matter what he did with that marijuana,

16   under the court's analysis, that would be an affirmative step,

17   unless he left it on the ground.

18               THE COURT:  I don't need to go there.

19               MR. GREGORY:  OK.

20               THE COURT:  Because as a practical matter, he didn't

21   put it in his locker.  He threw it away.  And, you know, the

22   example of he put it in his locker is closer to what the

23   argument is that you're making, which is, well, he didn't do

24   anything really here other than he failed to tell anybody about

25   it.

1          But he actually threw evidence away.  He destroyed

2     evidence.  To me, that makes it an easy case.  It makes it an

3     easy case on whether he took steps to conceal a felony.  I

4     believe when someone throws away the evidence that would be

5     necessary to prove the felony, there cannot be any question

6     that they have taken an affirmative step to conceal the felony.

7          Accordingly, I'm overruling your objection.

8          All right.  Anything else, Mr. Gregory, Mr. Taylor, as

9     to the charge?

10          MR. GREGORY:  Nothing.

11          THE COURT:  How long do the parties expect their

12     closing arguments to be?

13          MS. BHASKARAN:  Your Honor, I won't expect more than

14     an hour for the government's principal summation.

15          MR. GREGORY:  Ours just got extended five minutes,

16     Judge, but I'm going to check with Mr. Taylor.

17          45 to 50 minutes, Judge.

18          THE COURT:  All right.  So that means we can probably

19     get the arguments in before lunchtime.  Say we get started at

20     ten.  I would like to get started earlier, but just being

21     realistic.  Say 9:45 maybe.  Maybe we can get both the closing

22     arguments and the charge in before lunch.  I don't know.

23     That's what I would like to do.

24          All right.  Anything else anyone wants to say?

25          MR. SCHAEFFER:  One quick matter, Judge.  This is just

1   following on the colloquy that just happened.

2           Mr. Gregory, perhaps, suggested that their closing

3   just extended by another five minutes following the court's

4   misprision ruling.  The government, just for an avoidance of

5   doubt, would think that it would be inappropriate to argue to

6   the jury that the misprision law is too broad or inappropriate

7   or would over-criminalize the actions of correctional officers.

8   That would amount to an argument for nullification, and we

9   would expect that that will not appear in the closing

10  statement.

11          THE COURT:  Well, I didn't understand your comment

12  that way, Mr. Gregory.  Should I have understood it that way?

13          MR. GREGORY:  No.  I don't think you're going to let

14  us do that anyway, Judge.  You did not misunderstand.

15          THE COURT:  All right.  If there is nothing else,

16  we'll resume at 9:30 tomorrow.

17          MR. GREGORY:  Thank you.

18          MS. BHASKARAN:  Thank you, Judge.

19          THE COURT:  Thank you.

20          (Adjourned to Wednesday, November 3, 2021, at

21  9:30 a.m.)

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                          Page

3     QUNISHA BOYCE

4    Cross By Mr. Taylor . . . . . . . . . . . 354

5     RICHARD L. FLETCHER

6    Direct By Mr. Schaeffer . . . . . . . . . 362

7    Cross By Mr. Gregory . . . . . . . . . . . 366

8     AMANDA GILDEA

9    Direct By Mr. Schaeffer . . . . . . . . . 367

10     ENRIQUE SANTOS

11   Direct By Ms. Bhaskaran . . . . . . . . . 372

12                  GOVERNMENT EXHIBITS

13   Exhibit No.                          Received

14   6  . . . . . . . . . . . . . . . . . . 388

15   GX 7   . . . . . . . . . . . . . . . . 387

16   GX 120   . . . . . . . . . . . . . . . 372

17   GX 412   . . . . . . . . . . . . . . . 380

18   GX 423   . . . . . . . . . . . . . . . 377

19   GX 430   . . . . . . . . . . . . . . . 383

20   GX 601   . . . . . . . . . . . . . . . 369

21                  DEFENDANT EXHIBITS

22   Exhibit No.                          Received

23   F  . . . . . . . . . . . . . . . . . . 394

24   G  . . . . . . . . . . . . . . . . . . 393

25