LB31ADA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20 Cr. 494 (PGG)

5   ROBERT ADAMS,

6              Defendant.               Jury Trial
    ------------------------------x
7
                                        New York, N.Y.
8                                       November 3, 2021
                                        9:49 a.m.
9

10  Before:

11                 HON. PAUL G. GARDEPHE,

12                                      District Judge

13
                          APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  JARROD L. SCHAEFFER, ESQ.
         RUSHMI BHASKARAN, ESQ.
17       NICOLAS T. ROOS, ESQ.
         Assistant United States Attorneys
18
    SAMUEL GREGORY, ESQ.
19       Attorney for Defendant

20  TAYLOR & COHEN LLP
         Attorneys for Defendant
21  BY:  ZACHARY S. TAYLOR, ESQ.

22  ALSO PRESENT:  ANNIE PHIFER, Paralegal Specialist, USAO

23  ALSO PRESENT:  NICHOLAS TALIERCIO, ESQ.

24

25

1           (In open court; jury not present)

2           THE COURT:  All right.  Are you prepared to proceed?

3           MS. BHASKARAN:  Yes, your Honor.

4           MR. GREGORY:  Yes.

5           THE COURT:  As the lawyers know, it is my practice to

6    send the exhibits back into the jury room so you should be

7    prepared to do that after I complete my instructions.  All

8    documentary exhibits received in evidence will go back into the

9    jury room.

10          (Jury present)

11          THE COURT:  Please be seated.

12          Good morning, ladies and gentlemen.

13          THE JURORS:  Good morning.

14          THE COURT:  We'll now hear the government's closing

15   argument.  Ms. Bhaskaran.

16          MS. BHASKARAN:  Thank you, your Honor.

17          (Video image shown)

18          MS. BHASKARAN:  The prison guard in that uniform is

19   Robert Adams.  That's him, standing over Shahada Harris, the

20   young woman he had just caught sneaking in drugs into the MCC.

21          As he stood over Harris, he had power -- power to

22   report her; power to keep her from visiting the MCC; and power

23   to get her into serious trouble.

24          After this trial, you know what Robert Adams did with

25   his power.  He abused it.  He abused it to take advantage of

1    Harris, who didn't want to go to jail and who wanted to keep

2    visiting the MCC.  He abused it to make Harris have sex with

3    him, and in exchange for sex, he abused his power again, by

4    concealing her crime, not reporting her, and allowing her to

5    keep visiting the MCC.

6           Members of the jury, the proof is in.  It's clear,

7    it's consistent, and it leads to only one conclusion:  Robert

8    Adams is guilty beyond a reasonable doubt.  He abused his

9    powers by bribing and blackmailing Harris for sex in exchange

10   for not reporting her and allowing her to keep visiting the

11   MCC.

12          This closing statement is our opportunity to discuss

13   the evidence that you've heard and that you've been so

14   carefully following during the course of this trial.

15          Let me start by giving you a quick overview of what

16   I'm about to say.

17          First, I'm going to talk about what's not in serious

18   dispute at this trial.  As you'll see, there are a lot of facts

19   that the government and the defendant agree on.

20          Second, I'm going to go a little bit out of order and

21   I'm going to start with Count Three, the misprision count, and

22   I'm going to do that because as to that count, the evidence

23   that makes Adams guilty is basically undisputed.

24          Third, I'm going to explain why the defendant is

25   guilty of Count One, the bribery count.

1    And fourth, I'm going to explain why the defendant is

2    guilty of Count Two, the blackmail count.

3         So let's begin with what's not in any serious dispute.

4    So much of this case is not in serious dispute.  The defendant

5    does not dispute that on July 5, 2019, Harris smuggled drugs

6    into the MCC.  He caught her, but he didn't report her.  He

7    told her to meet him at a pizzeria.  There's no dispute about

8    any of that.  Harris went to the pizzeria and Adams picked her

9    up from there.  He took her to a motel, and they had sex there.

10   There's no dispute about any of that either.

11        And after Harris had sex with Adams, she continued to

12   visit the MCC until she was caught again on August 14, 2019.

13   At the end of the day, there's really only one key dispute at

14   issue in this trial -- was there a connection between Adams

15   catching Harris with contraband and the two of them having sex?

16   Was this purely some romantic relationship?  Was it a fling?

17   Or did Adams and Harris have an exchange, sex for not

18   reporting?  In this closing argument, I'm going to take you

19   through all of the reasons why the evidence points to one

20   conclusion.  Of course there was an exchange.  That is why he

21   is guilty of Count One and Count Two.

22        Now throughout my remarks, I'm going to be talking

23   about the law.  Please keep in mind that Judge Gardephe will

24   give you detailed instructions on the law, so if anything I say

25   is different than what he tells you, you must follow his

1  instructions.

2          All right.  First, I'm going to start with Count

3  Three.  Why?  Because you don't even have to resolve the key

4  dispute in order to find that the defendant is guilty of that

5  count.

6          I'm going to start with the law of misprision.

7  Basically, that's a fancy way of saying concealing knowledge of

8  a felony.  Now this crime has four parts, or four elements.  I

9  expect that Judge Gardephe will tell you that what's on the

10 screen are those four elements.  You can take a second to just

11 read them.

12         Members of the jury, the proof of these four elements

13 is not in any serious dispute, but let's walk through them one

14 by one.

15         The first element of misprision is that someone other

16 than Adams committed a felony.  This is not in any serious

17 dispute.  You heard how visitors are not allowed to bring in

18 drugs to the MCC.  You heard how on July 5th, Harris smuggled

19 drugs for Outlaw and that she had seen Outlaw smoking marijuana

20 before.  You heard Boyce's testimony that when Adams confronted

21 Harris, he said that the drugs smelled real good.  That's how

22 you know that Harris gave or attempted to give Outlaw

23 contraband, that the contraband contained drugs, such as

24 marijuana, and that doing so was against the prison rules.

25 That's the first element.

1          The second element of misprision is that Adams knew

2     that Harris was smuggling drugs and that smuggling drugs was a

3     felony.  There's no dispute that Adams caught Harris smuggling

4     drugs, and there is no serious dispute that he knew that

5     smuggling drugs is a felony.  After all, he told Harris that

6     smuggling drugs could land her in jail.  Plus he was

7     extensively trained on all these rules and the consequences for

8     breaking them.  So the second element of misprision is not in

9     serious dispute.

10          The third element of misprision is that Adams failed

11     to report it.  This too is not in dispute.  You heard from

12     Lieutenant Jean that Adams knew the rules and had enforced them

13     before.  But did Adams report the discovery of contraband to

14     Lieutenant Jean during his shift?  No.  As you also heard from

15     Lieutenant Jean, Adams didn't fill out an incident report like

16     the one in front of you on the screen.  He never told a

17     supervisor about what he had found.  He never reported Harris.

18     In fact, the parties have an agreement about this.  It's up

19     there on the screen.  "Robert Adams did not prepare or submit

20     any form, report, or memorandum concerning any discovery of

21     contraband on July 5, 2019, nor did Adams inform any supervisor

22     concerning any discovery of contraband on July 5, 2019."

23          So the third element is met, and again, there is no

24     dispute about that.

25          Now let's turn to the fourth element of misprision,

1    whether Adams took a deliberate step to conceal Harris's crime.

2    So what does that mean?  I expect Judge Gardephe will tell you

3    that an affirmative step may include, for example, falsely

4    denying knowledge of a crime, giving an untruthful statement to

5    authorities, or disposing of evidence.  Adams took three

6    affirmative steps to deliberately conceal Harris's crime.

7            What's the first thing he did to deliberately conceal

8    Harris's crime?  He disposed of the evidence.  How do you know

9    that?  Well, he said he threw it away.  How else do you know

10   that?  Well, Lieutenant Jean told you that for every piece of

11   contraband that a guard finds, they have to fill out one of

12   these chain of custody forms.  Do we have one of these forms,

13   or any of the evidence that would be attached to it?  No.  Why?

14   Because Adams threw it away.

15           What's the second thing Adams did to deliberately

16   conceal Harris's crime?  He told her to go to the pizza shop.

17   By doing that, he gave her an escape route.  He allowed Harris

18   to leave when he knew that the protocol would have been for her

19   to be stopped, searched, and detained.

20           And what's the third thing that Adams did to

21   deliberately conceal Harris's crime?  He gave a false story to

22   Richard Fletcher, the officer in charge of the visiting room

23   around that time.  Lieutenant Fletcher testified that he

24   approached Adams to ask about allegations concerning a female

25   visitor.  We all know that that was Harris.  And this was about

a week after Harris got caught for the second time.  In

response to Fletcher's question, Adams said he knew Harris from

the neighborhood.  That was false.  Harris and Adams didn't

know each other from the neighborhood.  They knew each other

from the MCC, when Adams caught Harris smuggling drugs into the

MCC on July 5th.

How else do you know that they didn't meet in the

neighborhood?  Look at Harris's cellphone.  The first ever text

between them is on July 5, 2019, at 8:12 p.m.  Adams's false

story to Fletcher is therefore another act of concealing

Harris's crime.

So that's Count Three.  Adams knew that Harris

committed a felony, he chose not to report her, and he took

three steps to deliberately conceal Harris's crime.  That makes

him guilty of Count Three.

Now let me quickly address the issue of venue for all

of the counts.  As I expect Judge Gardephe will instruct you,

you must find that some part of the alleged crimes took place

in the Southern District of New York.  That includes Manhattan

and the Bronx and a few other places.  The parties agree that

venue is proper in the Southern District of New York, and you

have on the screen there a stipulation, and it applies to all

three counts.

All right.  Let's get going to Count One, the bribery

count.  There are four elements to Count One, which are on the

1      screen for you.  I will address these one by one.

2              The first element is whether Adams was a public

3      official.  He was.  You have on the screen before you another

4      agreement between the parties.  That's Government Exhibit 2.

5      That confirms that he was a public official.  So that element

6      is met.

7              The second element of bribery that you must find is

8      that Adams demanded, sought, accepted, agreed to receive or

9      accept something of value.  It doesn't matter whether Adams

10     sought out the bribe or just received it.  I expect Judge

11     Gardephe will tell you that the law makes no distinction

12     between demanding, seeking, or receiving a bribe.  This element

13     is basically asking one question:  Did the defendant get

14     something he valued?  I expect Judge Gardephe will tell you

15     that sexual intercourse can be a thing of value if Adams

16     attached value to it.  There is no serious dispute that Adams

17     valued the sex he received on July 5th.  He drove Harris to a

18     motel and told her that the purpose was to have sex with him.

19     Once he got to the motel, he paid for the room.  Once he got

20     the keys to that room, he told Harris to get undressed and they

21     had sex.  After they had sex, you saw, in the defendant's own

22     words, that he wanted to have sex again.  Take a look at his

23     texts on the screen.  I'll spare you from reading them out

24     loud.  Without a doubt, they show you that he valued having sex

25     with Harris.

1          I'm going to address the third and fourth elements

2     together.  The third element asks you whether the thing of

3     value was in exchange for doing an official act or not doing

4     something in violation of an official duty.  You already know

5     that Adams did not report Harris in violation of his official

6     duty.  We walked through that evidence when we discussed Count

7     Three.  What you have to determine here is whether there was a

8     corrupt exchange.  Sometimes people call that a quid pro quo.

9     Here, the question you must decide is whether Adams had sex

10    with Harris in exchange for not reporting her, getting her in

11    trouble, and allowing her to keep visiting the MCC.  The answer

12    is yes.  And I'm going to give you seven reasons why you know

13    there was a corrupt exchange.

14         Members of the jury, the first and the most obvious

15    reason that you know that there was a corrupt exchange is

16    because Shahada Harris took that witness stand and she told you

17    about it.  She told you about how Adams caught her, about how

18    he threatened her by telling her that she could go to jail, and

19    how she had sex with him because of that threat.  That is the

20    exchange right there.

21         So let's go back to July 5, 2019.

22         Harris saw her ex, Keith Outlaw, at the MCC, and

23    passed him some drugs.  The visit ended and Adams took Outlaw

24    out.  Harris had to stay back in the visit room.  Why?  No one

25    escorted her out, and she had to wait for a guard to arrive.

1    What happened less than five minutes later?  Adams

2  walks in.  He shuts the door.  Only three people are in the

3  room -- Adams, Harris, and Boyce, a total stranger to Harris.

4  At this point he demands a corrupt exchange.  What does Adams

5  say to her?  "Yo boy F'd up," and that she should meet him at

6  the pizzeria because she's going to be in trouble if she

7  doesn't.  Members of the jury, he told Harris that if she

8  didn't meet him at the pizzeria, she could go to jail.  Harris

9  didn't want to get into trouble, she didn't want to get

10  arrested, and she wanted to keep seeing Outlaw.  After all --

11  you heard her say it -- she still had love for Outlaw.  So

12  Harris did exactly what Adams told her to do.  She walked over

13  to the nearby pizzeria because she didn't want to get in

14  trouble.

15    Minutes after his shift ends, Adams pulls up in front

16  of the pizzeria.  He tells Harris to get in.  Harris complies.

17  At this point Adams makes his corrupt bargain even clearer.  He

18  told her that the right thing to do, so she wouldn't get in

19  trouble, was to have sex with him.  And if she did that, she

20  wouldn't get in trouble and could still go to visit the MCC.

21    They get to the motel.  Once again, he tells Harris

22  that having sex with him is the right thing to do so she won't

23  get in trouble.  He told her to get undressed.  They had sex.

24    Harris did not want to have sex with Adams, but she

25  did.  She did because she didn't want to get in trouble and

1    because she wanted to keep visiting the MCC.

2            After they had sex, Adams dropped her straight home.

3    They didn't grab something to eat.  They didn't hang out for a

4    little bit longer.  After all, it wasn't a date, it wasn't an

5    affair; it was a bribe.

6            After Harris had sex with Adams, she got her end of

7    Adams's corrupt bargain.  She didn't get in trouble, at least

8    not for a while.  And to make sure he didn't turn on her, she

9    kept texting him to stay on his good side.

10           Members of the jury, if you believe Harris, the

11   defendant is guilty of Count One.  And for that reason, I

12   expect defense counsel will spend much of his time in closing

13   argument attacking her, just like they have during the course

14   of this entire trial.  Please keep this in mind.  Harris has

15   made mistakes in her life.  There's no question about that.

16   But her mistakes did not give Adams the license to exploit her

17   for sex.

18           And keep this in mind too.  Just because someone has

19   made mistakes in their life, that doesn't mean you can't

20   believe their testimony.

21           And here's another thing.  You don't just have

22   Harris's word for it.  You should scrutinize her testimony and

23   see whether it lines up with the other evidence in this case.

24   When you do that, you will see that it does.  In fact, Harris's

25   testimony is just Reason No. 1 why you know that there was a

1    corrupt exchange.  There are six more reasons.  So let's keep

2    going down the list.

3         The second reason why you know there was a corrupt

4    exchange is your common sense.  Think about this.  The

5    defendant broke every single rule that applies to the situation

6    he had with Harris.  He broke the rule about reporting Harris;

7    he broke the rule about preserving the drugs that he found; and

8    he broke the rule about having sexual contact with a visitor.

9    Now while breaking these rules isn't a crime, it tells you

10   about Adams's state of mind, that the fact that he's breaking

11   every single rule that applies to the situation he found

12   himself in tells you he's acting out of his interest, not the

13   MCC's.

14        Now let's take a look at the timeline.  Those rules

15   that he broke about reporting Harris, telling his supervisor,

16   and preserving the contraband, all of that happened around

17   7:45 p.m. or so, because we know that Harris left the MCC

18   before 8 p.m.  We also know that Adams's shift ended at 8 p.m.,

19   and by 8:12 p.m., he and Harris were in the car together on the

20   way to a motel to have sex.  Let's pause here for a second.

21   Within a 30-minute time period, the defendant accuses Harris of

22   committing a felony and then is driving Harris, a total

23   stranger, to a motel to have sex with him.  Your common sense

24   tells you that these things are linked, that there was a

25   corrupt exchange.

1          The defense wants you to believe that Harris made this

2   whole thing up sometime around August 2019 to avoid getting

3   into trouble.  Here's another reason why that argument falls

4   flat.  Harris texted one of her closest friends about what

5   happened with Adams three days after it happened, and one month

6   before this alleged motivation to lie came about.  These

7   messages with her friend are another reason, the third reason,

8   you know that there was a corrupt exchange.  Let's take a look

9   at the messages.

10         Harris begins by confiding in her friend that she has

11  to get checked out for STDs.  She says that a federal officer

12  took the condom off.  She said something weird happened.  What

13  was weird?  The federal officer, and I quote, "bribed me."

14         Members of the jury, let's just pause here for a

15  second.  In a private message to one of her closest friends,

16  long before she got caught in August 2019, or spoke to the FBI,

17  or testified in this courtroom, she said that a federal officer

18  bribed her.  There's no reason why Harris would make that up to

19  her friend three days after it happened.  These messages are

20  yet another reason why you know there was a corrupt exchange.

21         The fourth reason that you know why there was a

22  corrupt exchange is Qunisha Boyce's testimony, which linked

23  Adams's pizzeria comment to Harris not getting into trouble.

24  Remember, Boyce has no skin in this game.  She doesn't know

25  Harris.  She doesn't have any beef with Adams.  She has nothing

1   to get out of testifying for the government.  She was just

2   sitting that day in the visit room minding her own business,

3   waiting to be escorted out.  What does Boyce recall Adams

4   saying during this exchange?  That Harris brought in something

5   that smelled really good, that it was a crime to bring in

6   drugs, that there were consequences to bringing that type of

7   stuff in, like going to jail, but that Harris would be good if

8   she went to the pizzeria.  Members of the jury, Boyce's

9   testimony is important not just because it confirms what Harris

10  told you.  Ask yourself, why is Adams demanding that Harris

11  meet him at a pizza shop in the same breath as telling Harris

12  that she could go to jail for bringing in drugs?  Adams was

13  supposed to report Harris, tell his supervisor about what

14  happened, detain Harris, and keep her from coming back to the

15  MCC.  None of these things happens at a pizza shop.  Your

16  common sense tells you that Adams told Harris to go to the

17  pizza shop because he didn't want to handle the situation the

18  way he was supposed to.  He had a different plan.  He had a

19  corrupt intent, one that would allow him to take advantage of

20  the situation for himself, off camera, off site, where no one

21  could see him.

22          The fifth reason you know there was a corrupt exchange

23  is Adams's false story to Lieutenant Fletcher.  As we already

24  discussed, Fletcher approached Adams to ask about allegations

25  concerning a female visitor.  Again, that was Harris.  In

1    response to Fletcher's question, Adams said he knew Harris from

2    the neighborhood.  The evidence at this trial, as you know, is

3    that Harris and Adams didn't know each other until July 5,

4    2019, when Adams caught her smuggling drugs into the MCC.  So

5    when Adams told Fletcher that Adams knew Harris from the

6    neighborhood, that was false.  Adams did not know her from the

7    neighborhood.  He knew her because she had smuggled in drugs on

8    July 5th.

9         I expect Judge Gardephe will tell you that if Adams

10   gave a false statement in order to divert suspicion from

11   himself, as he did here, you can conclude he believed he had

12   done something wrong.  And that's another reason why you know

13   there was a corrupt exchange.

14        Let's turn to the sixth reason why you know there was

15   a corrupt exchange.  Adams's statements to the FBI two days

16   after Harris got caught in August 2019.  You heard from Amanda

17   Gildea, an FBI agent who interviewed Adams on August 16, 2019.

18   That interview was about something completely unrelated; not

19   about Harris, not about contraband.  At the end of the

20   interview, the agent showed Adams a picture of Harris.  What

21   did he say after he saw that picture?  "Let me be clear, I

22   never brought anything into the jail or allowed anything in.  I

23   never did that."  Let's pause on this.  Adams sees a picture of

24   Harris, and what's the first thing that comes to his mind?

25   Contraband.  He blurts out some random comment about not

1    allowing contraband in, even though no one said anything about

2    anyone, including Harris, bringing contraband into the MCC.

3    Adams's sudden, spontaneous statement about contraband is

4    powerful evidence that the sex was exchange for not reporting

5    Harris.  Think about it.  If these things were truly unrelated,

6    if everyone had just put behind them that smuggling episode and

7    this whole case was actually about two adults flirting and

8    having sex, then why is contraband the first thing that comes

9    to Adams's mind when he sees a picture of Harris?  It's because

10   it's all related.  It's because the sex was in exchange for not

11   reporting her.

12          The seventh reason why you know that there was a

13   corrupt exchange is because the defendant deleted nearly every

14   single one of his messages with Harris.  Remember how you saw

15   several texts between Harris and Adams?  Those all came from

16   Harris's phone.  So you'd think they would be on Adams's phone

17   too.  Well, they weren't.  Adams had just one text message with

18   Harris, just one.  Harris?  151.  All those texts with Harris

19   that you saw on her phone had been deleted from Adams's phone.

20          And it's not like Adams was just deleting his messages

21   with everyone.  As Mr. Santos explained, he had plenty of other

22   texts with other people on the same days that he was texting

23   Harris.

24          And by the way, remember what defense counsel said in

25   his opening statement about this?  That Adams deleted his texts

1    with Harris because he didn't want his wife to know he was

2    having an affair?  Well, they recanted that.  They agreed that

3    his wife, or hiding an affair, was not the reason he deleted

4    his texts with Harris.  So what was the reason?  He has a

5    guilty mind.  There was a corrupt exchange.

6         So that's Count One.  Adams was a public official who,

7    with a corrupt intent, demanded and received sex from Harris in

8    exchange for not reporting her and allowing her to keep

9    visiting the MCC.

10        I'm now going to discuss Count Two, blackmail.  I'll

11   be able to go through this pretty quickly because so much of

12   this overlaps with the bribery count.

13        I expect Judge Gardephe will tell you that there are

14   three elements to blackmail.  They're on the slide for you

15   right there.

16        The first element is that Adams demanded or received a

17   thing of value.  That might sound familiar to you.  We talked

18   about this during our bribery discussion.  I won't repeat all

19   that evidence again.  I'll just say that this part is not in

20   serious dispute.  Adams demanded and received sex from Harris

21   and he valued it.

22        The second element of blackmail is that Adams acted

23   knowingly and wilfully.  Judge Gardephe will define those terms

24   for you.  But basically, knowingly means intentionally, not by

25   accident.  And you know there was no accident here.

1      We also talked about the last part of the third

2  element, the violation of a federal law.  And again, you know

3  that Harris committed a federal crime and that Adams did not

4  report her.  So what's left?  Did Adams get sex by threatening

5  to report Harris or in exchange for not reporting Harris?  And

6  did he do that wilfully?  Wilfully basically gets to the

7  question of whether Adams had an intent to do something that

8  the law forbids.  He did.  For all the same reasons that you

9  know that there was a corrupt exchange, you know that there was

10  a threat.  He told her in the visit room that Harris could get

11  into serious trouble, like go to jail, or she could go to a

12  pizzeria.  In the car, he told her that having sex with him

13  would be the right thing to do if she didn't want to get into

14  trouble.  Before he told her to take off her clothes, he told

15  her again that if she didn't want to get in trouble, she should

16  have sex with him.

17      So the defendant is guilty of blackmail too.  He

18  wilfully demanded and received sex from Harris by threatening

19  to report her, he wilfully demanded and received sex from

20  Harris for not reporting her crime.

21      Now I want to talk briefly about one word we've seen

22  defense counsel use a few times -- consent.  He has repeatedly

23  implied that Harris consented to have sex with Adams.  First of

24  all, consent is not an element of the crime.  Adams may not

25  have used physical force, but he certainly used threats of jail

1   to get what he wanted.  But it's more than just beside the

2   point.  It's offensive.  Imagine being in Harris's shoes.  She

3   was caught committing a felony.  Adams gave her two options --

4   have sex with him or get reported.  Is that really a choice?

5        Members of the jury, I'm about to wrap up, but before

6   I sit down, I want to address one more thing.  After all that

7   evidence, all that evidence, you might be asking yourself, how

8   could Adams be so brazen?  How could he abuse the power of his

9   job to take advantage of another human being?  It's because he

10  didn't think he would get caught.  He didn't think that this

11  day would come.  After all, he was a federal officer.  He

12  thought he had power over Shahada Harris.  He thought he was

13  above the law.  He's not.  It's time to hold Robert Adams

14  accountable for his abuse of power.  Find him guilty.

15       THE COURT:  All right.  Ladies and gentlemen, we'll

16  now hear the closing argument on behalf of the defendant.

17       MR. TAYLOR:  Hello, ladies and gentlemen.  I'd like to

18  thank you for being here, on behalf of myself and the other

19  members at counsel table, Mr. Gregory, Mr. Taliercio, and

20  especially Mr. Adams.  Obviously this is inconvenient for you,

21  and at this time, it really shows that you're civic minded, and

22  so we really do thank you from the bottom of our hearts.  And

23  it's important that you're here, because this case is going to

24  be in your hands.  And you have a big responsibility, and that

25  means that we've got to get down into the evidence of this

1    case, not just look at it with broad brushstrokes, but really

2    dig in.

3           Now the government has staked their whole case on

4    their claim that there was a threat in the visitor room on

5    July 5, 2019, because if they can't prove Mr. Adams threatened

6    Ms. Harris in that visitor room, they can't prove Mr. Adams

7    intended to solicit a bribe, or that he committed blackmail.

8    I'll get to Count Three later.  They can't prove either of

9    those first two counts.  And they've staked everything on

10   trying to convince you that there was a threat in the visitor

11   room.  You heard how many times Ms. Bhaskaran talked about that

12   in her summation.  And you recall how many times they asked

13   Ms. Harris about whether she felt threatened.

14          Now I want to be clear about one thing before I roll

15   up my sleeves and get into the evidence with you.  Mr. Adams

16   violated the BOP rules; he violated his commitments as a

17   correctional officer.  He didn't commit a crime.  Now the

18   things that he did that are wrong, we don't condone that.  We

19   don't expect you to.  He let himself down.  He should have done

20   better.  But he's not on trial for breaking the rules and

21   regulations of the Bureau of Prisons.  He's not on trial for

22   breaching his commitment as a correctional officer.  So if you

23   review the evidence carefully and you follow the judge's

24   instructions after these arguments are over, you will find

25   Mr. Adams not guilty of all the charges.

1     So as I said before, the key to this whole case is

2  what happened in that visitor room.  And it's in that visitor

3  room that there are two different accounts of what happened.

4  And so we're going to focus on the contrast between the

5  testimony of Shahada Harris and the contrast of Qunisha Boyce,

6  and their testimony was very different.  So let's start off

7  first with Ms. Harris's testimony, her direct testimony.

8     Let's go to page 185 of the transcript.  I'm going to

9  read this to you, ladies and gentlemen.

10     "Q.  And, Ms. Harris, do you recall what happened

11  during this clip?"

12     "A.  A little bit, yes."

13     "Q.  Tell us what you remember."

14     "A.  He, um, Adams came up to me and he said, yo boy

15  F'd up, that I should meet him at the pizzeria because I'm

16  going to be in trouble if I don't."

17     Now we're going to go further down the page, lines 24

18  and 25.

19     "Q.  And I think you mentioned he said that you were

20  in trouble?"

21     "A.  Yes."

22     So let's contrast this account of events in the

23  visitor room with what Ms. Boyce said.  Now you remember

24  Ms. Boyce, of course.  She was the bystander who witnessed the

25  conversation between Robert Adams and Shahada Harris in the

1    visitor room on July 5, 2019.  So how did Ms. Boyce describe

2    the conversation that she witnessed?  Let's pull it up and see.

3    We're going to start off with her direct testimony.

4              Let's go to page 336, at the bottom of the page.

5              "Q.  Can you tell the jury what you remember about

6    it."

7              "A.  So something happened inside the facility so the

8    inmates had to go back, so he let out two persons that was

9    incarcerated, like wait till the last moment or whatever.  So I

10   guess she was smuggling drugs, so he came back and he was like,

11   this s____ smells good.  Where did you get it from?  But you

12   could get in trouble.  I'll give it back to you.  You can meet

13   me at the pizza shop.  He was trying to describe where the

14   pizza shop was at.  And that was it."

15             Now even in this account, on Ms. Boyce's direct

16   testimony, there was no threat.  He says it smells good, asks

17   her where she got it from.  He points out that she could get in

18   trouble.  He says he's going to give it back to her.  He says:

19   You can meet me, you can meet me at the pizza shop.

20             Now let's go to the cross-examination of Ms. Boyce,

21   where we fleshed out that story a little bit more.  Let's go to

22   page 358.

23             All right.  We'll start at line 19, please.  Scroll

24   down.  Thanks.

25             "Q.  And in that meeting or during that conversation

in January 14, 2020, didn't you tell the agent that when

Officer Adams closed the door, he told the other visitor that

she could not bring drugs into the MCC?"

"A.  He said that, but that was the first thing he had

said."

I think she actually said that was not the first

thing, but in any case, Ms. Boyce said he said that.  I'll move

on.

"Q.  I see.  So going on with that conversation,

Officer Adams told the visitor that he would let her go for

bringing drugs into the MCC, but if someone else caught her,

she could face charges, right?"

"A.  Yeah."

"Q.  And Officer Adams told the visitor that the

authorities could come to her house and arrest her, right?"

First we got a non-verbal response, but then at

line 8:  "A.  Yes."

"Q.  But Officer Adams told the visitor that he was

going to let it slide, right?"

"A.  Yes."

"Q.  And Officer Adams told the visitor, meet me down

the block and you're good, right?"

"A.  At the pizza shop, yes."

Can you scroll down, please.

I'm sorry.  Could we go to 359 at Line 20, please.

1           I'll just read it to you.

2           Can you find where it says, "But Officer Adams told

3   the visitor that he was going to let it slide, right?"

4           I'm sorry.  I'll read the testimony to you.  It's --

5   you can find it.  It's around page 359-360.

6           "Q.  But Officer Adams told the visitor he was going

7   to let it slide, right?"

8           "A.  Yes."

9           "And Officer Adams told the visitor meet me down the

10  block and you're good, right?"

11          "A.  At the pizza shop, yes."

12          "Q.  And he even asked you to help explain to her the

13  directions to the pizza place; is that right?"

14          "A.  I said it was down the block, yes."

15          Now let's go to page 360, line 17, please.

16          Thank you.

17          "Q.  I think you said yesterday that the marijuana

18  smelled good, right?"

19          "A.  Yes."

20          "And he asked the visitor where he could get some,

21  right?"

22          "A.  Yes."

23          "And you understood those to be jokes, correct?"

24          "A.  Yes."

25          And let's remember especially the last thing that

1    Ms. Boyce told you about the conversation on page 361, line 5.

2            "Q.  At no point during that conversation was Officer

3    Adams mean to the visitor, was he?"

4            "A.  No."

5            So what do we make of the difference between

6    Ms. Harris's and Ms. Boyce's versions of what happened?  Well,

7    the judge will instruct you on the law after the arguments, and

8    one of the things he's going to instruct you about is the

9    credibility of witnesses.  And one of the factors you should

10   consider is any interest, bias, or prejudice the witness may

11   have, and the judge will also instruct you that if you find

12   that any witness has lied under oath at this trial, you should

13   view the testimony of that witness cautiously and weigh it with

14   great care.

15           So Ms. Harris claimed that Mr. Adams said she would be

16   in trouble if she didn't meet up with him at the pizzeria.  But

17   Ms. Boyce remembered that conversation very differently.  She

18   said that Officer Adams was joking around, like no big deal, I

19   like that stuff too, I'm not going to make a federal case out

20   of it.  And Ms. Boyce said that Officer Adams wasn't mean at

21   any point in the conversation.  And you remember what happened

22   when we were done with the cross-examination.  The government,

23   they didn't come up to do any redirect, because everything that

24   Ms. Boyce said was true.

25           Now we're going to go back to Ms. Harris's testimony

1    on cross-examination, because something strange happened when

2    Mr. Gregory questioned her about what Robert Adams said in the

3    visitor room.  Let's go to 278, please, at line 9.

4           "Q.  He said, if somebody else had caught you, you

5    would be in big trouble, right?"

6           "A.  Yes."

7           "Q.  And then he said to you, I'm going to let it

8    slide, right?"

9           "A.  Yes."

10          Hang on a second.  That's Ms. Harris talking on

11   cross-examination.  What are we supposed to make of this?  She

12   didn't say anything on her direct examination about Robert

13   Adams telling her in the visitor room that he was going to let

14   it slide.  Now on cross-examination, she's corroborating

15   Ms. Boyce's version of events.

16          Now either Ms. Harris omitted those facts that Officer

17   Adams said he was going to let it slide and that if someone

18   else had caught you, you would be in big trouble, either she

19   omitted those facts from her direct testimony because she was

20   lying or she was prepared not to say those things, or it could

21   be she simply has no idea what the truth is.  The bottom line

22   is that Ms. Harris lied when she said that Robert Adams

23   threatened her in the visitor room.  And she lied many times.

24   And she has to lie, because she has the non-prosecution

25   agreement hanging over her.  If she says that Robert Adams

1   didn't threaten her, she loses the agreement, because that's

2   what she's been telling these people here all along.

3           Now let's move on, and we're going to see more that

4   tells us that Ms. Harris was lying about what happened in the

5   visitor room.

6           What's the next thing that happens after Ms. Harris

7   leaves the facility?  She calls Diamond Benson.  And you know

8   who Diamond Benson is.  That's one of her co-conspirators in

9   the drug smuggling conspiracy, bringing drugs into the MCC.

10          So let's go to page 279, line 4, please.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TAYLOR:  Thank you.

2     "Q.  Well, did you, when you came out, call Diamond Benson?

3     "A.  Yes.

4     "Q.  And it would be fair to say that you called Diamond Benson

5     at 8:02, correct?

6     "A.  Yes.

7     "Q.  And you said to Diamond Benson, this guy wants to meet me,

8     and she said, I would leave, correct?

9     "A.  Yes.

10    "Q.  And you decided not to leave, right?

11    "A.  Yeah.

12    "Q.  Correct?

13    "A.  Yes.

14    "Q.  And you didn't say anything to Diamond Benson about being

15    threatened, correct?

16    "A.  No."

17         Let's scroll down a little bit more, please.

18    "Q.  Pardon me?

19    "A.  That's correct."

20         MR. TAYLOR:  So Shahada Harris says here that she

21    never told, or she didn't tell Diamond Benson when she called

22    her after emerging from the facility, that she had been

23    threatened by Robert Adams.

24         Why didn't she tell her that?  She didn't tell her

25    because it never happened.  Ms. Harris' story about the threat

1    in the visitor room is totally made up.  The reason Ms. Harris

2    met up with Robert Adams is not because he threatened her.  She

3    said it herself.  She was worried about keeping her visits with

4    Keith Outlaw.  I mean, look, she had just been caught bringing

5    contraband into the MCC.  She knew that she could be in

6    trouble.  Nobody has to threaten you to know that, and she's

7    concerned about keeping the visits with Keith Outlaw.

8            So let's go to page 289, please, line 15.

9    "Q.  Now, when you walked out of the MCC before you met Adams,

10   as we said, you called Diamond Benson and you decided to meet

11   Adams, correct?

12   "A.  Yeah.

13   "Q.  And it was really the visits that were on your mind,

14   correct?

15   "A.  Yes.

16   "Q.  And the money was good?

17   "A.  Yes.

18   "Q.  And you say you were stuck on Outlaw?

19   "A.  Yes."

20           MR. TAYLOR:  We'll scroll down a bit.

21   "Q.  And so you went out there to speak to Adams to try to

22   preserve those visits, right?

23   "A.  Yes.

24           MR. TAYLOR:  Now, I want to be clear about something.

25   Shahada Harris' intent for meeting with Robert Adams, that is

1    not what's at issue in this case.  Whatever she had in mind at

2    that time doesn't say anything about what Robert Adams had in

3    mind.  All right.  And we'll get back to that.  In other words,

4    if she had some corrupt purpose, that doesn't mean he did.

5         Now, we know what Robert Adams had in mind from what

6    Ms. Harris admitted on cross-examination happened next.

7         Let's go to page 290, line four.

8    "Q.  And when you got out there, Adams said to you, this guy is

9    taking advantage of you, correct?

10   "A.  Um, I can't remember.

11   "Q.  Well, didn't you say that he said to you, this guy doesn't

12   love you?

13   "A.  Yes.

14   "Q.  And didn't he say to you, what are you doing with this

15   guy?

16   "A.  Yes.

17   "Q.  And didn't he say, do you have a job?

18   "A.  Well, I don't remember everything he said.

19   "Q.  Well, you remembered that he was telling you that what you

20   were doing was not productive or helpful to you as a person,

21   correct?

22   "A.  Yes."

23        MR. TAYLOR:  What does this testimony tell us about

24   what Robert Adams was thinking?  So it tells us that he told

25   Ms. Harris to meet him outside because he wanted to give her

1    some advice.  She admits that he was showing her concern.  He

2    told her not to waste her life smuggling drugs for some guy who

3    obviously didn't love her, because nobody would make somebody

4    smuggle drugs if that person really loved her.

5            And look, the fact that they had this conversation

6    outside, it makes perfect sense.  I hate to be flippant about

7    it, but Ms. Harris couldn't stay in the building.  Visitation

8    was over.  Mr. Adams was going to give her this advice.  He

9    couldn't do it in the visitor room.  And what's more, we know

10   that it was the end of Mr. Adams' shift.  In other words,

11   Ms. Harris walked out the door at 7:58 p.m. and Mr. Adams'

12   shift ended at eight.  So both of them had to leave the

13   building.

14           Now, let's go back to Ms. Boyce.  Let's go to page 356

15   of the transcript, please, line one.

16   "Q.  Is there something in comparison to the other guards at

17   the MCC that makes you remember Officer Adams?

18   "A.  Um, he was nice.  That's it.

19   "Q.  How was he nice, ma'am?

20   "A.  Um, he was more, like, sociable.  Like, he had

21   conversations with us.  Like, he wasn't acting the way the

22   other officers was acting."

23           MR. TAYLOR:  The conversation that Ms. Harris admitted

24   having with Robert Adams during her cross-examination is

25   completely in character for Mr. Adams.  Ms. Boyce told you

1    that.  She told you he was nice.  She told you he had

2    conversations with the visitors.  She told you that he was

3    sociable.  That's who he was.

4         Now, we know that within minutes of that conversation,

5    where Robert Adams is saying to Ms. Harris, Why are you doing

6    this with your life?  This is not a productive way to use your

7    life.  She asks him for his phone number.

8         Let's go to page 291, please, line 15.

9    "Q.  Well, now, you were in the car with Adams and you asked

10   for his number?

11   "A.  Yes."

12        MR. TAYLOR:  So she's in the car with Adams.  She

13   claims that she feels that she's been threatened, and she asks

14   him for his number.  And then we know that Robert Adams gave it

15   to her, because you see the text that was sent at 8:12 p.m.,

16   the text that just said the one word, Shahada.

17        Now, why on earth would Robert Adams give his number

18   to someone that he's forcing to have sex with him?  It just

19   doesn't make any sense.  It makes much more sense that Shahada

20   Harris asked him for his number because he was being nice to

21   her, because he was showing concern for her as a person, he was

22   being sociable, because that's who Robert Adams is.

23        Let's remember another thing.  Ms. Harris told you all

24   that she searched that hotel on her phone.  She says that

25   Mr. Adams didn't have his phone.  But she doesn't have to do

1    that.

2           Then there is another thing.  You remember from the

3    cross-examination, Ms. Harris never said anything to Mr. Adams

4    like, Don't do this to me.  Why are you doing this?

5           Let's go to page 291, please, at line 22.

6    "Q.  And when you were traveling to the motel, you didn't say

7    that Adams, Hey, I don't want to do this, don't do this?

8    "A.  I didn't say that.

9    "Q.  You didn't say, Man, you're better than this, don't do

10   this to me?

11   "A.  Right."

12          MR. TAYLOR:  Isn't that what somebody who is in that

13   situation would say?  I mean, it wouldn't cost her anything, if

14   her version of events were true, that she asked questions like

15   that.  You get shot down.  But she didn't even ask.  She admits

16   she didn't ask.  Well, that's because, well, she wanted to be

17   there with him.

18          Now, I want to address the issue Ms. Bhaskaran raised

19   about consent.  Look, this is a real issue.  This is something

20   that's very serious.  But what we're talking about here is the

21   evidence.  We're not trying to brush something aside.  We're

22   talking about the evidence of what happened between two people,

23   how they ended up that motel.  We're not just flippantly saying

24   that there was consent.  We're looking at the evidence.

25          And the evidence shows that, first of all, he never

1    threatened her in the visitor room.  Ms. Boyce said that she

2    didn't.  Sorry, take that back.  Ms. Boyce said that he, Robert

3    Adams, didn't.  Ms. Harris never told Diamond Benson when she

4    got on the phone with her after she got out that Robert Adams

5    had threatened her.  Ms. Harris admits that Robert Adams asked

6    her questions about herself and encouraged her not to do

7    something that is stupid and wasteful with her life.  And we

8    know then Ms. Harris asked him for his phone number.  So this

9    isn't us trying to force something on you.  We're just talking

10   about what happened.

11           Now, just to make sure that the sequence of events is

12   clear, I am just going to go quickly through the timeline for

13   you of these events that we have just described.

14           Shahada Harris left the MCC about a minute and a half

15   before eight p.m.  You can see that in Government Exhibit 204.

16   We know that Ms. Harris called Diamond Benson at 8:02, about

17   three and a half minutes later.  That is at page 279, line six

18   through eight.  And there was a thing I left out, which was

19   that Ms. Harris texted Keith Outlaw.  And I believe the time of

20   that text was 8:06.  That's at Defendant's Exhibit C2, line

21   126.  You can see the time for yourself there.  Ms. Harris

22   texted Robert Adams her number at 8:12 p.m. and that's at

23   Government Exhibit 401.

24           So that's the timeline.  Now, I want to pause for a

25   moment and talk about the calls and the texts between

1     Ms. Harris and Keith Outlaw.

2          Let's bring up Defense Exhibit C2, please.  We've seen

3     that's the text right there, that Ms. Harris sent to Keith

4     Outlaw shortly after she got out of the MCC.

5          Now, you might recall that during cross-examination,

6     Mr. Gregory confronted Shahada Harris with this.  And at first,

7     she denied that she texted Keith Outlaw when she got out of the

8     MCC.  But when Mr. Gregory showed her these messages, she

9     admitted that she did, in fact, text Keith Outlaw.

10         Let's go to page 205.  This starts at line six.

11    "Q.  And there's a text message that you sent to Keith Outlaw

12    on July 5 at 8:06 p.m., correct?

13    "A.  Yes.

14    "Q.  So when you said a minute ago that you didn't text him,

15    you were either mistaken or you were untruthful, because you

16    did text him at 8:06, correct?

17    "A.  Yeah."

18         MR. TAYLOR:  Now, there were 268 phone calls between

19    Shahada Harris from about June 1 to July 16, 2019.  Again, you

20    don't have to take my word for it.  These are in exhibits --

21    well, this is Exhibit C2.  That's the phone calls, if I'm not

22    mistaken.

23         Now, we all now know that Keith Outlaw had his own

24    personal cell phone inside the MCC, and that Ms. Harris and

25    Mr. Outlaw were calling and texting each other hundreds of

1     times in June and the first half of July 2019.

2          Now, Ms. Harris tried to conceal that fact from the

3     prosecutors here for years.  Something like ten meetings with

4     them where at these meetings, it was impressed upon her that

5     she could not omit things.  And by the way, she was represented

6     and advised by counsel, who would surely have told her that she

7     has to be forthright.  It's not a question of waiting for the

8     right question to come along.  You've got to let them know.

9     And she didn't do that.  Not until a couple of weeks ago, when

10    the prosecutors finally showed her the call records.

11         Now let's go to page 288, line ten.

12    "Q.  But, in fact, you know --"

13         MR. TAYLOR:  Strike that.  I'll start over.

14    "Q.  But, in fact, you knew that he" -- Mr. Gregory is

15    referring to Mr. Outlaw here -- "you knew that he had called

16    you hundreds of times and you had hundreds of text messages,

17    but you kept it from these people until they confronted you

18    with the text messages and the phone calls, correct?

19    "A.  Yeah."

20         MR. TAYLOR:  All right.  We're going to shift now from

21    the events before Mr. Adams and Ms. Harris got to the hotel and

22    were at the hotel.  Now they are at the motel.  They had sex

23    there, and then Mr. Adams dropped Ms. Harris off a block from

24    her home around 10:00 p.m., still July 5, 2019.  And the time

25    for that is at transcript page 302, lines 21 through 22.

1          Now, around 10:19 p.m., Ms. Harris called Keith

2     Outlaw.  That's at page 302 as well, couple lines later.

3     Ms. Harris' explanation for making that phone call was that

4     Mr. Outlaw was calling her over and over, and she hadn't had a

5     chance to call him back.  So now she was calling him back.

6          But what's going on here is that Ms. Harris and

7     Mr. Outlaw are scheming.  Now, you know, you remember this.

8     Ms. Harris spoke to her friends later on and said, I bagged one

9     of the Feds.  And she admitted that "bagged one of the Feds"

10    means I got him exactly where I want him.

11         Let's bring up page 303, line 20.

12    "Q.  Well, sometime later when you spoke to some friends, you

13    used the term, I bagged one of the Feds, correct?

14    "A.  Yes.

15    "Q.  And what you meant by that term was that you had one of

16    the Feds right where you wanted him, correct?

17    "A.  Not -- no."

18         MR. TAYLOR:  Let's move on to the next page.

19    "Q.  Well, when you say, I bagged one of the Feds, it means you

20    got him, right?

21    "A.  Just about, yes.

22    "Q.  Pardon me?

23    "A.  I said yes."

24         MR. TAYLOR:  So she admits it that she had Robert

25    Adams right where she wanted him.  She had got him.

1          Now, the next day, July 6, 2019, Ms. Harris received a

2    call from Keith Outlaw, who's still inside the MCC, sometime

3    just before one p.m.  And the time of that call can be found on

4    transcript page 305.

5          Mr. Gregory asked Ms. Harris if she called Adams,

6    called Adams, a few minutes after her call with Mr. Outlaw.

7    And maybe you remember, Ms. Harris' first answer was that she

8    didn't remember.  That's at 305, pages 19 through 21.

9          Let's bring up Defense Exhibit F.  Maybe blow it up a

10   bit, please.

11         This is going to show you the exact sequence of those

12   calls.  In other words, the day after Ms. Harris and Mr. Adams

13   have sex at the motel, a little bit before one p.m., Mr. Outlaw

14   calls Ms. Harris.  And you see the duration of that call,

15   209 seconds.  That's about three minutes, 29 seconds.  Then

16   just a few minutes later, Ms. Harris calls Robert Adams.  They

17   are scheming.

18         Now, what else happens on July 6?  Well, that's when

19   Ms. Harris saves and saved images on her phone, a screenshot of

20   a Cash App request directed to Robert Adams.  And that was --

21   that image was created around 7:18 p.m.

22         Now, we know that that request was never sent to

23   Mr. Adams, but it shows what's in Ms. Harris' mind, that she

24   wants to ask Mr. Adams for money.

25         Let's go to page 304, line six.

1    "Q.  And it would be fair to say, Ms. Harris, that the next

2    day, after Mr. Adams dropped you off on the 6th, you drew up

3    that Cash App request for a hundred dollars, correct?

4    "A.  I don't remember the day.

5    "Q.  Let me see if I can give you a hand with the date.

6          MR. GREGORY:  If you could put up the Cash App and the

7    stipulation."

8          MR. TAYLOR:  Then Ms. Harris said, Yeah.  In other

9    words, you don't have to, yeah.  She remembered.  It refreshed

10   her recollection.

11   "Q.  It was on July 6th in the evening, 7:18, correct?

12   "A.  Yes.

13   "Q.  So that was less than 24 hours after you had gone to the

14   motel with Mr. Adams, right?

15   "A.  Yes.

16   "Q.  And the reason why you did that is you wanted to get money

17   from him, right?

18   "A.  Yes."

19         MR. TAYLOR:  Now, Ms. Harris has said on the stand --

20   and the government told you just now in their argument -- that

21   the reason that Ms. Harris was reaching out to Mr. Adams is

22   that she wanted to stay on his good side.

23         Well, which is it?  Did she want money, or did she

24   want to stay on his good side?  Because those two motives don't

25   work together.  It doesn't make any sense.  If you're worried

1    that someone is going to stop your visits and that you're going

2    to get in trouble, well, you don't then think about asking that

3    person for money.  It can't be both.  It's got to be one or the

4    other, right?  That's just common sense.

5           I mean, the bottom line is -- and we're going to get

6    to the text messages in a bit -- is that it does appear that

7    Ms. Harris wanted to ingratiate herself with Mr. Adams.  But it

8    wasn't to keep the visits.  That had been made clear in the car

9    on the way to the motel the day before.  Mr. Adams had told her

10   that she could keep the visits.  There was no quid pro quo.

11   The only thing that he said to her was, You can't bring

12   anything in.  Just don't smuggle any more drugs in and then you

13   can keep the visits.

14          But if she was worried that she was not going to be

15   able to visit Keith Outlaw anymore, why is she thinking about

16   asking this guy for money?

17          So let's bring up the text messages.  This is

18   Government Exhibit 401.  Maybe shrink it down a bit, please.

19   Thank you.

20          Now, I don't want to belabor this, but I have to get

21   into them, because Ms. Harris testified that the reason they

22   were texting was all about sex and that the text messages

23   themselves were all about sex.  Certainly, that's true of a

24   number of the messages, back and forth, about sex.  But that's

25   not all it was about.

1              I mean, in fact, you can review these when you're

2      deliberating.  Ms. Harris and Mr. Adams were discussing all

3      sorts of non-sexual topics.  For instance, they discussed how

4      busy Mr. Adams was and why he couldn't see her.  Ms. Harris

5      noted that she was doing her niece's hair, and Mr. Adams said

6      that that was cute.  That's on pages four and five of GX 401.

7              Then there is a lot of affectionate texts.  Mr. Adams

8      texted, GN, my love.  Good night, my love.  And another time he

9      writes, LOL, I got you lovely.  And they are blowing kisses to

10     each other all the time.  I think Mr. Gregory said in his

11     opening statement that there were more kisses than on

12     Valentine's Day.

13             And then there is more evidence here of the kind of

14     concern that Mr. Adams was showing towards Ms. Harris as a

15     human being.  On page 12, he asked her, How was your day?

16     Page 13, he asked her whether she had a good time at a cookout

17     that she had just described.  He asked her if the food that she

18     had there was good.  And Mr. Adams reveals, you know, kind of

19     picayune details about himself.  He talks about how he likes to

20     grill, things like that.

21             And this does shed light on what's going on in his

22     mind.  All of this is a continuation from the 5th, from that

23     moment that he said to her, This isn't how you should be

24     spending your life.  That he's being nice to her.  And that

25     doesn't fit with someone who's a blackmailer, someone who's

1    coercing somebody into sex.  I mean, it would be a massive

2    turnaround, one moment to do this horrible, heartless thing to

3    someone, and then shortly thereafter, start blowing kisses and

4    asking how you enjoyed the cookout and was the food good,

5    without any sort of apology, without any sort of acknowledgment

6    that something bad had happened.

7         It doesn't make sense.  It's all a continuation.  I

8    mean, it even fits back all the way to back in the visitor

9    room, when Mr. Adams comes out and he admonishes her.  He says,

10   You can't bring drugs into the MCC.  He says it's a crime.  I

11   mean, that's obvious.  But he also gives her a break.  He tells

12   her right there in the visitor room, I'm going to let it slide.

13   And like I said, then he gives her -- you know, he expresses

14   concern.

15        Now, I don't mean to be suggesting that Mr. Adams is a

16   saint.  That's not what I'm saying.  You could very well, good

17   justification, feel like he is a bad person.  He's cheating on

18   his wife.  And, you know, what did he do?  He violated numerous

19   rules and regulations for his job.  But he did these things for

20   Shahada Harris.

21        Now, the court is going to instruct you not to let

22   bias or sympathy interfere with your thinking in this case.

23   Mr. Adams' moral qualities are not at issue here.  The issue is

24   whether the government has proved beyond a reasonable doubt he

25   committed the crimes alleged.

1      So I'm going to summarize.  This was a consensual

2  sexual encounter.  And as I said, we do not use that term

3  lightly.  It was based on the evidence.  Mr. Adams told

4  Ms. Harris that he would let it slide in the visitor room.

5  Ms. Boyce told you that.  And, look, Mr. Adams made up his

6  mind.  I mean, you can look at the time that he was gone --

7  well, you're not going to be able to look at the time he's gone

8  from the visitor room.  It's in the record.  He was outside of

9  that room four and a half minutes.  He finds contraband on

10  Mr. Outlaw.  And we know that according to the policies and

11  procedures at the MCC, you've got to inform the lieutenant of

12  that contraband violation right away.  It's simple.  You get on

13  your walkie-talkie and you let the lieutenant know.  That's

14  what you're supposed to do.

15      Mr. Adams found that contraband in the search room.

16  My apologies.  He did not get on the walkie-talkie with the

17  lieutenant.  That's the moment where he's letting things slide.

18  Was it the right thing to do?  No.  He had an obligation as a

19  correctional officer to report it.  But you also remember that

20  Mr. Jean, when he testified, he said, well, you're supposed to

21  report it, but he can't guarantee that everybody does.

22      And also keep in mind that while Mr. Adams is in that

23  search room with Mr. Outlaw, he can't see into the visitor

24  room.  And the question of the time that he was in there, that

25  came up.  And it matters, and there is a reason that Ms. Harris

1    testified in her direct testimony that it was two minutes.

2    Because the shorter that time is, the less likely it is that

3    whoever the visitors were in the visitor room would be gone by

4    the time Mr. Adams emerged from that room.

5              Now, you might recall that on her direct testimony,

6    Ms. Harris said on her direct testimony that it was less than

7    two minutes probably.  That's at page 185.

8              I'm sorry.  I need to back up about something.

9    Getting back to Mr. Jean, when I was asking him about the

10   procedures for taking the visitors down.  He told us that there

11   is no such thing as visitors being left in the visit room.

12   That's not the normal practice.  This is at page 149.

13             The question was:  So, in other words, usually when a

14   correctional officer is performing the last visual search of an

15   inmate, there are no visitors left in the visit room at that

16   time?

17             And Mr. Jean said, Yeah, correct.

18             So this connection that the government alleges between

19   not reporting the violation and what ensued at the motel later

20   becomes even more attenuated, because in the normal course of

21   events, when Mr. Adams came out of that visitor room, there is

22   not supposed -- strike that.  When Mr. Adams came out of the

23   search room, there is not supposed to be anyone left in the

24   visitor room.

25             Now let's get back to the amount of time.  This amount

1   of time that the government tried to shrink.  We noted a moment

2   ago, Ms. Harris said on direct that it was less than two

3   minutes probably.  But on cross-examination, she admitted that

4   she told the prosecutors over the weekend, in other words very

5   recently, that it was longer than that.  And she admitted to

6   you that when she said two minutes, she was wrong about that.

7           So let's go to page 238, line 17.

8   "Q.  OK.  By the way, you testified -- I'm just going to talk

9   about a couple of things you testified to on direct.  But you

10  testified on direct examination that when Mr. Adams removed

11  Keith Outlaw from the visit room, he came back about two

12  minutes later.  Do you recall that?

13              THE COURT:  "The court asked:  What

14          day are we talking about?

15              MR. GREGORY:  "July 5th.  Sorry,

16          Judge.  On July 5th.

17  "A.  Yes.

18  "Q.  And did you discuss that answer or that question with

19  respect to how long Adams was gone on July 5th, between the

20  time he took Outlaw out and the time he came back?  Did you

21  discuss that with these people over the weekend, or at any

22  time?

23  "A.  Yes.

24  "Q.  And did you say it was two minutes?

25  "A.  I said it was longer than that.

1   "Q.  And you came into -- you told them that it was more than

2   that, and yet you came in today and you testified it was two

3   minutes, right?

4   "A.  No.

5   "Q.  Well, didn't you say on direct examination that he was

6   gone about two minutes?

7   "A.  I said about -- I think I said five minutes.

8   "Q.  Have you looked at the tape to see how long it was?

9   "A.  Yeah.

10  "Q.  It would be fair to say it was four minutes and 22

11  seconds, correct?

12  "A.  On the tapes -- honestly, when I see the tape, it looks

13  longer than what it felt.  That's why I don't remember."

14       MR. TAYLOR:  Ms. Harris has testified here that the

15  reason she couldn't remember the correct length of time

16  Mr. Adams was in the strip room with Mr. Outlaw is that when

17  she watches the video, it looks longer than it felt.  That's

18  why she gave you this incorrect amount of time, because when

19  she watches the video, it looks longer than it felt.

20       Well, ask yourselves, ladies and gentlemen.  What is

21  the reality here?  Is the reality what's on a videotape that's

22  maintained by the Bureau of Prisons or is the reality what

23  Ms. Harris felt?

24       Ms. Harris does not know what the truth is.  For

25  Ms. Harris, the truth is a feeling.  For Ms. Harris, the truth

1    is not based on objective reality, the kind of thing you

2    establish on watching a tape when you're meeting with

3    prosecutors.  It's just a feeling that you have even when the

4    objective reality that you were shown a couple days before is

5    different.

6            I mean, Ms. Harris is playing games with you, ladies

7    and gentlemen.  She can say one thing and then deny it a short

8    while later, and both times she does it with equal commitment.

9    It's because she does not know what the truth is.

10           The prosecutors, they don't want you to know how long

11   Mr. Adams was out of the room in the strip room with Keith

12   Outlaw.  They want to shorten that amount of time because she

13   wants you to infer that Robert Adams thought that Ms. Harris

14   was still in the visitor room.

15           But let's think about it.  Four minutes and 22

16   seconds.  You can go back into the jury room.  You can sit

17   there in silence for four minutes and 22 seconds and feel how

18   long that is.  It's plenty of time to get in an elevator and

19   depart.

20           I'm pointing out lies that Ms. Harris said in the

21   courtroom to you people.  The purpose of this is not to make

22   her look bad.  The purpose of this is not to paint her as a

23   terrible person.  That is not our goal.  Mr. Adams has the

24   right to confront witnesses.  This is something enshrined in

25   the Constitution.  Just like you, it's a bedrock of our justice

1     system.  It's just how it works.  It protects our liberty.  The

2     purpose of this is not to make people look bad.  The purpose is

3     to get to the truth.

4          Now, look, it's going to be up to you to decide what

5     the lies are and what they are not.  I'm going to give you some

6     examples, and you might agree with me and you night not, but I

7     want to point them out to you.  And there might be examples

8     that I don't cover that you remember, and you should think

9     about that.

10         Now, we heard from Ms. Bhaskaran during their argument

11    that Ms. Harris claims that she still had love for Keith

12    Outlaw.  And you remember that she testified that since late

13    May 2019, he had been talking sweet to her.  He had been

14    buttering her up.  And you can find that testimony on page 160

15    page 169, lines one through six.

16         Ms. Harris said something along the lines of that

17    Mr. Outlaw told her that when he got out, that they would be

18    together.  Bottom line of that story is that Ms. Harris is

19    telling you this because she wants you to believe that she

20    smuggled drugs against her better nature.  It's all Keith

21    Outlaw's fault.  He manipulated her.  He made her fall in love

22    with him.  And she brought the drugs into the MCC not for the

23    money, but she did it for him.

24         Well, there's a problem with the story, ladies and

25    gentlemen.  There were videos of Shahada Harris and Keith

1    Outlaw interacting.

2              So let's watch them.  Let's look at GX 207.  We'll

3    just play it from the beginning, please.  Actually, pause it

4    right there.  Yes, 207.  All right.  So we'll pause just so we

5    can orient ourselves for a moment.

6              We see that Ms. Harris is sitting in a chair just to

7    the left of the left-hand door at the back of the room.

8              All right.  Let's play it.

9              (Video played)

10             OK.  You can stop.

11             Now let's play GX 209.

12             (Video played)

13             All right.  That's enough.

14             All right.  So those are videos from the visitor room

15   on July 5, 2019.  Ask yourselves, are those warm embraces?

16             Now, on their own, maybe you wouldn't read too much

17   into it.  But whether Ms. Harris is talking about Robert Adams

18   or Keith Outlaw, she's consistent about casting blame on

19   others.  In this case, she blames Keith Outlaw for seducing her

20   into smuggling drugs into the jail.  She wants you to feel

21   sorry for her.  It wasn't about the money, she says.  She did

22   it for love.  But those embraces, if you call them that, those

23   are just business, aren't they?

24             Let's keep in mind.  This is July 2019.  This is

25   pre-COVID times, back when people really hugged each other.

1    And by the way, in case you were wondering, ladies and

2    gentlemen, kissing is permitted in the visitor area.

3              Let's bring up 123, please.

4              MR. SCHAEFFER:  Objection.

5              THE COURT:  Well, let's see what the exhibit is.

6              Go ahead.

7              MR. TAYLOR:  It's the post.  123, please.

8              It says embracing and kissing are permitted within the

9    bounds of good taste, etc.

10             THE COURT:  Objection's overruled.

11             MR. TAYLOR:  Are those two lovers?

12             All right.  We're going to move on from that.  I'm

13   going to remind you about the August 14, 2019, texts between

14   Ms. Harris and Diamond Benson.  For those, you can refer to

15   pages 264 through 267 of the transcript.

16             Mr. Gregory was asking Ms. Harris at first about her

17   visit to the facility on August 7.  And as he went on with that

18   line of questioning, it was revealed that Ms. Harris never told

19   the government.  She claims that she forgot that she was

20   texting in realtime with a lookout, a person whose identity she

21   tried to protect from them.  That's Diamond Benson.

22             Let's go to 267, line 11.

23   "Q.  They asked you whether or not you knew who gave you the

24   drugs, right?

25   "A.  Yes.

1    "Q.  And you said, I don't know the people, I don't know their

2    names, correct?

3    "A.  Correct.

4    "Q.  That was a lie, right?

5    "A.  I don't know their names.

6    "Q.  Well, didn't Diamond Benson give it to you that day?

7    "A.  I know Diamond name from the Cash App.

8    "Q.  So it's your testimony that you know Diamond Benson from

9    Cash App?

10   "A.  When -- because when I met her, I never knew her name.

11   "Q.  I can't hear you.  Say it again.

12   "A.  When I met up with her, I never knew her name."

13           MR. TAYLOR:  But she remembered getting a text message

14   from Diamond Benson saying LMAO, like back in the old days.

15   That's at page 270, one through eight.

16           Ms. Harris claims that she just met Diamond Benson in

17   the course of the conspiracy, maybe a couple of weeks before

18   she got caught.  But Diamond Benson is texting her, Like back

19   in the old days.  What on earth is that referring to?  Unless

20   they've known each other for a long time.

21           Ms. Harris suggests that she only even knows Diamond

22   Benson's name because it popped up on the Cash App when she got

23   payment for bringing drugs into the MCC.  But she knows Diamond

24   Benson.  They go way back.  That's why Diamond Benson says,

25   Like back in the old days.

1      Let's go to page 270, just so we can see it.

2  "Q.  Do you recall her writing to you, Laughing my ass off,

3  just like back in the old days?

4      Do you remember that?

5  "A.  Yeah, I remember the message.

6  "Q.  Well, the truth is that you just lied in front of these

7  people when you said you met Diamond Benson at the MCC, didn't

8  you?

9  "A.  No."

10      MR. TAYLOR:  Well, she got caught but she kept lying.

11  So she lied to you again.

12      Look, we'll touch on one more.  Ms. Harris, you heard

13  the testimony about Ms. Harris asking Keith Outlaw whether she

14  should have sex with Robert Adams to get him to help them bring

15  in contraband in the MCC.  I want you to read that in the jury

16  room when you're deliberating.  That's at pages 240 through

17  244.  I'm not going to go through it all because it's a lot of

18  back and forth.  These are just examples.

19      Ladies and gentlemen, you saw the testimony, and

20  you're absolutely equipped to make your own assessment about

21  the difference between Ms. Harris' demeanor on her direct

22  testimony and her demeanor during the cross.

23      Like I said, the point of this is not to make

24  Ms. Harris look bad.  The question is whether you can rely on

25  her testimony.  As the judge will tell you, your common sense

1    is your greatest asset as a juror.  Putting this another way,

2    would you rely on what Shahada Harris told you when making an

3    important decision in your own life?  I mean, for example, if

4    Ms. Harris told you that a car that you were considering

5    purchasing ran great and it had never been in an accident,

6    would you rely on what she told you?  You can apply the exact

7    same common sense when assessing what she says about what

8    happened between her and Robert Adams.

9         All right.  I'm now going to address several of the

10   arguments that the government made during their argument.

11   We're going to start off with the text message, GX 410, "nawh,

12   bribed me."  Just bring it up for a second just so we can

13   remind ourselves.

14        This one.

15        Now, it is puzzling how this statement "nawh, bribed

16   me" is supposed to apply to the crimes alleged here.  Mr. Adams

17   is not accused of paying Shahada Harris a bribe.  But Shahada

18   Harris has said on the witness stand that "nawh, bribed me" is

19   essentially shorthand for her claim that Robert Adams told her

20   that she had to have sex with him so she wouldn't get in

21   trouble.

22        Now, you have to ask yourself whether that makes

23   sense, especially in light of Ms. Harris' practice, making her

24   recollections or lack of recollection fit into the claim that

25   got her out of trouble on August 14, 2019.

1        Now, one thing that she said during cross-examination

2    is that that's not a term she would ordinarily use.  Well,

3    that's significant.  Because, look, it's important that the

4    government did not call as witnesses any of the friends that

5    Shahada Harris claims she told about what she says happened

6    between her and Robert Adams.  And that includes the recipient

7    of this e-mail, Naomi, and two other people, Stags and Delly.

8        Now, the government is quite capable of bringing these

9    people to court if the government wants you to hear from them.

10   But they didn't do that.

11       So there is this text to Naomi, and she hasn't said

12   anything to you about any other conversations, any more

13   elaboration that may or may not have taken place between

14   herself and Ms. Harris about what that text meant.

15       Now, Ms. Harris described Naomi as her best friend.

16   And that's on page 208.  Now, it would be odd if Ms. Harris'

17   best friend did not inquire further into what Ms. Harris now

18   claims is a reference to being forced into having sex.  And

19   judging from the remainder of this text chain, Naomi appears to

20   think that the encounter between Robert Adams and Shahada

21   Harris is something to make jokes about.

22       Did Ms. Harris never set the record straight with her?

23   Or is it more likely that when Ms. Harris texted "nawh, bribed

24   me," she was simply referring to the big favor that Mr. Adams

25   had done for her?  He had let her slide.  Ms. Harris called

1    that a bribe.

2             But, remember, Ms. Harris' state of mind isn't the

3    issue you were being asked to decide.  The issue is whether

4    Mr. Adams demanded and intended to demand a bribe, not whether

5    Ms. Harris considered something that was done for her a bribe.

6             Now we're going to move on.  The government has argued

7    that Mr. Adams deleting messages from his phone shows knowledge

8    of guilt.  Well, that's not so.  Now, Mr. Gregory misspoke when

9    he said that Mr. Adams was hiding an affair from his wife.  He

10   said it in the heat of the moment, and that's why openings are

11   not evidence.

12            But there is still an obvious reason to delete the

13   messages, and this reason has nothing to do with bribery or

14   coercion.  The answer is that Mr. Adams wouldn't want anyone to

15   find on his phone texts that are of a sexual nature between

16   himself and the visitor he let slide in violation of BOP rules.

17            Yes, it does show consciousness that he had done

18   something wrong.  What had he done wrong?  He had broken all

19   sorts of rules that the BOP sets as parameters for his job.

20            The government also talked about what Mr. Adams said

21   to Officer Fletcher.  And yes, you can conclude that Robert

22   Adams did something wrong.  The thing that he did wrong was

23   that he violated the rules.  Again, he doesn't want Fletcher to

24   know that he had sex with a woman after giving her a break.

25   Fletcher ran the visit room.  Adams doesn't want to lose his

1    job.

2            As for the statement to the FBI, Amanda Gildea, I

3    mean, there is nothing strange about the outburst that

4    Mr. Adams made.  I mean, it's clear from Officer Fletcher's

5    testimony that Adams knew about Shahada Harris' arrest.  And

6    what he said to the FBI agent is 100 percent true.  He didn't

7    bring anything in and he didn't allow anybody to bring anything

8    in.

9            The government says that it shows that he's got a

10   guilty conscience because contraband comes up without the agent

11   having mentioned anything about contraband.  Well, sure.

12   Contraband was the first thing that came to mind for him.  I

13   mean, he had given her a break after he caught her bringing

14   contraband into the MCC.  That's a violation of his duties as

15   an officer.

16           Look, what are the essential issues in the case?  The

17   issue is whether or not Robert Adams, in effect, coerced

18   Ms. Harris to meet him outside and to have sex with him.  If

19   you have a reasonable doubt as to whether Robert Adams

20   threatened to get Ms. Harris in trouble if she did not meet him

21   by the pizzeria, you should acquit him.

22           Now, the government asked Ms. Harris many times

23   whether Mr. Adams said she would be in trouble.  And under the

24   agreement between her and the government, that agreement

25   hanging over her head, she said 'yes' repeatedly.

1      Well, let the government answer this in their

2  rebuttal.  If Mr. Adams threatened Ms. Harris in the visitor

3  room, why does the evidence not support it?  And listen, ladies

4  and gentlemen, to their rebuttal, if they try to move that

5  threat, that threatening behavior, that coercion outside of the

6  visitor room onto the street, where there was no witness.

7      The government has stated their case on what happened

8  in the visitor room.  They claim that a threat took place

9  there, notwithstanding what Ms. Boyce said.  Without a threat

10  in the visitor room, it completely undercuts their case.  When

11  they hinge their entire case on what happened in that visitor

12  room, how can they maintain there was a threat when there was

13  an independent witness who said otherwise?  And I encourage you

14  to go back through that testimony again.  Compare Ms. Harris'

15  testimony with Ms. Boyce's testimony.

16      Now let's talk about the elements of the three

17  offenses.  The judge is going to instruct you on the elements,

18  so I'm not going to go into too much detail, but please pay

19  close attention to the judge's instructions on the elements.

20      Now, I'm just going to touch on a few of these, and

21  this doesn't mean that these are the only ones the government

22  hasn't proved.  To prove Count One, the government has to show

23  Mr. Adams had a corrupt intent.  As I've said many times

24  already, Ms. Harris' intent does not matter.  If she intended

25  to bribe Mr. Adams, that does not prove the offense.  Likewise,

1    if Mr. Adams' state of mind was bad because he was cheating on

2    his wife or he knew he was breaking BOP rules, that is also not

3    sufficient.

4         Now, the government also has to demonstrate a quid pro

5    quo.  Now, that phrase does not appear in Count Two, but it's a

6    similar idea, an exchange.  If the evidence of that quid pro

7    quo, or that exchange, is coming only from Ms. Harris, you have

8    to acquit Mr. Adams.

9         Now, in his opening, Mr. Gregory referred to Count

10   Three, which I haven't talked about much yet, as a Hail Mary.

11   Now, the judge is going to instruct you that the government

12   must prove beyond a reasonable doubt that Mr. Adams had

13   knowledge of the fact that Ms. Harris had committed a felony.

14   The judge will instruct you that to prove this element, the

15   government must prove beyond a reasonable doubt not only that

16   Mr. Adams knew that Ms. Harris had smuggled contraband into the

17   MCC, but also that Mr. Adams knew that smuggling contraband

18   into the MCC constituted a felony.

19        The government, when they went through the elements in

20   their conclusion, said that there is no serious dispute about

21   that element.  Well, look, ladies and gentlemen, maybe there is

22   no serious dispute because there is no proof of this.  You can

23   go through all the training materials, all those BOP materials,

24   the rules and regulations, the program statements, the post

25   orders.  There is nothing that says that what Ms. Harris did

1   was a felony.  Also, no one testified that they trained or

2   instructed Mr. Adams to know that smuggling in tobacco and

3   marijuana was a felony.

4           Let's bring up GX 111.  Well, here, it's talking about

5   introduction of contraband.  In that second paragraph, it says

6   that, "Introducing or attempting to introduce contraband into

7   or upon the grounds of a correctional institution, or taking or

8   attempting to take contraband out of it, without the CEO's

9   knowledge or consent, is prohibited."

10          It doesn't even say that it's breaking the law, much

11  less a felony.

12          Let's go to 123.  You're going to look at paragraph

13  five.  "Bringing any unauthorized items, such as medication,

14  weapons, tools, food or drugs, into the institution is a

15  violation of institution regulations and the law.  This

16  infraction may result in the visitor's permanent removal from

17  the visiting list and referral to the proper law enforcement

18  agencies for prosecution."

19          (Continued on next page)

20

21

22

23

24

25

1          MR. TAYLOR:  So the infraction may result -- not

2     definitely, may -- in the visitor's permanent removal from the

3     visiting list, and referral to the proper law enforcement

4     agencies for prosecution.  Nothing about a felony there.

5          Now the government says that there's no serious

6     dispute about this because this is an offense for which you can

7     go to jail.  Well, I think everybody knows that you can go to

8     jail for a misdemeanor.  What do we expect of Mr. Adams?

9     There's zero evidence that he knew that bringing tobacco or

10    marijuana into that facility is a felony.  Now maybe certain

11    things like bringing a loaded firearm into the facility, that

12    would be obvious.  But you remember when I asked Mr. Jean about

13    things that are legal outside on the street but not allowed on

14    the inside, and he said:  Yeah, it all depends on the

15    circumstances.  Just things that are coming from the outside.

16    But he didn't display any understanding or say that people knew

17    that this was a felony.

18          And let's look at the direct testimony that Mr. Jean

19    gave.  Let's go to page 104.  Now Mr. Jean was his boss.

20    Line 4.

21          "Q.  And when this says referral to the proper law

22    enforcement agencies for prosecution, what does that mean?"

23          By the way, this is the government asking him these

24    questions.

25          "A.  That means -- depends on the infraction or what

1    the incident -- depends on the contraband or whatever the

2    visitor brought in.  This could be referred to the FBI for

3    prosecution."

4         So it depends.  So how is he supposed to know that

5    it's a felony if it depends?  Look, he knows that you're not

6    supposed to bring contraband into the MCC.  There's no question

7    about that.  It's against the rules.  It says so.  But nowhere

8    does it say that it's a felony.  So how is he supposed to know

9    that what Shahada Harris has done was a felony?

10        Let's go to page 120, line 25.  So we're starting at

11   the bottom of the page.

12        "Q.  What, if anything, happens to a visitor who

13   brings contraband to the MCC?"

14        "A.  That visitor, the visiting form will be taken,

15   and we will pass that visiting form to the legal department,

16   will pass the visiting form to the legal department for further

17   investigation, and that visitor will be -- will not be

18   permitted to enter the institution.

19        "Depending on the contraband, the SIS department could

20   pass that information, pass that on to the FBI for referral,

21   for FBI referral for prosecution."

22        All right.  So it's pretty attenuated.  It's not up to

23   him to know what's a felony, what's not a felony.  This is

24   something that, when you find the contraband, you pass it on to

25   the legal department and then the legal department makes a

1    decision whether to pass that on to the FBI.  Maybe it happens,

2    maybe it doesn't.  Maybe you don't get prosecuted at all.  How

3    is he supposed to know that that's a felony?

4          Now Mr. Jean's understanding appears to be that the

5    seriousness of the offense depends on what was brought in.

6    Well, like I said, gun, very serious; tobacco, marijuana,

7    obviously less so.  I mean, these are things that are either

8    completely legal or somewhere on the borderline.

9          And look, I mean, if these things aren't getting

10   referred and he's not involved in that referral process because

11   he doesn't work in the legal department, how does he know that

12   it's a felony?  How does anyone know this?  It doesn't seem

13   like Mr. Jean knows.  And look, there's a difference between a

14   felony and a misdemeanor.  These are different kind of crimes.

15   So this is not something where the government suggests that

16   there's no serious dispute.  They're talking about something

17   that he was never trained on, no one ever told him about.

18   Look, there's no evidence in this case that he knew that was a

19   felony.

20         Now also, with respect to misprision of a felony,

21   Count Three, the government has to show beyond a reasonable

22   doubt that Mr. Adams actively concealed a crime, a felony.

23   They can't prove that if it depends only on Ms. Harris's

24   testimony.  Not beyond a reasonable doubt.  Now Ms. Bhaskaran

25   talked about some other ways in which Mr. Adams concealed,

1    actively concealed -- we're not talking about something

2    passive, not just talking about being silent.  Ms. Bhaskaran

3    said that Mr. Adams allowed Ms. Harris to leave the building.

4    Well, as I said before, I don't think he had much choice about

5    that.  It's the end of the visit time, she's got to go.  Again,

6    not trying to be flippant about it, but you can't stay

7    overnight there.  So allowing her to leave is something that

8    happens in the regular course of events at the end of the

9    visiting time, and as we know, she left at 7:58:30.

10         They also talk about Mr. Adams telling Officer

11   Fletcher that he knew Ms. Harris from the neighborhood.  Well,

12   look, that's not concealing Ms. Harris's crime.  That's just

13   concealing the nature of his relationship with her.

14         Now after closing arguments, Judge Gardephe is going

15   to instruct you on the law that's going to apply when you

16   deliberate, and I implore you, please listen to the judge's

17   instructions carefully.  One of those instructions is going to

18   concern the presumption of innocence.  This is a bedrock of the

19   American justice system.

20         Now one of the amazing things about our justice system

21   is that it's not like what you see on TV.  It's not just a

22   question of there being two competing stories and you decide

23   between them.  As the judge said at the very beginning of this

24   trial, and he's going to explain it to you again, in our

25   system, the burden is entirely on the government to prove guilt

1  beyond a reasonable doubt.  And every defendant is afforded the

2  presumption of innocence.  What does that mean?  I mean, these

3  are terms that we hear all the time as Americans.  We say it,

4  we hear it on TV, but what does it really mean?  Well, let's

5  start -- what is a presumption?  A presumption is an idea

6  that's taken to be true.  That's the dictionary definition.

7  That means that even if you don't like Mr. Adams, even if you

8  think that he's a womanizer, a bad correctional officer, who

9  has no business getting a government paycheck, the law still

10  requires you to take it as truth that he's innocent of these

11  crimes that the government is accusing him of until you decide

12  otherwise.

13         And the burden is on the government, not just to put

14  up a witness who tells an incredible story but to present

15  evidence of the quality that will change minds about

16  Mr. Adams's innocence, that you say to yourself, the thing that

17  I take to be true, Mr. Adams is innocent, has been overcome by

18  proof beyond a reasonable doubt.

19         Now this is the kind of proof that you rely on to make

20  important decisions in your everyday life.  It's the kind of

21  proof that would make you question your own presumptions.

22  Ladies and gentlemen, the glory of our system is that we apply

23  that same standard to everyone, whoever is sitting in that

24  chair, whether it's your best friend, or whether it's a man

25  that you just met last week when you came into the courthouse.

```
 1    This is bigger than Mr. Adams.  This is about the power of
 2    ordinary citizens to hold the government to account, to demand
 3    that they prove their case before taking away someone's
 4    liberty.  You are the only ones standing between Mr. Adams and
 5    the government's power to do that.  Our system puts that
 6    responsibility -- gives that power to you, citizens.  And now,
 7    in a few minutes, it's going to be your turn to exercise it.
 8    And I know that you're going to exercise it carefully,
 9    attentively, and responsibly, as you've done throughout the
10    case, by being patient and listening carefully to the evidence.
11    And if you do that, there's only one verdict to return -- not
12    guilty.  Thank you.
13              THE COURT:  Ladies and gentlemen, we're going to take
14    a brief recess.  Don't discuss the case yet because there's
15    more argument as well as my instructions, and do keep an open
16    mind.  We'll be back to you shortly.
17              THE DEPUTY CLERK:  All rise.
18              (Jury not present)
19              THE COURT:  All right.  We'll take a 10-minute break.
20              (Recess)
21              (In open court; jury not present)
22              THE COURT:  How long do you expect the rebuttal to be?
23              MR. SCHAEFFER:  No longer than 20 minutes, your Honor.
24              (Jury present)
25              THE COURT:  Please be seated.
```

1        Ladies and gentlemen, we'll now hear the government's

2   rebuttal.

3        MR. SCHAEFFER:  Thank you, your Honor.

4        Ladies and gentlemen, you've been very patient this

5   morning, and so I promise that I'm going to be as brief as I

6   possibly can.

7        What you just heard this morning was a perfect example

8   of evidence versus distraction.  Ms. Bhaskaran gave her

9   summation and walked you step by step through all of the

10  evidence in this case, the evidence that proves the defendant's

11  guilt as to each count.  That evidence is overwhelming, and it

12  comes in many different forms.  Remember the seven reasons that

13  Ms. Bhaskaran walked through with you -- Shahada Harris's

14  testimony; her text messages; Qunisha Boyce's testimony; the

15  defendant's false statements to Richard Fletcher; the

16  defendant's statements to the FBI; the defendant's deletion of

17  his text messages; and your common sense.  Remember those

18  reasons when you go back to deliberate, and remember how few of

19  them were discussed in the defendant's summation.

20       Ms. Bhaskaran took you through all of the evidence and

21  showed you how those reasons and how the other evidence come

22  together to prove that the defendant is guilty.  And when she

23  did that, you saw exhibit numbers, images, quotes from

24  testimony, transcript citations.  What you heard from

25  Mr. Taylor, on the other hand, was just arguments -- arguments

1    meant to distract you from the evidence, arguments without

2    evidentiary support, sometimes contrary to the evidence.

3    Mr. Taylor speculated.  He cherry-picked quotations from

4    different witnesses throughout the trial.  He attacked Shahada

5    Harris.  He tried to convince you that she and the other

6    witnesses were either lying or didn't know what they were

7    talking about.  Don't fall for that.

8            Let me be clear.  As Judge Gardephe will instruct you,

9    and as he's already instructed you, the defendant has no burden

10   of proof.  It is the government's burden to prove that the

11   defendant is guilty beyond a reasonable doubt.  That's why we

12   called all of these witnesses.  That's why we offered all of

13   the evidence -- the documents, the pictures, the videos that

14   you saw -- because we embrace that burden.  But when a

15   defendant, through counsel, chooses to make arguments, they

16   must be scrutinized.  So I'm going to take a few minutes to

17   discuss the arguments that you just heard from Mr. Taylor and

18   how you know that they don't hold water.

19           Let me say this, though.  I'm not going to talk about

20   everything that Mr. Taylor mentioned, or address every point

21   the defense has tried to make throughout this trial.

22   Ms. Bhaskaran already reviewed the evidence in this case, so

23   frankly, there's no need to spend much time on a lot of the

24   things that Mr. Taylor said in his summation.

25           For instance, remember when Mr. Taylor suggested

1    during his summation that only the visiting room matters here?

2    That was laid down like a gauntlet for the government:  You

3    must respond to that.  Well, I'll respond to that now.  That

4    doesn't matter.  It's a distraction, ladies and gentlemen, pure

5    and simple.  And you know why?  Because they want you to focus

6    only on the visiting room.  And it's pretty clear why that

7    would be.  They don't want you to focus on the car, on the

8    motel, on the sex.  They don't want you thinking about that,

9    because all the evidence that relates to those things leads in

10   one direction.  It's clear why Mr. Taylor and the defendant

11   want you to forget that he repeatedly threatened Ms. Harris,

12   not just in the visiting room.  When he went to pick her up at

13   the pizzeria, in the car, in the motel room before he told her

14   to undress.  It wasn't just one threat.  It happened multiple

15   times.  But because there's no other explanation for the

16   evidence, Mr. Taylor would prefer that you forget it.

17        Now how do you know that in the visiting room there

18   was a threat?  Ms. Harris told you that, on the stand, herself.

19   And like Ms. Bhaskaran said, her testimony is enough.  But your

20   common sense also tells you the same thing.  Because if he

21   didn't threaten her, as Ms. Harris testified, why did she

22   leave?  Why did she go to the pizzeria?  If he didn't threaten

23   her at the pizzeria, why did she get in the car?  If he didn't

24   threaten her in the car, why did she go to the motel?  If he

25   didn't threaten her at the motel, why did she have sex with

1    him?  Your common sense tells you the answer to all of those

2    questions, ladies and gentlemen.

3              But let's take a quick step back.  Why are we talking

4    about a threat at all?  Well, one, because that's what

5    Mr. Adams did.  He threatened to report her, to turn her in, to

6    ban her from the MCC.  But the reason that Mr. Taylor focused

7    on that is another distraction, because as I expect Judge

8    Gardephe will instruct you, there is no requirement that there

9    has actually been a threat.  The key elements to bribery and

10   blackmail are an exchange, a corrupt exchange.  I expect that

11   the judge will instruct you that that is the same for bribery

12   and for blackmail, a threat or in consideration for, which I

13   expect you'll hear simply means an exchange.  There's no

14   question there was an exchange, ladies and gentlemen.  Even

15   Mr. Taylor said that in his summation.  You heard him time and

16   time again say that Mr. Adams did this for Ms. Harris.  It was

17   a favor.  That is a quid pro quo, ladies and gentlemen.  This

18   for that.  That is an exchange.  And you'll hear, when Judge

19   Gardephe instructs you on the law, that the law makes no

20   distinction between soliciting, demanding, receiving a bribe.

21   All of it counts as an exchange.  And there's no question that

22   the defendant had sex with Ms. Harris.  There's no question

23   that he never reported her.  There's no question that he never

24   turned in the contraband that she brought into the MCC.  Ladies

25   and gentlemen, the evidence is clear that there was an

1    exchange, and that is what the law requires.

2         I'm not going to spend much time on Mr. Taylor's

3    argument that of course Mr. Adams and Ms. Harris went to the

4    pizzeria after they left the MCC.  The logic behind that

5    appears to be that his shift was over, so he was going to

6    leave, and visiting was over, so she was going to leave as

7    well.  It's just ridiculous, and so I'm not going to waste much

8    time on it.  Apparently when your shift as a prison guard is

9    over, it's time for pizza with someone that you just caught

10   smuggling drugs.  You know that argument doesn't make sense.

11   Apparently when you've just been caught smuggling drugs into

12   the MCC, it's time to meet the guard who did that, who caught

13   you, at a pizzeria.  You know that doesn't make sense either.

14   There's only one reason why Ms. Harris went to that pizzeria.

15   She was ordered to by someone with power over her.  The

16   evidence makes that clear.

17        I'm also not going to talk much about the suggestion

18   that the defendant was staging an intervention for Ms. Harris,

19   that he was trying to make her life better, he was giving her

20   advice, he was being friendly.  Ladies and gentlemen, Mr. Adams

21   met Ms. Harris that day and within a half an hour was having

22   sex with her at a motel.  This was not an intervention.  This

23   was a corrupt exchange.

24        Mr. Taylor also mentioned several calls with

25   Mr. Outlaw, between Ms. Harris and Mr. Outlaw.  He suggested

1    numerous times that she somehow concealed these calls from the

2    government.  I confess that I have some difficulty

3    understanding that argument, and when you look at the evidence,

4    I think you will as well.  It's no secret that Harris

5    communicated with Outlaw.  She took that stand and freely

6    admitted that these were calls that she had had with

7    Mr. Outlaw.  The only reason we're talking about these calls is

8    because Ms. Harris herself testified about them.  So it's not

9    clear and doesn't make sense to say how those calls were

10   somehow concealed during this trial.

11        The same goes for messages with Diamond Benson.

12   Messages with Ms. Benson came from Ms. Harris's phone.  You've

13   seen plenty of evidence from Ms. Harris's phone during this

14   case.  It's not clear why Mr. Taylor suggested those were

15   somehow concealed from the government.

16        And lastly, I'm really not going to spend a lot of

17   time on the lengthy dissertation that you received about the

18   minutes in the visiting room.  Was it four minutes?  Was it

19   five minutes?  Was it two minutes?  Was it in fact four minutes

20   and 22 seconds?  You know that doesn't matter.  Mr. Taylor

21   suggested that perhaps it was important because Ms. Harris

22   could have left the visiting room.  Well, but did she?  You saw

23   the government exhibits of the video footage at the MCC.  You

24   saw Mr. Adams come back into the room and meet Ms. Harris.

25   Does that evidence really support the argument that Mr. Taylor

1    made?  And do those arguments really matter to what you need to

2    decide here today?  No.  Again, it's a distraction.

3            But there are a few arguments that I'm going to

4    respond to, mostly because they form the bulk of Mr. Taylor's

5    summation.  When you take a closer look at those, you'll see

6    how they also are contradicted by the actual evidence in this

7    case.

8            So the central defense argument is that Shahada Harris

9    is lying.  That's no surprise.  And that's because her

10   testimony is by itself enough to convict the defendant.  So

11   defense counsel has tried very hard to convince you that Harris

12   made up everything that she testified to, and everything that

13   she told her friend before getting caught, and everything that

14   she told the government after getting caught.  Except, of

15   course, when Ms. Harris says something that the defense thought

16   was useful.  In those cases defense counsel wants you to

17   believe Ms. Harris.  Remember every time defense counsel said

18   "admit" or "concede," when talking about Ms. Harris's

19   testimony, he was talking about testimony that she gave that

20   the defense wants you to believe.  They want you to credit it.

21   In other words, Mr. Taylor wants to have it both ways --

22   believe Ms. Harris when it helps the defense, but don't believe

23   her otherwise.  You know it doesn't work that way.

24           Mr. Taylor also suggested that there were

25   discrepancies between the testimony of Ms. Boyce and

Ms. Harris.  I'm not going go through and talk about each of

the individual quotes that he pulled out from their testimony.

You remember that testimony.  And if you need a refresher, you

have the transcripts.  Their testimony was relatively short --

this trial was relatively short -- and you can review it if

necessary.  But what I expect you'll see is that if you don't

slice and dice the testimony in the same way that Mr. Taylor

did, Ms. Harris and Ms. Boyce were consistent on every issue

that is relevant to this trial.  Are there small differences?

Sure.  These are two separate individuals who don't know each

other recalling the same incident from two years in the past.

As I expect the judge will instruct you, no two people recall

the same incident exactly the same.  You know that that's the

case.  But does that in any way undermine the core testimony

that each of those witnesses gave?  No.  It's another

distraction.

        Mr. Taylor also mentioned the non-prosecution

agreement pursuant to which Ms. Harris testified at this trial.

Ms. Bhaskaran explained the reasons that you can and should

believe Ms. Harris.  And Mr. Taylor tried to muddy the waters

by saying that that non-prosecution agreement was hanging over

her head, that she'd told a lie in the beginning and had to

stick with it.  But ladies and gentlemen, Ms. Harris had a

powerful reason to tell the truth.  She gets no benefit if the

defendant is convicted.  But if she's caught in a lie, her

1    agreement can be ripped up and the government can prosecute her

2    both for her original crimes and for lying.  Do those

3    consequences really sound like an incentive to lie?  It's a

4    huge risk to take.  If Ms. Harris's story was a lie, how could

5    she be sure that we wouldn't uncover another witness, another

6    piece of evidence that would reveal the lie?  It's a massive

7    gamble for a witness to take.

8            As Ms. Harris herself admitted, she's made some bad

9    choices.  She's made serious mistakes.  You saw ample evidence

10   that Ms. Harris was telling the truth when she testified to you

11   at this trial.  You saw the text messages.  You heard from

12   Qunisha Boyce.  You know that evidence is consistent with

13   Harris's testimony.  Defense counsel has no good answer for

14   that corroborating evidence.  And so they want you to look at

15   it piecemeal, one piece but not as a whole.  Don't fall for

16   that.

17           And from a larger perspective, Shahada Harris is not

18   on trial here.  You may not like the fact that she was bringing

19   contraband into the MCC, but remember, the government did not

20   make Ms. Harris the witness to these crimes, the defendant did.

21   He chose her to be his victim.  And it was precisely because

22   Ms. Harris had done something wrong that the defendant was able

23   to gain leverage over her and demand sex.  That's why the

24   defendant chose her, and that's why she was a witness at this

25   trial.

1          You also heard a lot from Mr. Taylor and throughout

2    this trial about how Shahada Harris supposedly initiated the

3    relationship with the defendant.  It's been argued to you over

4    and over that Ms. Harris sent the first text message, that she

5    sent the defendant nude pictures, she sent messages with emojis

6    and hearts.  The defense wants you to believe that all of those

7    things show that there was some romantic relationship between

8    Harris and the defendant, even though there is nothing romantic

9    about being threatened, driven to a liquor store, and taken to

10   a motel for sex.  You've seen the evidence.  You know there's

11   no evidence Ms. Harris ever met the defendant again, like you'd

12   expect in a real relationship.  You know that she was just

13   trying to stay on his good side when she sent those messages on

14   July 5th, and after July 5th.  But again, guess what, ladies

15   and gentlemen?  This is yet another attempt to distract you

16   from what's important, because like I just said, all of those

17   things that the defense keeps harping about -- emojis and

18   hearts, so many that it seems like Valentine's Day -- all of

19   that happened after July 5th.  In other words, they happened

20   after the defendant committed these crimes.  And those crimes

21   are why we're here.

22          Now this leads to one of the most troubling arguments

23   advanced by the defense, that the sex between Shahada Harris

24   and the defendant on July 5th was consensual.  As Ms. Bhaskaran

25   pointed out, that's not only wrong, it's offensive.  Defense

1    counsel wants you to believe that Harris chose to have sex with

2    a man she'd never met right after he caught her breaking the

3    law but didn't report her.  Defense counsel wants you to

4    believe that Harris chose to have sex with a man whose name she

5    didn't know until he was driving her to a motel, a man who

6    ripped off the condom at the last second and threatened her

7    with jail if she had an STD.  Consensual.  You heard Harris's

8    testimony.  You saw how she described the encounter to friends

9    in private text messages just days later.  Mr. Taylor faulted

10   the government for not calling those individuals as witnesses,

11   but as I expect Judge Gardephe will tell you, that can play no

12   role in your deliberations.

13        Harris said that she felt she was bribed, coerced.

14   You know something can be coercive even though it doesn't

15   involve physical force.  And you know something isn't

16   consensual just because someone makes you choose between having

17   sex or getting reported for committing a crime.

18        But let's pause for a minute and think about the

19   defense's argument, really think about it, because here's how

20   you really know it's a distraction from the evidence that

21   you've seen.  Even if the sex between the defendant and Harris

22   was consensual in some sense, that has nothing to do with the

23   defendant's guilt.  Listen closely to Judge Gardephe's

24   instructions on the law, and you won't hear one word about

25   consent.  That's because lack of consent is not an element to

1   any of the crimes charged in this case.  This case is about a

2   corrupt exchange.  What the defendant demanded or received,

3   whether the sex he obtained was consensual or not, it has

4   nothing to do with whether he is guilty of bribery, blackmail,

5   and misprision.

6         There's also no evidence that Harris ever schemed to

7   get the defendant to help her smuggle contraband, nor is there

8   any evidence that Harris had sex with the defendant for that

9   purpose.  And it's obvious why.  Harris told you she had

10  feelings for Outlaw.  You saw the log entries where she came to

11  the MCC again and again, only visiting him.  Your common sense

12  tells you that the plan Mr. Taylor imagined just wasn't

13  realistic.  And Harris told you that straight out.  These

14  conspiracy theories are totally irrelevant to what you actually

15  need to decide.

16        Now Mr. Taylor also suggested there was no evidence of

17  any affirmative step by the defendant to conceal Harris's

18  contraband smuggling.  That's just nonsense.  Ms. Bhaskaran

19  walked you through three different affirmative steps that the

20  defendant took that are relevant to the misprision count.  As

21  Ms. Bhaskaran pointed out, we expect Judge Gardephe will

22  instruct you that an affirmative attempt, or affirmative step

23  to conceal includes things like falsely denying knowledge of a

24  crime, giving an untruthful statement to authorities or

25  disposing of evidence.  The defendant did those things.  Having

1   sat through this trial, you know that the defendant disposed of

2   evidence and made a false statement in order to conceal his

3   connection to Harris's crime.  Ms. Bhaskaran also pointed out

4   that the defendant directed Ms. Harris to leave the MCC, which

5   was also an affirmative step to conceal the crime.  Mr. Taylor

6   says no.  Mr. Taylor suggested that that was merely because

7   visiting time was over.  His shift was up.  But ladies and

8   gentlemen, nothing about those two things justifies a direct

9   order to leave the MCC, leave the place where Ms. Harris would

10  otherwise have been detained, questioned, processed, and go to

11  a pizza shop.  That's not in the ordinary course, ladies and

12  gentlemen.  That's not a mere omission.  That's an affirmative

13  step to conceal a crime, to provide an escape route, and to

14  help prevent a crime from being uncovered.

15          The second aspect of misprision that Mr. Taylor took

16  issue with was the defendant's knowledge of a felony.  Ladies

17  and gentlemen, the suggestion that Mr. Adams, who has worked

18  for the Bureau of Prisons, a division of the Department of

19  Justice, at that time since 2015, did not know that smuggling

20  contraband -- specifically narcotics, marijuana -- into a

21  prison was a felony is absurd.  What do you think he meant when

22  he told Ms. Harris that she could get in serious trouble?

23  Ms. Harris, in fact, had already smuggled contraband into the

24  prison at that point.  Ms. Harris had already lied on GX 125,

25  which is the notification form that all visitors receive.  That

1    form informed visitors that lying about any of the items on

2    that form may subject you to up to five years in prison.  What

3    did Ms. Harris lie about on that form?  About the contraband

4    she was carrying.  What do you think the defendant meant when,

5    even after knowing that she'd already lied on that form, she

6    could get into serious trouble?

7            I expect that Judge Gardephe will also tell you that

8    guilty knowledge of a felony can be inferred from the

9    surrounding circumstances.  So think about too what the

10   defendant did.  Did he really think this was a minor

11   infraction, a slap on the wrist was all that's required for

12   someone who brings in contraband like Ms. Harris did?  Would he

13   really have ordered someone to leave the prison immediately,

14   would he have met her on different premises, would he have

15   driven her from the prison if he thought that all of this was a

16   small infraction?  Would he have lied to Richard Fletcher

17   later?  No, ladies and gentlemen.  Your common sense tells you

18   otherwise.

19           Mr. Taylor also spent a lot of time talking about how

20   there's a difference between breaking MCC rules and breaking

21   federal law.  Agreed.  Mr. Adams is not charged with breaking

22   MCC rules.  Mr. Adams is charged with bribery, blackmail, and

23   misprision.  You know that breaking those rules was not the

24   crime charged here, but it is evidence of the crimes charged

25   here.  Because breaking those rules, that's what the defendant

1    traded for sex.  And I expect that Judge Gardephe will instruct

2    you that when an officer violates his official duties, when he

3    breaks the rules in exchange for something he values, like sex,

4    that's bribery.

5           At the end of his summation, the defense lawyer

6    focused on the government's burden in this case, the burden of

7    proving the defendant's guilt beyond a reasonable doubt.

8    There's nothing new or magical about that statement.  It is the

9    same burden the government has in every criminal case

10   throughout every courtroom in this country.  Everyone agrees

11   that's the standard.  We knew that when we walked in this

12   courtroom.  That's why you saw all of the witnesses and

13   evidence that we introduced in this case.  That's why we spent

14   so much time painstakingly reviewing the events of July 5th, by

15   showing you prison logs, by showing you phone evidence, by

16   showing you videos.  Like I said at the beginning, the

17   government always has the burden of proof, so we embrace that

18   burden.  After sitting through this trial, you know that the

19   government has met that burden.

20          I just want to leave you with a few final thoughts.

21   Mr. Taylor cited Ms. Boyce's testimony and then gave you a

22   bunch of additional information about Mr. Adams, suggesting

23   that he was a good correctional officer; he'd followed the

24   rules in the past, he was likeable, he joked with people, he

25   was great.  But ladies and gentlemen, you know the truth after

1   looking at the evidence in this case.  You know that good

2   upstanding officers don't break the rules that require them to

3   report people who smuggle drugs into the prisons they're

4   guarding.  Good officers don't just dispose of the drugs they

5   find while on duty.  Good officers don't break rules that

6   require them not to have relationships with inmates'

7   associates.  And good officers certainly don't have sex with

8   visitors that they just caught bringing drugs into a prison.

9   Mr. Taylor suggested that this last item, having sex with a

10  visitor, was why Mr. Adams deleted his text messages, but you

11  also know that's not true.  And how?  Because Mr. Adams told

12  Mr. Fletcher that he had a relationship with Ms. Harris.  And

13  if you'll remember, Mr. Gregory asked if that could be

14  characterized as having had fun in the past.  Mr. Fletcher said

15  yes.  Mr. Fletcher was the officer in charge of the visiting

16  room.  If Mr. Adams were really worried about people finding

17  out about him having a sexual relationship with a visitor, if

18  he was really worried about a workplace infraction and that's

19  why he deleted his text messages, would he have told that to

20  Mr. Fletcher?  No.  The evidence in this case revealed the

21  defendant for what he really is.  Pulling away the mask of a

22  good officer and revealing someone who preys on those he can

23  control.  You know that no matter what the defense says, the

24  evidence says otherwise.  This isn't a close case, not by a

25  long shot.

1          And so I'll end where I started at the beginning of

2    the trial.  If you trust your common sense, stay focused on the

3    evidence, and follow Judge Gardephe's instructions on the law,

4    then you'll return the only verdict consistent with all the

5    evidence you've seen over the past few days –– that Robert

6    Adams is guilty.

7          THE COURT:  Ladies and gentlemen, the time now is

8    1:00.  Your lunch is waiting for you.  We'll resume at 1:45

9    with my instructions on the law and then the case will be given

10   to you to deliberate on and reach your verdict.

11         Don't discuss the case yet because you haven't heard

12   the legal instructions.  Keep an open mind until you hear the

13   legal instructions.  We'll resume at 1:45.

14         THE DEPUTY CLERK:  All rise.

15         (Jury not present)

16         THE COURT:  All right.  We'll resume at 1:45.

17         (Luncheon recess)

18

19

20

21

22

23

24

25

LB3sADA4                    Jury Charge

1                          AFTERNOON SESSION

2                             1:50 p.m.

3          (Jury not present)

4          THE DEPUTY CLERK:  Your Honor, I'll get the jury.

5          THE COURT:  Yes.

6          MR. GREGORY:  Judge, one quick two-minute thing, if we

7     could.

8          THE COURT:  All right.

9          MR. GREGORY:  We're not sure about it.  We just want

10    to ask.  Mr. Taylor will deal with it.

11         MR. TAYLOR:  I'm not sure I heard fully, your Honor,

12    what the government said about the sign-in sheet and the

13    five-year penalty on the sign-in sheet.  Obviously, Ms. Harris

14    committed a crime by filling that in improperly.  But my

15    understanding is that that is not in the indictment.

16         So I just can't remember how the government presented

17    it, whether it constituted a constructive amendment in the

18    indictment or not.  I'm not saying it did.  I haven't seen the

19    minutes.

20         THE COURT:  Well, so this is in evidence, right, this

21    form?

22         MR. SCHAEFFER:  Yes, your Honor.

23         THE COURT:  Do you happen to know what the exhibit

24    number is?

25         MR. SCHAEFFER:  It's Government Exhibit 125.

1          THE COURT:  OK.  This is the form that a visitor to

2     the MCC has to sign, right, saying they haven't brought

3     anything in?

4          MR. SCHAEFFER:  Correct, your Honor.

5          THE COURT:  And I gather from the argument that the

6     form indicates that if you have, in fact, brought in

7     contraband, you could be subject to as much as five years in

8     prison, is that what it says?

9          MR. SCHAEFFER:  Yes, your Honor.  It's a 1001 warning.

10          THE COURT:  1001.

11          So the Assistant was clearly commenting on something

12     that's in evidence, so he's free to do that.  And he was citing

13     the five-year penalty for purposes of suggesting to the jury

14     that it was, in fact, a serious crime that Ms. Harris had

15     committed.  So that's what I understood the argument to mean.

16          To the extent you're suggesting, Mr. Taylor, that

17     there is some risk of amending the indictment, I don't really

18     follow the argument.

19          MR. TAYLOR:  No, your Honor.  I don't dispute your

20     recollection.  I was merely raising it because I wasn't quite

21     sure what I had heard.  If it's as you said, your Honor, then

22     there wouldn't be an issue.

23          THE COURT:  I don't think there is an issue of any

24     sort.

25          First of all, the document is in evidence.  So both

1    sides can comment on anything that's in evidence.  I think the

2    argument was an appropriate response to the defense suggestion

3    that the crime at issue here, the smuggling crime, wasn't

4    serious.  And so I think it was an appropriate rebuttal to that

5    argument, so I don't see anything improper in it.

6              MR. TAYLOR:  Very well, your Honor.

7              (Jury present)

8              THE COURT:  Mr. Ruocco, would you please distribute

9    the jury instructions to the jury.

10             THE DEPUTY CLERK:  Yes, your Honor.

11             THE COURT:  Members of the jury, I will now instruct

12   you as to the law that governs this case.  You have each been

13   handed a copy of the instructions I will read.  I do ask you to

14   read along with me.  You will be able to take your copy of the

15   instructions into the jury room and to consult them during your

16   deliberations.

17             There are three parts to these instructions.  I'll

18   begin with general instructions about your role, and about how

19   you are to decide the facts of the case, that is, what

20   happened.  I will then give you instructions that are specific

21   to the charges in this case.  I will close with instruction by

22   such matters as communications with the court, conduct during

23   deliberations, and the process for returning a verdict.

24             It is important that you listen carefully.  I am

25   reading these instructions from a prepared text because the law

is made up of words that are very carefully chosen.  This is

not a time to ad lib.  When I tell you what the law is, it is

critical that I use exactly the right words.

My duty at this point is to instruct you as to the

law.  It is your duty to accept these instructions of law and

to apply them to the facts as you determine them.  With respect

to legal matters, you must take the law as I give it to you.

If any lawyer has stated a legal principle different from any

that I state to you in my instructions, it is my instructions

that you must follow.

You are to consider these instructions together as a

whole; in other words, you are not to isolate or give undue

weight to any particular instruction.  You must not substitute

your own notions or opinions of what the law is or what you

think it ought to be.

As members of the jury, you are the sole and exclusive

judges of the facts.  You decide what happened.  It is your

sworn duty to determine the facts based solely on the evidence

received in this trial.  Any opinion I might have regarding the

facts is of absolutely no consequence.

The personalities and the conduct of counsel in the

courtroom are not in any way at issue.  If you formed an

opinion of any kind as to any of the lawyers in the case,

favorable or unfavorable, whether you approved or disproved of

their behavior as advocates, that should not enter into your

1   deliberations at all.

2          The lawyers and I have had conferences at the bench

3   and other conferences out of your hearing.  These conferences

4   involved procedural or evidentiary matters that are the

5   responsibility of the judge and should not enter into your

6   deliberations at all.

7          A lawyer has a duty to object when the other side

8   offers testimony or other evidence that the lawyer believes is

9   not admissible.  It is my responsibility to rule on those

10  objections.  Why an objection was made or how I ruled on it is

11  not your concern.  You should not draw any inference simply

12  from the fact that a lawyer objects to a question, or that I

13  sustained or overruled an objection.

14         You must evaluate the evidence calmly and objectivity,

15  without prejudice or sympathy.  You must be completely fair and

16  impartial.  Your verdict must be based solely on the evidence

17  introduced at this trial, or the lack of evidence.  Our system

18  of justice cannot work unless you reach a verdict through a

19  fair and impartial consideration of the evidence.  Under your

20  oath as jurors, you are not to be swayed by sympathy or

21  prejudice.  You are to be guided solely by the evidence in this

22  case and the crucial, bottom-line question that you must ask

23  yourselves as you sift through the evidence is.  Has the

24  government proven each element of each charge against Mr. Adams

25  beyond a reasonable doubt?

1      It is for you alone to decide whether the government

2  has proven that Mr. Adams is guilty of the crimes charged, and

3  you are to do so solely on the basis of the evidence, and

4  subject to the law as I explain it to you.  If you let fear or

5  prejudice or bias or sympathy interfere with your thinking,

6  there is a risk that you will not arrive at a true and just

7  verdict.

8      If you have a reasonable doubt as to Mr. Adams' guilt

9  as to a particular charge, you should not hesitate for any

10  reason to reach a verdict of not guilty as to that charge.  On

11  the other hand, if you should find that the government has met

12  its burden of proving beyond a reasonable doubt that Mr. Adams

13  is guilty of a particular charge, you should not hesitate

14  because of sympathy or any other reason to reach a verdict of

15  guilty as to that charge.

16      The question of possible punishment must not enter

17  into or influence your deliberations in any way.  The duty of

18  imposing a sentence rests exclusively on me.  Your function is

19  to weigh the evidence in the case and to determine whether or

20  not the government has proven Mr. Adams' guilt beyond a

21  reasonable doubt, solely on the basis of such evidence or lack

22  of evidence.  Under your oath as jurors, you cannot allow a

23  consideration of the punishment that may be imposed on

24  Mr. Adams, if he is convicted, to influence your verdict in any

25  way, or, in any sense, to enter into your deliberations.

1    Similarly, you cannot permit any feelings you might have about

2    the nature of the crimes charged to interfere with your

3    decision-making process.  Your verdict must be based

4    exclusively upon the evidence or the lack of evidence in this

5    case.

6            In reaching your verdict, you must remember that all

7    parties stand equal before a jury in the courts of the United

8    States.  The fact that the government is a party and that the

9    prosecution is brought in the name of the United States does

10   not entitle the government or its witnesses to any greater

11   consideration than that accorded to any other party.  By the

12   same token, you must give the government and its witnesses no

13   less consideration.

14           In reaching your decision as to whether the government

15   sustained its burden of proof, you may not consider any

16   personal feelings you may have about the defendant's race,

17   religion, ethnicity, national origin, sex, or age.  All persons

18   are entitled to the same presumption of innocence.

19           Mr. Adams has pleaded not guilty to all charges.  In

20   doing so, he has denied the charges in the indictment.  As a

21   result, the government has the burden of proving the charges

22   against him beyond a reasonable doubt.  This burden of proof

23   never shifts to a defendant, because the law never imposes on a

24   defendant in a criminal case the burden or duty of testifying,

25   of calling any witness, or of locating or producing any

1    evidence.

2           A defendant does not have to prove his innocence.  To

3    the contrary, Mr. Adams is presumed innocent until such time,

4    if ever, that you as a jury are satisfied that the government

5    has proven him guilty beyond a reasonable doubt.

6           Mr. Adams began the trial with a clean slate, and this

7    presumption of innocence alone is sufficient to acquit

8    Mr. Adams unless you as jurors are unanimously convinced beyond

9    a reasonable doubt of his guilt, after a careful and impartial

10   consideration of all of the evidence.  If the government fails

11   to sustain its burden, you must find Mr. Adams not guilty.

12          I will now address reasonable doubt.  What is

13   reasonable doubt?  It is a doubt founded in reason, as opposed

14   to a doubt based on speculation, emotion, sympathy, or

15   prejudice.  It is a doubt that arises out of the evidence, or

16   the lack of evidence.  It is a doubt that a reasonable person

17   has after carefully weighing all the evidence.  Reasonable

18   doubt is a doubt that arises from your own judgment, life

19   experience, and common sense when applied to the evidence.

20          If, after a fair and impartial consideration of all of

21   the evidence, you are not satisfied of the guilt of

22   Mr. Adams -- that is, if you do not have an abiding conviction

23   of his guilt -- you must find him not guilty.  In other words,

24   if you have such a doubt as would cause you, as a prudent

25   person, to hesitate before acting in a matter of importance to

1    yourself, then you have a reasonable doubt, and it is your duty

2    to find Mr. Adams not guilty.

3           Ordinary, if, after a fair and impartial consideration

4    of all the evidence, you do have an abiding conviction of

5    Mr. Adams' guilt -- in other words, a conviction you would be

6    willing to act upon without hesitation in an important matter

7    in your own life -- then you have no reasonable doubt, and it

8    is your duty to find Mr. Adams guilty.

9           Reasonable doubt is not whim or speculation.  It is

10   not an excuse to avoid the performance of an unpleasant duty.

11   Reasonable doubt also does not mean beyond all possible doubt.

12   It is practically impossible for a person to be absolutely and

13   completely convinced of any disputed fact that by its nature is

14   not susceptible to mathematical certainty.  As a result, in a

15   criminal case, the law is that it is sufficient for the

16   government to establish the guilt of a defendant beyond a

17   reasonable doubt, not beyond all possible doubt.

18          In determining the facts, you must rely on your own

19   recollection of the evidence.  The evidence in this case is the

20   testimony of the witnesses, the exhibits received in evidence,

21   and the stipulations or agreements as to the certain facts

22   entered into by the parties.  When I sustained an objection to

23   a question, the answer that the witness may have given in

24   response to that question is not part of the evidence in this

25   case and may not be considered by you.  You are likewise not

1    to consider a lawyer's questions as evidence.  It is the

2    witnesses' answers that are evidence, not the questions.

3         Where I ordered that testimony be stricken from the

4    record, you may not consider that testimony during your

5    deliberations.

6         The only exhibits that are evidence in this case are

7    those that were received in evidence.  Exhibits shown to a

8    witness but not received in evidence are not evidence, nor are

9    materials that were used only to refresh a witness's

10   recollection.

11        Witnesses sometimes have a failure of recollection

12   when testifying.  In such circumstances, it is important for

13   the lawyer questioning the witness to attempt to refresh his or

14   her recollection.  Where a document is used to refresh

15   recollection, that document does not have to have been prepared

16   by the witness, nor does it have to have been made

17   contemporaneously with the events described in it.  Where a

18   witness states that a writing has refreshed the witness's

19   memory, then the witness may proceed to testify as to the

20   matters on which his or her memory was refreshed.  That

21   testimony is evidence.  However, where a witness states that

22   his or her recollection is not refreshed, any statements a

23   lawyer may have made about the document used in the attempt to

24   refresh the witness's recollection are not evidence.

25        As I told you at the outset of the case, arguments by

1    the lawyers are not evidence, because the lawyers are not

2    witnesses.  The lawyers have no personal knowledge of what

3    happened here.  What they have said to you in their opening

4    statements and in their closing arguments is intended to help

5    you understand the evidence to reach your verdict.  However,

6    where your recollection of the evidence deliveries from what a

7    lawyer has argued, it is your recollection of the evidence that

8    controls.  You must determine the facts based solely on the

9    evidence received in this trial.  In determining the facts, you

10   must rely on your own recollection of the evidence.  What the

11   lawyers said in opening statements, in closing arguments, in

12   objections, or in questions is not evidence.

13        I remind you also that nothing I have said during the

14   trial, or will say in instructing you on the law, is evidence.

15   Similarly, the rulings I have made during the trial are not any

16   indication of my views of what your decision should be.

17        It is for you alone to decide what weight, if any, to

18   give to the testimony of the various witnesses and to the

19   exhibits that have been received in evidence.

20        During the trial, I told you that certain evidence

21   could be considered only for a limited purpose.  Where I gave

22   you such an instruction, you may consider that evidence only

23   for the purpose I identified.

24        For example, during Shahada Harris' testimony, I

25   instructed you that GX 401 -- which reflects text messages

between Mr. Adams and Ms. Harris -- was admitted solely for

purposes of Mr. Adams' state of mind.  Statements in GX 401

cannot be relied on for their truth, but only to the extent

that you believe they shed light on Mr. Adams' state of mind --

what he was thinking or what he understood at the time he

allegedly committed the charged offenses -- and whether he

acted with criminal intent.

Generally, there are two types of evidence that you

may consider in reaching your verdict:  Direct evidence and

circumstantial evidence.

Direct evidence is testimony by a witness about

something he or she knows by virtue of his or her own senses --

something seen, felt, touched, or heard.  For example, if a

witness testified that when he left his house this morning, it

was raining, that would be direct evidence about the weather.

Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence from which you may

infer the existence of certain facts.  For example, assume that

when you came into the courthouse this morning, the sun was

shining and it was a nice day.  Assume that the courtroom

blinds are drawn and you cannot look outside.  As you're

sitting here, someone walks in with an umbrella which is

dripping wet.  Then a few minutes later, another person enters

with a wet raincoat.  Now, you can't look outside the courtroom

to see whether it's raining, so you have no direct evidence of

1   that fact.  But, based on the facts that I have asked you to

2   assume, you could conclude that it had been raining.

3          That's all there is to circumstantial evidence.  On

4   the basis of reason, life experience, and common sense, you

5   infer from one established fact the existence or nonexistence

6   of some other fact.

7          The matter of drawing inferences from facts in

8   evidence is not a matter of guesswork or speculation.  An

9   inference is a logical, factual conclusion that you might

10  reasonably draw from other facts that have been proven.  Many

11  material facts -- such as what a person was thinking or

12  intending -- are rarely easily proven by direct evidence.

13  Often such facts are established by circumstantial evidence.

14         Circumstantial evidence may be given as much weight as

15  direct evidence.  The law makes no distinction between direct

16  and circumstantial evidence, but simply requires that before

17  convicting a defendant, the jury must be satisfied of the

18  defendant's guilt beyond a reasonable doubt, based on all the

19  evidence in the case, whether direct or circumstantial.

20         There are times when different inferences may be drawn

21  from the evidence.  The government may ask you to draw one set

22  of inferences, while the defendant asks you to draw another.

23  It is for you, and for you alone, to decide what inferences you

24  will draw from the evidence.

25         What is important here is the quality of

persuasiveness of the evidence relied on by a party, not the

number of witnesses, the number or variety of the exhibits that

party introduced, or the length of time that party spent on a

particular subject.

You should draw no inference or conclusion of any

kind -- whether favorable or unfavorable -- with respect to any

witness or party, by reason of any question I posed to a

witness.  My questions were designed to clarify or expedite

matters, and were not intended to suggest any view on my part

as to a witness's credibility, or as to what your decision

should be.  The decision here is for you alone.

Summary charts were admitted at trial.  These exhibits

purport to summarize the underlying evidence that was used to

prepare them, and were shown to you to make the other evidence

more meaningful, and to aid you in considering it.  You may

consider the summary charts as you weigh the evidence only to

the extent that you find that they accurately reflect the

exhibits that were received in evidence.

There is no legal requirement that the government

prove its case through any particular means.  You are not to

speculate as to why the government used the techniques it did,

or why it did not use other techniques.  Law enforcement

techniques are not your concern.  Your concern is to determine

whether or not, based on the evidence or lack of evidence, the

government as proven Mr. Adams guilt beyond a reasonable doubt.

1          You have heard testimony that law enforcement

2     officials recovered evidence during certain circumstances, and

3     certain text messages and other electronic evidence have been

4     received in evidence.  This evidence was obtained in a lawful

5     manner, no one's rights were violated.  The government's use of

6     this evidence is entirely lawful.

7          Regardless of any personal opinions you may have

8     regarding the obtaining of such evidence, you must give this

9     evidence full consideration along with all the other evidence

10    in this case in determining whether the government has proven

11    Mr. Adams' guilty beyond a reasonable doubt.  What weight you

12    give these materials, if any, is entirely up to you.

13         Some of the exhibits received in evidence contain

14    redactions, meaning that part of the exhibit was deleted.

15         You are to concern yourself only with the part of the

16    exhibit that has been received in evidence.  You should not

17    speculate about what information was deleted, or why it was

18    deleted.

19         You should evaluate the credibility of the witnesses

20    by using your common sense.  Common sense is your greatest

21    asset as a juror.  Ask yourself whether the witness appeared

22    honest, open, candid, and truthful.  Did the witness appear

23    evasive, or as though he or she was trying to hide something?

24    How responsive was the witness to the questions asked on

25    cross-examination in comparison to the questions posed on

1    direct examination?  You should also consider the witness's

2    ability to recall past events.

3         If you find any witness has lied under oath at this

4    trial, you should view the testimony of that witness cautiously

5    and weigh it with great care.  It is for you to decide,

6    however, how much of that witness's testimony, if any, you wish

7    to believe.  A witness may be inaccurate, contradictory, or

8    even untruthful in some respects and yet entirely believable

9    and truthful in other aspects.

10        You should also keep in mind that few people recall

11   every detail of every event precisely the same way.  It is for

12   you to determine whether inconsistencies in witness accounts

13   are significant or inconsequential.

14        In sum, it is up to you to decide whether the

15   testimony of a witness is truthful and accurate, in part, in

16   whole, or not at all, as well as what weight, if any, to give

17   to that witness's testimony.

18        In evaluating the testimony of any witness, you may

19   consider, among other things:

20        The witness's intelligence;

21        The ability and opportunity the witness had to see,

22   hear, or know the things that the witness testified about;

23        The witness's memory;

24        Any interest, bias, or prejudice the witness may have;

25        The manner of the witness while testifying; and

1          The reasonableness of the witness's testimony in light

2     of all the evidence in this case.

3          The government is not required to prove the essential

4     elements of an offense by any particular number of witnesses.

5     The testimony of a single witness may be sufficient to convince

6     you beyond a reasonable doubt of the existence of the essential

7     elements of an offense if you believe that that witness has

8     truthfully and accurately related what he or she has told you.

9     Similarly, the testimony of a single witness may provide the

10    basis for reasonable doubt, if you believe that that witness

11    has testified truthfully and accurately.

12          The lawyers have argued that, at some earlier time, a

13    witness said or did something that is inconsistent with their

14    trial testimony.

15          Evidence of prior statements that a lawyer argues are

16    inconsistent was introduced for the purpose of helping you

17    decide whether to believe a witness's testimony.  If you find

18    that a witness made an earlier statement that conflicts with

19    the witness's trial testimony, you may consider that fact in

20    deciding how much of the witness's trial testimony, if any, to

21    believe.

22          In making this determination, you may consider whether

23    the witness intentionally made a false statement or whether it

24    was an innocent mistake; whether the inconsistency concerns an

25    important fact or an insignificant detail; whether the witness

had an explanation for the inconsistency; and whether that

explanation accords with your common sense.

It is exclusively your duty, based on all the evidence

and your own good judgment, to determine whether the prior

statement was inconsistent, and if so how much, if any, weight

to give to the inconsistent statement in determining whether to

believe all, part of, or none of the witness's testimony.

You have heard testimony that Mr. Adams made a

statement to Richard Fletcher, a supervisory corrections

officer at the MCC, in which Mr. Adams stated that he knew

Shahada Harris from "the neighborhood."  The government claims

that this statement was false.

If you find that Mr. Adams gave a false statement in

order to divert suspicion from himself, you may -- but are not

required to -- infer that Mr. Adams believed he was guilty.

You may not, however, infer on the basis of this statement

alone that will Adams is, in fact, guilty.

It is for you, the jury, to decide what Mr. Adams'

statement shows and what weight, if any, to give it.

In deciding whether to believe a witness, you should

consider whether the witness has an interest in the outcome of

the case, or is biased in favor of or against one side or the

other.  You should also consider evidence of any interest or

motive that the witness may have in cooperating with one side

or the other.  It is your duty to consider whether any witness

has permitted bias or interest to color his or her testimony.

If you find that a witness is biased, you should view his or

her testimony with caution, weigh it with great care, and

subject it to close and searching scrutiny.

        Of course, the mere fact that a witness has an

interest in the outcome of this case does not mean he or she

has not told the truth.  It is for you to decide from your

observations, and applying your common sense, life experience,

and all other considerations I have mentioned, whether the

possible interest of a witness has -- intentionally or

otherwise -- colored or distorted his or testimony.  You are

not required to disbelieve an interested witness; you may

accept as much of his or her testimony as you deem reliable and

reject as much as you deem unworthy of acceptance.

        Shahada Harris testified for the government at trial

pursuant to a nonprosecution agreement.  In that agreement, the

government agreed not to prosecute Ms. Harris for certain

crimes if she meets her obligations under the agreement,

including testifying truthfully at trial.  The law permits the

government to enter into such nonprosecution agreements, and it

is no concern of yours why the government did so with

Ms. Harris.  Instead, you must decide whether Ms. Harris gave

truthful testimony at trial.

        You may convict Mr. Adams on the basis of Ms. Harris'

testimony alone, if you find that her testimony proves

1    Mr. Adams guilty beyond a reasonable doubt.

2          You should bear in mind, however, that a witness who

3    has entered into a nonprosecution agreement with the government

4    has an interest and motives different from those of other

5    witnesses.  In evaluating the testimony of such a witness, you

6    should ask yourself whether the witness would benefit more by

7    lying, or by telling the truth.  Was the witness's testimony

8    influenced in any way by a belief or hope that she would

9    receive favorable treatment by testifying falsely, or did the

10   witness believe that her interests would be best served by

11   testifying truthfully?  If you believe that Ms. Harris was

12   motivated by hopes that she would not be prosecuted, was that

13   motivation one that would cause her to lie, or was it one that

14   would cause her to tell the truth?

15         In sum, you should consider all of the evidence in

16   deciding what weight, if any, to give to Ms. Harris' testimony.

17   If you find that her testimony was false, you should reject it.

18   However, if -- after a cautious and careful examination of her

19   testimony in light of all the evidence -- you conclude that she

20   told the truth, you should accept her testimony as credible and

21   act upon it accordingly.

22         As with any witness, the issue of credibility need not

23   be decided on an all-or-nothing basis.  If you find that a

24   witness testified falsely in one part, you may still accept

25   that witness's testimony in other parts, or you may disregard

1    all of that witness's testimony.  That is a determination

2    entirely for you, the jury, to make.

3        You have heard testimony from law enforcement officers

4    and other government employees.  The fact that a witness is a

5    law enforcement officer or employed by the federal government

6    does not mean that that witness's testimony deserves more or

7    less consideration, or greater or lesser weight, than that of

8    any other witness.  It is up to you to decide, after reviewing

9    all the evidence, what weight to give the testimony of law

10   enforcement officers and other government employees.

11       Your verdict must be based solely on the evidence

12   developed at trial or the lack of evidence.  It would be

13   improper for you to consider, in reaching your decision as to

14   whether the government sustained its burden of proof, any

15   personal feelings you may have about the defendant's race,

16   religion, national origin, sex, or age.  Similarly, it would be

17   improper for you to consider any personal feelings you may have

18   about the race, religion, national origin, sex, or age of any

19   witness or anyone else involved in this case.  Both sides are

20   entitled to a trial free of prejudice, and our judicial system

21   cannot work unless you reach your verdict through a fair and

22   impartial consideration of the evidence.

23       You may not draw any inference, whether favorable or

24   unfavorable, as to either side from the fact that no person

25   other than Mr. Adams is on trial here.  You may not speculate

1    as to the reasons why other people are not on trial.  Those

2    matters are wholly outside your concern and have no bearing on

3    your function as jurors.

4         There are people whose names you heard during the

5    trial but who did not appear to testify.  You should not

6    speculate as to what those people would have testified to had

7    they been called.  Their absence should not affect your

8    judgment in any way.  You should keep in mind my instruction,

9    however, that the law does not impose on a defendant the burden

10   of proof or duty of calling any witnesses or producing any

11   evidence.  It is the government's burden to prove beyond a

12   reasonable doubt each element of the crimes charged in the

13   indictment.

14        Mr. Adams did not testify in this case.  As I told you

15   at the outset of this case, under our Constitution, a defendant

16   has no obligation to testify or to present any evidence,

17   because it is the government's burden to prove the defendant's

18   guilt beyond a reasonable doubt.  That burden remains with the

19   government throughout the trial and never shifts to Mr. Adams.

20   A defendant is never required to prove that he or she is

21   innocent.

22        You may not attach any significance to the fact that

23   Mr. Adams did not testify.  You may not draw any inference

24   against him because he did not take the witness stand.  You may

25   not speculate as to why he did not testify, and you may not

consider this against him in any way in your deliberations.

There has been evidence that witnesses discussed the facts of this case and their testimony with lawyers before they appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, you should be aware that there is nothing unusual or improper about a witness meeting with lawyers before testifying.  Indeed, it would be unusual for a lawyer to call a witness to testify without such preparation.

The weight you give to the fact or the nature of the witness's preparation for his or her testimony, and what inferences you draw from such preparation, are matters completely within your discretion.

The indictment in this case refers to various dates. It does not matter if the indictment states that specific conduct is alleged to have occurred on or about a certain date and the evidence indicates that, in fact, it was on another date.  The law only requires a substantial similarity between the dates alleged in the indictment and the dates established through evidence at trial.

You have heard evidence in the form of stipulations, or agreements, as to certain facts.  Where the parties have entered into an agreement as to certain facts, you must regard the agreed-upon facts as true.

1         Similarly, where the parties have entered into a

2    testimonial stipulation, you must accept for purposes of your

3    deliberations that if a witness had been called to testify, he

4    or she would have testified as set forth in the stipulation.

5         I will now turn to the charges in this case.

6         The charges against Mr. Adams are set forth in an

7    indictment.  An indictment is not evidence of the guilt of a

8    defendant.  It is merely an accusation.  The indictment gives a

9    defendant notice of the charges against him, and it informs the

10   court and the public of the nature of the accusations.

11        Given that an indictment is proof of nothing, a

12   defendant begins trial with a clean slate and without any

13   evidence against him.

14        Here, the indictment contains three charges or counts

15   against Mr. Adams.  You must determine as to each count of the

16   indictment whether the government has demonstrated Mr. Adams'

17   guilt beyond a reasonable doubt, and you will be asked to

18   return a separate verdict as to each count.

19        The three charges against Mr. Adams are as follows:

20        Count One charges Mr. Adams with bribery.  Count One

21   charges that "from at least on or about July 5, 2019, up to and

22   including at least in or about August 2019, in the Southern

23   District of New York and elsewhere, Robert Adams, the

24   defendant, being a public official, directly and indirectly,

25   corruptly demanded, sought, received, accepted, and agreed to

receive and accept a thing of value, personally, in return for

being influenced in the performance of an official act and

being induced to do and omit to do an act in violation of his

official duty, to wit, Adams, a correctional officer at the

Metropolitan Correctional Center ("MCC"), solicited and

accepted sexual acts from a non-inmate visitor at the MCC

[Shahada Harris] in exchange for not arresting her, reporting

her to law enforcement, or denying her future entry into the

MCC."

Count Two charges Mr. Adams with blackmail.  Count Two

charges that "from at least on or about July 5, 2019, up to and

including at least in or about August 2019, in the Southern

District of New York and elsewhere, Robert Adams, the

defendant, knowingly did demand and receive a thing of value

under threat of informing, and as a consideration for not

informing, against a violation of a law of the United States,

to wit, Adams demanded and received sexual acts from [Shahada

Harris] under threat of informing, and as consideration for not

informing, law enforcement of her having brought contraband

into a federal correctional facility."

Count Three charges Mr. Adams with misprision of a

felony.  Count Three charges that "from at least on or about

July 5, 2019, up to and including at least in or about August

2019, in the Southern District of New York and elsewhere,

Robert Adams, the defendant, having knowledge of the actual

1    commission of a felony cognizable by a court of the United

2    States, concealed and did not as soon as possible make known

3    the same to some judge or other person in civil and military

4    authority under the United States, to wit, after Adams learned

5    that [Shahada Harris] had smuggled contraband into the MCC, in

6    violation of federal law, he concealed the fact that he had

7    discovered contraband, did not report [Harris'] violation of

8    federal law, and allowed [Harris] to continue to enter the MCC

9    on subsequent dates."

10          I will now instruct you as to the elements of each of

11   the crimes with which Mr. Adams is charged.

12          Count One charges Mr. Adams with bribery.  The law

13   provides that "whatever, being a public official ..., directly

14   or indirectly, corruptly demands, seeks, receives, accepts, or

15   agrees to receive or accept anything of value personally ... in

16   return for ... being influenced in the performance of any

17   official act ... or ... being induced to do or omit to do any

18   act in violation of the official duty of such official or

19   person bracket is guilty of a crime bracket."

20          To find Mr. Adams guilty of Count One, you must find

21   that the government has proven each of the following elements

22   beyond a reasonable doubt:

23          First, that Mr. Adams demanded, sought, received,

24   accepted, or agreed to receive or accept a thing of value;

25          Second, that when Mr. Adams did so, he was a public

1    official;

2            Third, that Mr. Adams did so in return for being

3    influenced in the performance of an official act, or in return

4    for being induced to perform an act or not to perform an act in

5    violation of his official duties; and

6            Fourth, that Mr. Adams did so with corrupt intent.

7            The first element of bribery that the government must

8    prove beyond a reasonable doubt is that Mr. Adams demanded,

9    sought, received, accepted, or agreed to receive or accept a

10   thing of value.

11           The law makes no distinction between demanding,

12   seeking, or receiving a bribe.  The mere seeking of a bribe is

13   just as much a violation of the statute as the actual receiving

14   of one.

15           A "thing of value" is not limited to tangible items.

16   It may include intangible items, such as sexual intercourse or

17   the promise of sexual intercourse, so long as you find beyond a

18   reasonable doubt that Mr. Adams subjectively attached value to

19   the thing he sought or received.

20           The second element of bribery that the government must

21   prove beyond a reasonable doubt is that Mr. Adams was a public

22   official when he sought or received the thing of value.

23           The term "public official" means an officer or

24   employee or person acting for or on behalf of the United States

25   Government -- or any department, agency, or branch of

1    government thereof -- in any official function, under or by the

2    authority of the United States Government.

3              The parties have stipulated in GX 2 that, "in at least

4    July and August of 2019, Adams was employed by the United

5    States Bureau of Prisons as a correctional officer, and was

6    therefore a "public official" as that term is defined "with

7    respect to the crime of bribery."

8              The third element of bribery that the government must

9    prove beyond a reasonable doubt is that Mr. Adams engaged in a

10   quid pro quo -- or "this for that" -- transaction in which he

11   sought or received a thing of value in return for either

12   (1) being influenced in the performance of an official act, or

13   (2) being induced to perform or not to perform an act in

14   violation of his official duties.

15             An "official act" means any decision or action on any

16   matter or question that may, at any time, be pending, or that

17   may be law be brought before a public official in his official

18   capacity.  Two requirements must be metaphor an act to qualify

19   as an official act.

20             First, the question or matter that is the subject of

21   the official act must be specific and focused, and it must

22   involve a formal exercise of governmental power.

23             Second, to perform an official act, a public official

24   must make or agree to make a decision or to take an action on

25   that specific question or matter.

1        For example, a decision by a police officer about

2   whether to make an arrest, or a decision by a prosecutor about

3   whether to bring formal charges against a defendant, are the

4   sorts of specific, formal exercises of governmental power that

5   would constitute official acts.

6        "Official duties" are not limited to those duties

7   imposed upon a public official by law or statute.  Official

8   duties can include duties that are imposed by written rules or

9   regulations of the governmental unit under whose authority the

10  public official is acting.

11       The agreement to perform an official act, or to

12  perform or not to perform an act in violation of official

13  duties, need not be explicit.  Rather, the quid pro quo

14  arrangement can be implied from words and actions, so long as

15  you find that Mr. Adams understood that the thing of value was

16  being provided in exchange for the promise or performance of an

17  official act, or in exchange for the promise or performance of

18  an act (or nonperformance of an act) in violation of his

19  official duties.

20       In considering this element, what matters is

21  Mr. Adams' intent to receive a bribe in return for being

22  influenced.  It is not a defense that Mr. Adams would have

23  performed an official act or violated his official duties

24  without the inducement of the thing of value.

25       The final element of bribery that the government must

1  prove beyond a reasonable doubt is that Mr. Adams solicited or

2  received a thing of value with corrupt intent.

3        Acting with "corrupt" intent means acting voluntarily

4  and deliberately with the improper motive or purpose of

5  accomplishing either an unlawful end or result, or a lawful end

6  or result by some unlawful method or means.  This requires

7  conscious wrongdoing, sometimes expressed as a bad or evil

8  state of mind.  Corrupt intent may be established by

9  circumstantial evidence of a person's state of mind, including

10  proof of a person's words and conduct and the logical

11  inferences that can be drawn from that proof.

12        It is no defense that a defendant acted with both

13  proper and improper motives.  A defendant may have a corrupt

14  intent even if he possesses a dual intent, such as a criminal

15  intent to receive an unlawful bribe and a noncriminal intent to

16  help out a friend.

17        Count Two charges Mr. Adams with blackmail.  The law

18  provides that "whoever, under a threat of informing, or as

19  consideration for not informing, against any violation of any

20  law of the United States, demands or receives any money or

21  other valuable thing [is guilty of a crime]."

22        To find Mr. Adams guilty of Count Two, you must find

23  that the government has proven beyond a reasonable doubt each

24  of the following elements:

25        First, that Mr. Adams demanded or received money or a

thing of value;

Second, that Mr. Adams did so willfully and knowingly; and

Third, that Mr. Adams did so under threat of informing, or as consideration for not informing, about a violation of federal law.

To prove that Mr. Adams committed the crime of blackmail, the government must prove beyond a reasonable doubt that he demanded or received money or a thing of value.

As I instructed you in connection with Count One, a "thing of value" may include intangible things, such as sexual intercourse or the promise of sexual intercourse, so long as you find beyond a reasonable doubt that Mr. Adams subjectively attached value to the thing he demanded or received.

The second element of blackmail that the government must prove beyond a reasonable doubt is that, when Mr. Adams demanded or received a thing of value, he did so willfully and knowingly.

A defendant acts "willfully" when he acts knowingly and purposefully, with the general knowledge that his conduct is unlawful, and with the intention to commit an act that the law for bids.

A defendant acts "knowingly" when he acts intentionally, voluntarily, and deliberately, and not because of a mistake or accident, mere negligence, or other innocent

1    reason.

2            The final element of blackmail that the government

3    must prove beyond a reasonable doubt is that, when Mr. Adams

4    demanded or received a thing of value, he did so under threat

5    of informing, or as consideration for not informing, about a

6    violation of federal law.

7            A "threat" for purposes of this crime must be

8    specific, conveying a gravity of purpose and an imminent

9    prospect of execution.  It is not joking or idle or careless

10   talk.  However, the government is not required to prove that

11   Mr. Adams actually intended to carry out the threatened

12   informing of a violation of federal law.

13           "Consideration" simply means "in exchange for."

14           In this case, the indictment alleges that the threat

15   of informing made by Mr. Adams concerned Shahada Harris

16   providing contraband to a federal inmate.  Providing certain

17   types of contraband to a federal inmate -- including a

18   controlled substance, such as marijuana -- is a violation of

19   federal law.

20           Count Three charges Mr. Adams with misprision of a

21   felony.  The law provides that "whoever, having knowledge of

22   the actual commission of a felony cognizable by a court of the

23   United States, conceals and does not as soon as possible make

24   known the same to some judge or other person in civil or

25   military authority under the United States [is guilt of a

crime]."

          To find Mr. Adams guilty of Count Three, you must find
that the government has proven beyond a reasonable doubt each
of the following elements:

          First, that someone other than Mr. Adams committed a
federal felony;

          Second, that Mr. Adams had knowledge of the commission
of that felony;

          Third, that Mr. Adams failed to notify federal
authorities about the commission of the federal felony as soon
as possible; and

          Fourth, that Mr. Adams deliberately took some
affirmative step to conceal the fact that another person
committed a federal felony.

          The first element of misprision that the government
must prove beyond a reasonable doubt is that someone other than
Mr. Adams committed a federal felony.

          The indictment alleges that Shahada Harris committed
the crime of smuggling contraband into the MCC, a federal
prison facility.

          It is a felony under federal law for someone to
"provide to an inmate of a prison a prohibited object, or
attempt to do so" in violation of "a statute or a rule or order
issued under a statute."  A "prohibited object" in this context
includes a controlled substance, such as marijuana.

1      You may find that Ms. Harris committed the crime of

2  providing contraband to an inmate if you find that the evidence

3  has established, beyond a reasonable doubt, that (1) Ms. Harris

4  knowingly provided or attempted to provide a federal inmate

5  with contraband; (2) the contraband was or included a

6  controlled substance, such as marijuana; and (3) the contraband

7  was prohibited in the prison by rule, order, or statute.

8      As I instructed you in connection with Count Two,

9  "knowingly" means acting intentionally, voluntarily, and

10  deliberately, and not because of a mistake or accident, mere

11  negligence, or other innocent reason.

12      The second element of misprision that the government

13  must prove beyond a reasonable doubt is that Mr. Adams had

14  knowledge of the fact that Ms. Harris had committed a felony.

15      To prove this element, the government must prove

16  beyond a reasonable doubt not only that Mr. Adams knew that

17  Ms. Harris had smuggled contraband into the MCC, but also

18  that Mr. Adams knew that smuggling contraband into the MCC

19  constituted a felony.

20      Guilty knowledge may be inferred from the secretive or

21  irregular manner in which a transaction is carried out, from

22  conduct such as the handling of one's affairs so as to avoid

23  making records that are usually kept, from the failure to keep

24  records, and from any conduct having the likely effect of

25  misleading others or concealing information.

1          The third element of misprision that the government

2     must prove beyond a reasonable doubt is that Mr. Adams failed

3     to notify federal authorities that Ms. Harris had committed a

4     federal felony as soon as possible.

5          "Federal authorities" includes a federal judge or some

6     other person in civil or military authority under the United

7     States, such as a federal law enforcement officer or agent.

8          "As soon as possible" means as soon as a defendant has

9     the opportunity to inform federal authorities after learning of

10    the commission of the federal felony.

11         The final element of misprision that the government

12    must prove beyond a reasonable doubt is that Mr. Adams

13    deliberately took some affirmative step to conceal Ms. Harris'

14    commission of a federal felony.

15         An "affirmative step to conceal" may include, for

16    example, falsely denying knowledge of a crime, giving an

17    untruthful statement to authorities, or disposing of evidence.

18    Mere silence, without something more, does not qualify as an

19    affirmative step to conceal a felony.

20         As to each of Counts One through Three, you must also

21    consider the issue of venue -- namely, whether any act in

22    furtherance of the alleged unlawful activity occurred within

23    the Southern District of New York.  The Southern District of

24    New York includes Manhattan and the Bronx.

25         It is sufficient to find venue in the Southern

1   District of New York with respect to a particular count if you

2   find Mr. Adams committed any act in furtherance of the unlawful

3   activity alleged in that count in this district.

4           As to venue, and as to venue alone, the government's

5   burden is not proof beyond a reasonable doubt.  Instead, venue

6   may be established by a preponderance of the evidence.  A

7   preponderance of the evidence means more likely than not.

8   Thus, the government has satisfied the venue requirement if you

9   conclude that it is more likely than not that any act in

10  furtherance of the charged unlawful activity took place in the

11  Southern District of New York.  If you find that the government

12  has not proven venue by a preponderance of the evidence with

13  respect to a particular count, then you must find Mr. Adams not

14  guilty of that count.

15          The parties have stipulated in GX 6 that events

16  relevant to all three offenses charged in the indictment

17  "occurred within the Southern District of New York, and

18  therefore that venue in the Southern District of New York is

19  proper in this case."

20          If, during your deliberations, you have any doubt as

21  to any of the testimony, you may request that relevant portions

22  of the trial transcript be sent back to you in the jury room.

23  If you want any testimony, please remember that it is not

24  always easy to locate what you might want, so be as specific as

25  you possibly can be in requesting portions of the testimony.

1      All of the documentary exhibits that have been

2  received in evidence will be sent into the jury room.  If you

3  wish to see any of the video recordings again, you may request

4  that, and we will play the recordings for you here in the

5  courtroom.

6      If you want any further explanation of the law as I

7  have explained it to you, you may also request that.  As I

8  noted earlier, however, you may all take into the jury room

9  your copy of these instructions.

10      Any communications to me should be made in writing,

11  signed by your foreperson, include the date and time, and be

12  given to one of the marshals.  Please make any notes as clear

13  and precise as possible.  Do not tell me or anyone else how the

14  jury stands on any issue until after a unanimous verdict is

15  reached.

16      Your function is to weigh the evidence in this case

17  and to decide whether the government has proven beyond a

18  reasonable doubt each of the essential elements of the crimes

19  with which the defendant is charged.  If the government has

20  succeeded in meeting its burden, your verdict should be guilty;

21  if it has failed to do so, your verdict should be not guilty.

22  You must base your verdict solely on the evidence and these

23  instructions as to the law, and you are obligated under your

24  oath as jurors to follow the law as I instruct you, whether you

25  agree or disagree with the particular law in question.

1      It is your duty as jurors to consult with one another

2  and to deliberate with a view to reaching an agreement.  As you

3  deliberate, please listen to the opinions of your fellow

4  jurors, and ask for an opportunity to express your own views.

5  Every juror should be heard.  No one juror should hold center

6  stage in the jury room and no one juror should control or

7  monopolize the deliberations.

8      Each of you must decide the case for yourself, but you

9  should do so only after a consideration of the case with your

10  fellow jurors, and you should not hesitate to change an opinion

11  when convinced that it is erroneous.  Discuss and weigh your

12  respective opinions dispassionately, without regard to sympathy

13  or to prejudice or favor for either side.

14      Your verdict as to each charge must be unanimous.

15  However, you are not bound to surrender your honest convictions

16  concerning the effect or weight of the evidence for the mere

17  purpose of returning a verdict or solely because of the opinion

18  of other jurors.  Each of you must make your own decision about

19  the proper outcome of this case based on your consideration of

20  the evidence and your discussions with your fellow jurors.  No

21  juror should surrender his or her conscientious beliefs solely

22  for the purpose of returning a unanimous verdict.

23      Remember at all times, you are not partisans.  You are

24  judges -- judges of the facts.  Your sole interest is to

25  determine whether the government has proven the defendant's

1    guilt beyond a reasonable doubt.

2              If you are divided, do not report how the vote stands,

3    and if you have reached a verdict, do not report what it is

4    until you are asked in open court.

5              If you have taken notes during the trial, your notes

6    are to be used solely to assist you and are not to substitute

7    for your recollection of the evidence in the case.  Any notes

8    that you may take are not evidence.  The fact that a particular

9    juror has taken notes entitles that juror's views to no greater

10   weight than those of any other juror and your notes are not to

11   be shown to any other juror during your deliberations.

12             I have prepared a verdict form for you to use in

13   recording your decision.  Please use that form to report your

14   verdict.

15             I referred a moment ago to a foreperson.  It is

16   customary for Juror No. 1 to serve as the foreperson, and that

17   is what we will do here.  The foreperson doesn't have any more

18   power or authority than any other juror, and the foreperson's

19   vote or opinion doesn't count for any more than any other

20   juror's vote or opinion.  The foreperson is merely your

21   spokesperson to the court.  The foreperson will send out any

22   notes, and when the jury has reached a verdict, the foreperson

23   will notify the marshal that the jury has reached a verdict,

24   and you will come into open court and deliver your verdict.

25             After you have reached a verdict, your foreperson will

1  fill in the form that has been given to you, sign and date it,

2  and advise the marshal outside your door that you are ready to

3  return to the courtroom.

4          Each of you must be in agreement with the verdict that

5  is announced in court.  Once your verdict is announced by the

6  foreperson in open court and officially recorded, it cannot

7  ordinarily be revoked.

8          During your deliberations, all the rules of conduct

9  concerning outside influences remain in effect.  As I have

10  instructed you many times, your verdict must be based solely on

11  the evidence presented in this courtroom.  Accordingly, you are

12  still not permitted to discuss this case with anyone but your

13  fellow jurors, and you may not read anything in the newspapers,

14  over the Internet, or anyplace else about this case.  Also, do

15  not listen to or watch any reporting about this case if it

16  should be broadcast on TV, over the radio, or over some other

17  media.

18          Members of the jury, that concludes my instructions to

19  you.

20          Does any lawyer wish to approach on any matter with

21  respect the jury instructions?

22          MR. SCHAEFFER:  No, your Honor.

23          MR. GREGORY:  No, your Honor.

24          THE COURT:  All right.  At this point, it is my duty

25  to discharge the alternate jurors.  All the rules of conduct

1    that I just mentioned apply to the alternate jurors, as well as

2    the jury of 12, until the jury has reached a verdict.  And

3    that's because in the event one person on the jury of 12 could

4    not continue with deliberations, I would, of course, have to

5    bring back one of the alternates to serve in that juror's

6    place.

7            All rules of conduct remain in effect for the

8    alternate jurors.  If you wish to be advised of the jury's

9    verdict, just tell Mr. Ruocco, and he'll be happy to call you

10   once the jury has reached a verdict.  I would like to thank the

11   alternate jurors for their service very much.

12           Now, Mr. Ruocco, we should swear in the marshal.

13           (Marshal sworn)

14           Ladies and gentlemen of the jury, you may begin your

15   deliberations.

16           (At 3:07 p.m., the jury retired to deliberate)

17           Have the parties put together the documentary exhibits

18   that have been received in evidence?

19           MR. SCHAEFFER:  Yes, your Honor.  I believe we have

20   two binders.  The government has reviewed both binders, and I

21   believe the defense has also --

22           MR. GREGORY:  We have just one little small thing

23   which we'll work out now.  Some of the stipulations, I think,

24   list items not in evidence.

25           MR. SCHAEFFER:  That's fine.  The stipulations

1    themselves, I think, are evidence, but those exhibits have not

2    been offered and are not included.

3              MR. GREGORY:  Do you want to remove these?

4              Since they weren't in, do you want to redact them out?

5              MR. SCHAEFFER:  I think our position is that they

6    don't have to be redacted, with the exception of the one that

7    you pointed out, which we have redacted simply because of the

8    nature of its information.  The rest of it, I don't think

9    necessarily need to be.  The stipulation itself is in evidence.

10             MR. GREGORY:  I would assume that if it is not in

11   evidence, you wouldn't want to have it in the stipulation.  We

12   certainly wouldn't want to have it in there.  It is referring

13   to things we thought were coming in that are not in evidence.

14             MR. SCHAEFFER:  The content of those is not --

15             MR. GREGORY:  Judge, I don't know if you want to

16   decide this.

17             THE COURT:  Well, from my perspective, the fact that a

18   stipulation refers to an exhibit that was not ultimately

19   offered and received, I don't think that presents an issue.

20             But, Mr. Gregory, if you disagree, by all means, tell

21   me so.

22             MR. GREGORY:  Judge, I don't think there is nothing

23   that's major league prejudicial, it just refers to

24   communications that are not in evidence.

25             THE COURT:  Oh, when you say communications, is there

LB3sADA4                    Jury Charge

1    something other than a reference to an exhibit?

2            MR. GREGORY:  Text messages between Harris and a

3    contact saved as Stags.

4            MR. TAYLOR:  The description of what the exhibit was.

5            If I may, your Honor, Stacks is Stags in the

6    transcript.

7            THE COURT:  Well, the problem is that the exhibit was

8    received in evidence, and the condition it was offered in, and

9    if it needed to be redacted, it should have been redacted

10   before it was offered.

11           But if the parties can reach an agreement about

12   something that should be redacted, obviously, I don't object to

13   it.  But as a technical matter, the stipulation was received

14   and no one objected to it at the time.  In fact, everybody told

15   me they had no objection.

16           MR. GREGORY:  The court is right about that.  We

17   didn't object.

18           THE COURT:  I mean, what I will say is that if the

19   stipulation contains substantive information that was not

20   presented to the jury, I'm certainly willing to entertain the

21   notion that, with the parties' agreement, it be redacted out.

22           My question is, does the stipulation contain

23   substantive evidence about an exhibit that was not received in

24   evidence?

25           MR. SCHAEFFER:  That's right, your Honor.  I think

1    that is our position, too.  We are happy to redact anything

2    that would be prejudicial.  For instance, the defense pointed

3    out that there was a reference to the press release, which of

4    course has not come into evidence.  So that has been redacted.

5         With respect to the reference to the messages, that

6    was presented in testimony that such messages existed, but it

7    is the contents of the exhibits that didn't make it into

8    evidence.

9         If there is something the defense thinks is

10   prejudicial, I think we're happy to come to an agreement on it.

11             THE COURT:  All right.

12             MR. GREGORY:  Judge --

13             THE COURT:  The lawyers can consult on this.

14             MR. GREGORY:  -- he's right on that.  There was

15   testimony about Stags.  So reflection, I think you're right

16   about that.  There is no problem with that being in there.

17             THE COURT:  All right.

18             MR. GREGORY:  I think there was testimony about text

19   messages, if I'm not mistaken, am I right?

20             MR. SCHAEFFER:  I think so.  If there is anything you

21   have concerns about --

22             MR. GREGORY:  We'll just take two minutes to look at

23   it, and if we have a concern, we'll let you know.

24             THE COURT:  Absolutely.

25             MR. GREGORY:  Thank you, your Honor.

LB3sADA4                    Jury Charge

1            MR. SCHAEFFER:  Thank you, your Honor.

2            MS. BHASKARAN:  Judge, one logistical question.

3       Would it be your preference during the jury's

4  deliberations we remain in the courtroom or just nearby?

5            THE COURT:  You're welcome to return to the U.S.

6  Attorney's office or some other convenient location, as long as

7  we can reach you immediately in the event the jury sends out a

8  note.  You should be wherever you're most comfortable.

9            MS. BHASKARAN:  Thank you, your Honor.

10            MR. GREGORY:  It's fine.

11            THE COURT:  You're OK with it, Mr. Gregory?

12            MR. GREGORY:  Yes, your Honor.

13            THE COURT:  All right.  When Mr. Ruocco returns,

14  you'll give him the exhibits that should go back in the jury

15  room and, obviously, we'll be sending a copy of the verdict

16  sheet back with the exhibits.

17            Mr. Ruocco, I think we have exhibits ready to go back

18  into the jury room.

19            THE DEPUTY CLERK:  Great.

20            THE COURT:  You'll send back a verdict sheet too,

21  right?

22            THE DEPUTY CLERK:  Yes.

23            Everyone has agreed this is all good?  OK.

24            MS. BHASKARAN:  Thank you, Mike.

25            THE COURT:  I will keep them until five o'clock.  If

1    we don't have a verdict by then, I'll bring them out and send

2    them home for the evening.

3           MR. GREGORY:  Judge, do you want us to remain in the

4    courtroom?

5           THE COURT:  No.  As I told the assistant, you don't

6    have to remain in the courtroom, as long as we can reach you

7    immediately.  You're welcome to go wherever you're most

8    comfortable.  Just tell Mr. Ruocco where you're going to be,

9    and you're free to leave the courtroom.

10          MR. GREGORY:  Thank you, your Honor.

11          (Recess pending verdict)

12          (Jury not present)

13          THE DEPUTY CLERK:  I'll get the jury, your Honor.

14          THE COURT:  So the time now is five o'clock.  I'm

15   going to send the jury home.

16          (Jury present)

17          Ladies and gentlemen, we have reached the five o'clock

18   hour.  As is our practice, I am going to be sending you home

19   for the evening.

20          As always, don't discuss the case with anyone.  It's

21   particularly important during this period when you're

22   deliberating.  Please don't discuss the case with anyone other

23   than your fellow jurors, and please don't resume your

24   deliberations tomorrow morning until all 12 of you are present.

25          So I do ask you to return at 9:30 tomorrow morning to

1    continue your deliberations.  In the meantime, have a pleasant

2    evening, and your deliberations will resume at 9:30 tomorrow

3    morning.

4              Thank you all very much.

5              (Jury not present)

6              We'll just await their first note tomorrow.  Have a

7    pleasant evening.

8              MR. ROOS:  Judge, just to be clear, you don't need us

9    here first thing?

10             THE COURT:  No.  As I said, you're able to be at any

11   convenient place, as long as we can reach you in the event that

12   they send out a note.

13             MR. ROOS:  Thank you.

14             THE COURT:  OK.

15             (Adjourned to Thursday, November 4, 2021, at

16   9:30 a.m.)

17

18

19

20

21

22

23

24

25